## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| GREEN FARMS SEAFOOD JOINT STOCK COMPANY | |
| Plaintiff, | **Court No. 22-00092** |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| CATFISH FARMERS OF AMERICA, *et al.* | |
| Defendant-Intervenors. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## <u>RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Robert L. LaFrankie

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Email:  lafrankie@crowell.com

*Counsel to Plaintiff Green Farms*
*Seafood Joint Stock Company*

Dated:  October 20, 2022

i

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ................................................................ 1

PLAINTIFF'S STATEMENT PURSUANT TO USCIT RULE 56.2(c) ........................ 3

STATEMENT OF FACTS ........................................................................... 7

ARGUMENT ......................................................................................... 15

I.   COMMERCE'S DECISION GRANTING EAST SEA A SEPARATE
     RATE WAS NOT IN ACCORDANCE WITH LAW ................................... 15

     A.   Legal Framework – Separate Rate Respondents Must
          Affirmatively Demonstrate a Lack of Government
          Control ..................................................................... 17

     B.   Commerce's Decision Granting East Sea a Separate
          Rate is Contrary to its Separate Rate Practice and the
          law ........................................................................ 19

     C.   Commerce's Explanation for Granting East Sea a
          Separate Rate is Not Supported by the Case law it cites .... 30

II.  COMMERCE'S DECISION GRANTING EAST SEA A SEPARATE
     RATE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ......................... 33

     A.   East Sea's Separate Rate Certification was Deficient ......... 33

     B.   Commerce Failed to Consider the Deficiencies in East
          Sea's Separate Rate Status ......................................... 35

     C.   Commerce's Findings are Unsupported by the Evidence .... 36

     D.   Commerce Otherwise Failed to Explain its Findings or
          the Evidence ........................................................... 37

III. COMMERCE ERRED IN CALCULATING GREEN FARMS'
     SEPARATE RATE ...................................................................... 39

     A.   Legal Framework for Calculating Separate Rates: *Fair
          Treatment and Rates Reasonably Reflective of
          Dumping* ................................................................ 40

     B.   Commerce's Decision to use East Sea's AFA Rate to
          Calculate Green Farm's Separate rate was
          Unreasonable ......................................................... 42

C.    Commerce's Justification for its Methodology is
Neither Reasonable nor Supported by Substantial
Evidence ....................................................................... 53

IV.   COMMERCE MUST ADDRESS RELEVANT ARGUMENTS ABOUT
EAST SEA'S AFFILIATIONS AS PART OF ANY REMAND ........................... 57

CONCLUSION ........................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Albemarle v United States*,
821 F.3d 1345 (Fed. Cir. 2016) ......................................... 41, 42, 43, 51

*AMS Assocs. v. United States*,
719 F. 3d 1376 (Fed. Cir. 2013) ............................................. 33

*Ausimont USA, Inc. v. United States*,
19 CIT 151, 882 F. Supp. 1087 (1995) .................................... 5

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012) .............................................. 6

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*,
467 U.S. 837 (1984) ............................................................. 6

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ............................................................. 6

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ............................................................. 6

*Fuyao Glass Indus. Group Co. v. United States*,
30 CIT 165 (2006) ............................................................... 40

*Globe Metallurgical, Inc., v. United States*,
350 F. Supp 2d 1148, 28 CIT 1608 (2004) ............................. 25

*Godaco Seafood Joint Stock Co. v. United States*,
494 F. Supp. 3d 1294 (Court Int'l Trade 2021) ..................... 52

*Goldlink Indus. Co. v. United States*,
30 CIT 616 (2006) ............................................................... 40

*Hartford Fire Ins. Co. v. United States*,
772 F.3d 1281 (Fed. Cir. 2014) ............................................. 7

*Huvis Corp. v. United States*,
570 F.3d 1347 (Fed. Cir. 2009) ..................................................... 24, 28

*Nat'l Nail Corp. v. United States*,
279 F. Supp. 3d 1372 (Court Int'l Trade 2018) ................................... 31

*Navneet Publications (India) Ltd. v. United States*,
999 F. Supp. 2d 1354 (Court Int'l Trade 2014) .......................... *passim*

*Nippon Steel Corp. v. U.S. Int'l Trade Comn'n*,
494 F.3d 1371 (Fed. Cir. 2007) ..................................................... 24, 28

*NMB Singapore Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009) ........................................................... 25

*Shandong Huarong General Group Corp. v. United States*,
27 CIT 1568, Slip Op. 03-135 (Oct. 22, 2003) ..................................... 31

*Sigma Corp. v. United States*,
117 F.3d 1401 (Fed. Cir. 1997) ........................................................... 18

*Suramerica de Aleanciones Laminadas C.A. v. United States*,
44 F.3d 978 (Fed. Cir. 1994) .............................................................. 38

*West Deptford Energy LLC v. FERC*,
766 F.3d. 10 (D.C. Cir. 2014) ............................................................. 28

*Yante Xinke Steel Structure Co. v. United States*,
36 CIT 1035 (Oct. 2, 2003) .......................................................... 31, 32

## Other Authorities

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................. 5

19 U.S.C. § 1673d(c)(5)(B) ........................................................... 56, 58

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of Sixteenth Antidumping Administrative Review; 2018-2019, (June 25, 2021)* ................................................. 27

*Decision Memorandum for Final Affirmative Determination of Dumping in Certain Tool Chests and Cabinets from China* (A-570-056) (April 3, 2018) ....................................................... 31

*Decision Memorandum for the Preliminary Results of Sixteenth Antidumping Duty Administrative Review: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam; 2018-2019, (Dec. 15, 2020)* ........................................... 26, 27

*Final Issues and Decision Memorandum for Final Affirmative Determination of Dumping in Sodium Gluconate, Gluconic Acid, and Derivative Products from China (A-570-071) (Sept. 17, 2018)* .................................................... 31

Statement of Administrative Action, H.R. Doc. No. 103-316 (1994), reprinted in 1994 ........................................................... *passim*

## GLOSSARY

| Abbreviations | Term |
|---|---|
| *AR14* | Fourteenth Administrative Review |
| *AR15* | Fifteenth Administrative Review |
| *AR16* | Sixteenth Administrative Review |
| *AR17* | Seventeenth Administrative Review |
| *AR16 Final Decision Memo* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of Sixteenth Antidumping Administrative Review; 2018-2019, (June 25, 2021)* |
| *AR16 Preliminary Decision Memo* | *Decision Memorandum for the Preliminary Results of Sixteenth Antidumping Duty Administrative Review: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam; 2018-2019, (Dec. 15, 2020)* |
| *CFA or Petitioners* | Catfish Farmers of America |
| *CFA Deficiency Comments* | Letter from Cassidy Levy Kent to the Department Re: *Comments and Factual Information Regarding East Sea's Section A Questionnaire Response (Feb. 26, 2021)* |
| *Final Results* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020, 87 Fed. Reg. 15,912 (Dep't of Commerce March 21, 2022)* |
| *Final Decision Memo* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of the Seventeenth Antidumping Duty Administrative Review: 2019-2020, (March 9, 2020)* |
| *Green Farms Case Brief* | Letter from Crowell & Moring to the Department Re: *AR17 Case Brief of Green Farms Joint Stock Company* (Nov. 16, 2021) |
| *Green Farms SRA* | Separate Rate Application for Green Farms Seafood Joint Stock Company *(July 30 2021)* |
| *Green Farms SRC* | Separate Rate Certification for Green Farms Seafood Joint Stock Company (Nov. 5, 2020) |

| Abbreviations | Term |
|---|---|
| *Initiation Notice* | *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 Fed. Reg. 63,081 (Dep't Commerce Oct 6, 2020) |
| NME | Non-market economy |
| *Preliminary Decision Memo* | *Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review, 2019-2020; Certain Frozen Fish Fillets from Vietnam (Dep't Commerce August 31, 2021)*) |
| *Preliminary Results* | *Certain Frozen Fish Fillets from Vietnam: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 50,698 (Dep't Commerce Sept. 10, 2021)* |
| SAA | Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) at 873, reprinted in 1994 U.S.C.C.A.N. 4040. |
| SRA | Separate Rate Application |
| SRC | Separate Rate Certification |

## SUMMARY OF THE ARGUMENT

This case challenges the antidumping ("AD") rate assigned to Plaintiff Green Farms in an AD proceeding involving the seventeenth administrative review of the AD order on certain frozen fish fillets from Vietnam. The U.S. Department of Commerce ("Commerce") erred in the methodology it used to calculate Green Farms' AD rate.

Commerce calculated an unreasonably high "separate rate" for Green Farms based in part on a punitive "adverse facts available" ("AFA") AD rate that it assigned to East Sea Seafoods Joint Stock Company ("East Sea"), one of two other respondents in that AD case. Commerce determined that East Sea had failed to cooperate, and it therefore assigned East Sea a very high punitive AD rate of $3.87/kg (equivalent to 100%).

Commerce then used East Sea's punitive AD rate of $3.87/kg to calculate an AD rate of $1.94/kg for Green Farms. It did so by averaging East Sea's punitive total AFA rate of $3.87/kg with the $0.00/kg rate that Commerce calculated for the other mandatory respondent, NTSF Seafoods Joint Stock Company ("NTSF"). Commerce used East Sea's

1

punitive AD rate to calculate Green Farm's AD rate notwithstanding that Green Farms *cooperated fully in Commerce's proceeding*.

Commerce erred in relying on East Sea's AD rate to calculate Green Farms' AD rate. Commerce committed two separate overarching legal errors in doing so. First, Commerce should not have granted East Sea its own separate AD rate in this proceeding. East Sea failed to complete all of its questionnaires and it completely quit the case. East Sea was therefore not eligible for its own AD rate in this proceeding under the law and Commerce's practice. Nor was this finding otherwise supported by substantial evidence.

Second, even if this Court determines Commerce properly granted East Sea its own separate AD rate, Commerce nevertheless erred in otherwise relying on East Sea's AD rate to calculate Green Farms' AD rate. East Sea's AD rate is based on total AFA, and it was neither calculated nor based on economic reality. As such, it does not reflect the potential dumping margins of Green Farms. It reflects the punitive AFA rate assigned to East Sea for its non-cooperation. Commerce's use of this AFA rate was highly prejudicial to Green Farms.

Commerce may not rely on East Sea's AD rate based on AFA for this purpose under its practice and under court precedent. Commerce's decision was unsupported by substantial evidence and otherwise not in accordance with law. We discuss this in detail below. We first discuss Commerce's errors in granting East Sea its own separate rate. We next discuss Commerce's errors in otherwise relying on East Sea's AD rate to calculate Green Farm's AD rate.

## PLAINTIFF'S STATEMENT PURSUANT TO USCIT RULE 56.2(c)

### A.   Administrative Determination to be Reviewed

Plaintiff Green Farms Seafood Joint Stock Company ("Green Farms" or "Plaintiff") contests the *Final Results* of the seventeenth administrative review ("AR17") of the antidumping ("AD") order on certain frozen fish fillets from the Socialist Republic of Vietnam. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020,* 87 Fed. Reg. 15,912 (Dep't of Commerce March 21, 2022) ("*Final Results*"), Appx__ (PD 447).[1]

---

[1] Citation to documents on the administrative record in the underlying review are in the form of "PD __" for public documents and "CD __" for confidential documents.

Plaintiff challenges the factual and legal conclusions of the U.S.
Department of Commerce ("Commerce") in the *Final Results* as set
forth primarily in its March 9, 2022 "Issues and Decision
Memorandum" for the *Final Results. See Certain Frozen Fish Fillets
from the Socialist Republic of Vietnam: Issues and Decision
Memorandum for the Final Results of the Seventeenth Antidumping
Duty Administrative Review: 2019-2020,* (March 9, 2020) ("*Final
Decision Memo*"), Appx__ (PD 444).

## A.   Issues of Law and Fact Presented

1. Whether Commerce's decision granting mandatory respondent
   East Sea a separate rate was contrary to law because East Sea
   refused to answer all questionnaires and otherwise quit the
   case?

2. Whether Commerce's decision granting mandatory respondent
   East Sea a Separate Rate was otherwise unsupported by
   substantial evidence because East Sea's separate rate
   application was deficient and failed to rebut the presumption of
   government control?

3. Whether Commerce erred in relying on East Sea's punitive AD
   rate based on non-cooperative "adverse" inferences to calculate
   Plaintiff Green Farms' separate rate, despite the fact Green
   Farms had fully cooperated in this proceeding?

4. Whether Commerce otherwise erred in granting East Sea a
   separate rate for failing to consider or explain the evidence
   regarding its potential affiliates?

**B.     Reasons for Contesting the Final Results**

Plaintiff contests the *Final Results* because Commerce's factual

and legal conclusions are unsupported by substantial evidence and

otherwise contrary to law. Commerce inflated Green Farm's "separate

rate" based on a punitive "adverse facts available" ("AFA") AD rate

applied to a different exporter participating in the case. Plaintiff's

reasons for contesting the *Final Results* are explained in detail below in

the Argument section of this Memorandum.

**C.     Standard of Review**

The Court will hold unlawful agency determinations that are

"unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Ausimont USA, Inc.*

*v. United States*, 19 CIT 151, 157, 882 F. Supp. 1087, 1092 (1995).

Substantial evidence means that there is "more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938).

In applying its standard of review involving Commerce's

interpretation of a statute, the Court must do so within the framework

5

established by *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). Under *Chevron*, the Court must first ask whether Congress has directly spoken to the precise question at issue. If Congress has done so, the inquiry ends; the Court "must give effect to the unambiguously expressed intent of Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S. at 842-43). It is only when there is an absence of clear direction from the statute that the Court then can proceed to ask "whether there is ambiguous statutory language that might authorize the agency to fill a statutory gap," and, in turn, "whether Commerce's interpretation of ambiguous statutory language is based on a permissible interpretation of the statute." *FAG Italia, S.p.A. v. United States*, 291 F.3d 806, 815 (Fed. Cir. 2002).

Commerce must act reasonably and may not be arbitrary and capricious. *See e.g.*, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("Commerce's decision will be set aside if it is arbitrary and capricious."). "{A} clear error of judgment occurs when an action is arbitrary, fanciful, or clearly unreasonable." (quoting *Robert Bosch LLC v. Pylon Mfg. Corp.,* 659

F.3d 1142, 1147-48 (Fed. Cir. 2011); *Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281, 1286 (Fed. Cir. 2014).

## STATEMENT OF FACTS

On October 6, 2020, Commerce initiated the seventeenth administrative review of the AD order on certain frozen fish fillets from Vietnam. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 Fed. Reg. 63,081 (Dep't Commerce Oct 6, 2020) ("*Initiation Notice*"), Appx__ (PD __).[2]  Plaintiff was named as one of several respondents subject to this review. *See id.* at 63,084.

On January 8, 2021, Commerce selected the two largest eligible exporters of subject merchandise (*i.e.,* exporters other than Green Farms) as the "mandatory respondents" in this case. *See Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review, 2019-2020; Certain Frozen Fish Fillets from Vietnam* (Dep't Commerce August 31, 2021) ("*Preliminary Decision Memo*"), Appx__ (PD 385) at 3. Specifically, Commerce selected the following two exporters as mandatory respondents: (1) NTSF Seafoods

---

[2] Plaintiff notes that this document, while part of the record, appears not to have been assigned a document number in the record index.

Joint Stock Company ("NTSF"); and (2) East Sea Seafoods Joint Stock Company ("East Sea"). *See id.*

Although Green Farms was not selected as a "mandatory respondent," Commerce nonetheless considered Green Farms' eligibility for a "separate rate" in this proceeding as one of the non-selected respondents seeking a separate rate. *See id.* at 11-12. Under Commerce's well-established practice, it considers such other non-selected respondents such as Green Farms for "separate rate" status if they participate fully in the case and can show the absence of any "*de jure*" or *"de facto"* government control. *See id.*

On November 5, 2020, Green Farms timely submitted its initial "Separate Rate Certification" ("SRC"), wherein it fully documented and explained that it was entitled to a "separate rate" in this proceeding. *See generally* Separate Rate Certification for Green Farms Seafood Joint Stock Company (Nov. 5, 2020) ("*Green Farms SRC*"), Appx__ (CD 10; PD 51). It did so by showing an absence of both *de facto* and *de jure* government control over its operations. *See id* at 6-8.

On July 30, 2021, Green Farms submitted a supplemental "Separate Rate Application" ("SRA") to account for a change in

ownership since the last time it had applied for and received a separate rate. *See* Separate Rate Application for Green Farms Seafood Joint Stock Company (July 30 2021) ("*Green Farms SRA*"), Appx__ (CD 197-201; PD 353). Green Farms thus further documented its eligibility for a separate rate by answering all questions posed by Commerce about the lack of *de jure* and *de facto* government control. *See id.* at 9-27.

Wholly apart from Green Farms' efforts to obtain its separate rate, each of the two selected mandatory respondents (*i.e.*, East Sea and NTSF) also submitted their own Separate Rate Certifications as part of their status as mandatory respondents. *See Preliminary Decision Memo* at 2-4, Appx__ (PD 385). NTSF submitted its SRC on October 30, 2020 and East Sea submitted its SRC on November 5, 2020. *See id.* Both NTSF and East Sea were required to complete their SRC as part of their responsibilities as mandatory respondents. *See Initiation Notice*, 85 Fed. Reg. at 63,082-83, Appx__ (PD __).

Importantly, Commerce's *Initiation Notice* in this case specifically noted that exporters such as NTSF and East Sea who are selected as mandatory respondents must not only submit a separate rate certification, but they must also respond to "all parts of the

9

questionnaire as mandatory respondents" in order to remain eligible to receive a separate rate. *See id.*

Thereafter, NTSF participated fully in the proceeding as a mandatory respondent and completed all AD questionnaires and supplemental questionnaires. *See Preliminary Decision Memo* at 3-4, Appx__ (PD 385). East Sea however, never fully participated and it failed to complete all of its questionnaires. In fact, according to Commerce, East Sea voluntarily "suspended" its participation and ultimately "cease{d} participation" in the case after submitting its initial SRC. *See Final Decision Memo* at 26, Appx__ (PD 444).

On April 19, 2021, Commerce issued a supplemental questionnaire to East Sea regarding the status of East Sea's suppliers. *See Preliminary Decision Memo* at 3, Appx__ (PD 385). East Sea failed to respond to this supplemental questionnaire. *See id.* East Sea provided no other responses or communications to Commerce after this time and it ceased participation in the review. *Final Decision Memo* at 26, Appx__ (PD 444).

On August 27, 2021, Commerce issued its *Preliminary Results* in this case (published in the Federal Register on September 10, 2021).

*See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020*, 86 Fed. Reg. 50,698 (Dep't Commerce Sept. 10, 2021) ("*Preliminary Results*"), Appx__ (PD 400). Commerce accepted Green Farms' separate rate application as adequate and determined that Green Farms was entitled to a separate rate. *See Preliminary Decision Memo* at 9-12, Appx__ (PD 385).

Having determined Green Farms was entitled to a separate rate, Commerce next considered which AD rate to apply to Green Farms as its separate rate. *See id.* at 12. Because Green Farms was *not* selected as one of the "mandatory respondents", Commerce determined it was appropriate to calculate an "all-others" AD rate for Green Farms by averaging the individual AD rates of the two selected mandatory respondents (*i.e.,* the two individual AD rates each calculated separately for NTSF and East Sea based on their responses to their own separate AD questionnaires). *See id.* at 12.

Commerce calculated an AD rate of "zero" (*i.e.,* $0.00/kg) for NTSF, which had cooperated fully and fully answered its SRC and all sections of the full AD questionnaire issued to mandatory respondents.

*Preliminary Decision Memo* at 3-4, 12 and 22-24, Appx__ (PD 385).

Conversely, Commerce assigned a very high punitive AD rate of

$3.87/kg to East Sea based on total "adverse" facts available (or "AFA").

*See id* at 8-9. Commerce assigned this punitive adverse total AFA rate

to East Sea because it ceased participation in the proceeding and it

failed to answer all AD questionnaires issued to it. *Id.* at 7-8.

Commerce took a "simple average" of these two very different AD

rates for NTSF and East Sea to derive an overall "average" AD rate as

the new separate rate for Green Farms. *Id.* at 12. The resulting

separate AD rate assigned to Green Farms was $1.94/kg (*i.e.*, simple

average of $0.0/kg and $3.87/kg). *See Preliminary Results*, 86 Fed. Reg.

at 50,700, Appx__ (PD 400). (This $1.94/kg rate assigned to Green

Farms was equivalent to an AD rate of approximately 50%.)

On November 16, 2021, Green Farms filed an administrative case

brief challenging Commerce's preliminary decision to calculate an AD

rate of $1.94/kg for Green Farms. Letter from Crowell & Moring to the

Department Re: *AR17 Case Brief of Green Farms Joint Stock Company*

(Nov. 16, 2021) ("*Green Farms Case Brief*"), Appx__ (PD 422). Green

Farms argued in its case brief that Commerce wrongly relied upon East

Sea's very high and punitive AD rate of $3.87/kg as part of the calculation used to derive Green Farm's separate rate. *See id.* at 11-20.

Green Farms urged Commerce *not* to use East Sea's information as part of the calculation to derive Green Farms' separate rate. Rather, Green Farms asserted that Commerce should base Green Farm's separate rate on the $0.0/kg AD rate calculated for NTSF, the sole fully participating mandatory respondent. *Id.* at 2-9. Green Farms explained that because East Sea ceased participating and withdrew from the case entirely, Commerce should have denied East Sea's eligibility for its own separate rate. *See id.*

Green Farms noted that such an approach was consistent with Commerce's practice in the immediately preceding sixteenth administrative review ("AR16"). In that AR16 proceeding, Commerce disqualified the separate rate status of one of the two mandatory respondents (for failing to answer all questionnaires) and it then based the AD rate of the non-selected separate rate applicant on the AD rate of the lone remaining mandatory respondent. *See id.* Green Farms argued that Commerce must follow the same practice here in AR17 as it

followed in AR16, as there was no reason to treat the two situations differently. *Id.*

Green Farms also argued (in the alternative) that even if Commerce were to grant a separate rate to East Sea, Commerce should still not use East Sea's punitive total AFA rate as part of the calculation to derive Green Farm's separate rate. Green Farms noted that Commerce's use of East Sea's total AFA rate was not reasonable under the facts of this case because the resulting average was "not reasonably reflective of economic reality or of any dumping rate potentially applicable to Green Farms." *See id.* at 13-14.

On March 9, 2022, Commerce issued its *Final Results*, rejecting all of Green Farms' arguments, and affirming its preliminary decision basing Green Farm's separate rate on an average of the NTSF rate of $0.0/kg and the East Sea total AFA rate of $3.87/kg. *See generally Final Decision Memo* at 24-31, Appx__ (PD 444). Commerce concluded in its *Final Results* that (1) it was appropriate to grant a separate rate to East Sea (rather than simply deny East Sea its separate rate) and (2) it was otherwise proper to rely on East Sea's punitive total AFA rate as

part of the average used to derive Green Farm's separate rate of

$1.94/kg. *See id* at 26-29 and 34-36.

Commerce again took a simple average of East Sea's total AFA

rate of $3.87/kg and the $0.0/kg rate calculated for NTSF to derive the

$1.94 /kg AD rate assigned to Green Farms. *See id*. 32 and 35, n.222.

On March 22, 2022, Green Farms filed a summons with this Court

appealing Commerce's *Final Results*. Summons (ECF No. 1). On April

20, 2022, Green Farms filed a complaint setting forth its claims. Compl.

(ECF No. 9).

## **ARGUMENT**

### I.   COMMERCE'S DECISION GRANTING EAST SEA A SEPARATE RATE WAS NOT IN ACCORDANCE WITH LAW

Commerce determined in the *Final Results* that East Sea was

"eligible for a separate rate." *Final Decision Memo* at 26, Appx__ (PD

444). Commerce made this finding even though East Sea failed to

answer certain questionnaires and made a "decision to cease

participation" in proceeding entirely. *Id.* at 26. Commerce reasoned that

East Sea had "established independence from government control" in

the questionnaires it did provide. *See id*. at 27. Commerce explained

that East Sea's noncooperation "related directly to information

15

necessary to calculate a dumping margin, but did not call into question the company's separate rate reporting." *Preliminary Decision Memo* at 12-13, Appx__ (PD. 385). Therefore, rather than deny East Sea a separate rate, Commerce instead granted East Sea a separate rate and then applied a total AFA rate to East Sea. *See Final Decision Memo* at 26-27, Appx__ (PD 444).

Commerce's actions in granting East Sea a separate rate after that company decided to "cease" its participation in the case are contrary to law. Commerce committed two separate legal errors. First, Commerce ignored the plain language of its policy requiring separate rate applicants to respond to all questionnaires issued to it in a proceeding. Second, Commerce's decision was directly contrary to its prior decisions, including the AR16 proceeding, where it denied a separate rate to a company under virtually identical circumstances. We discuss this below. We first discuss the proper legal requirements governing Commerce's approval of separate rate status. We next demonstrate how Commerce disregarded these legal requirements.

## A.    Legal Framework – Separate Rate Respondents Must Affirmatively Demonstrate a Lack of Government Control

In all "non-market economy" ("NME") cases, the Department starts with a rebuttable presumption that all exporters such as East Sea "are subject to government control and, therefore, should be assigned a single AD margin." *See e.g., Preliminary Decision Memo* at 9, Appx__ (PD 385). Exporters such as East Sea can only qualify for a separate rate by affirmatively rebutting this presumption with positive evidence "showing an absence of central government control, *both in law and in fact*, with respect to exports." *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997) (emphasis added).

To properly evaluate these criteria, Commerce requires any company seeking a separate rate go through an "application process" spelled out in the *Initiation Notice* for each case. *See Preliminary Decision Memo* at 9, Appx__ (PD 385). The application process requires the submission of a separate rate *application* or a separate rate *certification. See Initiation Notice,* 85 Fed. Reg. at 63,082 (emphasis added), Appx__ (PD __). Companies previously granted a separate rate may file a separate rate *certification* (to certify they continue to meet the applicable criteria). *See id.* (emphasis added). Conversely,

17

companies not previously granted a separate rate (or that otherwise changed their corporate operations since receiving a separate rate) must file a separate rate *application*. *See id.* (emphasis added).

In addition, the *Initiation Notice* makes clear that companies seeking a separate rate and who are also selected as mandatory respondents must also respond in full to all parts of the additional questionnaires issued to mandatory respondents. *Id.* The *Initiation Notice* emphasizes this point by stating:

> "For Exporters and Producers who submit a Separate Rate Application or Certification and subsequently are selected as mandatory respondents, *these exporters and producers will no longer be eligible for separate rate status unless they respond to all parts of the questionnaire as mandatory respondents.*"

*See id.* at 63,083 (emphasis added).

Thus, under Commerce's clear policy as set forth in its *Initiation Notice*, any company seeking a separate rate must submit a fully completed separate rate application (first time applicant) or certification (previous applicant). In addition, companies who are selected as mandatory respondents (as is the case here) must also respond to all parts of the separate questionnaires issued to them as

18

mandatory respondents. Commerce will only grant separate rate status to companies fulfilling the above requirements and who demonstrate they are "sufficiently independent so as to be entitled to a separate rate." *Id.* at 63,082.

**B.**   **Commerce's Decision Granting East Sea a Separate Rate is Contrary to its Separate Rate Practice and the law**

Commerce failed to adhere to the above legal requirements in granting East Sea a separate rate. Commerce granted East Sea a separate rate despite East Sea's refusal to answer all questionnaires and despite the fact that East Sea completely quit the case. Commerce should have denied East Sea's separate rate application outright as a matter of law, consistent with prior practice. We discuss this below.

**1.**   **East Sea Failed to Answer all Questionnaires**

In the *Final Results*, Commerce concedes that East Sea failed to complete all required questionnaires, including a "supplemental questionnaire" seeking documentation "substantiating its purported purchases" from a supplier. *See Final Decision Memo* at 26, Appx__ (PD 444). Commerce states that East Sea "did not respond to that questionnaire, and it suspended participation in the review." *Id.*

19

Not only did East Sea refuse to respond to a supplemental questionnaire and subsequently quit the case, but it also filed the shorter Separate Rate "Certification" in its initial filing rather than the more fulsome Separate Rate "Application." *See* Letter from Cassidy Levy Kent to the Department Re*: Comments and Factual Information Regarding East Sea's Section A Questionnaire Response (Feb. 26, 2021)*, Appx__ (CD 108-117; PD 143-144).[3] Moreover, East Sea neglected to file an Appendix required of its initial Section A response. *See id.* at 2-3.

### 2.   Commerce Unlawfully Granted East Sea a Separate Rate Despite Not completing all Questionnaires

Yet, notwithstanding East Sea's failure to submit all required questionnaires – and the fact that it completely quit the case -- Commerce nevertheless determined that East Sea remained "eligible for a separate rate." *Final Decision Memo* at 27, Appx__ (PD 444). Commerce starkly summarized its position as follows: "Although Green Farms asserts that {East Sea's} failure to respond to our supplemental

---

[3] Petitioners CFA pointed out East Sea's separate rate status had been previously "revoked" and that it was now required to submit a more fulsome separate rate application rather than a separate rate certification. *See id.* at 3.

questionnaire undermines its eligibility for a separate rate, we disagree." *Id.* at 26.

Commerce's decision granting East Sea a separate rate is unlawful. It violates the plain language of its written policy requiring applicants such as East Sea to answer "*all* parts of the questionnaire as mandatory respondents" to remain eligible for separate rate status. *See Initiation Notice,* 85 Fed. Reg. at 63,083 (emphasis added), Appx__ (PD __). The policy is clear. "All" means "all." East Sea failed to answer "all" parts of the questionnaire it received as a mandatory respondent. Therefore, under Commerce's written policy, it can "no longer be eligible for separate rate status." *See Id.*

Commerce justifies its actions by reasoning that East Sea's "non-cooperation related directly to information necessary to calculate a dumping margin, but did not call into question {East Sea's} separate rate reporting." *See Preliminary Decision Memo* at 12, Appx__ (PD 385). Commerce explained that its decision granting separate rate status and "is separate from its analysis regarding sales and cost data." *Final Decision Memo* at 27, Appx__ (PD 444). Commerce therefore

concluded that "it found no basis to determine that the separate rate information submitted was not reliable." *Id.*

But this justification misses the point, which is that East Sea failed to satisfy the basic *threshold* requirement under Commerce's own written policy that it respond to *all* questionnaires to remain eligible for separate rate status, including those issued to it as a mandatory respondent. There is no question that East Sea failed to do so as Commerce concedes this point.

As explained above, East Sea failed to respond fully to all questionnaires issued to it as a mandatory respondent, including (1) a supplemental questionnaire about its suppliers; (2) its failure to submit the Section A Appendix; and (3) and any portion of its Section D questionnaire regarding FOP data.[4] Moreover, Petitioners CFA pointed out that East Sea also submitted the completely wrong separate rate documentation inasmuch as it submitted the abbreviated separate rate

---

[4] Indeed, Commerce explained that it used total AFA against East Sea precisely because East Sea failed to respond to all of these additional questionnaires, including the full Section D questionnaire and supplemental questionnaires about the Section D Questionnaire. *See Preliminary Decision Memo* at 7-9, Appx__ (PD 385).

"certification" rather than the more fulsome separate rate "application." *See CFA Deficiency Comments* at 3, Appx__ (CD 108-117; PD 143-144).

Commerce was legally required to reject East Sea's separate rate status for these reasons alone. But Commerce wrongly places the proverbial cart before the horse by looking at the substance of the submissions East Sea did provide to justify its decision to overlook East Sea's failure to meet the threshold filing requirements. But Commerce may not consider the substance of East Sea's separate rate status because East Sea failed to satisfy the *threshold* filing requirements. As such, East Sea is not eligible to maintain a separate rate, regardless of the merits of its claim.

Commerce's actions granting East Sea a separate rate are unlawful. Commerce may not arbitrarily depart from this written policy, and particularly not without adequate notice or explanation. It is axiomatic that an agency must adequately explain a change or deviation in policy. *See, e.g., Nippon Steel Corp. v. U.S. Int'l Trade Comn'n*, 494 F.3d 1371, 1377 n.5 (Fed. Cir. 2007) (agency must "adequately explain the reason for a reversal of policy"); *see also Huvis Corp. v. United States*, 570 F.3d 1347, 1354-55 (Fed. Cir. 2009)

(Commerce must show "good reasons" for methodological change). Indeed, "{a} court may measure Commerce's reasonableness by determining whether Commerce's actions are consistent with a past practice or stated policy." *See Globe Metallurgical, Inc., v. United States*, 350 F. Supp 2d 1148, 1159, 28 CIT 1608, 1621 (2004) (citing *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT 1185, 1199 (2004)); *see also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1331 (Fed. Cir. 2009).

### 3. Commerce's Decision Granting East Sea a Separate Rate Contradicts Its Prior decisions

Not only do Commerce's actions contradict its written policies, but they also contradict its decision in the AR16 proceeding in nearly an identical situation involving a different mandatory respondent (DOTA Seafoods). *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of Sixteenth Antidumping Administrative Review; 2018-2019, (June 25, 2021) ("AR16 Final Decision Memo") at 39-42.* In AR16, when confronted with the same situation for a different respondent (*i.e.*, mandatory respondent DOTA failed to respond to all required questionnaires), Commerce denied DOTA's separate rate status. *See id.*

24

In other words, Commerce denied DOTA's separate rate outright rather than first granting it a separate rate and then applying total AFA (as it did here for East Sea). *See id.*

In reaching its decision denying DOTA's separate rate status in *AR16,* Commerce explained fully in its preliminary decision that "Companies that submit an SRA or SRC and are subsequently selected as mandatory respondents, *must respond to all parts of a Commerce's questionnaire to be eligible for separate rate status*." *See Decision Memorandum for the Preliminary Results of Sixteenth Antidumping Duty Administrative Review: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam; 2018-2019, (Dec. 15, 2020) ("AR16 Preliminary Decision Memo")* at 9 (emphasis added).

Commerce further determined in AR16 that although DOTA submitted an initial SRC and initial Sections A and C response, DOTA also "failed to respond to our subsequent request for information regarding its separate rate status, *or any of the other information requested in the supplemental questionnaire.*" *Id.* (emphasis added). Commerce reiterated that "mandatory respondents must respond to *all* parts of Commerce's questionnaire to be eligible for separate rate

status." *Id.* (emphasis added). Commerce concluded that DOTA "failed to do so" and therefore failed to demonstrate "the absence of *de jure* and *de facto* government control" and as such "is not eligible for separate rate status." *Id.*

Importantly, Commerce emphasized in AR16 that it denied DOTA's separate rate because DOTA not only failed to respond to a supplemental questionnaire about its Separate Rate Certification ("SRC"), but because it also failed to respond to "any of the other information requested in the supplemental questionnaire." *See AR16 Final Decision Memo* at 40. Commerce reiterated that mandatory respondents such as DOTA seeking a separate rate "must respond to all parts of Commerce's questionnaire to be eligible for separate rate status." *Id.*

Indeed, Commerce adhered to this decision in the *AR16 Final Results* over the strenuous objections of Petitioners CFA, who argued that Commerce should instead apply total AFA to DOTA for its obvious failure to cooperate. *See id. at 39 – 40.* But Commerce rejected these arguments, pointing out and confirming that its normal practice in

26

these circumstances is to deny an exporter's separate rates status rather than apply AFA. *See id.* at 40.

Commerce's actions with regard to East Sea *in* AR17 are directly contrary to its actions for DOTA in the immediately preceding AR16 review. As already noted above, Commerce may not depart from its policies without adequate explanation or justification. *See e.g.*, *Nippon Steel,* 494 F.3d at 1377 n.5; *see also Huvis*, 570 F.3d at 1354-55. Nor may Commerce treat two situations differently without adequate justification as it did here. *See West Deptford Energy LLC v. FERC*, 766 F.3d. 10, 21 (D.C. Cir. 2014) (an agency is arbitrary and capricious if it "offers insufficient reasons for treating similar situations differently").

Commerce's justification for treating these two situations differently is not persuasive. Commerce relies on a variant of its stated justification that East Sea had provided "sufficient information necessary to determine its independence from the Government" whereas DOTA did not. *See Final Decision Memo* at 29, Appx__ (PD 444). We have already discussed above why this reasoning is not valid.

Regardless, this distinction drawn by Commerce is not borne out by the record of either case, including the AR16 review. As noted above, Commerce clearly applied its standard policy in AR16 and denied DOTA's separate rate application because it failed to respond to all questionnaires, including those related generally to Sections A and C.

Perhaps most tellingly, Commerce further acknowledges in a footnote that its practice "in the past" had been to "deny a separate rate status where a company did not provide full questionnaire responses." *See id.* at 27 n.172. Yet, for the first time, Commerce now declares that it has "reexamined this general practice" in light of recent court decisions and it has changed its analysis "to be conducted on a case-by-case basis." *See id.*

There are several problems with this statement. First, Commerce has not adequately explained this general change in policy. As already noted above, Commerce is required to do so. Second, its stated policy still appears in the *Initiation Notice* published as part of the AR17 proceeding. *See Initiation Notice,* 85 Fed. Reg. at 63,083, Appx__ (PD __). That policy was still in force for this proceeding, and Commerce may not override that policy with a brief statement in a footnote.

28

Commerce must explain any such change in policy and apply it uniformly.

Third, it does not appear that Commerce has actually changed its policy as it claims. Indeed, the *Initiation Notice* for the recently initiated nineteenth review ("AR19") was just published last week, and it contains the same statement of policy regarding NME separate rate applicants. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 61,278, 61,279 (Oct. 11, 2022) (noting again that separate rate applicants selected as mandatory respondents must respond to all questionnaires to remain eligible for separate rate status). Thus, Commerce has not actually changed its policy as it claims.

Commerce has offered no valid reasons explaining why it has treated East Sea differently than DOTA, and why it has failed to adhere to its stated policy. Commerce arbitrarily treated these two similar situations differently, and it did so without adequate justification.

Finally, it is worth noting that Commerce's decision in rejecting DOTA's separate rate status in AR16 was not an outlier. Indeed, Commerce has rejected separate rate status in numerous other similar

29

situations where the mandatory respondent either failed to answer all questionnaires or otherwise quit the case. *See e.g., Decision Memorandum for Final Affirmative Determination of Dumping in Certain Tool Chests and Cabinets from China* (A-570-056) (April 3, 2018) at 6-7 (rejecting separate rate status where mandatory respondent had "withdrawn" from proceeding). *See also Final Issues and Decision Memorandum for Final Affirmative Determination of Dumping in Sodium Gluconate, Gluconic Acid, and Derivative Products from China* (A-570-071) (Sept. 17, 2018) at 4 (rejecting separate rate status where mandatory respondent "notified Commerce of its intention to not continue participating" in the case).

### C. Commerce's Explanation for Granting East Sea a Separate Rate is Not Supported by the Case law it cites

Commerce also seeks to justify its decision by citing various court decisions which Commerce claims support its separate rate decision in this case. *See Final Decision Memo* at 27 *citing, inter alia, Nat'l Nail Corp. v. United States*, 279 F. Supp. 3d 1372, 1377 (Court Int'l Trade 2018); *Shandong Huarong General Group Corp. v. United States*, 27 CIT 1568, 1594, Slip Op. 03-135 (Oct. 22, 2003); and *Yante Xinke Steel*

*Structure Co. v. United States*, 36 CIT 1035, 1054 (Oct. 2, 2003), Appx_ (PD 444).

Commerce cites these decisions for the broad proposition that its separate rate determination "with respect to independence from the Government is separate from its decision regarding sales and cost data." *Id.* at 27. Commerce emphasizes that it may not disqualify a separate rate applicant based upon "the unreliability of a company's questionnaire submissions concerning its factors of production and/or U.S. sales." *See Id. at n.170 citing Yantai Shinke* 36 CIT 1035, 1594 (July 18, 2012).

Commerce's reliance on these decisions is misplaced and otherwise inapposite. These cases involve situations where the separate rate applicant actually submitted all questionnaire responses, but Commerce found them deficient with regard to non-separate rate responses. This is distinguishable from East Sea's situation, where East Sea refused to submit all questionnaires issued. Moreover, unlike those prior cases, East Sea completely quit this case. *See Final Decision Memo* at 26, Appx__ (PD 444). This is a critical distinction.

Indeed, Commerce fails to note that its stated practice has been to deny a separate rate application when the separate rate applicant has quit the case and otherwise "withdrew" from the proceeding. *See e.g., AMS Assocs. v. United States*, 719 F. 3d 1376, 1378-80 (Fed. Cir. 2013). Commerce explained that a company's "withdrawal" from a proceeding leaves Commerce "unable to verify" the company's separate rate status. *Id.* at 1379. Thus, where a separate rate applicant quits the case, Commerce denies the company's separate rate status. *See id.* The Federal Circuit has specifically upheld this practice. *See id.* at 1380. Commerce fails to mention the *AMS* decision in its *Final Results*.

Thus, for these reasons, Commerce's decision granting East Sea a separate rate is unlawful. East Sea failed as a matter of law to meet all threshold eligibility requirements and Commerce should have rejected its separate rate status. The Court should remand on this point alone and require that Commerce reject East Sea's separate rate status, or at least provide a more fulsome discussion of why East Seat remained eligible for a separate rate under these circumstances. If Commerce wishes to change or deviate from its policies, it must do so for all cases consistently and it must do so with adequate explanation.

II.   **COMMERCE'S DECISION GRANTING EAST SEA A SEPARATE RATE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

The Department's decision granting East Sea a separate rate is not only unlawful (for all the reasons discussed above), but it is also otherwise unsupported by substantial evidence. Even if Commerce reasonably determined that East Sea's failure to submit all questionnaires was not fatal to its separate rate status as a matter of law, the evidentiary record nevertheless shows that East Sea failed to provide sufficient evidence to rebut the presumption of government control. We discuss this below.

A.   **East Sea's Separate Rate Certification was Deficient**

The record reflects serious evidentiary deficiencies in East Sea's initial SRC itself. While Commerce states that East Sea provided an "adequate" response to its SRC, the record evidence suggests otherwise. *Preliminary Decision Memo* at 12, Appx__ (PD 385). Indeed, as pointed out earlier in this brief, Petitioners CFA filed detailed comments challenging East Sea's initial SRC response as wholly deficient in several respects. *See CFA Deficiency Comments* at 3-9, Appx__ (CD 108-117; PD 143-144). Importantly, CFA points out that East Sea

wrongly filed an abbreviated "Certification" when it should have instead filed a more fulsome "Application" because its separate rate status had been previously revoked. *See id.* at 3-4. This means East Sea filed the wrong separate rate form in its initial submission.

Commerce disingenuously downplays this serious deficiency by claiming it obtained any missing information from East Sea's Section A response. *See Final Decision Memo* at 27, n.175, Appx__ (PD 444). But this ignores that CFA's comments challenging East Sea's SRC were actually submitted as part of CFA's comments challenging East Sea's Section A response more generally. See *CFA Deficiency Comments* at 1 (entitled "*Comments and Factual Information Regarding East Sea's Section A Questionnaire Response*"), Appx __ (CD 108; PD 117). CFA raised numerous other questions about East Sea's Section A response, including the fact that East Sea failed to submit a response to a case-specific Appendix to the Section A Questionnaire. *See id.* at 2-3. CFA also noted other deficiencies in East Sea's Section A reporting that were relevant to its Separate Rate status. *See id.* at 3-9.

Moreover, CFA pointed out numerous other deficiencies in East SRC, including deficiencies in its business registration certificate and

34

its failure to disclose fully its relationship with other Vietnamese processors of subject merchandise. *Id.* at 4-9. CFA also raised relate issues about certain "Board of Management" members, which CFA points out undermines East Sea's claim it was "unaffiliated" with certain other entities. *See id.* These deficiencies further call into question East Sea's separate rate status.

### B. Commerce Failed to Consider the Deficiencies in East Sea's Separate Rate Status

Commerce failed to consider all of this record evidence in concluding East Sea was entitled to a separate rate. Indeed, Commerce does not even mention CFA's deficiency comments, much less consider them. This includes deficiencies about East Sea's SRC deficiencies in East Sea's Section A response related to its SRC.

Commerce's actions in ignoring East Sea's deficiencies (and in not following up on those deficiencies) are even more arbitrary because Commerce actually engaged in similar follow-up in this case for Green Farms. *See* Letter from the Department to Green Farms JSC Re: *Separate Rate Application* (July 21, 2021), Appx__ (PD 316). Commerce issued a supplemental questionnaire to Green Farms requesting that Green Farms submit an SRA rather than an SRC. *See id.* (This was the

same issue Petitioners CFA had raised about East Sea). Commerce

issued this questionnaire on July 21, 2020, which was very late in the

proceedings. Yet Commerce issued no such supplemental questionnaire

to East Sea despite CFA's deficiency comments pointing out this

significant error months earlier. Nor did Commerce otherwise consider

this issue for East Sea as it did for Green Farms.

### C.   Commerce's Findings are Unsupported by the Evidence

Yet, despite all of this evidence calling into question East Sea's

separate rate status, Commerce nevertheless determined East Sea was

"eligible for a separate rate." *Final Decision Memo* at 27, Appx__ (PD

444). Commerce stated it "found no basis to determine that the

separate-rate information submitted was not reliable." *Id*.

Commerce cites precious little evidence to support this finding.

Commerce states that East Sea "provided Commerce's required

attestation, its business registration certificate, and its tax forms." *Id* at

27. Commerce also notes that East Sea "provided a full response to

Section A of Commerce's questionnaire with respect to the Company's

operations, independence from the government, and relevant

affiliations." *Id*.

But Commerce failed to discuss or evaluate the serious deficiencies in East Sea's responses identified by CFA. Nor has Commerce otherwise considered or evaluated all of the evidence on the record about the deficiencies apparent in East Sea's SRC. Commerce's failure to do so undermines its decision. The "substantial evidence" standard requires that Commerce consider "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleanciones Laminadas C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994). Commerce failed to consider any such conflicting evidence for East Sea.

### D.    Commerce Otherwise Failed to Explain its Findings or the Evidence

Nor has Commerce adequately explained its decision, or how the evidence supports its findings under each of the factors relevant to determining the absence of both "*de jure*" and "*de facto*" control. *See Preliminary Decision Memo* at 11-12, Appx__ (PD 385).[5] Commerce simply states in a conclusory fashion that the evidence submitted by

---

[5] Commerce uses two separate sets of requirements to determine whether an exporter has sufficiently rebutted government control (*i.e.,* control "in fact" (*de facto*) and control "in law" (*de jure*). *See id. at* 9-12.

East Sea supports a finding that East Sea has demonstrated the absence of both "*de jure*"[6] and "*de facto*"[7] government control under all of these factors. *See id*. While Commerce dutifully lists each of the various factors, it fails to explain what evidence supports its findings under each factor. *See id*. at 11-12.

Indeed, Commerce renders a one sentence conclusion for each of the separate "*de jure*" and "*de facto*" prongs despite the fact that each prong has multiple evidentiary factors. Commerce made no effort to elaborate on these initial perfunctory preliminary evidentiary findings in the *Final Results*. Commerce was obligated to do so given the questions raised about East Sea's separate rate status.

Thus, not only has Commerce failed to support its decision with substantial evidence for all the reasons already discussed above, but it

---

[6] With regard to *de jure* control, Commerce examines three factors to determine whether the exporter/respondent is free of such control: (1) an absence of restrictive stipulations associated with an exporter's business and export licenses: (2) legislative enactments decentralizing control of companies; and (3) any other formal government measures decentralizing control of companies. *See id*. at 11.

[7] With regard to *de facto* control, Commerce examines the following four factors for evidence of whether the exporter/respondent: (1) sets its own export prices independent of the government and other exporters; (2) retains the proceeds of its sales; (3) has the authority to negotiate and sign contracts and other agreements; and (4) has autonomy from the government in making decisions regarding the selection of its management. *See id.at 11-12.*

also failed to explain how it reached its decision or how the evidence supports its decision. This too was error. It is axiomatic that Commerce must "adequately explain" its reasons for reaching a decision. *See e.g., Fuyao Glass Indus. Group Co. v. United States,* 30 CIT 165, 169 (2006). If Commerce fails to explain its decision "the court is unable to determine whether Commerce's decision is reasonable." *Goldlink Indus. Co. v. United States*, 30 CIT 616, 629 (2006).

## III.   COMMERCE ERRED IN CALCULATING GREEN FARMS' SEPARATE RATE

For all the reasons discussed above, Commerce may *not* confer a "separate rate" upon East Sea at all, thereby obviating the need to even rely on any East Sea information or calculations as part of Green Farm's separate rate. Nevertheless, should the Court determine Commerce lawfully granted East Sea a separate rate, Commerce still may not rely on East Sea's AFA rate to determine Green Farms' separate rate. East Sea's AFA rate is not reasonably reflective of Green Farms potential dumping margins. Commerce must look for other AD rates that are properly reflective of Green Farms' potential dumping margins, including other contemporaneous calculated AD margins.

We discuss this below. We first discuss the legal requirements for determining the separate rate for non-selected respondents. We next show that Commerce failed to follow those legal requirements, and that its decision relying on East Sea's AFA rate was unreasonable and otherwise unsupported by substantial evidence.

### A.   Legal Framework for Calculating Separate Rates: *Fair Treatment and Rates Reasonably Reflective of Dumping*

Commerce normally calculates the separate rate of non-selected NME respondents by averaging the "dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under {facts available}." *See* 19 U.S.C. § 1673d(c)(5); *see also Albemarle v United States,* 821 F.3d 1345, 1351 (Fed. Cir. 2016). But, if all rates for all respondents are zero, *de minimis*, or "facts available" (as in this case), Commerce may use "any reasonable method" to establish the all-others rate applied to the non-selected respondents, including "averaging the estimated weighted-average dumping margins determined for the exporters and producers individually investigated." *See id.*

40

The Statement of Administrative Action ("SAA") clarifies that when using "any reasonable method" in this situation (where all rates are zero, *de minimis* or facts available), it is "expected" that Commerce will "weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available."  Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) at 873, reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA").

However, the SAA suggests that Commerce should not automatically weight-average the rates under the "expected method" if doing so is "not feasible" or if it otherwise "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers." SAA at 873. Rather, Commerce may use other reasonable methods. *See id.*

Commerce's methodology for determining separate rates for cooperating respondents under this statutory provision and under these circumstances must be reasonable. *See Navneet Publications (India) Ltd. v. United States,* 999 F. Supp. 2d 1354, 1362-63 (Court Int'l Trade 2014). In particular, Commerce's determination "for nonmandatory, cooperating separate rate respondents must … bear some relationship

41

to their actual dumping margins." *Id.* Commerce has a "duty to verify that the resulting rate reflects economic reality." *Id.* Further, "accuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters." *See Albemarle,* 821 F.3d at 1354-55.

### B. Commerce's Decision to use East Sea's AFA Rate to Calculate Green Farm's Separate rate was Unreasonable

#### 1. East Sea's AFA Rate is Not Reasonably Reflective of Green Farm's Dumping Rate

In the *Final Results*, Commerce averaged the $0.00/kg rate for NTSF with the very high AFA rate of $3.87/kg for East Sea to derive an overall "average" AD rate of $1.94/kg for Green Farms. *See Final Decision Memo* at 32 and 35-36, Appx__ (PD 444); *see also Preliminary Decision Memo* at 12, Appx__ (PD 385). Commerce's derivation of Green Fam's separate rate by averaging together two widely divergent rates of $0.00/kg and a total AFA rate of $3.87/kg was unreasonable.

While the statute contemplates averaging of these rates under certain and appropriate circumstances, Commerce may not simply average these rates without consideration of the evidence in each case, and without consideration of whether doing so is "reasonable" under the

facts. Prior court decisions make clear that doing so is not always reasonable. *See e.g., Navneet*, 999 F. Supp. 2d at 1362-63. The SAA also suggests that doing so may not be reasonable if it is "not reasonably reflective of potential dumping margins" for the non-investigated companies." *See* SAA at 873.

In this specific instance, the resulting averaged rate of $1.94/kg is not reasonably reflective of any dumping rate potentially applicable to Green Farms during the current POR. Commerce simply averaged together the two rates that are extreme opposites – one based on actual calculations showing no dumping and one based on an old total AFA rate that had built in "adverse" inferences intended to deter the behavior of non-cooperating respondents in prior proceedings. And it did so without meaningful consideration of the evidence. Commerce should have instead meaningfully looked at and considered all the evidence on the record to assess the reasonableness of its actions.

2. **Recent Calculated Rates of Other Mandatory Respondents are Reasonably Reflective of Green Farm's Potential Dumping**

Commerce should have considered and used recent actual calculated rates for cooperating respondents, including the $0.00/kg

rate actually calculated for NTSF in this current AR17 proceeding (which Commerce did use as part of the overall average), as well as other non-AFA calculated rates for cooperating respondents from the most recently completed segments of this proceeding. *See e.g.*, *Green Farms Case Brief* at 16-19, Appx__ (PD 422). Doing so is consistent with Commerce's past practice and recent court decisions, including those decisions noted above.

In this context, the Courts have judged the reasonableness of Commerce's separate rate determination by comparing it to recent prior calculated dumping margins of other cooperative respondents (in prior reviews for the same proceeding), as well as to the rates of other cooperative respondents in the same proceeding. *See Navneet*, 999 F. Supp. 2d at 1364-65. Specifically, in the *Navneet* decision, Commerce originally calculated the separate rate for a cooperating respondent by averaging the 0% of cooperating mandatory respondents[8] with the total AFA rate of 22.02% of the non-cooperating respondents, to derive a simple average AD rate of 11.01%. *Id.* at 1363-64. (Thus, Commerce's actions in *Navneet* were similar to its actions in this case for East Sea.)

---

[8] There were two mandatory respondents in *Navneet.*

44

But the Court in *Navneet* invalidated Commerce's methodology as unreasonable and unsupported by substantial evidence because Commerce's 11.01% rate was completely "untethered to respondents pricing behavior." *Id.* at 1363-64. The Court reached this decision in large part because Commerce failed to corroborate its decision with any record evidence, and it otherwise failed to explain its decision. *See id.* Moreover, the Court noted there was evidence from prior reviews showing that such a rate is "high for cooperative respondents in proceedings under this order." *Id.* In this regard, the Court compared the 11.01% rate to previously calculated rates of "1.22% in the first review, 1.34% in the second and third reviews, and 3.95% in the fourth review." *See id.*

Upon making this comparison, the Court noted that Commerce's separate rate calculation was "aberrational because it {was} significantly higher than all prior margins calculated for cooperative respondents." *Id.* at 1365. The Court observed that this new rate represented a "nearly four-fold increase from the preceding review during a time when mandatory respondent margins dropped to zero." *Id.* The Court also noted that the averaged separate rate was also

45

aberrational when compared to the only other margins calculated in that current review, which were the two zero rates calculated for the two mandatory respondents. *See id*. The Court noted that "those zero rates … {in the current proceeding} constitute the only contemporaneous evidence of pricing practices among large exporters of subject merchandise and are presumed to represent respondents as a whole." *See id.*, *citing Amanda Foods (Vietnam) Ltd. v. United States*, 837 F. Supp. 2d. 1338, 1345-46 (Court Int'l Trade 2012).

The Court's findings in the *Navneet* decision are highly instructive here. Indeed, as was the case in the underlying Commerce decision in the *Navneet* case, Commerce calculated the separate rate in this proceeding by simply averaging a zero (from the mandatory respondent) with a total AFA rate for non-cooperating respondents. The average rate in this proceeding ($1.94/kg) is much higher than the $0.00/kg rate calculated for the lone mandatory respondent NTSF.

Further, as in the *Navneet* case, the only cooperating mandatory respondent with a calculated rate in the most recently completed segment of these fish fillet proceedings (*i.e.,* Vinh Hoan in AR16) also received a calculated zero. *See AR16 Final Results, 86 Fed. Reg. at*

46

*36103*. Thus, the two most recent calculated rates for cooperating respondents in these ongoing fish fillet reviews were both zero. Commerce's derivation of the extremely high $1.94/kg rate in this current AR17 proceeding by averaging such widely divergent rates (*i.e.,* $3.87/kg and $0.00/kg) is not reasonably reflective of actual dumping (as articulated by the Court in *Navneet*), either in this review or in the most contemporaneous proceedings, nor is it otherwise reflective of economic reality.

### 3.    The Most Recent Calculated Rates Demonstrate the Unreasonableness of Commerce's Actions

Substantial evidence demonstrates that Green Farms separate rate as calculated by Commerce is unreasonable when compared to historical calculated rates from the most recent prior segments for cooperating mandatory respondents. As noted above, the only calculated rates in the current and prior proceeding were both zero. Similarly, the only other calculated rates in the most recently completed segments of reviews of this same order were also much lower than the $1.94/kg rate Commerce derived here. This includes a rate of $0.15/kg (NTSF) in the *AR15* proceeding. For convenience we summarize those rates in the below chart.

|     | Review[9] | Period | Rates ($/kg) | Company |
| --- | --- | --- | --- | --- |
| 1. | AR17 | 8/1/19-7/31/20 | 0.0 | NTSF |
| 2. | AR16 | 8/1/18-7/31/19 | 0.0 | Vinh Hoan |
| 3. | AR15 | 8/1/17-7/31/18 | 0.15 | NTSF |

As shown, the separate rate of $1.94/kg Commerce calculated for Green farms in AR17 is much higher than any of the other prior rates calculated for cooperating respondents in any of the three current or most recent prior proceedings.[10] We note for completeness that in the fourteenth administrative review ("AR14") Commerce calculated an AD

---

[9] *See Green Farms Case Brief* at 17, App__ (PD 422). As shown there, these rates are derived from the Federal Register notices for each of these three proceedings, as follows: (1) the *AR 17 Final Results,* 87 Fed. Reg. at 15,913; (2) the *AR16 Final Results as published at Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and Final Determination of no Shipments, 2018-2019*, 86 Fed. Reg. 36,102-03 (Dep't of Commerce July 8, 2021) ("*AR16 Final Results*"); and *(3)* the *AR15 Final Results* as published *at Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No shipments; 2017-2018,* 83 Fed. Reg. 23,75 -57 (Dep't of Commerce April 29, 2020) ("*AR15 Final Results*"). Note that we have only included the calculated rates not inclusive of AFA, as including AFA rates is the very issue we are challenging.

[10] This analysis, of course, excludes total AFA rates and others calculated with partial AFA. We only include those rates that were calculated by cooperative respondents, and excluding AFA. are s

rate of $1.37/kg for NTSF. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Final Results of No Shipments; 2016-2017,* 82 Fed. Reg. 18,007, 18,008 (Dep't of Commerce April 29, 2019) ("*AR14 Final Results*").

But that rate is based in part upon AFA and it is also based upon data from more than *five years ago* (*i.e.,* from the time period 8/1/16-7/31/17) and is thus not as contemporaneous as the more recent rates in AR17 through AR15. It is more appropriate to look to the more recent calculated rates for purposes of determining the reasonableness of AR17 separate rate. *See e.g.*, *Navneet*, 999 F. Supp. 2d at 1364 (noting comparisons of current separate rate to most recent rates calculated for cooperating respondents.). *See also Albemarle*, 821 F.3d at 1356 (noting that the statute has "manifest preference for contemporaneity in periodic administrative reviews").

Indeed, the Federal Circuit in *Albemarle* actually suggests that Commerce should seek first to rely on information from the current review period (which is the most contemporaneous), provided that information is reflective of actual dumping margins. *See Albemarle at 1356-1358.* This supports the notion Commerce should look first to the

49

rate of $0.00/kg calculated for NTSF in the AR17 proceeding, and then to the $0.00/kg rate calculated for Vinh Hoan in AR16.

### 4. Commerce's Actions in this Case are Contrary to its Prior Decisions and otherwise unreasonable and unsupported by substantial evidence

Moreover, this approach advocated by Green Farms of comparing this current separate rate to other calculated rates in recently completed segments of the same proceedings is not only consistent with the caselaw discussed above, it is also consistent with the approach Commerce itself used in its recently completed third remand pursuant to court proceedings in the thirteenth administrative review ("AR13").[11] Indeed, in that case, after two remands, Commerce ultimately looked at and used an average of the calculated AD rates from the most recently completed administrative reviews. *See id*.[12] Commerce ultimately took

---

[11] *See* Final Results of Redetermination Pursuant to Court Remand, *GODACO Seafood Joint Stock Co. v. United States,* Court No. 18-0063, Slip. Op. 21-03 (Court Int'l Trade Jan. 6, 2021) ("*GODACO II Remand*").

[12] We note that Commerce did so under protest. *See Final Decision Memo* at n.224 (noting Commerce filed the *Navneet* remand "under protest"), Appx__ (PD 444). We also note that Commerce took an average of previous separate rates rather than taking an average of individual calculated rates. But Commerce did so because the separate rates were derived from other calculated rates during those proceedings, rather than AFA as in the current AR17 proceeding. As such, it was reasonable to look to prior calculated separate rates based upon other calculated rates. While Commerce may disagree with the Court's holding in that case, the Court

an average of those prior rates to derive its separate rate in that proceeding. *See id.*

Thus, Commerce's actions in calculating Green Farms separate rate as $1.94/kg based on a simple average of NTSF's rate of $0.00/kg and East Sea's total AFA rate of $3.87/kg was unreasonable and unsupported by substantial evidence. For all the reasons discussed above, Commerce should have first considered using NTSF's calculated rate of $0.00/kg in AR17 as the separate rate for Green Farms. As noted in *Navneet,* this is the most contemporaneous rate showing the true measure of an exporter's actual dumping during the POR. This is also consistent with Commerce's actions in AR16, where it also used the rate of $0.00/kg calculated for the sole mandatory respondent (Vinh Hoan) as the separate rate for the separate rate respondents. *See AR16 Final Results, 86 Fed. Reg. at 36103.*

Should Commerce wish additional validation of NTSF's $0.00/kg rate from the current AR17 proceeding, it need look no further than the very same $0.00/kg rate calculated for the AR16 mandatory respondent

---

nevertheless approved of this specific methodology of looking to prior rates. *See generally Godaco Seafood Joint Stock Co. v. United States,* 494 F. Supp. 3d 1294 (Court Int'l Trade 2021).

Vinh Hoan, which as noted above is the next most contemporaneous calculated AD rate. This further confirms that Commerce should simply apply a rate of $0.00/kg to Green Farms as its separate rate.

Should Commerce need additional validation of these recent $0.00/kg rates, it can consider the other prior calculated rate from AR15 (which is $0.15/kg and also for NTSF), and it can take an average of those three rates (which is $0.5/kg). While Green Farms believes Commerce should look no further than the current AR17 proceeding or perhaps one year earlier (AR16), Commerce should certainly go back no further than AR 15, where the calculated rate was 0.15.[13] This is because, as noted above, Commerce must consider the contemporaneity of the rates, and at some point the older rates become obsolete and outdated. And as shown in the above charts, the AD rates have moved downward the past few reviews and stabilized. There has been no dumping calculated at all in the two past reviews.

Regardless, in light of the above case history, and prior precedent (and Commerce's own practice). it was unreasonable for Commerce to simply average the NTSF rate of $0.00 kg with the total AFA rate of

---

[13] A simple average of those three rates from AR17, AR16, and AR15 is $0.05/kg.

$3.87/kg applied to East Sea as doing so is not reflective of current or actual calculated dumping margins for Green Farms.

###   C.   Commerce's Justification for its Methodology is Neither Reasonable nor Supported by Substantial Evidence

In response to these arguments, Commerce suggests that its methodology in this case is "reasonable" because it is one of the methods "expressly" authorized by the statute. *See Final Decision Memo* at 34-35 (noting use of "expected method"), Appx__ (PD 444). Yet this argument ignores the SAA and the court decisions discussed above interpreting this statute.

In this regard, Commerce does not correctly or completely analyze the statutory language (and the SAA). While the statute does expressly authorize this specific methodology (*i.e.*, averaging zero and AFA rates) as one possible reasonable method, it is not absolute. Indeed, the SAA also suggests it might not be appropriate to use this methodology if it "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers." *See* SAA at 873.

This is precisely the point Green Farms made in its case brief to Commerce (and noted above in the legal background section). Yet

53

Commerce downplays this part of the SAA and instead disingenuously focuses only on that part of the SAA discussing the "expected method." *See Final Decision Memo* at 35-36, Appx__ (PD 444).

Rather than address this statement from the SAA, Commerce instead states without justification that Green Farms' proffered alternatives (*i.e.*, using NTSF rate alone) is "directly contrary to the statute." *Id*. But this argument wholly lacks merit. Indeed, the plain language of the statute itself broadly authorizes the use of "*any*" reasonable method to calculate the all others rate in this situation where all margins are either zero or based on total AFA. *See* 19 U.S.C. § 1673d(c)(5)(B) (emphasis added). Green Farms proffered alternative certainly qualifies as one of "any" such alternative. (and as already discussed above, it is reasonable).

Commerce also defends its averaging methodology by emphasizing that it "examined respondents representing a substantial portion of the total volume of imports under review." *Final Decision Memo* at 35, Appx__ (PD 444). Commerce therefore suggests that "the rate assigned to the mandatory respondents is representative unless substantial evidence shows otherwise …"*Id*. Commerce states that this proposition

54

holds true regardless of "whether we had calculated a zero rate, a *de minmis* rate, or assigned a rate based entirely on facts available." *Id.*

Commerce appears to be saying it will rely on whatever rates are calculated for the mandatory respondents, regardless of the outcome and regardless of any disparity in those rates (or adversity in calculating those rates), as long as those respondents account for a "substantial portion" of total imports. *See id.* But this is not consistent with the law, which contains no such statement about the "volume" of the shipments examined. *See* 19 U.S.C. § 1673d(c)(5). Rather, as already explained above, the use of those rates must still be "reasonable" and those rates must be "reasonably reflective of potential dumping margins for non-investigated exporters or producers." *See* SAA at 873; *see also Navneet,* 999 F. Supp. 2d. at 1362-63.

More to the point, Green Farms did provide "substantial evidence" to the contrary and Commerce ignored it. As discussed above, Green Farms demonstrated this with historical trends and rates, and proposed that Commerce consider using separate rates "from three preceding review periods," consistent with an approach laid out by the Court in *Navneet. See Green Farms Case Brief* at 14-19, Appx__ (PD 422).

Yet, perhaps tellingly, Commerce does not even mention the
*Navneet* decision in its *Final Results,* much less analyze it. Rather than
substantively address the holding in that case and Green Farms
arguments – and the different rates suggested by Green Farms –
Commerce instead largely ignores this argument and the evidence
presented. It dismisses this entire analysis by stating simplistically
that relying on an average of separate rates from three preceding
review periods "defies the statutory directive." *See Final Decision
Memo* at 35, Appx__ (PD 444). But as already discussed above, the
statute does not prohibit such a methodology. Rather, it allows for "any"
reasonable methodology. *See* 19 U.S.C. § 1673d(c)(5)(B).

Commerce's effort to dismiss this analysis is inconsistent with
prior court holdings requiring that Commerce consider the recent
calculated rates from the most contemporaneous proceedings, and that
it determine that its analysis is both reasonable and otherwise
reflective of potential dumping. Commerce has not done so.

Commerce's additional statement that the derived rate of $1.94/kg
for Green Farms is reasonable because it is similar to Green Farms
prior deposit rate of $1.37 is utterly without merit. *See Final Decision*

*Memo* at 36, Appx__ (PD 444). Though not citing its source for this statement, it appears Commerce extracted this rate of $1.37/kg from the *AR14 Final Results*, which as noted earlier in this brief was the separate rate derived from the AD rate calculated for NTSF in the AR14 review. *See AR14 Final Results*, 82 Fed. Reg. at 18,008.

As noted earlier, this rate was not calculated for Green Farms, but was derived as the separate rate for Green Farms in that proceeding from the rate calculated for NTSF. *See id.* As also noted, that rate is based on data that is now more than five years old (and it was based in part upon AFA). It should be updated. The fact that this rate was still in effect for Green Farms during the review as the "deposit rate" is wholly irrelevant. The very point of the separate rate process is to afford Green Farms the opportunity to update its AD deposit rate. Indeed, this is the reason companies such as Green Farms request a review in the first place.

## IV.   COMMERCE MUST ADDRESS RELEVANT ARGUMENTS ABOUT EAST SEA'S AFFILIATIONS AS PART OF ANY REMAND

As discussed earlier in this brief, the Court should find that Commerce unlawfully granted East Sea a separate rate. The Court

should therefore remand this case back to Commerce to reconsider this decision. Commerce must thoroughly consider all questions raised in this proceeding about East Sea's separate rate status as part of any such remand, including several questions raised about its affiliation with other entities, including Vietnamese processors of subject merchandise. *See, e.g., CFA Deficiency Comments* at 3-4, Appx__ (CD 108-117; PD 143-144). Commerce did not adequately address this issue in the *Final Results,* including the impact of this issue on its decision granting East Sea a separate rate and on its application of AFA to East Sea. If necessary, Commerce should reopen the record to seek additional information about this issue.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that Court remand this case to Commerce with instructions that Commerce reconsider its decision consistent with the arguments made in this brief.

Respectfully submitted,
/s/ Robert L. LaFrankie

Robert L. LaFrankie

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500

58

Email: rlafrankie@crowell.com

*Counsel to Plaintiff Green Farms*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JUDGE BAKER**

GREEN FARMS SEAFOOD JOINT
STOCK COMPANY

                    Plaintiff,

          v.                                    **Court No. 19-00055**

UNITED STATES,

                    Defendant,

          and

CATFISH FARMERS OF AMERICA, *et al.*

                    Defendant-Intervenors.

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to U.S. Court of International Trade Rule 2(b)(2) of the Court's Standard Chambers Procedures, undersigned counsel for Plaintiff IDI, certifies this brief complies with the Court's type-volume limitation rules. This brief contains no more than 11,215 words and therefore does not exceed 14,000 words. This brief also complies with all typeface and margin requirements.

Respectfully submitted,

/s/ Robert L. LaFrankie
Robert L. LaFrankie

*Counsel to Plaintiff Green Farms*