NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| GREEN FARMS SEAFOOD JOINT STOCK COMPANY, )<br><br>                PLAINTIFF, )<br><br>      V. )<br><br>UNITED STATES, )<br><br>                DEFENDANT, )<br><br>      AND )<br><br>CATFISH FARMERS OF AMERICA, ET AL., )<br><br>                DEFENDANT INTERVENORS. ) | Court No. 22-00092<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information Removed from Pages 31 and 32** |

## RESPONSE TO MOTION FOR JUDGEMENT ON THE AGENCY RECORD

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: February 10, 2023

Ct. No. 22-00092                                      NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ................................................................................ 1

II.   BACKGROUND ................................................................................. 1

III.  ARGUMENT ...................................................................................... 9

      A.    Commerce's Decision to Grant ESS a Separate
           Rate Should Be Affirmed ...................................................... 10

      B.    Commerce's Reliance on ESS's Margin in
           Determining the Rate Applied to Green Farms
           Should Be Affirmed .............................................................. 26

IV.  CONCLUSION ................................................................................. 36

i

## TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Albemarle Corp. v. United States*,
821 F.3d 1345 (Fed. Cir. 2016) ............................................... 23, 30, 33

*AMS Associates, Inc. v. United States*,
719 F.3d 1376 (Fed. Cir. 2013) ..................................................... 19, 20

*Bosun Tools Co. v. United States*,
493 F. Supp. 3d 1351 (Ct. Int'l Trade 2021),
*aff'd*, No. 2021-1929, 2022 WL 94172 (Fed. Cir. Jan. 10,
2022) ................................................................................................ 33

*Catfish Farmers of America v. United States*,
No. 20-00105, slip op. 22-38 (Ct. Int'l Trade Apr. 25, 2022) ............. 32

*Ellwood City Forge Co. v. United States*,
582 F. Supp. 3d 1259 (Ct. Int'l Trade 2022) ...................................... 17

*Fresh Garlic Producers Ass'n v. United States*,
121 F. Supp. 3d 1313 (Ct. Int'l Trade 2015) ...................................... 16

*GODACO Seafood Joint Stock Co. v. United States*,
539 F. Supp. 3d 1286 (Ct. Int'l Trade 2021) ...................................... 34

*Nat'l Nail Corp. v. United States*,
279 F. Supp. 3d 1372 (Ct. Int'l Trade 2018) ...................................... 15

*Navneet Publications (India) Ltd. v. United States*,
999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) .......................... 28, 33, 34

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ......................................................... 22

*SeAH Steel Vina Corp. v. United States*,
950 F.3d 833 (Fed. Cir. 2020) ........................................................... 17

*Shenzhen Xinboda Indus. Co. v. United States*,
    180 F. Supp. 3d 1305 (Ct. Int'l Trade 2016) ...................................... 15

*Sigma Corp. v. United States*,
    117 F.3d 1401 (Fed. Cir. 1997) ............................................................ 3

*Solianus, Inc. v. United States*,
    391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019) ...................................... 23

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) .......................................................... 23

*Zhejiang Dunan Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) .......................................................... 22

*Zhejiang Zhaofeng Mech. & Elec. Co. v. United States*,
    355 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ...................................... 15

**Statutes**

19 U.S.C. § 1673d(c)(5)(A) ............................................................... 25, 27

19 U.S.C. § 1673d(c)(5)(A)-(B) ................................................. 2, 5, 23, 24

19 U.S.C. § 1673d(c)(5)(B) ................................................................. 8, 27

19 U.S.C. § 1675(a) .................................................................................. 1

19 U.S.C. § 1677e(b) .......................................................................... 5, 10

Tariff Act of 1930 ......................................................................... *passim*

**Administrative Materials**

*Antidumping or Countervailing Duty Order, Finding, or
    Suspended Investigation*, 85 Fed. Reg. 47,167 (Dep't
    Commerce Aug. 4, 2020) ...................................................................... 2

*Certain Frozen Fish Fillets from the Socialist Republic
    of Vietnam*, 86 Fed. Reg. 50,698 (Dep't Commerce
    Sept. 10, 2021) ..................................................................................... 2

Ct. No. 22-00092                                NON-CONFIDENTIAL VERSION

*Certain Frozen Fish Fillets from the Socialist Republic
   of Vietnam*, 87 Fed. Reg. 15,912 (Dep't Commerce
   Mar. 21, 2022) ........................................................................ 7

*Certain Frozen Fish Fillets from the Socialist Republic
   of Vietnam*, 85 Fed. Reg. 84,300 (Dep't Commerce
   Dec. 28, 2020) ..................................................................... 18

*Certain Frozen Fish Fillets from the Socialist Republic of
   Vietnam*, 87 Fed. Reg. 15,912 (Dep't Commerce Mar. 21,
   2022) ...................................................................................... 25

*Certain Steel Nails from the People's Republic of China*,
   84 Fed. Reg. 55,906 (Dep't Commerce Oct. 18, 2019) ........................ 14

*Certain Steel Nails from the People's Republic of China*,
   83 Fed. Reg. 45,883 (Dep't Commerce Sept. 11, 2018) ..................... 15

*Certain Tool Chests and Cabinets from the People's Republic
   of China*, 83 Fed. Reg. 15,365 (Dep't Commerce Apr. 10,
   2018) .......................................................................... 20, 21, 22

*Initiation of Antidumping and Countervailing Duty
   Administrative Reviews*, 85 Fed. Reg. 63,081 (Dep't
   Commerce Oct 6, 2020) ...................................................... 14

*Initiation of Antidumping and Countervailing Duty
   Administrative Reviews*, 83 Fed. Reg. 26,258 (Dep't
   Commerce June 6, 2018) ...................................................... 15

*Multilayered Wood Flooring from the People's Republic
   of China*, 86 Fed. Reg. 59,987 (Dep't Commerce
   Oct. 29, 2021) ................................................................... 24

*Sodium Gluconate, Gluconic Acid, and Derivative Products
   from the People's Republic of China*, 83 Fed. Reg. 47,876
   (Dep't Commerce Sept. 21, 2018) .................................... 20, 21

## Other Authorities

Separate Rate Application ...................................................................... 3, 18

Separate Rate Certification for Firms Previously Awarded
    Separate Rate Status ............................................................................ 3

Uruguay Round Agreements Act, Statement of
    Administrative Action, H.R. Doc. No. 103-316, vol. 1
    (1994) *reprinted in* 1994 U.S.C.C.A.N. 4040 .............................. 8, 9, 27

Ct. No. 22-00092                                      NON-CONFIDENTIAL VERSION

<u>**GLOSSARY**</u>

**AFA**
 Adverse Facts Available

**CAFC**
 U.S. Court of Appeals for the Federal Circuit

**CFA**
 Catfish Farmers of America

**Commerce**
 U.S. Department of Commerce

**ESS**
 East Sea Seafoods LLC

**Green Farms**
 Green Farms Seafood Joint Stock Company

**NMEs**
 Non-Market Economies

**NTSF**
 NTSF Seafoods Joint Stock Company

**Vietnam**
 Socialist Republic of Vietnam

NON-CONFIDENTIAL VERSION

## I.   INTRODUCTION

Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA") respectfully submit this response to the motion for judgment on the agency record filed by Plaintiff Green Farms Seafood Joint Stock Company ("Green Farms") regarding the final results issued by the U.S. Department of Commerce ("Commerce") in the 2019-2020 administrative review of the antidumping duty order on frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam"). *See* Mem. in Supp. of Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Oct. 20, 2022), ECF No. 29 ("Green Farms' Br.").

## II.   BACKGROUND

Pursuant to 19 U.S.C. § 1675(a), after the imposition of an antidumping duty order, Commerce annually notifies interested parties of the opportunity to request a review of the order. *See, e.g.,*

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*, 85 Fed. Reg. 47,167, 47,168 (Dep't Commerce Aug. 4, 2020) (opportunity to req. admin. rev.). Where review is requested for more companies than Commerce can practicably review individually, the agency selects a subset of respondent companies for individual examination. *See, e.g.*, Memorandum from Kelsie Hohenberger, Int'l Trade Compliance Analyst, Off. V, AD/CVD Operations, through Robert Galantucci, Program Manager, Off. V, AD/CVD Operations, to Shawn Thompson, Director, Off. V, AD/CVD Operations, re: *Administrative Review of Antidumping Duty Order on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Respondent Selection* (Jan. 8, 2021), C.R. 83, P.R. 112 at 2-3, Appx____-____. Commerce then bases the final margin for the non-individually examined companies on the margins determined for individually examined respondents. *See* 19 U.S.C. § 1673d(c)(5)(A)-(B); *see also* Preliminary Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 86 Fed. Reg. 50,698 (Dep't Commerce Sept. 10, 2021) (prelim. results of antidumping duty admin. rev., prelim. deter. of no shipments,

NON-CONFIDENTIAL VERSION

and partial rescission of antidumping duty admin. rev.), P.R. 385 at 12,

Appx____ ("Preliminary IDM").

In proceedings involving non-market economies ("NMEs") such as

Vietnam, Commerce applies a rebuttable presumption that all

companies within the subject country are government-controlled, and

thus part of a "country-wide" entity. *See, e.g.*, *Sigma Corp. v. United

States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997). To overcome this

presumption, companies—including those not selected for individual

examination—must provide certain data regarding their operations.

This information typically takes the form of a voluntary "separate rate

application" or "separate rate certification"; Commerce's Section A

questionnaire also actively requests this information from companies

selected for individual examination. *See, e.g.*, Separate Rate

Application, https://enforcement.trade.gov/nme/sep-rate-files/app-

20190221/srv-sr-app-022119.pdf; Separate Rate Certification for Firms

Previously Awarded Separate Rate Status,

https://enforcement.trade.gov/nme/sep-rate-files/cert-20150323/srv-sr-

cert-20150416.pdf; Letter from East Sea Seafoods LLC to Sec'y

Commerce, re: *Section A Questionnaire for East Sea Seafoods LLC* (Feb.

5, 2021), C.R. 84, P.R. 128 at PDF pages 5-11, Appx____-____ ("ESS

Section A QR").

East Sea Seafoods LLC ("ESS"), a Vietnamese exporter, filed a

separate rate certification in the 2019-2020 review. Letter from East

Sea Seafoods LLC to Sec'y Commerce, re: *Separate Rate Certification for*

*East Sea Seafoods LLC* (Nov. 5, 2020), C.R. 9, P.R. 50, Appx____-____

("ESS SRC"). After being selected as a mandatory respondent, ESS also

filed a Section A response. *See* ESS Section A QR at 1, Appx____. ESS

then filed responses to the other sections of the agency's initial

questionnaire. *See, e.g.*, Preliminary IDM at 3, Appx____.

Because ESS reported that it did not produce any subject goods

itself, Commerce sought information on production inputs from the

companies that ESS identified as its suppliers. *Id.*; *see also* ESS

Section A QR at PDF page 11, Appx____. After one of these companies

denied supplying ESS, Commerce issued ESS a supplemental

questionnaire requesting documentation of ESS's purchases from the

company. Preliminary IDM at 3, Appx____; *see also* Letter from Robert

Galantucci, Program Manager, AD/CVD Operations, Off. V, to East Sea

Seafoods LLC, re: *Administrative Review of the Antidumping Duty*

NON-CONFIDENTIAL VERSION

*Order on Certain Frozen Fish Fillets from the Socialist Republic of*

*Vietnam: Supplier Clarification* (Apr. 19, 2021), C.R. 148, P.R. 187,

Appx____-____. ESS did not respond. Preliminary IDM at 3-4,

Appx____-____.

    Commerce preliminarily found that ESS had demonstrated its

eligibility for a separate rate but, because it failed to respond to the

supplemental questionnaire requesting documentation of its purchases

from an identified supplier, had ceased participating in the proceeding.

Preliminary IDM at 1, 3-4, 12, Appx____, Appx____-____, Appx____.

Commerce accordingly assigned it an "adverse facts available" (or

"AFA") margin. *Id.* at 12, Appx____; *see also* 19 U.S.C. § 1677e(b).

Commerce also calculated a preliminary margin of zero for the other

mandatory respondent in the review, NTSF Seafoods Joint Stock

Company ("NTSF"). Preliminary IDM at 1, Appx____.

    In addition to determining margins for ESS and NTSF, Commerce

also determined a preliminary margin for Green Farms, a Vietnamese

exporter that was not selected for individual investigation. *Id.* at 2, 12,

Appx____, Appx____. Commerce preliminarily found that Green Farms

was eligible for a separate rate. Relying on 19 U.S.C. § 1673d(c)(5)(A)-

(B), Commerce assigned Green Farms the average of the zero and AFA margins determined for ESS and NTSF. *Id.* at 12, Appx____.

In its case brief, Green Farms challenged both Commerce's decision to find ESS eligible for a separate rate and the use of ESS's preliminary margin in determining Green Farms' margin. Letter from Crowell & Moring to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: AR17 Case Brief on behalf of Green Farms Seafood Joint Stock Company* (Nov. 16, 2021), P.R. 420 at 1-2, Appx____-____. Green Farms argued that ESS should be found ineligible for a separate rate, because (1) it had not fully responded to the initial questionnaires or to the agency's supplemental questionnaire requesting clarification of supplier identity, (2) Commerce's policy and precedent indicated that this was reason to deny a separate rate, and (3) ESS had otherwise provided deficient information regarding its freedom from government control. *Id.* at 4-11, Appx____-____. Green Farms also argued that ESS's AFA margin should not be taken into account in determining Green Farms' margin, because the resulting margin would not reasonably reflect Green Farms' potential dumping liability. *Id.* at 11-14, Appx____-____. Rather, Green Farms argued that

Commerce should rely either solely on the zero margin calculated for NTSF, or the zero – 0.15 percent rates calculated for mandatory respondents in two prior reviews of the order. *Id.* at 14-20, Appx____-____.

Commerce continued to find ESS eligible for a separate rate in the final results. Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 87 Fed. Reg. 15,912 (Dep't Commerce Mar. 21, 2022) (final results of antidumping duty admin. review and final deter. of no shipments; 2019-2020), P.R. 444 at 24-30, Appx____-____ ("IDM"). Commerce noted that the courts have repeatedly ruled that the agency's analysis of government control is separate from the analysis of sales/cost data, such that it is unreasonable to conclude that a company has failed to rebut the presumption of government control on the grounds that it has not provided complete or reliable sales/cost data. *Id.* at 27, Appx____. Here, ESS filed requested data to show its independence from the Vietnamese government. *Id.* at 28, Appx____.

Moreover, Commerce noted, the Vietnam-wide entity rate was lower than the AFA rate. *Id.* at 28-29, Appx____-____. As such, adopting

the view that a separate rate must be denied if any portion of a

questionnaire – whether initial or supplemental – went unanswered

would not only be inconsistent with judicial precedent, it would

hamstring the agency's ability to utilize the deterrent effect of AFA. *Id.*

at 29, Appx____. Commerce then distinguished certain precedents cited

by Green Farms on the basis that respondents there failed to respond to

any part of the agency's initial questionnaire, provided false

information regarding their relationship with an NME government, or

interfered with the agency's planned verification of their separate rate

data. *Id.* at 29-30, Appx____-____.

Commerce continued to take ESS's AFA margin into account in

determining Green Farms' margin. *Id.* at 32-36, Appx____-____.

Commerce noted that not only does 19 U.S.C. § 1673d(c)(5)(B) expressly

contemplate averaging zero and AFA margins to determine the rate for

non-individually examined companies, Congress described this as the

"expected" method where all mandatory respondents' margins are zero

or based on the facts available. *Id.* at 35, Appx____; *see also* Statement

of Administrative Action accompanying the Uruguay Round

Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), *reprinted*

*in* 1994 U.S.C.C.A.N. 4040, 4201 ("SAA"). Commerce also noted that (1) the mandatory respondents in a review are presumed to be representative of the non-selected companies, (2) the Court of Appeals for the Federal Circuit ("CAFC") has upheld the averaging of *de minimis* and AFA rates to determine non-examined companies' margins, and (3) that margins overall have moved both up and down over the course of the proceeding involving Vietnamese frozen fish fillets. IDM at 36, Appx____. Finally, Commerce noted that the $1.94/kg rate preliminarily determined for Green Farms was more similar to Green Farms' $1.37/kg cash deposit rate during the review period than the $0-0.15$ percent margins it proposed in its case brief. *Id.*

This appeal followed.

## III.  ARGUMENT

Commerce's determination to grant ESS a separate rate, and to include ESS's margin in determining the rate applied to Green Farms, should be affirmed. As explained below, Commerce's decision to grant ESS a separate rate was both lawful and supported by substantial record evidence. Likewise, the agency's reliance on ESS's margin in

determining Green Farms' rate was also lawful and supported by the record.

### A.    Commerce's Decision to Grant ESS a Separate Rate Should Be Affirmed

In NME proceedings, Commerce presumes that all respondent companies are government-controlled, and thus part of a single country-wide entity, unless they provide data to demonstrate their independence from government control. Preliminary IDM at 9-10, Appx____-____. The Tariff Act of 1930 ("the Act") also provides that Commerce may determine the margin for uncooperative respondents by making inferences unfavorable to those respondents from the facts otherwise available. 19 U.S.C. § 1677e(b). Commerce's practice is to assign non-cooperative companies AFA margin equal to the highest rate from the history of the proceeding. *See, e.g.*, Preliminary IDM at 8-9, Appx____-____.

Here, Commerce found that ESS submitted information for the record that demonstrated its freedom from government control. *Id.* at 11-12, Appx____-____. At the same time, ESS failed to respond to a supplemental questionnaire regarding the company's suppliers and

production inputs – issues unrelated to the company's independence from government control. *Id.* at 12, Appx____. Commerce accordingly determined ESS's margin based on AFA, while treating it as independent from the Vietnam-wide entity. *Id.*

Green Farms argued below that Commerce should instead have treated ESS as part of the Vietnam-wide entity. *See, e.g.*, IDM at 23-24, Appx____-____. Green Farms argued that Commerce had established a policy of denying a separate rate to mandatory respondents that failed to respond to any portion of the agency's questionnaires. *See id.* at 23, Appx____. Green Farms averred that ESS failed to respond to all questions posed to it, requiring denial of a separate rate. *Id.* Green Farms further alleged that Commerce might have chosen to ask additional questions relevant to ESS's separate rate status had the company not failed to respond to the supplemental questionnaire. *Id.* at 23-24, Appx____-____. Finally, Green Farms alleged that ESS submitted insufficient evidence to demonstrate its independence from the Vietnamese government. *Id.* at 24, Appx____.

Commerce disagreed with these arguments and continued to treat ESS as independent from the Vietnamese government for the final

results. *Id.* at 26-30, Appx____-____. Commerce found that ESS timely submitted information, which Commerce deemed reliable, that was sufficient to demonstrate the company's independence from government control. *Id.* at 26-27, Appx____-____. While ESS failed to respond to a supplemental questionnaire, the questions therein were unrelated to government control. *Id.* at 26, Appx____. And to the extent that Commerce had previously articulated a generalized policy of denying mandatory respondents a separate rate absent full questionnaire responses, case law indicated that this policy was unlawful where a mandatory respondent nonetheless provided evidence sufficient to demonstrate its independence from government control. *Id.* at 27 n.172, Appx____. Commerce explained that Green Farms' speculations as to whether the agency might have chosen to issue additional questionnaires to ESS were just that – speculative. *Id.* at 27-28, Appx____-____. The agency then explained why denying ESS a separate rate here would be inconsistent not just with the record evidence, but also with the statutory purpose of AFA. *Id.* at 28-29, Appx____-____. Finally, Commerce explained why certain prior cases cited by Green Farms were inapposite. *Id.* at 29, Appx____.

In its appeal, Green Farms nonetheless challenges Commerce's determination to treat ESS as independent from the Vietnam-wide entity. Green Farms' Br. at 15-32.  The company argues that such treatment violated established policy, given that ESS did not respond to every question posed to it as a mandatory respondent. *Id.* at 16, 19-24. Green Farms argues that Commerce's treatment of ESS was also inconsistent with precedent, *id.* at 24-32, and unsupported by substantial record evidence. *Id.* at 33-39.

In its response brief, the Government asserts that Commerce committed no legal error. Def.'s Resp. in Opp'n to Pls.' Mots. For J. on the Agency R. (Jan. 27, 2023), ECF No. 32 at 49-58 ("Government's Br."). CFA agrees with and adopts the Government's arguments in this regard, with one exception, and below provides additional argument for the court's consideration.

With respect to the exception, Green Farms characterizes Commerce has having articulated a policy of denying a separate rate where a mandatory respondent fails to respond to any questionnaire, whether initial or supplemental. Green Farms' Br. at 16, 20-21. While the Government appears to accept this characterization, it is not at all

clear to CFA that Commerce has the policy or practice that Green

Farms describes. Government's Br. at 49-51. The agency's initiation

notice in this review contained the following language:

> For exporters and producers who submit a Separate Rate
> Application or Certification and subsequently are selected as
> mandatory respondents, these exporters and producers will
> no longer be eligible for separate rate status unless they
> respond to all parts of the questionnaire as mandatory
> respondents.

*Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews*, 85 Fed. Reg. 63,081, 63,083 (Dep't Commerce Oct 6, 2020).

Green Farms reads the reference to "the questionnaire" as including not

just the initial questionnaire (which is traditionally divided into three

parts in NME cases – A, C, and D) but all supplemental questionnaires

in their entirety. Green Farms' Br. at 16, 20-21. But that is not a

necessary construction; indeed, the agency has granted separate rates

even to mandatory respondents that fail to answer the initial

questionnaires, notwithstanding the appearance of this language in

relevant initiation notices. Preliminary Decision Memorandum

accompanying *Certain Steel Nails from the People's Republic of China*,

84 Fed. Reg. 55,906 (Dep't Commerce Oct. 18, 2019) (prelim. results of

the antidumping duty admin. rev. and prelim. deter. of no shipments;

2017-2018) at 3-4, 9-12; *compare Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 26,258,

26,260 (Dep't Commerce June 6, 2018) (containing same language),

*with* Preliminary Decision Memorandum accompanying *Certain Steel*

*Nails from the People's Republic of China,* 83 Fed. Reg. 45,883 (Dep't

Commerce Sept. 11, 2018) (prelim. results of the antidumping duty

admin. rev. and prelim. deter. of no shipments; 2016-2017) at 4, n.19, 17

(unchanged in final).

    But even if the agency had the policy that Green Farms describes,

that does not mean that it could be lawfully applied in this case. Rather,

as the Government observes, Government's Br. at 52, the courts have

repeatedly held that the analysis of whether a respondent company has

rebutted the presumption of government control is separate from any

analysis of whether it has provided complete and reliable information

relevant to other topics. *See, e.g.*, *Zhejiang Zhaofeng Mech. & Elec. Co.*

*v. United States*, 355 F. Supp. 3d 1329, 1334-35 (Ct. Int'l Trade 2018);

*Nat'l Nail Corp. v. United States*, 279 F. Supp. 3d 1372, 1379 (Ct. Int'l

Trade 2018); *Shenzhen Xinboda Indus. Co. v. United States*, 180 F.

Supp. 3d 1305, 1315 (Ct. Int'l Trade 2016); *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1327-28 (Ct. Int'l Trade 2015); *see also* IDM at 27 & n.172, Appx____ (collecting cases; admitting inappropriateness of a uniform policy of denying a separate rate based on the failure to provide data not relevant to government control). As such, where a respondent company comes forward with affirmative evidence to rebut that presumption, that evidence must be considered in its own right, regardless of what other types of information the respondent places, or fails to place, on the record.

Here, ESS submitted affirmative evidence to rebut the presumption of government control. It first provided a separate rate certification, and then filed a response to the agency's multi-part questionnaire. *See, e.g.*, Preliminary IDM at 2-3, Appx____-____. This included a response to Section A, which explicitly solicited data relevant to the company's eligibility for a separate rate. ESS Section A QR at PDF pages 5-11, Appx____-____ Commerce reviewed and analyzed that information and found it sufficient. IDM at 26-30, Appx____-____; Preliminary IDM at 9-12, Appx____-____. In arguing that Commerce should have found otherwise, Green Farms is asking this court to

reweigh the evidence. That the court cannot do. *See, e.g.*, *SeAH Steel Vina Corp. v. United States*, 950 F.3d 833, 841 n.5 (Fed. Cir. 2020); *Ellwood City Forge Co. v. United States*, 582 F. Supp. 3d 1259, 1272 (Ct. Int'l Trade 2022).

Further, Green Farms' assertions that ESS failed to provide certain information relevant to its separate rate status rings hollow. Green Farms argues, for example, that ESS did not respond to an appendix to Section A of the questionnaire. Green Farms' Br. at 19-20, 34-35. That appendix, however, consists of questions that are irrelevant to separate rate status and, moreover, were inapplicable given the company's lack of affiliates. Letter from Robert Galantucci to East Sea Seafoods LLC, re: *Administrative Review of the Antidumping Duty Order on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Initial Questionnaire* (Jan. 8, 2021), P.R. 115-116 at XI-2, Appx____; ESS Section A QR at PDF pages 11-13, Appx____-____. Green Farms' argument that the company did not fully respond to Section D of the questionnaire or to the supplemental questionnaire regarding supplier identity is likewise unavailing, Green Farms' Br. at 22, as neither questionnaire implicated government control. IDM

at 26, Appx\_\_\_\_; Preliminary IDM at 12, Appx\_\_\_\_. Too, while ESS

initially filed a separate rate certification instead of a separate rate

application, Green Farms' Br. at 33-34, the company then filed a

response to Section A, which solicited the same substantive data that a

separate rate application would have entailed. *Compare* ESS Section A

QR at PDF pages 5-11, Appx\_\_\_\_-\_\_\_\_, *with* Separate Rate Application,

https://enforcement.trade.gov/nme/sep-rate-files/app-20190221/srv-sr-

app-022119.pdf; *see also* ESS SRC, Appx\_\_\_\_-\_\_\_\_.

    Green Farms cites certain precedents in a bid to convince the

court that Commerce here acted arbitrarily, and inconsistently with

past practice. Green Farms' Br. at 24-32. But as Commerce explained,

and the Government cogently argues, these precedents are inapposite.

IDM at 29-30, Appx\_\_\_\_-\_\_\_\_; Government's Br. at 56. In the 2018-2019

administrative review of the order, for example, while the agency

denied a separate rate to a mandatory respondent, that respondent

failed to respond to supplemental questions that Commerce deemed

relevant to the company's separate rate status. Preliminary Decision

Memorandum accompanying *Certain Frozen Fish Fillets from the*

*Socialist Republic of Vietnam*, 85 Fed. Reg. 84,300 (Dep't Commerce

Dec. 28, 2020) (prelim. results of the antidumping duty admin. rev.,

prelim. deter. of no shipments, and partial rescission of the

antidumping duty admin. rev.; 2018-2019) at 9.[1] Here, by contrast,

Commerce reasonably held that ESS had responded to all questions

implicating its separate rate status, and otherwise found ESS's data

sufficient establish its independence. ESS Section A QR at PDF pages

5-11, Appx____-____; IDM at 26-30, Appx____-____; Preliminary IDM at

11-12, Appx____-____.

  *AMS Associates, Inc. v. United States*, 719 F.3d 1376 (Fed. Cir.

2013), is likewise inapposite. *AMS* involved a respondent company that

not only stopped participating in an administrative review, but formally

withdrew all of its prior-submitted proprietary data from the record.

*AMS*, 719 F.3d at 1378-80. In the absence of this information,

---

[1]     For that matter, CFA has challenged the denial of a separate rate
to the mandatory respondent in the 2018-2019 review as inconsistent
with Commerce's duty to reasonably assess the affirmative evidence
regarding a company's freedom from government control. Thus, even
putting any factual distinctions between that review and the one at bar
aside, the 2018-2019 administrative review does not support Green
Farms' arguments here. Ct. No. 21-00380 (appeal of the 2018-2019
review).

Commerce reasonably treated the remaining, public record data as inadequate to rebut the presumption of control. Here, while ESS failed to respond to a supplemental questionnaire, all of its prior-submitted data remained on the record. That data, as Commerce reasonably found, supported the conclusion that ESS was independent of government control.

As for Commerce's decision in *Tool Chests*, the agency there reviewed the China-wide entity, and applied AFA to that entity, including non-cooperative companies that failed to rebut the presumption of government control. *Certain Tool Chests and Cabinets from the People's Republic of China*, 83 Fed. Reg. 15,365, 15,366 (Dep't Commerce Apr. 10, 2018) (final affirm. deter. of sales at less than fair value) and accompanying Issues and Decision Memorandum at 6-7. The same is true of *Sodium Gluconate*; further, the only company that applied for and was denied a separate rate there withdrew from scheduled verifications of its separate rate data, leaving the agency unable to confirm that data's veracity as planned. *Sodium Gluconate, Gluconic Acid, and Derivative Products from the People's Republic of China*, 83 Fed. Reg. 47,876, 47,877 (Dep't Commerce Sept. 21, 2018)

(final affirm. deter. of sales at less than fair value) and accompanying

Issues and Decision Memorandum. Here, the Vietnam-wide entity was

not under review; nor did Commerce announce plans to verify any of the

responses filed by any respondent.

Moreover, both *Tool Chests* and *Sodium Gluconate* arose in the

context of original investigations in which there was no difference

between the AFA margin and the margin applied to companies that did

not demonstrate independence from government control. *Sodium*

*Gluconate, Gluconic Acid, and Derivative Products from the People's*

*Republic of China*, 83 Fed. Reg. 47,876, 47,877 (Dep't Commerce Sept.

21, 2018) (final affirm. deter. of sales at less than fair value); *Certain*

*Tool Chests and Cabinets from the People's Republic of China*, 83 Fed.

Reg. 15,365, 15,366 (Dep't Commerce Apr. 10, 2018) (final affirm. deter.

of sales at less than fair value). Accordingly, regardless of whether

Commerce denied a separate rate or applied AFA, there was no risk

that a non-cooperative party's failure to cooperate would be rewarded.

That is not the case here, where the Vietnam-wide entity rate is lower

than the AFA rate. IDM at 28-29, Appx___-___. Thus, had Commerce

denied a separate rate to ESS, ESS's noncooperation with respect to the

supplemental questionnaire would have gone not just unaddressed, but would have been rewarded. *Id.*

Green Farms' arguments that Commerce lacked substantial record evidence to support the conclusion that ESS was independent of the Vietnamese government are unpersuasive. Green Farms' Br. at 33-39. As noted above, Green Farms inappropriately invites this court to reweigh the evidence, and to second-guess the agency's own judgment about the reliability of ESS's data. Moreover, in challenging Commerce's determination on substantial evidence grounds, Green Farms must surpass a high bar. It is insufficient for Green Farms to speculate, or even to show, that Commerce could have reasonably interpreted the record differently. Rather, Green Farms must show that no reasonable mind could have concluded from the record as a whole that ESS was independent of government control. *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006); *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011). That it cannot do.

Finally, Green Farms' arguments are all rooted in the assumption that, had ESS been denied a separate rate, its margin would not have

NON-CONFIDENTIAL VERSION

been available for use in determining Green Farms' rate. But this is not the case.

As further described in Section B below, the Act directs Commerce to determine the margins for non-mandatory respondents by averaging the margins determined for the "individually investigated" companies. 19 U.S.C. § 1673d(c)(5)(A)-(B).[2] A company selected as a mandatory respondent is "individually investigated" regardless of whether it demonstrates freedom from government control or even responds to any questionnaires. *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1377-80 (Fed. Cir. 2013) (treating a company that Commerce found ineligible for a separate rate as individually investigated); *see also Solianus, Inc. v. United States*, 391 F. Supp. 3d 1331, 1388-89 (Ct. Int'l Trade 2019) (relying on *Yangzhou Bestpak* to find that mandatory respondents remain "individually investigated" regardless of their level of cooperation). Accordingly, regardless of its level of cooperation or independence from government control, ESS was

---

[2]    While the statute applies by its terms to investigations, Commerce applies it in administrative reviews as well. *Albemarle*, 821 F.3d at 1352-53.

"individually investigated" within the meaning of 19 U.S.C. §
1673d(c)(5)(A)-(B) because it was selected as a mandatory respondent.

Had Commerce denied ESS a separate rate as a mandatory
respondent in the review, the agency would not also have applied AFA
in relation to ESS's failure to respond to the supplemental
questionnaire concerning supplier identity. *See* Issues and Decision
Memorandum accompanying *Multilayered Wood Flooring from the
People's Republic of China*, 86 Fed. Reg. 59,987 (Dep't Commerce Oct.
29, 2021) (final results of antidumping duty admin. rev., final successor-
in-interest deter., and final deter. of no shipments; 2018-2019) (denying
separate rate, without application of AFA, to mandatory respondent
that failed to respond to the agency's initial Section A questionnaire);
*see also* Preliminary IDM at 11, Appx___ (denying separate rate to
companies that were subject to the review but that did not rebut the
presumption of government control, with no indication that AFA was
being applied). Rather, Commerce would have simply found that,
having failed to rebut the presumption of government control, ESS was
subject to the $2.39/kg rate applicable to the Vietnam-wide entity. *See,
e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,

87 Fed. Reg. 15,912, 15,913-14 (Dep't Commerce Mar. 21, 2022) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2019-2020), P.R. 447, Appx___-____ (applying that rate to companies that failed to rebut the presumption of government control in the review at bar).

Given NTSF's zero margin, ESS would then be the only individually investigated company with a rate not equal to zero/*de minimis* or based in AFA, and the statute would call for ESS's $2.39/kg margin to be applied to Green Farms. *See* 19 U.S.C. § 1673d(c)(5)(A). In other words, Green Farms would be worse off had Commerce denied ESS a separate rate. To the extent that Green Farms actively benefited from Commerce's treatment of ESS, Green Farms has suffered no legal harm, and there is nothing for the court to remedy.

In sum, Commerce's determination that ESS had rebutted the presumption of government control, and subsequent assignment of an AFA rate in relation to ESS's failure to respond to a supplemental questionnaire, should be affirmed. Commerce's treatment of ESS appropriately recognized the agency's lawful duty to evaluate record evidence regarding a company's freedom from government control

independently of record information regarding other issues. Commerce's actions here were not contrary to apposite precedent; indeed, Commerce has previously treated respondents similarly situated to ESS in the same manner. Commerce's treatment of ESS made particular sense in the context of the order on Vietnamese fish fillets, because the Vietnam-wide entity rate is lower than the AFA rate. Commerce's treatment of ESS was also supported by substantial record evidence. Finally, Green Farms' arguments are rooted in a misguided assumption that, once corrected, calls into question whether the company has suffered harm cognizable at law.

B.   Commerce's Reliance on ESS's Margin in Determining the Rate Applied to Green Farms Should Be Affirmed

The Act states that, in determining the antidumping duty margin for non-individually examined respondents in antidumping duty investigations, Commerce will average the margins determined for "individually examined" companies, excluding rates that are zero, *de minimis*, or determined entirely using the facts available. 19 U.S.C.

§ 1673d(c)(5)(A).[3] Where the individually examined respondents'
margins are all zero, *de minimis*, or determined using the facts
available, Commerce may use "any reasonable method" to determine
the margin for non-individually examined respondents. *Id.*
§ 1673d(c)(5)(B).  The SAA confirms that, in this latter case, the
"expected method" is for Commerce to average the margins determined
for the individually examined respondents, notwithstanding the fact
that they are all zero, *de minimis*, or determined using the facts
available. SAA at 873, 1994 U.S.C.C.A.N. at 4201. The SAA further
states that Commerce should depart from the "expected method" only if
it is not feasible or would not produce a margin "reasonably reflective"
of non-individually examined companies' dumping margins.

Green Farms was not individually examined in the 2019-2020
review; Commerce determined the company's rate by averaging NTSF's
zero and ESS's AFA margins. Green Farms argued that the resulting
$1.94/kg rate was not "reasonably reflective" of Green Farms' potential
dumping, but Commerce found otherwise. IDM at 35-36, Appx___-___.

---

[3]     *See* note 2, *supra*.

The agency found that Green Farms had pointed to no record evidence indicating that the mandatory respondents were not appropriately representative, and had not established that bringing forward a rate from a prior review would result in a margin more "reasonably reflective" of Green Farms potential dumping liability than the $1.94/kg rate.

Green Farms nonetheless argues on appeal that the $1.94/kg rate resulting from the "expected method" is unreasonable because it was derived from two "extremes." Green Farms' Br. at 41-43. Green Farms further argues that the rate's unreasonableness is demonstrated by low margins calculated for cooperative mandatory respondents in recent reviews, and that bringing those low margins forward would be consistent with *Navneet Publications (India) Ltd. v. United States*, 999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) and Commerce's actions under protest in Ct No. 18-00063. *Id.* at 43-56. Finally, Green Farms argues that while it was subject to a $1.37/kg cash deposit rate during the review period, the rate is outdated and thus does not indicate that the $1.94/kg rate is reasonable. *Id.* at 57.

In its response brief, the Government asserts that Commerce committed no legal error. Government's Br. at 58-65. CFA agrees with and adopts the Government's arguments in this regard, and below provides additional argument for the court's consideration.

First, as Commerce and the Government have noted, the $1.94/kg rate applied to Green Farms was derived using a method that Congress has deemed facially reasonable. Nor is there any merit to Green Farms' arguments that, as applied, the method produced unreasonable results here. For example, while Green Farms argues that the $1.94/kg rate resulted from the averaging of "extreme opposites," it nonetheless advocates for one of the two margins it deems "extreme" – NTSF's zero margin – to be assigned to it outright. Green Farms' Br. at 43. This exposes the hollowness of Green Farms' challenge to the $1.94/kg rate.

Nor can the $1.94/kg rate reasonably be deemed extreme in comparison with other rates applied over the course of the proceeding. It is lower than the Vietnam-wide entity rate of $2.39/kg; Green Farms itself was subject to a $1.37/kg cash deposit rate during the review period. Preliminary IDM at 13, Appx____; IDM at 36, Appx____. Sitting

comfortably between these two non-extreme margins, the $1.94/kg rate is not unreasonable within the context of the proceeding.

Green Farms argues that the unreasonable nature of the $1.94/kg rate is demonstrated by the zero margin calculated for NTSF in this review. Green Farms' Br. at 47-48. But there were two mandatory respondents here – NTSF and ESS. It is the mandatory respondents as a whole that are considered "representative" of the experience of all exporters. *See Albemarle Corp. v. United States*, 821 F.3d 1345, 1353, 1356 (Fed. Cir. 2016). Nor is there any record evidence indicating NTSF's dumping liability is more representative of Green Farms' own than ESS's.

If anything, the record shows suggests that NTSF's margin alone would not be appropriately representative of Green Farms' potential dumping liability. For example, unlike NTSF – but like ESS – Green Farms did not have an active Food Safety Inspection Service registration during the review period. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: CFA Comments and Factual Information Regarding Respondent's Separate Rate and No Shipment Certifications*

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

*and Request that Commerce Collect Additional Information* (Nov. 19,

2020), C.R. 11-24, P.R. 54-59 at Appendix 2 (List of Plants Eligible to

Export Meat to the United States), Appx____-____. As such, unlike

NTSF – but like ESS – Green Farms could only export fish fillets

manufactured by other companies that did have active registrations.

*See id.* at 4-5 n.10, Appx____-____.

Beyond this, Green Farms' per-unit export prices were only

[          ] during the review period, approximately [

                    ]. Letter from Crowell & Moring to Sec'y Commerce, re:

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:*

*Separate Rate Certification for Green Farms Seafood Joint Stock*

*Company* (July 30, 2021), C.R. 197-201, P.R. 353 at Exhibit SRA-2,

Appx-007,[4] Appx____; Letter from Trade Pacific PLLC to Sec'y

Commerce, re: *Frozen Fish Fillets from Vietnam – Section C and D, and*

*Appendix XI Questionnaire Response* (Feb. 23, 2021), C.R. 99-107, P.R.

141 at Exhibit C-7 ([

---

[4]      Green Farms used the designation "Appx-007" to refer to one of
the pages in its separate rate certification; this is not a reference to the
joint appendix developed for this litigation.

]) and Appendix

C-1 (containing copies of NTSF's U.S. sales invoices), Appx____,

Appx____-____. This additionally suggests disparate potential dumping

liability between Green Farms and NTSF.

In arguing that the $1.94/kg rate is unreasonably applied to it,

Green Farms points not just to NTSF's zero margin in the review at

bar, but to the margins calculated for mandatory respondents in the

immediately two preceding reviews. Green Farms' Br. at 47-48.

Tellingly, it cannot point to its own past experience as a mandatory

respondent, as it has never been individually investigated or reviewed.

Further, the margins calculated for the mandatory respondents in the

two immediately preceding reviews are on appeal; indeed, this Court

has remanded the final result of the 2017-2018 review. *See Catfish*

*Farmers of America v. United States*, No. 20-00105, slip op. 22-38 (Ct.

Int'l Trade Apr. 25, 2022) (remanding the final results of the 2017-2018

review); Ct No. 21-00380 (appeal of the 2018-2019 review).

Nonetheless, Green Farms argues that judicial precedent obliged

Commerce to bring forward the margins calculated in the 2017-2018

and 2018-2019 reviews, given the unreasonable rate that the "expected

method" produced in the review at bar. Of course, as detailed above,

Green Farms has not shown that the expected method produced an

unreasonable rate here. Thus, Commerce was not required to bring

forward prior rates, notwithstanding the precedents on which Green

Farms relies. Indeed, judicial precedent from the CAFC supports the

agency's use of the "expected method" here.

Green Farms relies principally on *Navneet*. Green Farms' Br. at

41, 43-47. But *Navneet* predates the CAFC's decision in *Albemarle*. *See*

*Albemarle*, 821 F.3d at 1345; *see also Bosun Tools Co. v. United States*,

493 F. Supp. 3d 1351 (Ct. Int'l Trade 2021), *aff'd*, No. 2021-1929, 2022

WL 94172 (Fed. Cir. Jan. 10, 2022); *Navneet*, 999 F. Supp. 2d at 1354.

The *Albemarle* Court rejected reliance on rates from prior reviews

absent specific evidence showing the rate produced by the expected

method to be unreasonable; it also noted that the mandatory

respondents are presumed under the Act to be representative of all

exporters. *Albemarle*, 821 F.3d at 1353, 1356.

*Navneet* also involved highly distinguishable facts. In particular,

both of the mandatory respondents in *Navneet* received zero margins.

*Navneet*, 999 F. Supp. 2d at 1356-58. But rather than employ the

"expected method," Commerce averaged the zero margin with a new adverse rate that it had applied to a subset of non-individually examined companies that failed to respond to a request for shipment quantity/value information. *See id.* This methodological choice was not only inconsistent with the "expected method," it injected into the calculation a margin applied to companies that, unlike mandatory respondents, could not be presumed representative of non-individually examined exporters' dumping behavior as a whole.

Green Farms also points to Commerce's determination on remand in litigation arising from the 2015-2016 administrative review of the order on Vietnamese fish fillets. Green Farms' Br. at 50-51. In those results, Commerce calculated a rate for non-individually examined companies of $0.89/kg, based on an average of the rates applied to such companies in the four immediately preceding administrative reviews. *See GODACO Seafood Joint Stock Co. v. United States*, 539 F. Supp. 3d 1286, 1288 (Ct. Int'l Trade 2021). But those results arose in the context of the court's rejection of Commerce's original determination to apply a $3.87/kg margin to non-individually examined companies. The $1.94/kg rate applied here is, of course, much lower. And as explained above,

NON-CONFIDENTIAL VERSION

Green Farms has adduced no compelling argument that it is inappropriate.

In sum, the Court should affirm Commerce's reliance on ESS's AFA margin in determining the rate applied to Green Farms. Reliance on that rate was consistent with the Act, Congress's expectations, and CAFC precedent. Green Farms' arguments that the rate applied to it was unreasonable ring hollow – it points to no compelling evidence of this assertion and indeed, its claims run contrary to the record. They also rely on outdated and inapposite precedents. Accordingly, the Court should affirm Commerce's determination of Green Farms' rate.

Ct. No. 22-00092                                          NON-CONFIDENTIAL VERSION

## IV.   CONCLUSION

For the foregoing reasons, CFA respectfully submits that the

Court should affirm Commerce's determination to grant ESS a separate

rate, and to include ESS's margin in determining the rate applied to

Green Farms.

                                        Respectfully submitted,

                                        */s/ Nazak Nikakhtar*
                                        Nazak Nikakhtar, Esq.
                                        Maureen E. Thorson, Esq.
                                        Stephanie M. Bell, Esq.

                                        WILEY REIN LLP
                                        2050 M Street, NW
                                        Washington, DC 20036
                                        (202) 719-7000

                                        *Counsel to Catfish Farmers of
                                        America, et. al*

Dated: February 10, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that

this brief complies with the word limitation requirement.  The word

count for Memorandum in Support of Plaintiff's Rule 56.2 Motion for

Judgment on the Agency Record, as computed by Wiley Rein LLP's

word processing system (Microsoft Word 2019), is 6,383 words.


<u>/s/ Nazak Nikakhtar</u>
(Signature of Attorney)

<u>Nazak Nikakhtar</u>
(Name of Attorney)

<u>Catfish Farmers of America, et al.</u>
(Representative Of)

<u>February 10, 2023</u>
(Date)