# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

GREEN FARMS SEAFOOD JOINT
STOCK COMPANY

Plaintiff,

v.

UNITED STATES,

Defendant,

and

CATFISH FARMERS OF AMERICA, *et al.*

Defendant-Intervenors.

**Court No. 22-00092**

## <u>PLAINTIFF'S</u><br><u>RULE 56.2 REPLY BRIEF</u>

Robert L. LaFrankie

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Email:  rlafrankie@crowell.com

*Counsel to Green Farms Seafood
Joint Stock Company*

Dated:  March 10, 2023

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................ 1

I.   COMMERCE'S DECISION GRANTING EAST SEA A
     SEPARATE RATE WAS NOT IN ACCORDANCE WITH
     LAW ................................................................................................ 1

     A.   Commerce Violated its Written Policy Requiring
          Separate Rate Applicants to Respond to All
          Questionnaires ...................................................................... 2

     B.   Commerce's Decision Granting East Sea a Separate
          Rate Contradicts its Prior Decisions ................................. 12

II.  COMMERCE'S DECISION GRANTING EAST SEA A
     SEPARATE RATE IS UNSUPPORTED BY SUBSTANTIAL
     EVIDENCE .................................................................................... 17

     A.   Commerce Failed to Consider all the Evidence,
          Including Evidence which Detracts from its Decision ........ 18

     B.   Commerce Failed to Explain its Decision or How the
          Evidence Supports its Decision ........................................... 19

III. COMMERCE ERRED IN CALCULATING GREEN FARMS'
     SEPARATE RATE ......................................................................... 21

     A.   Commerce Unreasonably Relied on East Sea's AFA
          Rate to Calculate Green Farms' Separate Rate ................. 22

     B.   Defendants Evidentiary Arguments are Flawed ................. 27

     C.   Green Farms Provided Substantial Evidence
          Demonstrating Commerce's use of East Sea's Total
          AFA Rate was Unreasonable ............................................... 34

IV.  CONCLUSION .............................................................................. 36

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AMS Assocs. Inc. v. United States,*
   719 F. 3d 1376 (Fed. Cir. 2013) ...................................................................10,16

*Bosun Tools Co. v. United States,*
   2022 WL 94172 (Fed. Cir. Jan. 10. 2022)...........................................................24

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States,*
   216 F.3d 1027 (Fed. Cir. 2000) ....................................................................12,26

*Fresh Garlic Producers Ass'n v. United States,*
   121 F. Supp. 3d 1313 (Ct. Int'l Trade 2015) .................................................8,9,20

*Fuyao Glass Indus. Group Co. v. United States,*
   30 CIT 165 (2006) ...........................................................................................20

*Goldlink Indus. Co. v. United States,*
   30 CIT 616 (2006) ...........................................................................................21

*Nat'l Nail Corp. v. United States,*
   279 F. Supp. 3d 1372 (Court Int'l Trade 2018)......................................................7

*Navneet Publications (India) Ltd. v. United States,*
   999 F. Supp. 2d 1354 ...............................................................................27,28,33

*Qingdao Taifa Group Co. V. United States,*
   637 F. Supp. 2d 1231 ..........................................................................................7

*Shandong Huarong General Group Corp. v. United States,*
   27 C.I.T 1568 (Ct. Int'l Trade 2003) .....................................................................7

*Shenzhen Xinboda Indus. Co. v. United States,*
   180 F. Supp. 3d 1305 (Ct. Int'l Trade 20-16).........................................................8

*Suramerica de Aleanciones Laminadas C.A. v. United States,*
   44 F.3d 978 (Fed. Cir. 1994) ..............................................................................19

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
   716 F. 3d 1370 (Fed. Cir. 2013) ...................................................................*passim*

DCACTIVE-60279337.1

*Yantai Xinke Steel Structure Co. v. United States*,
    36 C.I.T. 1035 (Oct. 2, 2012) ........................................................... 7

*Zhejiang Zhaofeng Mech. & Elec.* Co. *u. United States,* 355 F. Supp.
    3d 1329, 1334-35 (Ct. Int'l Trade 2018) ......................................... 8

**Statutes**

19 U.S.C. § 1673d(c)(5) ...................................................................22,23

**Other Authorities**

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:*
    *Final Results of the Antidumping Duty Administrative Review and*
    *Final Determination of no Shipments, 2018-2019*, 86 Fed. Reg.
    36,102-03 (Dep't of Commerce July 8, 2021) .................................. 16

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:*
    *Issues and Decision Memorandum for the Final Results of*
    *Sixteenth Antidumping Administrative Review; 2018-2019,* (June
    25, 2021) *("AR16 Final Decision Memo")* at 39-40 ......................... 12

*Certain Surface Products from India: Issues and Decision*
    *Memorandum for the Final Results of Antidumping Duty Review*;
    2019-2021 (Dec. 30, 2022) ............................................................. 29

*Decision Memorandum for Final Affirmative Determination of*
    *Dumping in Certain Tool Chests and Cabinets from China* (A-570-
    056) (April 3, 2018) *("Tool Chests")* ............................................... 15

*Decision Memorandum for the Preliminary Results of Sixteenth*
    *Antidumping Duty Administrative Review: Certain Frozen Fish*
    *Fillets from the Socialist Republic of Vietnam; 2018-2019, (Dec.*
    *15, 2020) ("AR16 Preliminary Decision Memo")* ........................... 13

*Final Issues and Decision Memorandum for Final Affirmative*
    *Determination of Dumping in Sodium Gluconate, Gluconic Acid,*
    *and Derivative Products from China* (A-570-071) (Sept. 17, 2018)
    *("Sodium Gluconate")* ..................................................................... 15

Statement of Administrative Action, H.R. Doc. No. 103-316 (1994),
    reprinted in 1994 ............................................................................ 24

DCACTIVE-60279337.1

## __GLOSSARY__

| __Abbreviations__ | __Term__ |
| --- | --- |
| AFA | Adverse Facts Available |
| *AR14* | Fourteenth Administrative Review |
| *AR15* | Fifteenth Administrative Review |
| *AR16* | Sixteenth Administrative Review |
| *AR17* | Seventeenth Administrative Review |
| *CFA* | Catfish Farmers of America |
| *Commerce* | U.S. Department of Commerce |
| DOTA | DOTASEAFOODS |
| NME | Non-market economy |
| SAA | Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) at 873, reprinted in 1994 U.S.C.C.A.N. 4040. |
| SRA | Separate Rate Application |
| SRC | Separate Rate Certification |

DCACTIVE-60279337.1

## **INTRODUCTION**

Plaintiff Green Farms Seafood Joint Stock Company ("Plaintiff" or "Green Farms") submitted its rule 56.2 Motion for Judgment on the Agency Record (Oct. 20, 2023) ("*Pl. Br.*"), ECF No. 29, challenging the actions of the U.S. Department of Commerce ("Commerce") in this case. Defendant United States Government ("Defendant USG") and Defendant Intervenor Catfish Farmers of America ("Defendant CFA") (collectively "Defendants") each submitted response briefs. Defendant USG submitted its response brief ("*Def. Br.*"), ECF No. 32, on January 27, 2023. CFA submitted its response brief ("*CFA Br.*"), ECF No. 34, on February 10, 2023.

Plaintiff submits this reply to Defendants' response briefs. Defendants fail to convincingly rebut Plaintiff's legal and evidentiary arguments. The Court should therefore grant Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record. We discuss this below.

## **ARGUMENT**

## I.   **COMMERCE'S DECISION GRANTING EAST SEA A SEPARATE RATE WAS NOT IN ACCORDANCE WITH LAW**

Green Farms demonstrated in its opening brief that Commerce unlawfully granted a separate rate to East Sea Seafoods ("East Sea"),

one of the mandatory respondents in this case. *See Pl. Br.* at 15-32.

Green Farms explained that Commerce committed two separate legal

errors. First, Commerce violated the plain language of its written policy

requiring a separate rate applicant to respond fully to all

questionnaires issued to it as a mandatory respondent. Second,

Commerce's decision granting East Sea a separate was directly contrary

to its prior decisions denying a separate rate to applicants who fail to

answer all questionnaires or participate fully. *See id. at 16.* Defendants

fail to meaningfully rebut these arguments. We discuss this below.

### A.   Commerce Violated its Written Policy Requiring Separate Rate Applicants to Respond to All Questionnaires

Commerce granted East Sea a separate rate even though East Sea

failed to complete all questionnaires issued by Commerce. East Sea

answered some of the questionnaires and then quit the case. *See Pl. Br.*

at 19-20. Commerce's actions contradict its written policies requiring

that separate rate applicants respond to *all* questionnaires to remain

eligible for a separate rate. *See id*. at 20-22. This is a "threshold"

requirement to remain eligible for separate rate status. *See id*.

Defendants fail to rebut this argument head-on. Defendant USG acknowledges this written policy was in effect but argues it was nevertheless "appropriate in this instance" for Commerce to ignore its written policy and focus on "whether the company provided adequate information as it relates to its separate rate status." *USG Br.* at 50-51. Defendant USG explains that Commerce's separate rate analysis (which relates to independence from the government) is "separate from its analysis regarding sales and cost data." *Id.* at 52.

Therefore, according to Defendant USG, Commerce reasonably determined that East Sea "provided an adequate response to Commerce's questionnaire as it relates to the company's independence from the Vietnamese Government and separate rate eligibility." *Id.* at 51. In sum, Defendant USG argues that East Sea's non-cooperation and questionnaire deficiencies relate only to East Sea's "suppliers" and "factors of production data" and it therefore "did not call into question the company's separate rate reporting." *See id.*

**1.     Commerce's Written Policy Establishes Threshold Legal Requirements that Must be Satisfied to Remain Eligible for a Separate Rate**

As an initial matter, Defendants are wrong in asserting that East Sea's deficiencies did not relate to its separate rate reporting issues. As discussed later in this brief, East Sea's responses were not merely deficient on sales and cost data, but they were also deficient regarding independence from the government, including "affiliation" and "business registration" deficiencies. *See Pl. Br.* at 34-35.  Moreover, East Sea completely quit the case, thus invalidating all responses.

Regardless, Defendant USG's arguments ignore that Commerce's written policy establishes *threshold* legal requirements that must be met for a separate rate applicant to remain eligible for separate rate status. *See Pl. Br.* at 22. Commerce's written policy states that separate rate respondents "will no longer be eligible for separate rate status unless they respond to all parts of the questionnaire as mandatory respondents." *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 Fed. Reg. 63,081, 63083 (Dep't Commerce Oct 6, 2020) ("*Initiation Notice*"). Failure to meet this requirement means the applicant is not eligible to maintain its separate rate status,

regardless of what information is contained in its partial questionnaire responses.

Indeed, Defendant USG acknowledged in related litigation currently before this court (involving an appeal of the sixteenth review ("*AR16*")) that Commerce's separate rate analysis imposes such a "threshold" requirement which separate rate applicants "must first pass" to remain eligible for a separate rate. *See Catfish Farmers of America v. United States*, Court No. 21-380, ECF No. 42 at 57 (Defendant USG response brief in CFA appeal of *AR16*).[1] Defendant USG argued to the Court in that appeal that Commerce may not "skip the step of determining whether a company is actually *eligible* for separate rate status" before applying adverse facts available "if the company chooses (or refuses) to cooperate." *Id.* at 57-58 (emphasis in original). Defendant USG argued that failing to enforce this threshold requirement "entirely ignores the presumption of government control in the nonmarket economy context." *See id.*

---

[1] As discussed later in this brief, this *AR16* litigation involves mandatory respondent DOTASEAFOODS ("DOTA") wherein Commerce denied DOTA's separate rate for its failure to complete all questionnaires. The Court has not yet issued a decision in that case.

This very same "threshold" principle applies in this case. East Sea must answer all questionnaires and fully cooperate *as a threshold matter*, otherwise it is not eligible for a separate rate.  Failure to do so disqualifies its application, regardless of what information may be contained in its partial responses.

Viewed in this context, Defendant USG's arguments in this proceeding involving a purported "separate" analysis for Green Farms questionnaires wholly miss the point. Indeed, Green Farms does not dispute that Commerce may reasonably "separate" the analysis of a separate rate applicant as between "independence from the government" on the one hand and "sales and cost data" on the other hand. *See USG. Br.* at 49. But a separate rate applicant must actually participate fully and submit *all* questionnaire responses, as Commerce's policy requires. This is the "threshold" and "first step" as Defendant USG acknowledges in its response brief to the Court in the *AR16* litigation (as noted above). Only after a separate rate applicant fulfills this threshold requirement, may Commerce proceed to determine whether such applicant has established independence from the government.

## 2. The Cases cited by Defendants are Inapposite

Defendant USG also argues that "numerous cases" justify Commerce's actions in granting East Sea a separate rate despite its refusal to answer all questionnaires in violation of Commerce's written policy. *See USG Br.* at 52. Defendant USG asserts that Commerce may not reject an applicant's separate rate status based on "unreliable or incomplete" information as long as "the respondent has established independence from government control." *See id.* at 52 *citing, Qingdao Taifa Group Co. v. United States, 637 F. Supp. 2d 1231, 1240-41 (Ct. Int'l Trade 2009); Yantai Xinke Steel Structure Co. v. United States*, 36 C.I.T. 1035, 1054 (Oct. 2, 2012); *Shandong Huarong General Group Corp. v. United States*, 27 C.I.T 1568, 1594 (Ct. Int'l Trade 2003); and *Nat'l Nail Corp. v. United States*, 279 F. Supp. 3d 1372, 1377 (Court Int'l Trade 2018). Defendant USG asserts that Commerce therefore "reasonably focused its analysis of {East Sea's} responses on the information necessary to rebut the presumption of government control" and determined East Sea was eligible for a separate rate. *Id.* at 52.

Defendant CFA makes a similar argument citing these same cases and additional cases for the broad proposition that Commerce may not

"adopt a uniform policy of denying a separate rate based on the failure to provide data not relevant to government control". *See CFA Br.* at 15-16 *citing, inter alia, Zhejiang Zhaofeng Mech.* & *Elec.* Co. v. *United States,* 355 F. Supp. 3d 1329, 1334-35 (Ct. Int'l Trade 2018); *Shenzhen Xinboda Indus. Co. v. United States,* 180 F. Supp. 3d 1305, 1315 (Ct. Int'l Trade 20-16); *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1327-28 (Ct. Int'l Trade 2015). Defendant CFA cites these cases for the proposition that a respondent's separate rate information "must be considered in its own right, regardless of what other types of information the respondent places, or fails to place on the record." *See CFA Br.*at 16.

Yet these cases are inapposite and fail to squarely address the issue presented in this case, which is whether it is appropriate for Commerce to analyze the separate rate evidence submitted when the separate rate applicant failed *as a threshold matter* to answer all questionnaires (as Commerce's written policy requires that it do).[2] This

---

[2] Nor do the above court decisions address the issue presented in this case, which is the effect of Commerce's written policy requiring that a separate rate applicant respond to all questionnaires to remain eligible to receive a separate rate. This issue was neither raised nor briefed by the parties in those cases, nor considered by the courts.

is particularly true where, as here, the separate rate applicant *has quit the case.*  The cases cited by Defendants involve the distinguishable situation where the separate rate applicant submitted all questionnaires and was fully cooperating but the information submitted was deficient with regard to sales and cost data.  *See e.g., Zhejiang,* 355 F. Supp. 3d at 1334-35 (respondent fully cooperated but had deficiencies in sales and factors of production); *Fresh Garlic*, 121 F. Supp. 3d at 1327-28 (respondent fully cooperated but had deficiencies in sales data).

Nor do these cases address the situation presented here where a respondent quit the case. Indeed, Commerce itself concedes that East Sea did not respond to all questionnaires and "suspended participation in the review." *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of the Seventeenth Antidumping Duty Administrative Review: 2019-2020,* (March 9, 2022) ("*Final Decision Memo*") at 26, Appx__ (PD 444). This is a wholly different scenario than the above-noted cases where the respondents fully cooperated but their information was

_____

deficient regarding information not relevant to government control (*e.g.,* information related to sales or cost data).

This distinction is particularly important given that the Federal Circuit has ruled that Commerce may reasonably reject a separate rate applicant's separate rate status where that company quit the case after submitting its separate rate information. *See AMS Assocs. Inc. v. United States*, 719 F. 3d 1376, 1378-80 (Fed. Cir. 2013). The Federal Court held in *AMS* that Commerce reasonably denied the applicant's separate rate status because Commerce was "unable to verify" its separate rate information after it withdrew from the case. *Id.* at 1379. This is analogous to East Sea's situation where it has completely quit the case, thus depriving Commerce of an opportunity to verify its information.[3]

---

[3] CFA's effort to distinguish *AMS* because the respondent formally "withdrew" its confidential separate rate information is unavailing. *See CFA Br*. at 19-20. The Federal Circuit in *AMS* focused on the inability of Commerce to verify any of the information submitted by respondent because it withdrew from the case, including that which was withdrawn and that which remained. *See AMS,* 719 F. 3d at 1379-80. This is the same situation presented in this case for East Sea.

### 3.   Commerce's Policy Justification has no merit

Defendants also seek to justify Commerce's actions by arguing there are "additional policy considerations unique to this proceeding." *USG Br*. at 54. Defendants argue that denial of East Sea's separate rate would allow East Sea to "benefit from its own lack of cooperation."  *See USG Br*. at 54; *see also CFA Br*. at 21-22 (denial of East Sea's separate rate would have "rewarded" its non-compliance).

 This argument has no merit. First, the notion that East Sea would "benefit' or be "rewarded" by Commerce denying its separate rate application is absurd in this case. East Sea sought its separate rate to avoid the harshly punitive country-wide rate of $2.39/kg applicable to the Vietnam-wide entity. *See Final Decision Memo* at 3, 28, Appx__ (PD 444). This rate, while lower than the AFA rate of $3.87/kg, is still prohibitively high. Regardless, this general policy concern is not enough to overcome Commerce's written policy establishing threshold reporting requirements, and Commerce has failed to articulate why this is so. Rather, it appears Commerce is applying the highest calculated rate simply to punish respondents. Commerce may not administer the

11

dumping law to be "punitive." *See F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1033 (Fed. Cir. 2000).

Nor is this situation "unique" as Defendant USG claims. *See USG Br*. at 54. This very same "policy" concern arose in the *AR16* review involving DOTASEAFOODS ("DOTA"), where Commerce denied DOTA's separate rate, despite the fact that DOTA faced a higher total AFA rate of $3.87/kg rather than the lower countrywide rate of $2.39/kg. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of Sixteenth Antidumping Administrative Review; 2018-2019,* (June 25, 2021) *("AR16 Final Decision Memo")* at 39-40. Commerce raised no such policy concerns in *AR16* for DOTA, and it stated that once a company fails to demonstrate it is entitled to a separate rate, it "must be treated as part of the country-wide entity and is assigned the country-wide rate." *Id*. at 40.

## B. Commerce's Decision Granting East Sea a Separate Rate Contradicts its Prior Decisions

In addition to violating its written policies, Commerce's decision granting East Sea a separate rate is directly contrary to Commerce's prior decisions on this same issue. This included Commerce's decision in

the immediately preceding *AR16* review in the fish fillet proceedings,
which as noted above involved mandatory respondent DOTA. *See Pl. Br.*
at 24-30. Commerce denied the separate rate application of DOTA
under very similar circumstances because DOTA failed to complete all
questionnaires as a mandatory respondent. *See id.*

### 1.   Defendants Fail to Distinguish the *AR16* Decision regarding DOTA

Defendants both argue that Commerce's *AR16* decision rejecting
DOTA's separate rate is distinguishable because DOTA failed to provide
the information necessary to determine independence from the
Government. *See USG Br. at 55-56; see also CFA Br.* at 18-19. Yet,
Defendants spend precious little time discussing the actual facts of that
case or Commerce's findings. Defendants each spend no more than one
page responding to this argument. *See id.*

Defendants' collective rebuttal is unconvincing. Defendants ignore
that portion of the *AR16* decision explaining that Commerce rejected
DOTA's separate rate because DOTA failed "to respond to all parts of
Commerce's questionnaire."  *See AR16 Final Decision Memo* at 40; s*ee
also Decision Memorandum for the Preliminary Results of Sixteenth*

13

*Antidumping Duty Administrative Review: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam; 2018-2019*, (Dec. 15, 2020) ("*AR16 Preliminary Decision Memo*") at 9. Indeed, Commerce quoted in its *AR16* decision for DOTA the exact same language Green Farms quoted in this case (from the *Initiation Notice*) regarding a mandatory respondent's obligation to respond to "all" parts of Commerce's questionnaire once selected as a mandatory respondent. *See id.* at n.56. Commerce stated specifically as follows:

> {M}andatory respondents must respond *to all parts of Commerce's questionnaire* to be eligible for separate rate status. DOTASEAFOOD failed to do so. As such, DOTASEAFOOD has not demonstrated the absence of *de jure* and *de facto* government control and is not eligible for separate rate status.

*See id.* at 9 (emphasis added). Commerce clearly applied its same written policy in *AR16* to reject DOTA's separate rate application, and it did so because DOTA failed to file all questionnaire responses. Defendants ignore this aspect of the *AR16* decision.

### 2. Defendants Fail to Distinguish Other Decisions where Commerce Rejected Separate Rates for a Failure to Cooperate

Defendants also fail to distinguish other Commerce cases cited by Plaintiff where Commerce similarly rejected separate rate applications. *See Pl. Br.* at 29-30 *citing Decision Memorandum for Final Affirmative Determination of Dumping in Certain Tool Chests and Cabinets from China* (A-570-056) (April 3, 2018) ("*Tool Chests*") at 6-7 *(*rejecting separate rate status where mandatory respondent withdrew from proceeding); *see also Final Issues and Decision Memorandum for Final Affirmative Determination of Dumping in Sodium Gluconate, Gluconic Acid, and Derivative Products from China* (A-570-071) (Sept. 17, 2018) ("*Sodium Gluconate*") at 4 (rejecting separate rate where mandatory respondent ceased participation in the case).

Defendant USG fails to mention these two cases, much less distinguish them. For its part, Defendant CFA mentions these two cases but claims they are inapposite because Commerce was unable to verify the companies. *See CFA Br.* at 21. But CFA's argument actually supports Green Farms reliance on these two cases. As noted earlier in this brief, East Sea quit this case, thus preventing Commerce from verifying its information. Thus, the factual scenarios of the *Tool Chests* and *Sodium Gluconate* decisions are similar to East Sea's situation as

15

all cases involve facts where the respondents prevented Commerce from verifying the separate rate information provided. And, as noted earlier, the Federal Circuit has specifically upheld Commerce's authority to deny a separate rate where a company has withdrawn from a case, thus preventing verification. *See AMS,* 719 F. 3d at 1378-80.

Defendant CFA's alternative argument based on Commerce's review of the China-wide entity in those two cases is similarly unavailing. *See CFA. Br* at 21.[4] CFA argues that because Commerce was reviewing the China-wide entity in each of those cases there would have been no difference in the ultimate rate applied to the mandatory respondents, regardless of whether Commerce accepted or rejected respondents' separate rate applications. *See id.* But this argument is unconvincing for several reasons. First, as noted above, the China-wide rate in the current *AR17* proceeding is already prohibitively high (*i.e.*

---

[4] CFA also argues at length that Commerce must apply the $2.39/kg China-wide rate to Green Farms even if Commerce denies East Sea's separate rate. *See CFA Br.* at 24-25. This argument is wholly without merit.  CFA's argument is directly contrary to what Commerce did in the *AR16* proceeding, wherein it applied the $0.0/kg rate of Vinh Hoan as the separate rate for separate rate applicants.  *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and Final Determination of no Shipments, 2018-2019,* 86 Fed. Reg. 36,102-03 (Dep't of Commerce July 8, 2021). Regardless, CFA never raised this issue before Commerce and it may not raise it here for the first time as it failed to exhaust administrative remedies.

$2.39/kg as already noted above). There is no practical difference for East Sea as between the total AFA rate of $3.87/kg and the China-wide rate of $2.39/kg. Both rates are prohibitive.

Second, Defendant CFA's argument is contrary to Commerce's actions in *AR16*, where it applied to DOTA the $2.39/kg China-wide rate and not the higher 3.87/kg AFA rate for its failure to qualify for a separate rate. *See AR16 Final Decision Memo)* at 39-40.

Finally, it is worth noting that Defendant CFA itself chose not to seek a review of the China-wide entity in this current proceeding. *See id.* at 14.  Defendant CFA may not now complain given that it failed to request review of the China wide entity and otherwise slept on its rights.

## II.    COMMERCE'S DECISION GRANTING EAST SEA A SEPARATE RATE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Green Farms also demonstrated that Commerce failed to support its decision with substantial evidence. *Pl. Br.* at 33-37. Green Farms noted that Commerce failed to discuss all of the evidence, including serious deficiencies in East Sea's separate rate response pointed out by CFA. *See id.* at 33-35. Commerce also failed to explain its findings or

17

how its decision granting East Sea a separate rate was supported by the evidence. *Id.* at 36-39. Defendants fail to meaningfully rebut Plaintiff's arguments about the evidence.

## A.   Commerce Failed to Consider all the Evidence, Including Evidence which Detracts from its decision

Green Farms argued that Commerce failed to discuss and consider all of the evidence presented, including "contradictory evidence" that might detract from its findings. *See Pl. Br.* at 37 *citing Suramerica de Aleanciones Laminadas C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994). In particular, Commerce failed to consider the serious deficiencies pointed out by CFA regarding East Sea's separate rate certification. *See id.* at 33-36. CFA alleged multiple deficiencies relevant to East Sea's separate rate status and government control, including deficiencies with its "business registration certificate" its "relationship with other Vietnamese processors", and unresolved issues about its "Board of Management" members. *See id.* at 34-35. These deficiencies relate specifically to independence from the government.

In response, both Defendants argue primarily that Commerce was under no obligation to investigate questions posed in deficiency comments. *See USG Br.* at 53-54; *CFA Br.* at 12. This argument misses

the point. Regardless of whether Commerce had an obligation to ask the questions posed by CFA, Commerce had an obligation to address these evidentiary deficiencies pointed out by CFA in its decision. Commerce did not even mention these deficiencies or CFA's letter. *See Pl. Br*. at 35-36. While Commerce may not have had an obligation to issue a supplemental questionnaire based on CFA's comments, Commerce certainly had an obligation to address the evidence supporting these deficiency comments. *See Suramerica*, 44 F.3d 978, 985 (Fed. Cir. 1994).

## B. Commerce Failed to Explain its Decision or How the Evidence Supports its Decision.

Commerce also failed to explain how all the evidence on the record supported its findings more generally. *See Pl. Br*. at 36-39.  Commerce issued a perfunctory "one sentence conclusion" for each of the complicated "*de jure*" and "*de facto*" prongs of its separate rates analysis, despite the fact that each such prong has multiple evidentiary factors. *See id*. at 37-38. Commerce's failure to evaluate all the evidence was particularly egregious given the questions raised about East Sea's submissions, and given that East Sea actually quit the case.

Defendants do not directly address these evidentiary shortcomings, other than to state generally that Commerce considered

the evidence. *USG B*r. at 54. Yet Defendant USG fails to articulate exactly where or how Commerce discussed the evidence, other than to quote Commerce's perfunctory references to reviewing East Sea's "attestation, its business registration certificate, and its tax forms" and the fact that East Sea "provided a full response" to Section A of Commerce's questionnaire. *See id.* at 52-53. These conclusory findings are meaningless and unsupported by the record, or Commerce's explanation. Nowhere does Commerce explain in detail how East Sea's submissions or the evidenced presented meets all of the "*de jure*" and "*de facto*" requirements listed in its *Preliminary Decision Memo. See Preliminary Decision Memo* at 11-12, Appx__ (PD 385). As noted above, Commerce devoted only a few sentences to analysis of this issue.

Commerce's explanation of the evidence on this point is not sufficient. The Court has held that a "two sentence explanation" is not sufficient for purposes of Commerce's separate rate analysis. *See e.g. Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1328 (Ct. Int'l Trade 2015). As noted in Plaintiff's opening brief, failure to discuss the evidentiary findings is error because Commerce must explain its findings. *See e.g., Fuyao Glass Indus. Group Co. v. United*

20

*States,* 30 CIT 165, 169 (2006). If Commerce fails to explain its decision "the court is unable to determine whether Commerce's decision is reasonable." *Goldlink Indus. Co. v. United States*, 30 CIT 616, 629 (2006). Nor has Commerce otherwise explained or addressed the obvious evidentiary shortcomings pointed out by CFA with these very responses.

For its part, Defendant CFA argues that Green Farms is simply asking this Court to impermissibly "reweigh the evidence." *CFA Br. at 16-17.* But this is incorrect. Green Farms is not asking this court to reweigh the evidence. Green Farms is asking this Court to hold that Commerce failed to consider all the evidence presented, including that which detracted from its findings.

## III. COMMERCE ERRED IN CALCULATING GREEN FARMS' SEPARATE RATE

Should the Court determine that Commerce lawfully granted East Sea a separate rate, Commerce still may not reasonably rely on East Sea's total AFA rate to calculate Green Farm's separate rate. East Sea's total AFA rate is not reasonably reflective of economic reality or of Green Farm's potential dumping margins. *Pl. Br.* at 39-43. Commerce must instead rely on the most contemporaneous calculated AD rates of

21

other respondents to calculate Green Farms' separate rate, including

that of the cooperating mandatory respondent (NTSF) in this current

*AR17* proceeding and the rates of the other cooperating mandatory

respondents in the most recent administrative reviews. *See id*. at 43-49.

Defendants again fail to meaningfully rebut Plaintiff's legal and

evidentiary arguments on this issue. We discuss this below.

### A. Commerce Unreasonably Relied on East Sea's AFA Rate to Calculate Green Farms' Separate Rate

Commerce calculated Green Farms' AD rate of $1.94/kg by

averaging East Sea's very high AFA rate of $3.87/kg with the $0.00/kg

rate of the other mandatory respondent (NTSF). *See id*. at 42-43.

Plaintiff explained that doing so in this case was unreasonable under

the applicable statute (19 U.S.C. § 1673d(c)(5)) and the relevant case

law because the resulting AD rate was "not reasonably reflective of

potential dumping margins" for Green Farms. *See id*. at 40, 42-43.

Commerce simply averaged these disparate rates (including one based

on total AFA) without considering all the evidence. *See id*. This was

unlawful.

### 1.   Defendants Misstate the Statutory Standard

Defendant USG argues in rebuttal that Green Farms' suggestion to use the calculated rates of the other mandatory respondents (from this *AR17* proceeding or other proceedings) to derive Green Farms' separate rate "would defy the statutory directive" which "explicitly contemplates use of AFA and zero or *de minimis* rates in calculating a separate rate." *USG Br*. at 62.

Defendant USG's statutory argument is flawed. Green Farms' proposal to use the AD rates of other respondents does not "defy the statutory directive" as Defendant asserts. The relevant statutory provision (19 U.S.C. § 1673d(c)(5)) broadly authorizes the use of "any" reasonable method to calculate the all others AD rate in this situation. *See Pl. Br*. at 54 *quoting* 19 U.S.C. § 1673d(c)(5)(B) (emphasis added). The word "any" means "any."  Green Farms' alternative qualifies as one of "any" such alternatives and is reasonable under the facts.

Defendants' additional argument that the statute "explicitly contemplates" the use of an AFA rate as part of the calculation is disingenuous and ignores the Statement of Administrative Action ("SAA"), which indicates such a methodology may not be reasonably

used if it "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers." *See* Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) at 873, reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA"). Commerce does not have unfettered discretion to average a *de minimis* rate with an AFA. Rather, doing so must also be reasonable.

### 2.   Federal Circuit Decisions Cited by Defendants Support Green Farms' Argument

Defendant USG similarly argues that the Federal Circuit has specifically authorized the use of a simple average of a *de minimis* rate and a total AFA rate for this purpose. *See USG Br.* at 58 – 61 *citing Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F. 3d 1370, 1378 (Fed. Cir. 2013); *see also Bosun Tools Co. v. United States*, 2022 WL 94172 (Fed. Cir. Jan. 10. 2022). Defendant CFA makes a similar argument. *See CFA Br.* at 23, 33.

Defendants' reliance on those cases is misplaced. Those cases stand for the general proposition that Commerce may use a total AFA rate as part of any such averaging, but only if it is reasonable to do so. *See Yangzhou Bestpak,* 716 F. 3d at 1378. Those cases make clear that

24

Commerce may not simply average an AFA rate and a *de minimis* rate without regard to the evidence, and without regard to whether doing so is unreasonable under the circumstances.

The Federal Circuit's holding in *Yangzhou Bestpak* is particularly instructive and fundamentally supports Plaintiff's arguments. The Court addressed a situation very similar to this case. Specifically, in *Yangzhou Bestpak* Commerce averaged a 0% *de minimis* rate of one cooperating respondent (Yama) with the total AFA China-wide rate of 247.65% of the other non-cooperating respondent (Jintian) and applied the resulting average rate of 123.83% to twelve other participating and cooperating "separate rate" respondents (including Plaintiff Bestpak). *See Yangzhou Bestpak,* 716 F. 3d at 1375.

The Court invalidated Commerce's actions, holding that Commerce's use of "a simple average of a *de minimis* and AFA China-wide rate unreasonable as applied" under the facts of that case. *Id.* at 1378. While the Court acknowledged that Commerce may use an average of two such rates under appropriate circumstances, Commerce may not do so where the record "reveals a lack of substantial evidence showing that such a determination reflects economic reality." *Id.* The

25

Court further noted that "Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin." *Id.* at 1380.

Indeed, the Court noted several problems with Commerce's methodology of applying a 123.83% AD margin based on AFA to the twelve cooperating respondents in that case. The Court stated:

> The 123.83% rate assigned to Bestpak is far in excess of the *de minimis* rate assigned to the only cooperating, non-government controlled, and mandatory respondent: Yama. It is worth noting that similar to Yama, Bestpak successfully proved that it was independent of government control. However, Commerce ultimately assigned Bestpak a margin that was exactly half of the China-wide rate—a rate for those presumed to be under foreign government control. *Assigning a non-mandatory, separate rate respondent a margin equal to over 120% of the only fully investigated respondent with no other information is unjustifiably high and may amount to being punitive, which is not permitted by the statute.*

*Id.* at 1379 (emphasis added), *citing F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1032 (Fed.Cir.2000).

Commerce took the same unreasonable and punitive actions in this current case for Green Farms as it did in the *Yangzhao Bestpak* decision. Commerce unreasonably applied a very high punitive AD rate of $1.94/kg to Green Farms based on the very high AFA rate of

26

$3.87/kg assigned to the non-cooperating respondent East Sea. And Commerce did so without regard to the evidence presented by Green Farms that such a rate was not reasonably reflective of economic reality or of Green Farms' potential dumping. *See Pl. Br.* at 47-50. Green Farms cogently demonstrated that the most recent calculated rates of other cooperating mandatory respondents ranged from only from $0.0/kg to $0.15/kg. *See id.* Such lower rates from prior proceedings are evidence demonstrating that the $1.94/kg separate rate applied to Green Farms is "aberrational" and thus unreasonable. *See Navneet Publications (India) Ltd. v. United States*, 999 F. Supp. 2d 1354, 1364-65.

There is thus no support in the record for Commerce's actions in applying such a harsh punitive AFA rate of $1.94/kg to Green Farms, and *particularly given that Green Farms fully cooperated in this case.* The Court in *Yangzhou Bestpak* held that doing so under these circumstances is "punitive."

**B.    Defendants Evidentiary Arguments are Flawed**

**1.    Defendants Mischaracterize the AD Rates in Prior Fish Fillet Cases and Green Farms Arguments about those Rates**

Nor do Defendants convincingly rebut Green Farms' arguments about the relevance of AD rates calculated for other cooperating respondents in this current review and in prior segments of these proceedings. Defendant USG argues that "there is no pattern of low or high margins in this proceeding." *USG Br*. at 62.   But this is not true. As Green Farms laid out in its opening brief, and as noted again above, there is a very clear pattern to the recent AD rates calculated for cooperating respondents. The most recent AD rates calculated for cooperating mandatory respondents are very low, ranging from $0.0/kg to $0.15/kg. *See Pl. Br*. at 47-49. Tellingly, Defendant USG cites no evidence in support of its statement that there is no such pattern to the rates other than Commerce's own unsubstantiated statement from the *Final Decision Memo.  See USG Br.* at 62. Nor does Defendant USG address that these low rates are the most recent or contemporaneous, and therefore the most relevant. *See e.g*., *Navneet*, 999 F. Supp. 2d at 1364 (noting comparison of separate rate to most recent rates calculated for cooperating respondents).

Defendant USG also argues that Commerce cannot rely only on the lower $0.0/kg rate calculated for the sole participating respondent

NTSF in *AR17* claiming there is "no basis to depart from the statutory directive" allowing Commerce to use AFA rates. *See USG Br.* at 64. Yet this argument conflicts with the Court's holding in *Yangzhou Bestpak*, which makes clear that Commerce may depart from the statutory averaging methodology, and particularly where use of an AFA rate yields an "unjustifiably high" and otherwise "punitive" AD rate for a cooperating respondent. *See Yangzhou Bestpak,*716 F. 3d at 1379.

Also, Green Farms did not argue that Commerce must use only the NTSF Rate alone. Green Farms argued that Commerce could use either the NTSF rate of $0.0/kg alone (similar to what Commerce had in the recent *AR16* proceeding for DOTA Seafoods), or it could use that rate in conjunction with other recently calculated rates to derive an average AD rate more reflective of economic reality. *See Pl. Br.* at 51-52 (noting Commerce could take an average of all such rates). Indeed, Commerce similarly decided to "pull forward" recently calculated rates for cooperating respondents in a very recent case involving *Quartz Surface Products* from India. *See Certain Surface Products from India: Issues and Decision Memorandum for the Final Results of*

*Antidumping Duty Review*; 2019-2021 (Dec. 30, 2022) at 54-55
(Commerce reviewed "history of rates" and "pull{ed} forward" recently
calculated rates rather than rely on total AFA rate).

For its part, Defendant CFA largely echoes Defendant USG's
arguments, and further argues that Commerce may not rely solely on
NTSF's $0.0/kg rate due to a lack of "any record evidence"
demonstrating NTSF's AD rate "is more representative of Green
Farms' own {rate} than {East Sea's rate}." *CFA Br*. at 30. But this
argument ignores that East Sea's AD rate is based on total AFA, and
involves "adverse" assumptions intended to increase the rate. East
Sea's total AFA rate is not representative of Green Farms potential
dumping margins because Green Farms is a fully cooperating
respondent and Commerce would be required to use Green Farms'
actual pricing data, and not AFA.

CFA's argument also ignores that all AD rates Commerce
calculated in the most recent segments of these proceedings for
cooperating respondents have hovered around the same $0.0/kg AD
rate calculated for NTSF. *See Pl. Br*. at 47-49. Should Commerce need
additional validation that NTSF's rate of $0.00/kg (or any of the other

recent AD rates noted in Green Farms opening brief) is representative of Green Farms' likely AD rate, then Commerce may seek such information from the parties upon remand.

Defendant CFA also argues that a comparison of Green Farms' and NTSF's "per-unit export prices" shows "disparate potential dumping liability between Green Farms and NTSF." *CFA Br*. at 31-32. CFA supports this analysis with information purportedly gleaned from Green Farms' separate rate certification and "copies of NTSF's U.S. sales invoices." *See* i*d*.

Yet this analysis is contrived and highly speculative. It is based upon isolated unit prices derived from a separate rate certification and sample invoices.  *See id*. As such, it is akin to the "AUV estimates" analysis that the Court firmly rejected in *Yangzhou Bestpak*. The Court stated that "{i}t does not find Commerce's late attempt to backfill with these AUV estimates, untethered to the three respondents' actual dumping margins, as amounting to substantial evidence." *Yangzhou Bestpak*, 716 F. 3d at 1379.

Thus, Defendants' evidentiary arguments lack merit and should be rejected.[5]

## 2. Defendants' Reliance on Green Farms' old Cash Deposit Rate is Misplaced

Defendants also seek to bolster Commerce's weak evidentiary support by emphasizing that the $1.94/kg average rate calculated for Green Farms is more similar to Green Farms "cash deposit rate" of $1.37 per/kg that was in effect during the POR than to the alternatives proposed by Green Farms. *See USG Br*. at 63; *see also CFA Br*. at 28-29. Defendant CFA points out that Commerce's overall average rate of $1.94/kg is "comfortably between" the Vietnam-wide entity rate of $2.39/kg on the one hand and Green Farm's cash deposit rate of $1.37/kg on the other hand. *See CFA Br*. at 29-30.

These arguments lack merit. Commerce's reliance on Green Farms' pre-existing "cash deposit" rate is misplaced for a variety of

---

[5] Defendant CFA also argues that NTSF's AD rate is not representative of Green Farms' AD rate because Green Farms did not have an active "Food Safety Inspection Service" (FSIS) registration during the POR. *CFA Br*. at 30. This argument is frivolous and should be dismissed as such. There is no record evidence whatsoever supporting this argument.

reasons. First, Green Farm's cash deposit rate does not represent Green Farm's current or past dumping margins or pricing behavior. *See Pl. Br*. at 56-57. Commerce derived this cash deposit rate of $1.37/kg for Green Farms during the fourteenth review ("*AR14*") for a time period covering shipments more than five years ago. *See id.* Second, this rate was not based on Green Farms' own data, but was itself derived as the "separate rate" for Green Farms based on the rate calculated for NTSF during the fourteenth review ("*AR14*"), and it was based in part on AFA. *See id.*

Thus, Commerce may not rely on this old cash deposit rate to justify its unreasonable use of an AFA rate. This cash deposit rate does not reflect the actual "pricing behavior" of Green Farms (as it was not based on Green Farms data). *See Navneet*, 999 F. Supp. 2d at 1363; *see also Yangzhou Bestpak*, 716 F.3d at 1381 (noting that separate rate determinations for cooperating separate respondents must bear some relationship to their actual dumping margins). Nor is the cash deposit rate contemporaneous.  Rather, it is outdated.

Moreover, the fact that this cash deposit rate was in effect during the POR is irrelevant.   It is a *cash deposit rate*. The very

33

point of the AD review process (and separate rate application) is to afford Green Farms the opportunity to update this cash deposit rate with newer and updated data. *See Pl. Br.* at 57. This is the very reason companies such as Green Farms request a review. Otherwise there would be no point in participating in this review. The fact that Commerce seeks to use Green Farms old cash deposit rate derived from old data to justify its new calculation is wholly circular and arbitrary.

### C. Green Farms Provided Substantial Evidence Demonstrating Commerce's use of East Sea's Total AFA Rate was Unreasonable

Green Farms has already provided substantial evidentiary support demonstrating Commerce's use of East Sea's total AFA rate of $3.87/kg resulted in an unjustifiably high separate rate of $1.95/kg, which is much higher than any of the rates calculated in recent AD reviews for cooperating respondents using their own data. This included the following rates:

|  | Review[6] | Period | Rates ($/kg) | Company |
|---|---|---|---|---|
| 1. | AR17 | 2019 -2020 | 0.0 | NTSF |
| 2. | AR16 | 2018-2019 | 0.0 | Vinh Hoan |
| 3. | AR15 | 2017-2018 | 0.15 | NTSF |

Indeed, the only rates higher than these from this time period (including through *AR14*) is the rate of $1.37/kg calculated for NTSF in *AR14*[7], which as noted above was based in part on AFA. *See Pl. Br.* at 57. Commerce has never calculated and AD rate higher than $0.15/kg in more than five years that was not infected with AFA.

Thus, Commerce's derivation of this rate of $1.94/kg for Green Farms is unreasonable and otherwise not reflective of economic reality or Green Farms likely dumping margins. The record contains sufficient evidence to demonstrate that the above-noted AD rates should be used to derive Green Farms' rate, and that doing so reflects economic reality and Green Farms' likely dumping rate. Should the Court or Commerce need additional evidence, then the

---

[6] *See Pl. Br.* at 48.

[7] This is the same "cash deposit" rate Commerce relies upon to justify its derivation Green Farm's separate rate of $1.94/kg.

Court should order a remand and order Commerce to re-open the record to gather additional evidence.

## IV.   <u>CONCLUSION</u>

The Court should determine that Commerce's decision is unsupported by substantial evidence and otherwise contrary to law. The Court should remand this matter to Commerce in accordance with the Court's holding in this case.

Respectfully submitted,

<u>/s/ Robert L. LaFrankie   </u>

Robert L. LaFrankie
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500
Email: <u>rlafrankie@crowell.com</u>

*Counsel to Plaintiff Green Farms.*

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE JUDGE BAKER

| | |
|---|---|
| GREEN FARMS SEAFOOD JOINT STOCK COMPANY.<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>  and<br><br>CATFISH FARMERS OF AMERICA, *et al.*<br><br>      Defendant-Intervenors. | **Court No. 22-0092** |

## CERTIFICATE OF COMPLIANCE

Pursuant to U.S. Court of International Trade Rule 2(b)(2) of the Court's Standard Chambers Procedures, undersigned counsel for Plaintiff Green Farms certifies this brief complies with the Court's type-volume limitation rules and this Court's order in this case. This brief contains no more than 6,390 words and therefore does not exceed 7,000 words. This brief also complies with all typeface and margin requirements set by the Court.

        Respectfully submitted,

DCACTIVE-60279337.1

/s/ Robert L. LaFrankie

Robert L. LaFrankie

*Counsel to Plaintiff Green Farms*