A-552-801
Remand
Slip Op 24-46
POR:  08/01/2019 – 07/31/2020
~~Business Proprietary Document~~
E&C/OV:  RG/JB/CM

*Public Version*

**Green Farms Seafood Joint Stock Company v. United States, Ct. No. 22-00092; *Catfish Farmers of America v. United States*, Ct No. 22-00125, Slip Op. 24-46 (CIT April 17, 2024) Certain Frozen Fish Fillets from the Socialist Republic of Vietnam**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination in accordance with the opinion and remand order of the U.S. Court of International Trade (the Court) in *Green Farms Seafood Joint Stock Company v. United States*, Ct. No. 22-00092; *Catfish Farmers of America v. United States*, Ct No. 22-00125, Slip Op. 24-46 (CIT April 17, 2024) (*Remand Opinion*).  These final results of redetermination concern the *Final Results* in the administrative review of the antidumping duty (AD) order on certain frozen fish fillets (fish fillets) from the Socialist Republic of Vietnam (Vietnam)[1] covering the period of review (POR) August 1, 2019, through July 31, 2020.[2]

In the *Remand Opinion*, the Court remanded for further consideration:  (1) Commerce's determination that East Sea Seafoods Joint Stock Company (ESS) was eligible for a separate rate;[3] (2) Commerce's selection of a rate to assign to Greens Farms Seafood Joint Stock

---

[1] *See Notice of Antidumping Duty Order:  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 FR 47909 (August 12, 2003) (*Order*).
[2] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 15912 (March 21, 2022). (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Opinion* at 12-14.

Company (Green Farms), a company that was not selected for individual examination;[4] and (3) Commerce's selection of India as the primary surrogate country, which it used to calculate a margin for mandatory respondent NTSF Seafoods Joint Stock Company (NTSF).[5]  Below, we provide further discussion of these issues, consistent with the *Remand Opinion*.[6]

## II.    BACKGROUND

### A.    Commerce's *Final Results*

On October 6, 2020, Commerce initiated the 2019-2020 administrative review of the *Order*.[7]  On January 8, 2021, we selected the two largest exporters under review, ESS and NTSF, as mandatory respondents for individual examination[8] and we issued the standard non-market economy (NME) questionnaire to them.[9]

On September 10, 2021, we published the preliminary results of the administrative review.[10]  We calculated mandatory respondent NTSF's weighted-average dumping margin and, in so doing, relied on India as the primary surrogate country because we found that India was: (1) at the same level of economic development as Vietnam; (2) a significant producer of comparable merchandise; and (3) a country that provided adequate information with which to value NTSF's factors of production (FOPs).[11]  After analyzing the Indian data on the record, we

---

[4] *Id*. at 18.

[5] *Id*. at 20-21.

[6] In our analysis, we have treated Indonesia and India both as viable primary surrogate countries and have, under respectful protest, afforded India no preference despite its inclusion on the surrogate country list issued on the record of this segment.  *See Viraj Group v. United States*, 343 F. 3d 1371 (Fed. Cir. 2003); and Commerce's Letter, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated April 6, 2021, at Attachment 1 (Surrogate Country List).

[7] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 63081 (October 6, 2020).

[8] *See* Memorandum, "Respondent Selection," dated January 8, 2021.

[9] *See* Commerce's Letters, Initial Questionnaire, dated January 8, 2021 (Initial Questionnaire).

[10] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission of Antidumping Duty Administrative Review; 2019-2020*, 86 FR 50698 (September 10, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

[11] *Id.* at 13-16.

determined that, because India was on the Surrogate Country List,[12] and because another country for which the record contained data, *i.e.*, Indonesia, was outside the range of gross national incomes (GNI) represented by the on-list countries, India was an appropriate choice.[13]

We assigned a rate based on total adverse facts available with adverse inferences (AFA) to mandatory respondent ESS because ESS ceased participation in the review when it failed to submit responses to a supplemental questionnaire regarding its suppliers.[14]  Commerce also found Green Farms, a non-individually-examined company, eligible for a separate rate; we assigned Green Farms a final rate based on the simple average of the NTSF calculated rate ($0.00/kilogram (kg)) and the ESS rate which was based on AFA ($3.87/kg).[15]

On March 21, 2022, Commerce published its *Final Results*.[16]  In the *Final Results*, Commerce continued to calculate an individual weighted-average dumping margin of $0.00/kg for NTSF,[17] while relying on India as the primary surrogate country.[18]  Commerce also continued to apply AFA to ESS.[19]  Lastly, Commerce assigned Green Farms a rate of $1.94/kg based on the average of the NTSF and ESS margins.[20]  Green Farms and the petitioners[21] appealed.

### B.    *Remand Opinion*

In the *Remand Opinion*, the Court remanded three aspects of Commerce's *Final Results*. First, the Court remanded Commerce's determination that ESS was eligible for a separate rate.[22]

---

[12] *See* Surrogate Country List.
[13] *See Final Results* IDM at Comment 10.
[14] *See Preliminary Results* PDM at 8-9.
[15] *Id*. at 9-12.
[16] *See generally Final Results* IDM.
[17] *Id*. at Comments 2 and 10.
[18] *Id*. at Comment 10.
[19] *Id*. at Comment 6.
[20] *Id*. at Comment 8.
[21] The petitioners are the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, the petitioners).
[22] *See Remand Opinion* at 12-14.

Specifically, although the Court upheld Commerce's rationale underlying its selection of a rate based on AFA under the circumstances (rather than assigning the company to the country-wide entity),[23] the Court found that Commerce failed to explain how ESS demonstrated the absence of *de jure* and *de facto* control to warrant eligibility a separate rate in the first instance.[24]

Second, the Court remanded Commerce's choice of the rate assigned to non-examined company Greens Farms.[25]  As all dumping margins that Commerce determined in this segment were zero (NTSF) or based on facts available (ESS), Commerce relied on the "any reasonable method" provision of section 735(c)(5)(B) of the Tariff Act of 1930, as amended (the Act) to assign a rate to Green Farms based on the average of the ESS and NTSF rates.  The Court held that Commerce's application of the simple average of these rates was unreasonable, stating that Commerce failed to explain how such a rate reflects economic reality.[26]

Third, the Court remanded Commerce's selection of India as the primary surrogate country.[27]  The Court held that Commerce misapplied the statutory standard for surrogate country selection, which requires Commerce to select a surrogate country at a "comparable" level of economic development to the NME country in question.[28]  The Court held that, on remand, Commerce must either explain why it does not find Indonesia to be comparable to Vietnam, or it must compare the relative merits of the Indian data to the Indonesian data.

---

[23] *Id.* at 10.
[24] *Id.* at 12.
[25] *Id*. at 18.
[26] *Id.*
[27] *Id*. at 20-21.
[28] *Id.*

On August 13, 2024, Commerce issued its Draft Results.[29]  On August 27, 2024, the petitioners and Green Farms submitted comments on the Draft Results.[30]

## III.    ANALYSIS

### A.    ESS Separate Rate Eligibility

The record supports a finding that ESS is eligible for a separate rate.  In the *Preliminary Results*, Commerce set forth the legal standard for separate rate analysis and then concluded that ESS (as well as NTSF and Green Farms) provided sufficient information to demonstrate eligibility for a separate rate, *i.e.*, that there was no evidence of *de jure* or *de facto* government control over the company's operations.[31]  In the *Final Results*, we again identified the standard by which Commerce determines eligibility for a separate rate:

> Where a respondent operating in {an NME} country desires a separate rate (*i.e.*, a rate which is separate from the country-wide rate), it must rebut the presumption that its export activities, including the setting of its U.S. sales prices, are under government control.  It does so through its answers to Commerce's questions about corporate ownership, control, management, ownership or control by a provincial or local government, profit retention, and restrictions on use of foreign currency earnings.  For example, the absence of *de jure* government control can be demonstrated through the absence of restrictive stipulations associated with an individual exporter's business and export licenses; or any legislative enactments or other formal government measures decentralizing control of companies.[32]  Absence of *de facto* government control is assessed by examining evidence that each exporter sets its prices independently of the government and that each exporter keeps the proceeds of its sales.[33]

---

[29] *See* Draft Results of Redetermination Pursuant to Court Remand, *Green Farms Seafood Joint Stock Company v. United States*, Ct. No. 22-00092; *Catfish Farmers of America v. United States*, Ct No. 22-00125, Slip Op. 24-46 (CIT April 17, 2024), issued August 13, 2023 (Draft Results).

[30] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination," dated August 27, 2024 (Petitioners' Comments); and Green Farms' Letter, "Green Farms Comments on Draft Remand Redetermination Pursuant to Court No. 22-00092," dated August 27, 2024 (Green Farms Comments).

[31] *See Preliminary Results* PDM at 9-12.

[32] *Id.* (citing *Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) (*Sparklers from China*)).

[33] *See Final Results* IDM at 27 (citing *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003), *Sigma Corp. v. United States*, 117 F.3d 1401, 1405-07 (Fed. Cir. 1997); and *Sparklers from China*, 56 FR at 20589).

Then, Commerce stated the basis for its decision to continue to find ESS eligible for a separate rate:

> Here, we continue to determine that ESS is eligible for a separate rate. In response to our request for information, ESS provided Commerce's required attestation, its business registration certificate, and its tax forms showing independence from the government.[34] It also provided a full response to Section A of Commerce's questionnaire with respect to the company's operations, independence from the government, and relevant affiliations.[35] We found no basis to determine that the separate-rate information submitted was not reliable.[36]

The Court found that Commerce's analysis was conclusory.[37] Therefore, we provide additional explanation of our finding at this time.

At the outset, and as laid out in the underlying administrative review, it is Commerce's policy to assign all exporters of the subject merchandise from an NME country a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its exports.[38]

In recent proceedings, we have concluded that, where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's key operations generally.[39] This may include control over, for example, the selection of management, a key factor in determining whether a company has

---

[34] *See* ESS's Letter, "Separate Rate Certification for East Sea Seafoods LLC," dated November 5, 2020.
[35] *See* ESS's Letter, "Section A Questionnaire for East Sea Seafoods LLC," dated February 5, 2021 (ESS Section A Response).
[36] *See Final Results* IDM at 27.
[37] *See Remand Opinion* at 14.
[38] *See* Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries," (April 5, 2005), at 1-2, available at https://enforcement.trade.gov/policy/bull05-1.pdf.
[39] *See Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Preliminary Affirmative Determination of Critical Circumstances, in Part*, 79 FR 53169 (September 8, 2014), and accompanying PDM at 5-9, unchanged in *Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 79 FR 68860 (November 19, 2014).

sufficient independence in its export activities to merit a separate rate.  Consistent with normal business practices, we would expect any majority shareholder, including a government, to have the ability to control, and have an interest in controlling, the operations of the company, including the selection of management and the profit distribution of the company.

Here, ESS submitted a separate rate certification (SRC)[40] and a response to section A of Commerce's standard AD questionnaire (*i.e.*, the section related to the general operations of the company, including the company's eligibility for a separate rate).[41]  These submissions provided the information necessary for Commerce to assess ESS's independence from government control.  With respect to ownership, the business registration submitted indicates that ESS is owned by individuals, and the company certified that these individuals are not representatives or officials of the Vietnamese government.[42]  No party provided information on the record to the contrary.  Additionally, these submissions provided substantial information relating to the additional criteria that Commerce considers in our separate rates analysis.  We address such criteria, in turn.

### 1.  *De Jure Criteria*

Commerce considers the following *de jure* criteria in determining whether a company may be granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) any other formal measures by the government decentralizing control of companies.[43]

*Absence of Restrictive Stipulations*

---

[40] *See* ESS's Letter, "Separate Rate Certification for East Sea Seafoods LLC," dated November 5, 2020 (ESS SRC).
[41] *See* ESS Section A Response.
[42] *Id.* at 6 and Exhibit A-1.
[43] *See Sparklers from China*, 56 FR at 20589.

In its SRC, ESS certified that "the firm was not required by any national, provincial, or local government law or regulation to possess additional certificates or other documents related to the legal status and/or operation of its business beyond {a valid Vietnamese Business Registration Certificate, and a valid Certificate of Tax Registration},"[44] neither of which suggested restrictive stipulations on the company.  In its Section A Response, ESS also reported that the government imposes no restrictions on the use of ESS's export revenues.[45]

*Legislative Enactments Decentralizing Control*

ESS certified that there is no legislation controlling the export activities of ESS.[46]

*Other Formal Measures Decentralizing Control*

ESS reported that the subject merchandise it exports is not subject to export quotas and the company is not required to obtain an export license for such sales; further, there are no foreign exchange targets in effect for ESS's sales.[47]  Additionally, ESS reports that is not required to sell foreign currency to the government and can exchange it for local currency at its discretion at market rates.[48]

2. *De Facto Criteria*

Commerce considers four factors in evaluating whether a company is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by, or are subject to, the approval of a government agency; (2) whether the company has authority to negotiate and sign contracts and other agreements; (3) whether the company has autonomy from the government in making decisions regarding the selection of management; and (4) whether the

---

[44] *See* ESS SRC at 6.
[45] *See* ESS Section A Response at 9.
[46] *See* ESS SRC at 6; and ESS Section A Response at 7.
[47] *See* ESS Section A Response at 10.
[48] *Id.*

company retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.[49]  Commerce has determined that an analysis of *de facto* control is critical in determining whether companies are, in fact, subject to a degree of government control which would preclude Commerce from assigning such companies separate rates.[50]

*Export Pricing*

ESS certified that export prices were not set by, subject to the approval of, or in any way controlled by a government entity at any level.[51]  ESS reported that it sets the price of the merchandise on its own by negotiating prices directly with customers, without any government oversight or review.[52]

*Authority to Negotiate and Enter Contracts*

ESS certified that it has independent authority to negotiate and sign export contracts and other agreements (*i.e.*, independent price negotiation).[53]  As support for its certified statement, ESS provided documents related to a POR sale showing a sales contract entered into between the company's General Director and a U.S. customer.[54]

*Autonomy from Government in Management Selection*

ESS certified that its ownership remained the same since the last period in which it sought a separate rate, and it stated that the largest shareholders had no significant relationship with any Vietnamese government entity (including state-owned asset-management companies).[55]

---

[49] *See Silicon Carbide from the People's Republic of China*, 59 FR 22585, 22586-87 (May 2, 1994); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Furfuryl Alcohol from the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995) (*Furfuryl Alcohol from China*).
[50] *See Furfuryl Alcohol from China*, 60 FR at 22544.
[51] *See* ESS SRC at 7.
[52] *See* ESS Section A Response at 8.
[53] *See* ESS SRC at 7.
[54] *See* ESS Section A Response at Exhibit A-5.
[55] *See* ESS SRC at 6-7.

ESS also certified that it did not have to submit for approval to the government any of its candidates for managerial positions.[56]  ESS submitted its business registration, showing that it is a private company owned by individuals.[57]

*Retention of Export Sales Proceeds and Decisions Regarding Profit and Loss*

ESS certified that it retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or financing of losses.[58]

*Summary of Analysis of De Jure and De Facto Criteria*

For the reasons explained above*,* the evidence provided by ESS supports a finding of *de jure* and *de facto* absence of government control.  In summary, this evidence demonstrates that: (1) ESS is a private company, owned by individuals who are not affiliated with the government; (2) ESS's business license reflects no restrictive stipulations; and (3) ESS reported that Vietnam has no legislative enactments, or any other formal measures by the government, centralizing control over the company's export activities.  Regarding the final point, ESS's statements are also consistent with statements made by the other companies involved in this review that Vietnam, more generally, did not impose formal measures restricting exporters.[59]

In addition, ESS provided documentation showing that it has authority to negotiate and sign sales contracts, and it certified to the facts that it also independently sets its own export prices, selects its own management, retains the proceeds of its export sales, and makes decisions regarding the disposition of its profits.[60]

---

[56] *Id.* at 7.
[57] *See* ESS Section A Response at Exhibits A-1 and A-2.
[58] *See* ESS SRC at 7.
[59] *See* Green Farms' Letter, "Separate Rate Application," dated August 2, 2021 (Green Farms SRA), at 9-13; and NTSF's Letter, "Separate Rate Certification," dated October 30, 2020, at 4.
[60] *See* ESS SRC at 5-7.

Finally, the record contains no evidence indicating that ESS's statements were false, or that the information that it provided was incomplete or otherwise deficient.[61]  Given these facts, we find no basis to deny ESS a separate rate in this review.  Commerce's separate-rate analysis in the instant review is consistent with our approach in similar cases.[62]

### B.    Assignment of Green Farms' Rate

We continue to find that Commerce's derivation of a dumping margin for Green Farms was appropriate.  We provide additional discussion regarding the data on the record concerning the pricing practices of the various companies under review.

The Court found "that Commerce correctly followed the statutory command and the SAA by averaging NTSF's zero rate and East Sea's adverse-inference {rate of $3.87/kg}."[63]  However, the Court also found that following such a prescription is "not the end of the matter";[64] it held that Commerce must affirmatively tie the rate to record evidence to demonstrate that it reflects commercial reality,[65] and it further found that Green Farms' existing cash deposit rate was irrelevant for this purpose.[66]

---

[61] *See Yantai Xinke Steel Structure Co. v. United States*, 36 CIT 1035, 1054 (CIT July 18, 2012); *see also, e.g., Shandong Huarong General Group v. United States*, 27 CIT 1568, 1594 (CIT October 22, 2003) (holding that Commerce may not disregard separate rate information when "there is no indication that any necessary information was missing or incomplete") (citation omitted); and *National Nail Corp. v. United States*, 279 F. Supp. 3d 1372, 1377 (CIT 2018).

[62] *See, e.g., Forged Steel Fittings from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments; 2021-2022*, 88 FR 85221 (December 7, 2023), and accompanying PDM at 5-9, unchanged in *Forged Steel Fittings from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021-2022*, 89 FR 49154 (June 11, 2024); and *Xanthan Gum from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2021-2022,* 88 FR 51286 (August 3, 2023), and accompanying PDM at 9-13, unchanged in *Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Final Determination of No Shipments; 2021-2022*, 89 FR 8165 (February 6, 2024).

[63] *See Remand Opinion* at 16-17.  *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 873.

[64] *See Remand Opinion* at 17.

[65] *Id*. at 17 (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

[66] *Id*. at 17-18.

To address the Court's concern that the dumping margin assigned by Commerce is reflective of commercial reality, we examined the information on the record regarding Green Farms' pricing. Specifically, we compared the price of the sale covered by the documentation contained in Green Farm's separate rate application[67] with the price of a sale made by ESS during the POR,[68] as well as the pricing of NTSF.[69] As discussed below, this comparison shows that the dumping margin assigned to Green Farms is reasonably reflective of its commercial behavior, given that its pricing fell between the prices reported by the two mandatory respondents.

At the outset, we note that NTSF and ESS sold merchandise on different terms than Green Farms (*i.e.*, [                    ] and [                 ], respectively, as compared with [                ]).[70] Further NTSF made sales via its U.S. affiliate in the United States (*i.e.*, constructed export price sales), while ESS and Green Farms sold to unaffiliated U.S. customers directly (*i.e.*, export price sales). Therefore, prior to comparing the prices charged to U.S. customers by these companies, we adjusted the prices for these known differences. To do this, we removed from the prices: (1) international freight expenses from both the Green Farms and NTSF prices, using NTSF's reported international freight costs as representative for a Vietnamese exporter during the POR; (2) NTSF's U.S. inland movement expenses; and (3) any U.S. selling expenses incurred by NTSF's U.S. affiliate in making the sale

---

[67] *See* Green Farms SRA at Exhibit SRA-2. We also note that this sale represents the universe of sales by Green Farms during the POR, as reported by U.S. Customs and Border Protection. *See* Memorandum, "U.S. Customs and Border Protection Data Query," dated October 23, 2020 (CBP Data Query), at Attachment II.

[68] *See* ESS Section A Response at Exhibit A-5.

[69] *See* NTSF's Letter, "Response to Section A and Appendix X of the Questionnaire," dated February 5, 2021 (NTSF Section A Response), at Exhibit A-10.

[70] These terms, known as "Incoterms," define the obligations of the seller with respect to transportation expenses. Under [      ] terms, the seller, here ESS, is responsible for [                                                                                  ]. Under [      ] terms, the seller, here Green Farms, is responsible for [                                                        ]. Under [      ] terms, the seller, here NTSF, is responsible for [                                      ].

and the associated profit.[71]  As all sales were made on a per-pound basis, and all of NTSF's costs were submitted on a per-pound basis, there was no conversion necessary for differing units of measure.  Using this formula, we derived the following [      ] prices for Green Farms and NTSF:

| | Incoterm | Base Price/lb | Less Int'l Freight | Less U.S. Inland Movement | Less U.S. Affiliate Expenses | [   ] Price |
|---|---|---|---|---|---|---|
| ESS | [   ] | [   ] | 0 | 0 | 0 | [   ] |
| Green Farms | [   ] | [   ] | [   ] | 0 | 0 | [   ][72] |
| NTSF | [   ] | [   ][73] | [   ] | [   ] | [   ] | [   ][74] |
| | | | | | | |
| | *See* NTSF Section CD Response at Exhibit C-4 | | | | | |
| **Int'l Freight** | NTSF DMEBROKU | NTSF INTNFRU | NTSF USBROKU | NTSF USDUTYU | | |
| *per lb | [   ] | [   ] | [   ] | [   ] | | |
| | | | | | | |
| | *See* NTSF Section CD Response at Exhibit C-5 | | | | | |
| **U.S. Inland Movement** | USOTHTRU | USWARE HU | | | | |
| *per lb | [   ] | [   ] | | | | |
| | | | | | | |
| **Constructed Export Price Expenses** | INDIRSU | CREDITU | CEP Profit | | | |
| *per lb | [   ] | [   ] | [   ] | | | |

---

[71] *See* NTSF's Letter, "Section C and D, and Appendix XI Questionnaire Response," dated February 23, 2021 (NTSF Section CD Response), at Exhibit C-1.
[72] This figure was adjusted from the Draft Results, to correct a typographical error.
[73] *See* NTSF Section A Response at Exhibit A-10.
[74] We note that this is the lowest [      ] price in NTSF's sales database and the closest to Green Farm's calculated [      ] price; thus, it is a conservative estimate in that regard.  Calculating [      ] price for NTSF's other sales results in prices between [      ] and [      ], and, accordingly, the Green Farms prices are well below any of the prices contained in the database.

The comparison shows that, on [     ]-equivalent terms, the price for Green Farms's sale fell between the prices charged by ESS and NTSF.  Further, we find it significant that Green Farm's price was comparatively close to ESS's sales price and only [     ] of NTSF's prices. Accordingly, we find no basis to conclude that the margin calculated for NTSF alone would be reflective of commercial reality for Green Farms.  Therefore, although we do not have the data necessary to conduct a full margin analysis for the company – which was not selected for individual examination – we find that the pricing data on the record support application of a margin that is an average of the margins of the mandatory respondents.

### C.    Surrogate Country Selection – India and Indonesia Comparison

Commerce continues to find that its selection of India as the primary surrogate country was appropriate.  For the purposes of this remand, in accordance with the Court's *Remand Opinion*, we are considering both Indonesia and India, within very broad parameters, to satisfy the statutory standard of being at a "comparable" level of economic development.  As in prior litigation,[75] we also provide background on Commerce's surrogate country selection process.

### *1.  Surrogate Country Selection Practice*

At the outset, and as set forth in prior remands in this proceeding, as a general practice, Commerce selects a surrogate country that is at the same level of economic development as the NME country in question unless it is determined that none of such countries are viable options because they:  (1) are not significant producers of comparable merchandise; (2) do not provide sufficient, reliable sources of publicly available surrogate value (SV) data; or (3) are not suitable

---

[75] *See, e.g.*, *Final Results of Redetermination Pursuant to Court Remand*, *Catfish Farmers of America v. United States*, Court No. 21-00380, Slip Op. 23-97 (CIT July 7, 2023), dated November 6, 2023 (November 6, 2023 Redetermination), at 17-18, and 32-39, available at https://access.trade.gov/resources/remands/23-97.pdf.

for use because of other factors.[76]  Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected if data considerations outweigh level-of-economic-development differences or significant producer considerations.

While other countries may, where necessary, be selected from outside of the range of countries identified by Commerce in its surrogate country list, those countries are not considered to be at the same level of economic development.  The Court affirmed this practice in *Clearon III*, explaining:

> {e}xamining Commerce's primary country surrogate selection process as a general matter, *Clearon II* acknowledged that Commerce typically selects a country from the list of countries at the *same level of economic development* as the home country measured by per capita GNI, and it observed that Commerce will compare data from countries on the surrogate country list with data from a "less comparable country" when it becomes persuaded that none of the listed countries provide the requisite "scope of quality data." … Commerce on second remand concluded from the foregoing that absent adequate showing that the Philippines lacks the quality of data necessary to complete the review, it was not required to conduct a comparison of those data with those of a country at a less comparable level of economic development.  The court is unable to conclude that is an unreasonable interpretation of *Clearon II*, and the results of the second remand comply to that extent with what was ordered.[77]

Similarly, in *Jacobi Carbons*, the Court recognized that, "{a}lthough the statute only requires Commerce to seek a surrogate market economy country whose economic development is 'comparable' to the subject {NME}, when possible, the agency selects a surrogate country at the

---

[76] *See, e.g.*, *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013), and accompanying IDM at Comment 2; *Certain Steel Threaded Rod from the People's Republic of China:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review; 2010-2011*, 77 FR 67332 (November 9, 2012), and accompanying IDM at Comment 1; and *Certain Steel Wheels from the People's Republic of China:  Notice of Preliminary Determination of Sales at Less Than Fair Value, Partial Affirmative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 76 FR 67703, 67708 (November 2, 2011), unchanged in *Certain Steel Wheels from the People's Republic of China:  Notice of Final Determination of Sales at Less Than Fair Value and Partial Affirmative Final Determination of Critical Circumstances*, 77 FR 17021 (March 23, 2012).

[77] *See Clearon Corp. v. United States*, Consol. Court No. 13-00073, Slip-Op 16-110, 40 CIT (CIT November 23, 2016) (*Clearon III*), at 3 (internal citations omitted and emphasis added).

*same* level of economic development as the NME country" and "Commerce considers those countries that occupy a relatively narrow per capita GNI range that is *centered* on the per capita GNI of the NME country to have attained the same level of economic development."[78]  The Court also recognized the following rationale behind Commerce's selection of countries at the same level of economic development:

> The {surrogate country} list is non-exhaustive, and is intended to provide interested parties with a manageable set of potential surrogate countries to focus on.  When an interested party proposes an alternative country with a per capita GNI within the range of countries on the list, Commerce affords that country the same consideration as others on the list.  When an interested party proposes a country with a per capita GNI outside the selected range, Commerce will consider the country only if its data quality and availability, and significant producer status, outweigh its deficient economic comparability, and only when none of the countries at the same level of economic development (*i.e.*, within Commerce's per capita GNI range) present viable surrogate country options.[79]

Thus, the Court acknowledged and affirmed Commerce's preference to rely on countries at the "same" level of economic development, where possible.[80]

This approach has been applied in numerous proceedings.[81]  For example, in *Nails from China*, Commerce explained:

---

[78] *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1316 (CIT 2018) (*Jacobi Carbons*) (emphasis in original) (internal citations and quotations omitted).

[79] *Id.*, 313 F. Supp. 3d at 1318.

[80] *Id.*, 313 F. Supp. 3d at 1319-22 (holding that Commerce provided a reasoned explanation of how it generated the surrogate country list, including why it considers those countries on the list to be at the same level of economic development as the People's Republic of China).

[81] *See, e.g.*, *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 68881 (December 17, 2019) (*Activated Carbon from China 2017-2018*), and accompanying IDM at Comment 1 (explaining that "Malaysia and Romania are both economically comparable to China, as both countries are on the OP List, and are therefore determined, based on per capita GNI, to *be at the same level of economic development* as China." (internal citations omitted and emphasis added)); *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376 (January 30, 2020), and accompanying IDM at Comment 2 (noting that "pursuant to section 773(c)(4)(A) of the Act, both Russia and Brazil are considered to be at *the same level of economic development* as China.  Thus, they are not ranked, and are considered equal in terms of economic comparability.") (internal citations omitted and emphasis added); *Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 8821 (February 18, 2020), and accompanying IDM at the section titled "Surrogate Country" (noting that "{w}e selected Romania as the primary surrogate country, pursuant to section 773(c)(4) of the Act and 19 CFR 351.408(c)(2), because it is at *the*

Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development. … Here, because we have adequate data from those countries on the list of economically comparable countries, we find it reasonable to continue to limit our consideration to countries that are on the list. Therefore, because Mexico and Russia are both countries on the Surrogate Country List and both fulfill these selection criteria, there is no need to resort to countries that are not at the same level of economic development, such as Thailand and Romania.[82]

We further explained in *Nails from China* that, in view of the usable data from a country at the same level of economic development as the NME country in question, consideration of countries at comparable, but not the same, levels of development was unwarranted.  Again, in *Activated Carbon from China 2017-2018*, we explained:

consistent with its practice and section 773(c)(4) of the Act, Commerce considers Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia to be at the same level of economic development as China.  Commerce treats each of these countries as equally comparable.  Therefore, Commerce considers all six countries identified in the {Surrogate Country List} as having met this prong of the surrogate country selection criteria.   Unless Commerce finds that none of these countries is a significant producer of comparable merchandise, does not provide a reliable source

---

*same level of economic development* as China, because it is a significant producer of merchandise comparable to subject merchandise, and because of the availability and quality of Romanian data for valuing FOPs" (internal citations omitted and emphasis added)); *Forged Steel Fittings from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 53629 (September 28, 2021), and accompanying IDM at Comment 1 (noting that "consistent with our practice, and section 773(c)(4) of the Act, Commerce identified Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey as countries at *the same level of economic development* as China, based on per capita GNI data from the World Bank's World Development Report.  Therefore, we consider all six countries as having met this economic comparability prong of the {surrogate country} selection criteria.") (internal citations omitted and emphasis added); and *Polyester Textured Yarn from the Socialist Republic of Vietnam:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 58877 (October 25, 2021), and accompanying IDM at the section titled "Surrogate Country" (explaining that "{w}e selected India as the primary surrogate country, pursuant to section 773(c)(4) of the Act and 19 CFR 351.408(c)(2) because it is at *the same level of economic development* as Vietnam, because it is a significant producer of merchandise comparable to subject merchandise, and because of the availability and quality of Indian data for valuing factors of production (FOPs)." (internal citations omitted and emphasis added)).

[82] *See Certain Steel Nails from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 33219 (June 24, 2021) (*Nails from China*), and accompanying IDM at Comment 1; *see also Certain Quartz Surface Products from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 FR 23767 (May 23, 2019), and accompanying IDM at Comment 8 ("Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.").

of publicly available surrogate data, or is unsuitable for use for other reasons, or Commerce finds that another *equally comparable* country is an appropriate surrogate within the GNI range, Commerce will rely on data from one of these countries.   Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.   As discussed below, Commerce preliminarily determines that one or more of these six countries are significant producers of comparable merchandise and provide usable SV information, and as such, Commerce will not rely on data from Thailand, whose 2017 GNI do not fall within the range of GNI represented by the countries included on the surrogate country list issued by Commerce.[83]

Commerce has also applied its sequential surrogate country selection process in the context of administrative reviews covering merchandise from Vietnam.  In *OCTG from Vietnam*, which employed the same Surrogate Country List as in the administrative review underlying these final results of redetermination, Commerce explained:

> … Commerce identified Bolivia, Egypt, Honduras, India, Morocco, and Nicaragua as countries that are at the same level of economic development as Vietnam, based on per capita GNI.  Accordingly, we preliminarily find that these six countries meet the economic comparability criterion of the surrogate country analysis.

> Additionally, the domestic interested parties claimed that Indonesia is at a level of economic development comparable to Vietnam, although Indonesia does not appear on Commerce's list countries that are at the same level of economic development as Vietnam based on per capita 2019 GNI data.  We preliminarily find that Indonesia's gross national income per capita (GNI) of $4,050 reflects that it is not at the same level of economic development as Vietnam.  Specifically, Vietnam's 2019 GNI is $2,540, and the highest GNI of the six countries identified in Commerce's Surrogate Country Letter is Bolivia's GNI of $3,530.

> … We preliminarily find that the record contains factor values from India for all of {the respondent's} reported FOPs, and that these factor values are specific to the inputs, are tax- and duty-exclusive, represent a broad market average, and are contemporaneous and useable.  Because a country on the surrogate country list contains useable data, in accordance with our practice, we preliminarily find that

---

[83] *See Certain Activated Carbon from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 7758 (June 14, 2019), and accompanying PDM at "Surrogate Country and Surrogate Value Data" (internal citations omitted), unchanged in *Activated Carbon from China 2017-2018*.

there is no compelling reason to deviate from the surrogate country list in selecting a surrogate country.[84]

In each of the above determinations, Commerce applied its sequential surrogate country selection process (*i.e.*, selecting a surrogate country that:  (1) was at the same level of economic development as the NME country in question; (2) was a significant producer of comparable merchandise; and (3) had usable data) and declined to accord countries that were not at the same level of economic development as the NME country equivalent treatment.  The practice demonstrates a concerted effort by Commerce to achieve consistency and transparency in its approach and also adopting an implementation of the economic comparability requirement that is administratively practical.

Here, we applied the same process as in all NME investigations and reviews.  The annual release of the *World Bank Development Report*, which includes the latest per capita GNI data by country, initiates the process of generating a list of countries at the same level of economic development as the NME country in question.  Commerce examines the new per capita GNI data for the NME country (and the change in per capita GNI from the year before) and compares the change in the country's per capita GNI to the respective changes in per capita GNIs of the surrogate countries from the prior list.  Commerce places emphasis on achieving a degree of balance in the GNI range represented by the list.  We try to preserve the same number of surrogate countries above and below the NME country (*i.e.*, three countries with per capita GNIs higher/lower than the per capita GNI for the NME, for a total of six).  In arriving at this list of countries, Commerce considers a range of factors, including the expected data quality for the

---

[84] *See Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam:  Preliminary Results of Antidumping Duty Administrative Review; 2019-2020*, 86 FR 55807 (October 7, 2021) (*OCTG from Vietnam*), and accompanying PDM at the section titled "Surrogate Country," unchanged in *Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 21094 (April 11, 2022).

potential surrogate countries in question, the availability of alternative surrogate countries, the economic diversity of the manufacturing sector in the alternative countries, and the degree of specificity in the import data potentially relied on to value the FOPs.[85]  When generating the Surrogate Country List, Commerce also takes certain factors into account which may influence the availability and quality of the price and cost data such as whether the country is experiencing civil unrest or extreme levels of inflation.  When an interested party identifies another alternative surrogate country with a GNI within the range of GNIs set forth in the list, Commerce can accord that alternative surrogate country the same consideration as given to those identified on the Surrogate Country List.[86]

Taken in this context, the list of potential surrogate countries on the Surrogate Country List represents a starting point for interested parties, consistent with the statutory criteria enumerated under section 773(c)(4)(A) of the Act and 19 CFR 351.408(b).  It is intended to initiate a process whereby parties can focus their attention on a manageable set of potential surrogate countries that are at a similar level of economic development to the NME country in question.  One benefit of this approach is that interested parties do not expend their resources focusing on potential surrogate countries that are not at the same level of economic development as the NME country in question when there is a same-level country that provides adequate data.

The Surrogate Country List here, as in all cases, is largely based on an assessment of the countries with per capita GNIs closest to the per capita GNI of the NME country in question, and that are likely to provide usable data, at a given point in time.  Thus, a country that is represented

---

[85] *See, e.g.*, *Clearon Corp. et al. v United States*, Court No. 13-00073, Slip Op. 15-91 (CIT August 20, 2015)) (*Clearon II*), at 6 and n.5.

[86] *See Jacobi Carbons*, 313 F. Supp. 3d at 1355 (noting that the list is non-exhaustive, and that an interested party may propose an alternative surrogate country with a per capita GNI that falls within the range reflected in the list to be afforded the same treatment as an on-list country).

on the list at one point in time can be removed from the list if the per capita GNI of one or more other potential surrogate countries converges with the per capita GNI of the NME country in question. As the Court explained in *Jacobi Carbons*, in its response to a party's argument, the expansion of the GNI range need not exactly match the NME country's increasing per capita GNI for Commerce's development of the Surrogate Country List to be reasonable:

> Commerce's compilation of the list is reasonably based on its examination of annual changes to China's per capita GNI and re-centering of the list based on China's rapid economic expansion … {and} it would be inappropriate for this court to impose that type of bright-line requirement. As {Commerce} notes, {t}he GNI data on which the surrogate country list is based is a fluid measurement that can change from year to year.[87]

Thus, a country does not remain on the list indefinitely based on an earlier classification or based on nominal differences in per capita GNI. Instead, the subset of countries that are designated as being at the same level of economic development may fluctuate year to year. As noted above, Commerce tries to preserve the same number of surrogate countries on the list (*e.g.*, three countries each with per capita GNIs higher and lower than the NME country, for a total of six) to limit the number of potential surrogate countries for analysis. If Commerce were required to maintain Indonesia on the list, despite the relative changes in economic development and per capita GNIs of Vietnam and Indonesia and other potential surrogate countries over time, Commerce would potentially have to include numerous additional countries on the list in any given year (*i.e.*, by necessarily broadening the outer bounds of the list to force the inclusion of all countries that previously had been on the list), which defeats the purpose of Commerce's court-approved[88] approach in this regard.

---

[87] *Id.*, 313 F. Supp. 3d at 1317-23 (internal citations omitted).

[88] *Id.*, 313 F. Supp. 3d at 1320 (noting that "Commerce properly may narrow a list of countries within a band for purposes of administrative feasibility" and "Commerce's decision to limit {its} list of potential surrogates to six countries represents precisely the type of discretion left within the agency's domain") (internal citations omitted).

Here, the per capita GNI data on the record reveal a tight proximity between India and Vietnam throughout the entire period shown.  Specifically, the chart below highlights the economic comparability between India and Vietnam both before and during the instant POR.[89]



Commerce identified India as one of six countries at the same level of economic development as Vietnam, based on per capita GNI data and the other considerations identified above.  Moreover, Commerce determined that India was a significant producer of comparable merchandise and that the record contained usable data for India.[90]  Thus, this review does not present an instance where "none of the countries on the list are significant producers of comparable merchandise or have suitable sources of surrogate value data," requiring the selection of a country that was not at the same level of economic development.[91]  In short, Commerce applied its practice – consistent with numerous agency decisions and court precedent – in generating a Surrogate Country List and focusing its analysis on a country that was at the same level of economic development.

---

[89] The surrogate country list issued in this review was based on 2019 country GNI data.  *See* Surrogate Country List.
[90] *See Final Results* IDM at Comment 10.
[91] *See Jacobi Carbons*, 313 F. Supp. 3d at 1318 n. 12.

We acknowledge that section 773(c)(4) of the Act provides that, in valuing the FOPs in an NME country, Commerce will use SVs from one or more market economies "at a level of economic development *comparable* to that of the nonmarket economy country."[92]  However, we disagree that this language requires Commerce to consider all countries which may broadly meet the definition of "comparable" on an equal basis.  Indeed, Commerce's regulations at 19 CFR 351.408(b) direct Commerce as follows:

> *Economic Comparability*.  In determining whether a country is at a level of economic development comparable to the nonmarket economy under section 773(c)(2)(B) or section 773(c)(4)(A) of the Act, {Commerce} will place primary emphasis on *per capita* GDP as the measure of economic comparability.

Thus, this regulation contemplates that Commerce will consider relative national income levels as a factor in evaluating economic comparability.  Importantly, while neither the Act nor the regulations define the term "comparable," neither source prohibits Commerce from considering the extent to which the economies of potential surrogate countries are similar to the economy of the NME country at issue.  As discussed above, over time Commerce has developed a consistent practice of preferring surrogate countries that have economies at the "same" level of economic development as the NME country, not only in the interests of limiting administrative burden (*i.e.*, it would be time consuming to routinely consider a large number of countries in our analysis) but also in the interests of accuracy of the result (*e.g.*, price levels within a country tend to broadly track with GNI).[93]  Commerce applied that practice here.

---

[92] *See* section 773(c)(4) of the Act (emphasis added).
[93] *See, e.g.*, November 6, 2023 Redetermination at 17-18, and 32-39 (concerning the 2018-2019 administrative review of the *Order*).

2.  *Surrogate Country Comparison Pursuant to the Court's Directive*

Notwithstanding the discussion above, in accordance with the Court's *Remand Opinion*,[94] Commerce has considered the relative merits of the Indian and Indonesian data, while affording no preference to India, despite its inclusion on the Surrogate Country List.  We continue to find that the Indian data are the most appropriate source for SVs.

When evaluating SV data, Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the POR, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs.[95]  There is no hierarchy among these criteria.  It is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis.[96]  Commerce must weigh the available information with respect to each input value and make product-specific and case-specific decisions as to what constitutes the "best" available SVs.[97]

In the *Final Results*, we found that the SV criteria were, on balance, satisfied by relying on Indian data.[98]  We provided discussion with respect to whole live fish, fingerlings, fish feed, by-products, labor, and the surrogate financial ratios.[99]  We now provide a comparison of such sources to the Indonesian data as well.

---

[94] The Court directed that Commerce "examine whether Indonesia is at a level of economic development comparable to Vietnam and, if so, to analyze whether India or Indonesia offers superior surrogate data."  *See Remand Opinion* at 21.

[95] *See* Surrogate Country List.

[96] *See* Commerce's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin), available on Commerce's website at https://access.trade.gov/Resources/policy/bull04-1.html.

[97] *See, e.g.*, *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1; *see also* section 773(c)(1) of the Act.

[98] *See Final Results* IDM at 53-57.

[99] *Id.*

*Whole Live Fish*

For whole live fish, as we explained in the *Final Results*, the record contains reliable sources of Indian prices from a publication called *Undercurrent News* (*UCN*).[100]  We found in the *Final Results*[101] that the Indian data for whole live fish were publicly available, contemporaneous, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs (*i.e.*, the particular species of pangasius) in question.[102]  Additionally, with respect to the coverage of the data series provided for whole live fish, the publication states: "Data collected via interviews with farmers in all major producing regions."[103]  Accordingly, we find that the data constitute a broad market average as well.

The Indonesian data for whole live fish are less desirable.  These data come from two affidavits prepared in 2020 and 2021.[104]  In each case, an employee with a law firm that was engaged by the petitioners approached Mr. Yudi Priatno in 2020 (for 2019 values) and Dr. Dwi Budiyanto Trisnoharjono in 2021 (for 2019-2020 values) of the Indonesian Ministry of Marine Affairs and Fisheries (MMAF), to obtain information regarding the production and sale of pangasius (*patin*) and *Pangasius hypophthalmus* (*patin siam*) in Indonesia.[105]

In the 2020 Priatno questionnaire, the attorney posed several questions to elicit data from the MMAF official, including inquiries (questions 3-5) regarding the species covered by the MMAF's compiled data, and whether the data were "predominantly of production of the species

---

[100] *See* NTSF's Letter, "Factual Information Submission," dated August 2, 2021 (NTSF August 2, 2021 SV Submission), at Exhibits 1-3.
[101] *See Final Results* IDM at 53-55.
[102] *See* NTSF August 2, 2021 SV Submission at Exhibits 1-3 ("Mean prices for ex-farmgate pangasius ... whole fish, in India").
[103] *Id*.
[104] *See* Petitioners' Letter, "Pre-Preliminary Surrogate Value and Factual Information Submission," dated July 30, 2021 (Petitioners' July 30, 2021 SV Submission), at Exhibit 3 - Table 1 and Exhibit 4 (Attachment 1).
[105] *Id*.

*Pangasius hypophthalmus (Patin Siam).*"[106]  In each case Mr. Priatno answered that "there is no

information."[107]  In the 2021 Dr. Budiyanto questionnaire, similarly, the attorney requested data

from the MMAF official and asked several questions (questions 4-5) regarding the species

covered by the data.[108]  In each case, Dr. Budiyanto stated that the predominant species in

Indonesia was *patin siam*, but he did not indicate how predominant the species was, or the exact

extent to which others species' data were included in the presented figures.[109]  Thus, we do not

find that the whole live fish values offered by the Indonesian data are as specific as those offered

by the Indian sources, which unambiguously relate to the species in question.

        We also note that excerpts from the website, which are contained in the exhibit, indicated

that the data include "***Very, very provisional figures," "**Very provisional figures," and

"*Preliminary figures."[110]  The 2020 values are also denoted with an asterisk.[111]  Thus, it is

unclear the extent to which the data underlying the Indonesian prices are finalized,[112] and,

moreover, there is no indication on the record that the data in the affidavits were ultimately

published.  For these reasons, we find that the Indian data for whole live fish are preferable.

*Fish Feed*

        With respect to fish feed*,* we find that the Indian feed data further support the selection of

India as the primary surrogate country.  These data satisfy each of the SV criteria.  Regarding

specificity, the *Fishing Chimes* and *UCN* data contain values for three of the feed types used by

---

[106] *Id*. at Exhibit 4.
[107] *Id*.
[108] *Id*. at Exhibit 3 (Attachment 3).
[109] *Id*.
[110] *Id*. at Exhibit 4 (Attachment 1).
[111] *Id*. at Exhibit 3 (Table 1).
[112] The petitioners assert that the information from the MMAF website was provisional, but that information provided in response to their request for information, was not.  We address this argument below.

NTSF (*i.e.*, 24, 26, and 28 percent protein content).[113]  For the other feed type used by NTSF (*i.e.*, 35 percent protein content), the SV that Commerce relied on has a very similar protein content *i.e.*, 32 percent protein content.[114]  Regarding contemporaneity, we find that the *UCN* feed data are contemporaneous with the POR, while the *Fishing Chimes* feed data precede the POR by seven months, and we inflated these data to reflect POR values.[115]

With respect to the broad market average criterion, as it relates to the *Fishing Chimes* and *UCN* data, we find that these sources are representative of broad averages.  The *Fishing Chimes* study provides survey responses from farmers within the state of Andhra Pradesh, which is the largest pangasius-producing state during the period.  Evidence on the record shows that about 60 percent of Indian pangasius was produced in Andhra Pradesh as of the beginning of 2019,[116] and no other state was close to Andhra Pradesh in terms of production volume.[117]  In addition, the researchers explicitly stated that the "study team focused on Andhra Pradesh as it has major representation in production of pangasius."[118]  The study states that "{f}ield visits were conducted in 300 villages from two large-scale pangasius producing districts in Andhra Pradesh" and "108 data sets were collected for one crop each in 2017 and 2018 from 54 farmers" in 46 villages.[119]  Given that the survey data and the field visits were conducted in Andhra Pradesh, there is no question that the survey relied on a large number of data points from a broad

---

[113] *See* NTSF's Letter, "Response to Request for Surrogate Value Information," dated May 10, 2021 (NTSF May 10, 2021 SV Submission), at Exhibit SV-5-A and 7; and NTSF August 2, 2021, SV Submission at Exhibits 4-5
[114] *See* Memorandum, "Surrogate Values for the Primary Results," dated August 31, 2021 (Preliminary SV Memorandum).
[115] *Id.*
[116] *See* NTSF May 10, 2021 SV Submission at Exhibit SV-5-A (citing a publication titled "Current Status of Pangasius (*Pangasianondon hypopthalmus*) Farming in India," July 2019 Edition (*Fishing Chimes*), page 35).
[117] *Id.* ("Based on the inputs from the stakeholders the study was then focused on Andhra Pradesh because of its largescale representation in pangasius farming.").
[118] *Id.* at Exhibit SV-5-B.
[119] *Id.* at Exhibit SV-5-A.

collection of farmers, all of whom were located in the most significant pangasius-producing area in India.

Moreover, the *Fishing Chimes* publication, in multiple instances, emphasizes the steps that the researchers took to achieve generalizable data.[120]  In the methodology section of the report, the researchers explained that the "farmers from 46 villages were interviewed to decode the general trend" and stated that "{t}he collected data {were analyzed} for qualitative and quantitative results using statistical methods."[121]  The source also states that, following field collection, "{f}or cross verification of economic data outcomes, farm-gate prices were also obtained from vernacular newspapers from 2017 and 2018."[122]  The number of survey respondents and the method of sample selection all support Commerce's decision to rely on the *Fishing Chimes* data.

Regarding the total volume of feed represented by the source, although the volume of covered by the study is a fraction of the total production across the entire country of India, this is neither surprising nor problematic.  Data analysis relying on survey methodology does not necessarily (and typically does not) cover the entirety of a population and surveys are, naturally, likely to focus on groups or regions where there is a significant concentration of data points. Some of the sources that are most frequently used by Commerce, such as the World Bank's *Doing Business* publication, are often based on survey data that focus on a subset or a region

---

[120] It is important to note that Commerce's regulations do not define the term "broad market average."  When Commerce uses this term, we generally mean that the data themselves are broader than a single data point (such as an offer for sale or a transaction-specific price) and are generally reflective of market conditions on a larger scale. We do not require that the data be absolutely representative of an entire market; such an interpretation would not only be overly restrictive, but it would also be virtually impossible to achieve.

[121] *See* NTSF May 10, 2021 SV Submission at Exhibit SV-5-A.

[122] *Id.*

from which representative data may be obtained.[123]  There are numerous instances in this

proceeding[124] and elsewhere[125] where we relied on a subset of an economy's prices and still

found the data to be representative of a broad market average.[126]  Here too, beyond the

size/location of the sample, there are numerous indicators in *Fishing Chimes* that demonstrate

that the data were tested for representativeness.  Against this background, the record supports a

finding that the data constitute a broad market average.  Moreover, we emphasize that a

determination of whether data reflect a broad market average is a consideration that is made on a

spectrum; even assuming *arguendo* that the *Fishing Chimes*' whole live fish data are lower on

such a continuum, there are still various aspects of the data that make them reliable and

---

[123] *See, e.g.*, *Hangzhou Yingqing Material Co. v. United States*, 195 F. Supp. 3d 1299, 1311 (December 21, 2016) (*Hangzhou Yingqing*) (affirming Commerce's finding that the *Doing Business* survey reflects a broad market average, because:  (1) Bangkok is the largest and most industrial city in Thailand; (2) the survey was done by a trusted source, the World Bank; and (3) the survey was based on multiple sources and companies' actual experience); *see also Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) (*Diamond Sawblades from China*), and accompanying IDM at Comment 20 ("*Doing Business* contains data collected from local freight forwarders, shipping lines, customs brokers, port officials and banks.  Thus, although *Doing Business* provides freight costs solely for the distance between the main city and the port, it reflects the freight costs of multiple vendors and users (*i.e.*, shipping lines, customs brokers, port officials and banks) and it is a broad market average"); and *Certain Steel Threaded Rod from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71743 (December 3, 2014) (*STR from China*), and accompanying IDM at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in *Doing Business:  Thailand 2014* is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").

[124] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 75 FR 12726 (March 17, 2010), and accompanying IDM at Comment 1.A ("Petitioners argue that the FAO Report price does not represent as broad a market average as the Fish Pond Report, as the data contained within the FAO Report is based on only one region in Bangladesh as opposed to the Fish Pond Report data that is based on three provinces.  While Petitioners are correct that the FAO Report is not based on multiple provinces, we note that the data in the FAO Report is based on more fish farmers (60) than the Fish Pond Report (34).  Moreover, it is not clear that other provinces in Bangladesh have any meaningful production of Pangas fish.  However, the FAO Report does state why this particular region was selected (*i.e.*, importance of this region in Pangas farming, the availability of hatchery produced fry, availability of ponds, warm climate, cheap and abundant labor.)" (internal citations omitted)).

[125] *See, e.g.*, *Raw Honey from the Socialist Republic of Vietnam:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 22184 (April 14, 2022), and accompanying IDM at Comment 1 ("The five Indian news articles are specific to ingredient raw beekeeper honey, representative of the broad market average because they are from the largest raw honey producing regions of India … .").

[126] *See, e.g.*, *Hangzhou Yingqing*, 195 F. Supp. 3d at 1311; *Diamond Sawblades from China* IDM at Comment 20; and *STR from China* IDM at Comment 3.

preferable to the Indonesian data. Moreover, as noted above, the *UCN* publication states that its "{d}ata collected via interviews with farmers in all major producing regions."[127]

The Indonesian data, as with the whole live fish data, were obtained through an inquiry sent to Dr. Budiyanto with the MMAF, discussed above. These data are not specific to the particular type of feed applicable here. In particular, we note that, although the question requested data on "patin siam fish feed" pricing, the data clearly are not limited to this type of feed, as two of the entries explicitly state that the pricing is "specifically shrimp feed."[128] The affidavit also raises questions about the source; it states that the information was from "Mr. Deni, Marketing of CPP {PT. Central Protein Prima}, and internet."[129] Similarly, while the question issued to the affiant requested 2019-2020 data, the response simply states: "the prices have not changed from 2018-2021."[130] Given these facts, there is no basis to find that these data reflect a broad market average. For these reasons, we find that the Indian data for fish feed are preferable.

*Fingerlings*

With respect to another key input, fingerlings, we also find that the India data are superior to the Indonesian data. These sources, again, *Fishing Chimes* and *UCN*,[131] satisfy the SV selection criteria. These data are publicly available, generally contemporaneous with the POR, representative of a broad-market average, tax- and duty-exclusive, and specific to the inputs being valued, including with respect to species.[132]

---

[127] *See* NTSF August 2, 2021 SV Submission at Exhibits 1-3.
[128] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 3 (response to question 16).
[129] *Id*. It is unclear if different protein contents were obtained from different sources, or if the prices reflect some average between (an uncertain number of) sources.
[130] *Id*.
[131] For a subset of the fingerlings, we relied on data from *Fishing Chimes* (2017-2018 data), which we inflated to be contemporaneous with the POR. *See* Preliminary SV Memorandum.
[132] *See Final Results* IDM at 53-55.

Regarding the representativeness of the data, the fingerling prices were from commercial nurseries in two locales which collectively supplied fingerlings to 96 percent of India's pangasius farms.[133]  Although the *Fishing Chimes* source does not identify each individual survey participant, it clearly identifies key characteristics, and the location, of the participants. As noted above, the survey data for *Fishing Chimes* were based on responses from numerous farmers and were corroborated by field visits and comparisons to other data sources.[134] Additionally, with respect to the coverage of the *UCN* data series provided for fingerlings, here too the publication states:  "Data collected via interviews with farmers in all major producing regions."[135]

There are several disadvantages to the corresponding Indonesian source (*i.e.*, data contained in an affidavit from Dr. Budiyanto of the Indonesian MMAF).[136]  Unlike the Indian equivalent, there is no basis to conclude that the data are specific with respect to the particular species in question.  Moreover, Mr. Budiyanto identified the source as:  "Information from statistic production deriving from fingerlings farmers and literatures of Sari Agri 2020."[137] However, there is neither information on who/what "Sari Agri" is, nor are the document's underlying source data provided.  Similarly, there is no mention of the data collection methods regarding the farmers.  Accordingly, we find that the Indian data for fingerlings are clearly preferable.

---

[133] *See* NTSF May 10, 2021 SV Submission at Exhibit SV-5-A.
[134] *Id.*
[135] *See* NTSF August 2, 2021, SV Submission at Exhibits 2-3.
[136] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 3.
[137] *Id.*

*By-Products and Other SVs*

We are able to rely on Indian sources for the other inputs, with the exception of one Indonesian SV (boat freight).[138]  With respect to two key by-products (fish meal and fish oil) we relied on Global Trade Atlas (GTA) data.[139]  These data are specific, publicly available, contemporaneous with the POR, representative of a broad market average, and tax- and duty-exclusive.  On a routine basis, Commerce values FOPs using GTA import statistics to determine the SVs for certain inputs, which represent annualized, cumulative quantities and values for the applicable time period.[140]

The Indonesian source for fish oil, *i.e.*, another MMAF affidavit responding to questions from legal counsel, provide a limited explanation of the data, and the source(s) underlying the response to this question are uncertain.[141]  Similarly, for fish meal, the Indonesia data are price quotes from seven sellers, which are not contemporaneous with the POR,[142] and are, more generally, a disfavored type of source.[143]  Although fish oil and meal are significant contributors to normal value, we also note that the other Indonesia by-product price data are not preferable;

---

[138] *See* Memorandum, "Preliminary Results Analysis Memorandum for the NTSF Seafoods Joint Stock Company," dated August 31, 2021 (Preliminary Results Analysis Memorandum), at 2.
[139] *See* Preliminary SV Memorandum.
[140] *See Certain Steel Nails from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 11683 (March 16, 2018), and accompanying IDM at Comment 1 ("Indeed, in past reviews of this *Order* we have used GTA data to value FOPs because it fulfilled our SV selection criteria.").
[141] *See* Petitioners' Letter, "Submission of Proposed Surrogate Factor Values," dated May 10, 2021 (Petitioners' May 10, 2021 SV Submission), at Exhibit 9-A (Attachment 3).
[142] *Id*. at Exhibit 9-C.
[143] *See, e.g.*, *Certain Polyethylene Terephthalate Resin from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 81 FR 13331 (March 14, 2016), and accompanying IDM at Comment 2 ("Our general practice is not to use price quotes to value factors of production.  {Commerce} often does not know the conditions under which price quotes were solicited and whether or not these were self-selected from a broader range of quotes.  Without access to all of the information on how the price quotes were obtained (including any negotiations or agreed-upon adjustments), it is impossible to confirm that quotes reflect a typical broad market average cost.").

for instance, they are from a small number of sources, include price quotes, and in certain instances are not contemporaneous.[144]  Thus, these too offer no advantage over the Indian data.

With respect to labor, we relied on Indian International Labor Organization (ILOSTAT) data from 2012.  The data are specific as they cover "Skilled agricultural and fishery workers."[145]  Moreover, while the ILOSTAT data are not contemporaneous, we inflated this SV to reflect POR values.[146]  Therefore, although the Indonesian labor data are contemporaneous and specific,[147] and therefore offer an advantage for this FOP in that regard, the difference between the labor data do not warrant a departure from the primary surrogate country.[148]

*Financial Ratios*

We continue to find that the Indian sources for financial ratios are appropriate, and that they are superior to the Indonesian alternatives.  As we explained in the *Final Results*,

> NTSF placed on the record contemporaneous financial statements from two Indian seafood processors:  {Ananda Enterprises (India) Private Limited (Ananda)} and {MMC Exports Limited (MMC)}.  The petitioners also placed on the record the same contemporaneous financial statements from Ananda.  In the *Preliminary Results*, we found that the Ananda and MMC statements provide a reliable basis for valuing the surrogate financial ratios and are, thus, usable.  No party challenged the use of Ananda's or MMC's financial statements for surrogate valuation purposes.[149]

With respect to Indonesia, the petitioners provided financial statements of PT Dharma Samudera Fishing Industries Tbk (Dharma) and PT Japfa Comfeed Indonesia Tbk (Japfa).[150]  In

---

[144] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 3 (response to Question 20); and Petitioners' May 10, 2021 SV Submission at Exhibit 9-C.
[145] *See* NTSF May 10, 2021 SV Submission at Exhibit SV-15.
[146] *See* Preliminary SV Memorandum.
[147] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 8.
[148] Commerce strongly favors selecting all SVs from a single country, to the extent possible, pursuant to 19 CFR 351.408(c)(2).  Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."  *See, e.g.*, *Jiaxing Brother v. United States*, 961 F. Supp. 3d 1326, 1332-33 (CIT 2014) (*Jiaxing Brother*), *aff'd Jiaxing Brother v. United States*, 822 F.3d 1289, 1293-96, 1298 (Fed. Cir. 2016) (*Jiaxing Brother CAFC*).
[149] *See Final Results* IDM at 56-57 (citing NTSF May 10, 2021 SV Submission at Exhibit SV-19; and Petitioners' July 30, 2021 SV Submission at Exhibit 20).
[150] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 11.

certain respects, the Indonesian financial statements are less favorable than the ones from Indian companies. The statements from Dharma are accompanied by an unqualified auditor's opinion, but contain a note regarding the company's ability to continue as a going concern.[151] Commerce has previously found such notes to be relevant to our assessment of whether a financial statement serves as the best available evidence as a source of surrogate financial ratios.[152] Regarding Japfa's financial statements, information therein indicates that "Aquaculture" comprises a relatively small percentage of the company's sales (under 10 percent for the period covered by each set of statements).[153] Although we do not find that either of these observations render the statements unusable, they are relevant to our determination that the Indonesian statements are not preferable to the Indian statements.

Examining the relative merits of the data, and given that three key inputs, *i.e.*, whole live fish, fingerlings, and fish feed, in the aggregate, comprise a substantial portion of the normal value, we find it significant that the Indian data are superior to the Indonesia data for these FOPs. It also bears noting that, as NTSF is a producer that farms its own fish for processing, it relies especially heavily on the consumption of fingerlings and fish feed inputs – as they are the inputs necessary to raise fish for production.[154] Accordingly, the fact that the Indian data are preferable for feed and fingerlings is significant to Commerce's consideration of how to compute the most accurate normal value.

---

[151] *Id*. at Exhibit 11-A.
[152] *See, e.g., Certain Hardwood Plywood Products from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017- 2018*, 85 FR 77157 (December 1, 2020), and accompanying IDM at Comment 3 (noting that "the Company recorded negative operating cash flows … {and} the Company's current liabilities exceeded its current assets … . These events or conditions indicate that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern … . In this review, given the concern raised by the auditor with respect to Megamas, and in light of other usable financial statements available on the record to calculate the surrogate financial ratios, we find Megamas' financial statements do not constitute the best available information.").
[153] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 11-B and Exhibit 11-C.
[154] *See, e.g.*, NTSF Section CD Response at D-2.

In conclusion, consistent with our analysis in the underlying administrative review,[155] we continue to find that the Indian data are the best available information for valuing the FOPs here. Moreover, assuming *arguendo* that the Indonesian data and Indian data were equivalent, Commerce has the discretion to choose between potential surrogate countries.[156]

## IV.     INTERESTED PARTY COMMENTS

As noted above, on August 27, 2024, the petitioners and Green Farms submitted comments on the Draft Results.[157]  We address these comments below.

### A.  East Sea's Eligibility for a Separate Rate

*Petitioners' Comments*

The following is a verbatim executive summary submitted by the petitioners.  For further details, *see* Petitioners' Comments at 6-9.

> Commerce Should Continue to Find ESS Eligible for a Separate Rate.  In the final remand redetermination, the agency should continue to grant a separate rate to ESS. The Court remanded the agency's decision to grant the company a separate rate not for any inconsistency with law, but rather for further explanation of how the record regarding ESS's operations during the review period corresponded to each factor that the agency considers in assessing a company's freedom from government control.  Commerce's draft results provide the required explanation.  Specifically, the draft results go through each factor in turn, identifying relevant record statements and documentation, and detailing how they relate to and support the conclusion that ESS was free from government control during the 2019-2020 review period.  Beyond this, the record indicates that ESS provided information in support of its separate rate status that was comparable to information provided by other separate rate applicants.  As such, CFA respectfully requests that the agency continue to grant ESS a separate rate in the final remand results.

---

[155] *See Final Results* IDM at 51-57.
[156] *See GGB Bearing Tech (Suzhou) Co., Ltd. v. United States,* 279 F. Supp. 3d 1233, 1249 (CIT 2017) (noting that section 773(c)(1) of the Act "grants Commerce wide discretion in selecting potential surrogate countries and the information available in those countries."); and *Union Camp Corp. v. United States*, 941 F. Supp. 108, 116 (CIT 1996) ("When Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly.").
[157] *See generally* Petitioners' Comments; and Green Farms Comments.

*Green Farms Comments*

The following is a verbatim executive summary submitted by Green Farms.  For further details, *see* Green Farms Comments at 2-5.

> Commerce's {Draft Results} regarding East Sea's separate rate eligibility fail to address all of the relevant evidence on the record.  There are two important evidentiary omissions in Commerce's analysis.  First, Commerce failed to address important deficiencies in East Sea's submissions pointed out by Petitioners during the underlying proceeding, including deficiencies in East Sea's business registration certificates and in its disclosure of relationships with other Vietnamese processors.  Second, Commerce also failed to address the fact that East Sea *completely quit the case*, thus depriving Commerce of an opportunity to verify or otherwise confirm the very information submitted by East Sea that Commerce now relies upon.

**Commerce Position**:  We continue to find that granting ESS a separate rate in the *Final Results* was warranted.  Green Farms' arguments to the contrary are unavailing, and, notably, Green Farms essentially asks Commerce to reopen certain issues that were already decided by the Court.

As an initial matter, the Court's remand, as it relates to Commerce's analysis of ESS's separate rate eligibility, was limited in nature.  The Court stated:

> Commerce did not adequately explain{} its decision, or how the evidence supports its findings under each of the factors relevant to determining the absence of both *de jure* and *de facto* control {in conducting its separate rate analysis}… The agency further identified the relevant factors it considers in examining *de jure* and *de facto* independence, but in finding those factors satisfied it merely repeated the factors themselves and gave blanket citations to the company's separate-rate certification. … In layman's terms, {Commerce} didn't show its work.[158]

As a result, in the *Remand Order*, the Court directed Commerce to provide additional separate rate analysis to tie the facts of the record to the applicable legal standard set forth in the *Final Results*.  Commerce provided an extensive discussion of the separate rate criteria in response to

---

[158] *See Remand Opinion* at 12-13 (internal citations and quotations omitted).

the Court's directive.[159]

As noted above, ESS submitted an SRC and a response to section A of Commerce's standard AD questionnaire which provided the information necessary for Commerce to assess ESS's independence from government control. These documents included, for instance, the relevant Vietnamese laws for the *de jure* aspect of our analysis. They also included various documents relating to our *de facto* analysis; with respect to ownership, the business registration ESS submitted indicates that the company is owned by individuals and the company certified that these individuals are not representatives or officials of the Vietnamese government. No party provided information on the record to the contrary. As a result, we continue to conclude that there was no basis to deny ESS a separate rate in this review. Green Farms' comments do not undermine Commerce's analysis on this point.

Green Farms does, however, present several arguments which amount to an attempt to relitigate issues that the Court has already decided. First, Green Farms contends that, although "Commerce states that the record contains no evidence indicating that {ESS's} statements were false, or that the information that it provided was incomplete or otherwise deficient … this statement is not accurate … Green Farms has argued both to Commerce and the Court that Petitioners noted serious deficiencies in East Sea's submissions. … {and} Commerce must address these deficiencies in its Final Remand."[160] This precise argument was considered and squarely rejected by the Court in the *Remand Opinion*, which stated:

> {Green Farms} maintains that {Commerce} disregarded {the petitioner} Catfish Farmers' {pre-preliminary} comments about alleged deficiencies in East Sea's certification. … The final determination, in turn, makes clear that Catfish Farmers proffered no objection to {Commerce}'s preliminary conclusions. In other words, Catfish Farmers abandoned their arguments. After the agency issues its preliminary determination, the parties have 50 days to file case briefs that must present all

---

[159] *See supra*, at "ESS Separate Rate Eligibility."
[160] *See* Green Farms Comments at 4.

> arguments that continue in the submitter's view to be relevant to the Secretary's determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results. Both Commerce and reviewing courts normally find an argument not presented in a party's case brief to be waived unless the argument could not have been raised in the case brief.
>
> Because Catfish Farmers elected not to include their pre-preliminary arguments in their case brief, Green Farms needed to assert them. It failed to do so; instead, it now complains that Commerce does not even mention CFA's deficiency comments, much less consider them. But that is what ordinarily happens when a party abandons its arguments: {Commerce} reasonably chose not to address Catfish Farmers' forsaken comments when Green Farms declined to adopt them as its own.[161]

Thus, consistent with the Court's determination, we reject Green Farms' belated attempt to raise arguments that neither it, nor the petitioners, raised in case briefs in the underlying segment.[162]

Green Farms' second argument similarly fails. Green Farms takes issue with Commerce's decision to rely on the ESS separate rate information on the record, asserting that, in the Draft Results, "Commerce also failed to address the fact that East Sea *completely quit the case*, thus depriving Commerce of an opportunity to verify or otherwise confirm the very information submitted by East Sea that Commerce now relies upon."[163] However, we did not ignore this fact; to the contrary, we addressed the issue at length in the *Final Results*. We explained that, under the circumstances, reliance on ESS's separate rate filings, made prior to the cessation of its participation, was appropriate:

> In response to our request for information, ESS provided Commerce's required attestation, its business registration certificate, and its tax forms showing independence from the government. It also provided a full response to Section A of Commerce's questionnaire with respect to the company's operations, independence from the government, and relevant affiliations. We found no basis to determine that

---

[161] *See Remand Opinion* at 11-12 (internal citations and quotations omitted).
[162] *See NEXTEEL Co. v. United States*, 461 F. Supp. 3d 1336, 1344-1346 (CIT 2020) ("Generally, exhaustion requires that a party submit an administrative case brief to Commerce presenting all arguments that continue to be relevant to Commerce's final determination or results") (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010)).
[163] *See* Green Farms Comments at 4 (emphasis in original).

the separate-rate information submitted was not reliable.

. . .

Moreover, we note that the circumstances of this proceeding are unique. Unlike in the majority of NME proceedings, the applicable AFA rate here (*i.e.*, \$3.87/kg) is distinct from the country-wide rate (*i.e.*, \$2.39/kg). Commerce has applied this AFA rate to other exporters in this proceeding, and the Courts have upheld application of this rate as AFA. This is not surprising, as the presence of an AFA rate is necessary to incentivize future compliance on the part of respondents. The SAA provides that Commerce may employ an adverse inference to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully. As such, Commerce's practice is to consider, in employing adverse inferences, the extent to which a party may benefit from its own lack of cooperation. By denying separate-rate status to ESS in this context, the company would benefit from its lack of participation, despite the fact that it began participating in this review and submitted separate rate information that Commerce has no basis to disregard. Allowing a company to avoid application of a rate based on AFA under such circumstances would allow a company to selectively participate and withdraw from a proceeding if it anticipated an unfavorable result. This would undermine the integrity of the process and the remedial purpose of the law.

Moreover, Green Farms' interpretation – that Commerce should never grant a separate rate if any portion of a questionnaire, initial or supplemental, went unanswered – would severely and inappropriately limit the possibility for future application of AFA in this proceeding. Moreover, this interpretation is contrary to the Court's holdings that it is unreasonable to link issues relating to a company's FOP and sales reporting to Commerce's separate rate determination for that company, absent record evidence that the separate rate information was missing or incomplete.[164]

Significantly, we also discussed how our decision was consistent with Court precedent:

Commerce's determination with respect to independence from the government is separate from its analysis regarding sales and cost data. As the CIT has found, "Commerce's determination as to whether AFA is justified with respect to sale or prices, however, is distinct from its analysis of whether a respondent is eligible for a separate dumping rate."[165] The CIT has further held that, "it is unreasonable for Commerce to impute the unreliability of a company's questionnaire responses and submissions concerning its factors of production and/or U.S. sales to its separate-rate responses when there is no evidence on the record indicating that the latter were false, incomplete, or otherwise deficient, is unreasonable."[166] Accordingly,

---

[164] *See, e.g.*, *Final Results* IDM at Comment 6 (footnotes omitted).
[165] *See National Nail Corp. v. United States*, 279 F. Supp. 3d 1372, 1377 (CIT 2018) (*National Nail Corp*).
[166] *See Yantai Xinke Steel Structure Co. v. United States*, 36 CIT 1035, 1054 (CIT July 18, 2012); *see also, e.g.*,

because Commerce "presumes government control" when it assigns the country-wide rate to an exporter, the CIT has repeatedly held that Commerce should not apply the country-wide rate when "the respondent has established independence from government control" – even where Commerce has found that other information reported by the same respondent is unreliable or incomplete[167]. . . Here, we continue to determine that ESS is eligible for a separate rate.[168]

Thus, Commerce considered the reliability of the information on the record. We considered prior court holdings regarding the distinction between information relating to separate rate status and information necessary to calculate a dumping margin. We also considered the ability of a party to benefit from its lack of cooperation and noted – on numerous occasions in the *Final Results*[169] – that ESS ceased participation in the review.[170] Finally, we considered the unique circumstances surrounding this proceedings AFA rate. In sum, Commerce's analysis in this regard was complete and consistent with administrative precedent/policy as well as judicial precedent. Thus, Green Farms' assertion that Commerce failed to consider ESS's withdrawal from the case is without merit.

Green Farms's reliance on *AMS Assocs.* is misplaced.[171] There, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) upheld Commerce's decision to find a company to be part of the country-wide entity after the company withdrew from the proceeding, because

---

*Shandong Huarong General Group v. United States*, 27 CIT 1568, 1594 (CIT October 22, 2003) (holding that Commerce may not disregard separate rate information when "there is no indication that any necessary information was missing or incomplete") (citation omitted); and *National Nail Corp*, 279 F.Supp.3d at 1377.

[167] *See Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231, 1240-41 (2009) (internal citations omitted).

[168] We acknowledge that, in the past, Commerce's practice had been to deny a separate rate where a company did not provide full questionnaire responses. However, we have reexamined this general practice in light of the CIT's holdings in multiple cases, such as those cited above, that such a generalized policy was not always appropriate. As a result, Commerce modified its analysis in this regard to be one conducted on a case-by-case basis. For the reasons we explain herein, we find that it is appropriate to grant ESS a separate rate.

[169] *See Final Results* IDM at 3 and Comment 6 (at 24, 26, and 28-29).

[170] Moreover, this fact was also recognized by the Court in rendering its opinion, as it observed that "East Sea … ceased cooperating with the review after establishing its eligibility for a separate rate, prompting Commerce to apply facts otherwise available with an adverse inference." *See Remand Opinion* at 4.

[171] *See e.g., AMS Assocs. v. United States*, 719 F. 3d 1376, 1378-80 (Fed. Cir. 2013) (*AMS Assocs*).

the cessation of participation rendered the response unverifiable.[172]  However, that case did not involve the same fact pattern as in the instant case.  In stark contrast, there, at the separate rate applicant's request, Commerce removed all confidential information regarding the company's separate rate from the record.[173]

In any event, the Court has already upheld this approach in the instant review with respect to another respondent, and, thus, Green Farms' argument has no merit.[174]  Therefore, we continue to find that our granting of a separate rate to ESS was appropriate.

### B.  Selection of a Rate to Assign to Greens Farms

*Petitioners' Comments*

The following is a verbatim executive summary submitted by the petitioners.  For further details, *see* Petitioners' Comments at 9-13.

> Commerce Should Continue Its Calculation of Green Farms' Separate Rate.  Unless the agency adjusts the rate determined for {NTSF}, Commerce should continue to assign Green Farms a $1.94/kg separate rate in the final remand results.  The agency's draft results appropriately connect the rate to Green Farms' pricing practices in the review period.  Indeed, the draft results indicate that it would be reasonable to assign Green Farms an even higher rate.  Further, while the Court's concern with the agency's original analysis was largely premised on *Bestpak*,{175} legal developments subsequent to that decision call the case's relevance into question and further support the agency's original and remand determinations.

*Green Farms Comments*

The following is a verbatim executive summary submitted by Green Farms.  For further details, *see* Green Farms Comments at 5-17.

---

[172] *Id*., 719 F. 3d at 1381 ("Because Commerce could properly apply the default country-wide rate after concluding that, with critical information missing or unverifiable, Aifudi could not carry its burden to justify a separate rate, we affirm.").

[173] *Id*., 719 F. 3d at 1379-80.

[174] *See, e.g.*, *Hung Vuong Corp. v. United States*, Ct. No. 19-00055, Slip Op. 21-142, at 6 (CIT Oct. 12, 2021) (upholding Commerce's application of total AFA to a respondent as a result of its reporting failures, including the fact that "substantial portions of {the respondent's} data were unverifiable because of failure to maintain source documents.").

[175] *See Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370 (Fed. Cir. 2013) (*Bestpak*).

Commerce's {Draft Results} regarding Green Farms' separate rate calculation are unlawful and unsupported by substantial evidence. Commerce's decision fails to withstand scrutiny for two overarching reasons. First, Commerce completely ignored its prior practice for determining separate rates for non-selected respondents in analogous situations (wherein it normally relies on dumping rates calculated for the mandatory respondents from the most recent proceedings). Commerce instead used a "short-cut" comparison methodology relying on individual sales prices of the parties. Commerce failed to explain its departure from its past methodology as it is required by law to do. Second, Commerce also failed to demonstrate that its actions in determining Green Farms' separate rate using its "short-cut" methodology were otherwise supported by substantial evidence. Commerce's decision is grounded in numerous evidentiary flaws, including the mistaken use of the wrong sales price, faulty pricing and evidentiary comparisons, and faulty assumptions. In short, Commerce made several mistakes and it therefore failed to make an "apples-to-apples" comparison using its "short-cut" comparison methodology.

**Commerce Position**: We continue to find, based on an examination of the information on the record regarding Green Farms' pricing, that the dumping margin assigned to Green Farms is reflective of its commercial behavior. Accordingly, we continue to find our assignment of a rate to Green Farms was appropriate and consistent with the *Remand Order*.

First, Green Farms asserts that "Commerce completely ignored its prior practice for determining separate rates for non-selected respondents in analogous situations (wherein it normally relies on dumping rates calculated for the mandatory respondents from the most recent proceedings)."[176] This is a misstatement of Commerce practice. The SAA clarifies that, if the estimated weighted-average dumping margins established for all exporters and producers individually investigated are zero, *de minimis,* or determined entirely under section 776 of the Act, then the expected method for establishing the estimated rate for exporters and producers not individually investigated is to weight average the zero and *de minimis* estimated dumping margins and the dumping margins based on facts available (provided that volume data are available), unless doing so is not feasible, or the results would not be reasonably reflective of

---

[176] *See* Green Farms Comments at 1.

potential dumping margins for non-investigated exporters or producers.[177]  Where the

information necessary to calculate a weighted average is not available (*e.g.*, where volume data

are not on the record), calculating a rate for non-individually-examined companies based on a

simple average may be appropriate.[178]  The latter scenario is applicable here.  Because we do not

have publicly-ranged shipment data for ESS on the record, we calculated a simple average of the

zero and AFA rates assigned to the individually investigated respondents to determine the non-

selected company rate.  This approach has been applied in numerous proceedings.[179]

In support of its argument, Green Farms cites precedent that is not on point.  First, it

references Commerce's remand redetermination in *Navneet*[180] in support of its assertion that

Commerce has a practice of considering rates from a prior review, new shipper review, or

investigation.  That remand was conducted 10 years ago, prior to numerous relevant court

decisions on calculation of the all-others and non-selected companies' rates.  In any case, in

calculating rates for non-individually examined companies, Commerce does not have a practice

of relying on prior margins over the contemporaneous results of mandatory respondents, unless

the circumstances of a particular case make it reasonable to do so.  As the Federal Circuit has

recently explained in *Pro-Team*,

> {t}he very fact that the statute contemplates using data from the largest volume
> exporters suggests an assumption that those data can be viewed as representative of
> all exporters, unless the application of those data to non-examined parties is shown
> to be unreasonable.  The statute assumes that, absent {evidence that the largest

---

[177] *See* SAA at 873.

[178] *See Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333, 1341 (CIT 2014) (finding that it is not *per se* unreasonable for Commerce to use a simple average of zero and AFA rates to calculate the separate rate); *see also Solianus, Inc. v. United States*, 391 F.Supp.3d 1331, 1339 (CIT 2019).

[179] *See, e.g.*, *Aluminum Extrusions from Malaysia:  Final Affirmative Determination of Sales at Less Than Fair Value*, 89 FR 80458, 80459 (October 3, 2024); and *Aluminum Extrusions from Taiwan:  Final Affirmative Determination of Sales at Less Than Fair Value*, 89 FR 80477 (October 3, 2024).

[180] *See* Green Farms Comments at 7 (citing *Final Results of Redetermination Pursuant to Court Remands; Navneet Publications (India) Ltd. v. United States*, Court No. 13-00024; Slip Op. 14-87 (CIT July 22, 2014) (*Navneet*) at 3, available at https://access.trade.gov/Resources/remands/14-87.pdf).

> exporters are not representative}, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters.[181]

As in *Pro-Team*, here, there is "no indication that the selected mandatory respondents were not representative of the experience of the non-selected companies, even when the rate{} of {a mandatory respondent was} based on AFA."[182]  Ignoring this, Green Farms urges Commerce to cherry-pick the rate(s) from a cooperative mandatory respondent from either the 15th, 16th, 17th or 19th administrative review in this proceeding (none of which involved an examination of Green Farms itself).[183]  Thus, Green Farms provides no evidence that a rate derived from averaging the rates assigned to ESS and NTSF is not reasonably reflective of the experience of Green Farms during the POR.

Second, Green Farms takes issue with the price analysis Commerce conducted in its discussion of why the separate rate derived in this review was appropriate.  Specifically, Green Farms asserts numerous arguments regarding a purportedly faulty price comparison in the Draft Results.  With one exception,[184] these arguments are without merit, and the price comparison continues to support the rate assignment for Green Farms.

As noted above, we compared Green Farms' sales price to prices of sales of subject merchandise made by ESS and NTSF, the mandatory respondents in this review.  We found that the prices, as adjusted, were [        ] for ESS, [          ] for Green Farms, and [        ] for

---

[181] *See Pro-Team Coil Nail Enter. Inc. v. United States*, Ct. No 2022-2241 (Fed. Cir. August 15, 2024) (*Pro-Team*), at 18.

[182] *Id*. at 19.

[183] Green Farms also cites Commerce's approach on remand in the 13th administrative review of this order as support for its position.  *See Final Results of Redetermination Pursuant to Court Remand*, *GODACO Seafood Joint Stock Co. v. United States,* Court No. 18-0063, Slip. Op. 21-03 (CIT January 6, 2021), available at https://access.trade.gov/Resources/remands/21-03.pdf.  However, the cited aspect of that remand – relating to derivation of a rate for non-selected companies – was completed under protest and, in any case, is not a reflection of Commerce practice.  *Id*. at 7 and 9.

[184] We inadvertently used a starting price of [        ] for Green Farms, rather than [        ].  We have corrected the error in the chart above and in our narrative analysis of the pricing data on the record of the review.

NTSF, and determined that this supports the conclusion that Green Farms' pricing fell within the range of prices observed for ESS (to which we assigned a rate of $3.87/kg, based on AFA) and NTSF (which received a calculated margin of $0.00/kg). None of Green Farms' arguments to the contrary warrant a different conclusion.

On numerous occasions, Green Farms critiques the universe of prices that we relied upon, noting that "Commerce compared a single sale price from Green Farms' separate rate application to single sales prices submitted by the two mandatory respondents."[185] We find this argument confusing, given that Green Farms' sale constituted the sole transaction for the company during the POR.[186] It is unclear what other basis would be available to Commerce for use in a comparison, and Green Farms suggests no alternatives. Similarly, as to the ESS sale, we relied on the sales documentation contained in its Section A Response, prior to its withdrawal from the case;[187] again, Green Farms points to no alternative data on the record to form the basis of a price comparison. Finally, with respect to NTSF, while it is true that we relied on a single sale of subject merchandise in the comparison, this fact is not meaningful; our analysis clearly set forth NTSF's other sales prices, and we demonstrated that the result was consistent regardless of which sale from the NTSF database we selected (and we selected the lowest price, to be conservative).[188]

We also disagree with Green Farms that we inadequately considered other aspects of the examined sales. First, Green Farms asserts that the observed difference between Green Farms' price and NTSF's pricing is largely attributable to duties and contends that Commerce "ignored

---

[185] *See* Green Farms Comments at 10.
[186] *See* Green Farms SRA at Exhibit SRA-2; and Green Farms SRA at Attachment II.
[187] *See* ESS Section A Response at Exhibit A-5.
[188] *See* NTSF Section CD Response at Exhibit C-1.

the commercial reality of Green Farms' sale inasmuch as [                    ] had to pay

the very high dumping duty deposits [                    ] Green Farms, whereas NTSF's

[                    ]."[189]  As an initial matter, and as we have previously explained, "such deposits

(which are estimates of an uncertain duty liability to be assessed in the future) are not part of

Commerce's analysis."[190]  As the CIT acknowledged in *Ad Hoc Shrimp*, Commerce's practice is

"not to deduct the paid deposits from the export prices calculated … by relying on its

longstanding and judicially-affirmed statutory interpretation that antidumping duty deposits 'are

not costs, expenses, or import duties within the meaning of {section 772(c)(2)(A) of the

Act}.'"[191]  Green Farms acknowledges as much.[192]  Indeed, Green Farms appears to argue that

the observed difference between its and NTSF's prices is related to dumping (or the duties used

to remedy that dumping), thereby undermining its own point.

In any case, although Green Farms contends that Commerce failed to properly account

for differences in the terms of sale between the transactions examined (specifically, the fact that

the NTSF sales terms were [      ], whereas the Green Farms sales terms were [      ]), we did

make numerous adjustments to reflect the terms of sale, as well as adjustments for known

---

[189] *See* Green Farms Comments at 12.  Although Green Farms claimed business proprietary treatment for this information, the fact that companies involved in an antidumping duty order must post deposits of antidumping duties is not business proprietary and the cash deposit rates of both Green Farms and NTSF are public information.
[190] *See, e.g.*, *Xanthan Gum from the People's Republic of China:  Rescission of 2014-2015 Antidumping Duty New Shipper Review*, 81 FR 56586 (August 22, 2016), and accompanying IDM at Comment 2 ("We also disagree with IMJ's contention that {Commerce's} comparisons should consider dumping and cash deposit rates. {Commerce} does not adjust for cash deposit rates when calculating net prices in its price comparisons. … There is no reason for {Commerce} to depart from its practice here and IMJ has cited no precedent as evidence of past {Commerce} practice in this regard.").
[191] *See Ad Hoc Shrimp Trade Action Committee. v. United States*, 925 F. Supp. 2d 1367, 1373 (CIT 2013) (*Ad Hoc Shrimp*) ("But while it is true that the antidumping deposit paid on entries of subject merchandise has no corollary within the normal value of a foreign like product, it is not, strictly speaking, an additional cost included in the export price because it is a refundable security deposit to ensure that the importer does not purchase its merchandise below fair value.  If upon review of the relevant pricing data Commerce determines that the subject entries were purchased at fair prices, then the importer will be refunded its deposit; but if the review reveals that the entries were obtained at prices below normal value, then the deposit may be forfeited and, to the extent that the deposit is exceeded by the actual antidumping duties owed, will require additional payment.").
[192] *See* Green Farms Comments at 13.

differences in the actual costs to make those sales, and Green Farms cannot account for the remaining price differential using Commerce's normal methodology.

Moreover, regarding the volume of the sale, Green Farms asserts that "{t}he Green Farms sale [

]."[193]  We find that a sale of [          ] is commercially significant and, moreover, the size of the overall Green Farms transaction – when considering the other merchandise that comprised a large portion of the shipment – was [                    ].[194]  Thus, the Green Farms sale was of a significant quantity of merchandise and was not a [                    ][195] as Green Farms contends.

Green Farms also makes several speculative assertions regarding other aspects of the sales prices.  For instance, it notes that the timing of the Green Farms sales was different from either the NTSF sale or the ESS sale.[196]  However, it points to no information on the record to suggest that such timing would play a role in the observed pricing patterns or demonstrate that such timing would be relevant to our NME dumping calculation.  It also references[197] the timing of the sales contract for the NTSF sale, but does not demonstrate why that date is relevant, as Commerce typically relies on shipment date or invoice date as the date of sale in its margin calculations.  Similarly, Green Farms contends that the NTSF sale was distinct due to the fact that it was [                    ].[198]  Here too, the observation does not lead to the conclusion that Green Farms seeks to draw.  Even assuming that the NTSF sale had distinct packaging as compared with the Green Farms sale, the contribution of the packaging-related

---

[193] *Id*.
[194] *See* Green Farms SRA at Exhibit SRA-8.
[195] *See* Green Farms Comments at 14.
[196] *Id*. at 13.
[197] *Id*.
[198] *Id*.

FOPs to normal value simply cannot account for the observed price difference. (For instance, we note that utilizing NTSF's calculations as an example, the cost of bags used on packaging is only [      ] percent of the cost of production, which amounts to approximately [      ] percent of the sales price.[199])

The remainder of Green Farm's arguments are either based on incorrect presumptions or are strawmen. Green Farms asserts that "Commerce's revised methodology again relies on Green Farms' cash deposit to justify Commerce's findings."[200] It is unclear, however, how the analysis set forth above relates to the company's existing cash deposit rate at all. Rather, our analysis is based on observed POR prices actually charged by the company and the mandatory respondents; in fact, Green Farms elsewhere acknowledges as much, characterizing the analysis as Commerce comparing "Green Farms' U.S. export price (*i.e.,* Green Farms' selling price in the U.S.) to its competitor's U.S. export price."[201] Thus, as Green Farms itself acknowledges, we compared contemporaneous *prices* – not cash deposits – in our analysis.

Green Farms contends that "Commerce actually admits it does not even have all the necessary information it needs to make an actual dumping calculation or comparison {for Green Farms}. … {i}f Commerce prefers to do such a calculation, then Commerce should have selected Green Farms as a mandatory respondent and performed the actual calculation"[202] This is a red herring – Commerce does not solicit databases to conduct margin analyses for companies that have not been selected for individual examination. Green Farms' arguments, if taken seriously, would lead to absurd results. Commerce would be required to solicit entire sales and

---

[199] *See* Preliminary Results Analysis Memorandum, and Preliminary SV Memorandum. To obtain this figure, we multiplied NTSF's FOPs by the SV for each factor to obtain a total value of [            ] INR per kilogram, of which [      ] INR are bags.

[200] *Id*. at 15.

[201] *Id*. at 17.

[202] *Id*. at 15.

cost (or FOP) databases for all companies covered by a review and would have to perform margin calculations for all such companies, notwithstanding its decision to limit examination to a reasonable number of respondents. As the Federal Circuit recently stated in *Primesource*:

> {Our} conclusion is further bolstered by the statute's recognition of Commerce as an organization of finite resources. *See* 19 U.S.C. § 1677f–1(c)(2) (allowing Commerce to limit its investigation to a subset of the exporters or producers when the large number of exporters or producers means it is "not practicable" to determine individual dumping margins for each); 19 U.S.C. § 1677m(a) (allowing Commerce to decline to investigate a voluntary respondent when it would be "unduly burdensome" to do so). Placing an affirmative burden on Commerce to investigate the non-selected respondents and determine that the expected method produced results reasonably reflective of their dumping margin, as suggested by appellants, would contravene the purpose of those statutory provisions that allow Commerce to limit the number of parties individually investigated under certain circumstances.[203]

In sum, Green Farms points to no evidence on the record that suggests that the separate rate assigned to the company, which we based on the experience of the mandatory respondents, was unreasonable.

### C. Selection of India as the Primary Surrogate Country

*Petitioners' Comments*

The following is a verbatim executive summary submitted by the petitioners.[204] For further details, *see* Petitioners' Comments at 13-52.

> Commerce's Preferred Approach to Economic Comparability is At Odds with the Statute. In the draft, the agency attempts to justify its "same"-level approach to economic comparability by arguing that it follows a "sequential" method for selecting a surrogate country. Pursuant to this approach, the agency begins by identifying countries at the "same" level of economic development as the subject country. It considers countries that are at merely a "comparable" level of development only if there are no "same"-level countries presenting quality data that are significant producers of comparable goods. However, the CIT has repeatedly

---

[203] *See PrimeSource,* 111 F.4th at 1330 (citing *PrimeSource*, 581 F. Supp. 3d at 1341) (("Such an interpretation would defeat the purpose of the respondent selection process.")).

[204] We have combined the petitioners' arguments concerning Commerce's procedural approach to surrogate country selection and its application of that approach, in summarizing comments here.

found that the agency's approach is statutorily infirm, a finding that takes on greater heft in the wake of the Supreme Court's determination in *Loper Bright*.{205}

The draft results also fail to provide a clear and detailed explanation of the criteria used to determine economic comparability or the specific reasons for excluding Indonesia from consideration in this review. Neither Commerce's reliance on past cases and nor its chart comparing the {GNI} of Vietnam, Indonesia, and India adequately justify its decision. Rather, the agency's approach to comparability appears to be a deliberate, and unlawful, departure from the statutory requirement.

Despite its continuing disagreement with Commerce's interpretation of the statute, {the petitioner} acknowledges that Commerce has nonetheless compared Indian and Indonesian data for purposes of the draft remand results rather than disqualifying from consideration on the basis of economic comparability. That said, CFA urges the agency in its final results to definitively abandon its inappropriate approach to economic comparability.

Commerce Has Not Adequately Explained or Supported its Surrogate Country Selection or Valuation of Whole Live Fish, Fingerlings, Feed, Labor, Financial Factors, or By-Products. Commerce's results fail to appropriately assess the quality of Indian versus Indonesian data. The agency has not demonstrated that the *Undercurrent News*, *Fishing Chimes* and *Chepala Sandadi* data on which it has relied for valuing whole live fish, fingerlings, and feed reflect broad market averages and are otherwise reliable, has not appropriately confronted the non-contemporaneity of the *Fishing Chimes*/*Chepala Sandadi* data, and it has not adduced reasonable bases for rejecting the Indonesian data for valuing these inputs or judging it inferior.

With respect to whole live fish, the agency has failed to recognize the lack of record evidence demonstrating that *Undercurrent News* data reflect broad market averages and are otherwise reliable. It has also misread and mischaracterized the record data regarding the specificity and sourcing of the Indonesian whole live fish values. For fingerlings, the agency again has failed to recognize the lack of evidence supporting the breadth and reliability of the Undercurrent News data, and has likewise failed to show that the data in the *Fishing Chimes*/*Chepala Sandadi* reports reflect a broad market average and are reliable. Instead, it has misread those reports' statements regarding the source and nature of the fingerlings pricing data that they present, while continuing to misread the record regarding the specificity of the Indonesian fingerlings prices and their sources. The situation for feed is similar: the agency has again relied on the *Undercurrent News, Fishing Chimes, and Chepala Sandadi* data without acknowledging or evenhandedly addressing their flaws, while rejecting Indonesian data based on a partial and unsupported view of the record.

The agency's continued use of outdated wage data reflects circular reasoning, fails to appropriately consider the specificity of the data and fails to comport with the

---

205 *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2224 (2024) (*Loper Bright*).

agency's policy of using contemporaneous data where possible and relying on data from outside its primary surrogate where it is better than that available from the primary surrogate. The agency's assessment of the relative quality of the surrogate financial data available from India and Indonesia is likewise lacking. Finally, the agency has not adequately explained or supported its reliance on Indian data for fish oil and fish meal byproducts. For the final remand results, Commerce should reassess the record, select Indonesia as the primary surrogate country, and redetermine the margin for NTSF based on Indonesian surrogate values. At the very least, the agency must depart from using Indian surrogate values as to those factors for which Indonesia provides the best available information.

*No other party commented on this issue.*

**Commerce Position:** We continue to find that reliance on India as the primary surrogate country is appropriate here.

### 1. Surrogate Country Selection Process

At the outset, we note that in the Draft Results we provided substantial analysis regarding our surrogate country selection process to provide context for our approach and to identify various considerations underlying our generation of the Surrogate Country List.[206] We provided explanation as to why such a process is appropriate in Commerce's administrative proceedings, and why there is a need to limit the scope of Commerce's universe of potential sources for surrogate valuation.[207] We explained that this decision was not only warranted based on concerns regarding resources to administer our NME dumping orders, but also in light of the fact that India's GNI was far more proximate than Indonesia's to Vietnam's GNI. Finally, we noted that our decision here was consistent with administrative practice and court precedent relating to our sequential surrogate country selection practice.[208]

---

[206] *See* Draft Results at 14-23.
[207] *Id*. at 19-21. In this regard, we observed: "Thus, a country does not remain on the list indefinitely based on an earlier classification or based on nominal differences in per capita GNI. … If Commerce were required to maintain Indonesia on the list, despite the relative changes in economic development and per capita GNIs of Vietnam and Indonesia and other potential surrogate countries over time, Commerce would potentially have to include numerous additional countries on the list in any given year"). *Id*. at 21.
[208] *Id.* at 15-16, and 20. We also noted that Commerce's regulations "contemplate{} that Commerce will consider relative national income levels as a factor in evaluating economic comparability." *Id*. at 23.

The petitioners provided comments on this aspect of the Draft Results and take issue with various precedents cited therein.  The petitioners assert that the Court should dismiss Commerce's citation of *Clearon III*, contending that, there, the parties focused their arguments on relative data quality and significant producer status such that the *Clearon* court was not required to opine on Commerce's "same"-level analysis.[209]  That is incorrect.  In *Clearon III*, the Court explained:

> *Clearon II* acknowledged that Commerce typically selects a country from the list of countries at the same level of economic development as the home country measured by per capita GNI, and it observed that Commerce will compare data from countries on the surrogate country list with data from a less comparable country when it becomes persuaded that none of the listed countries provide the requisite scope of quality data.
>
> …
>
> Commerce on second remand concluded from the foregoing that absent adequate showing that the {Philippines, *i.e.*, the primary surrogate country selected} lacks the quality of data necessary to complete the review, it was not required to conduct a comparison of those data with those of a country at a less comparable level of economic development.  *The court is unable to conclude that is an unreasonable interpretation of Clearon II*, and the results of the second remand comply to that extent with what was ordered.[210]

Thus, *Clearon II* and *Clearon III* dealt with Commerce's practice of relying on a surrogate country at the same level of economic development as the NME country in question, insofar as that surrogate country offered adequate data.  Accordingly, the reviewing court in *Clearon III* affirmed Commerce's approach, and this was upheld (without an opinion) by the Federal Circuit.[211]

---

[209] *See* Petitioners' Comments at 17.

[210] *See Clearon III*, Slip-Op 16-110 at 11-12 (internal citations and quotations omitted and emphasis added).

[211] *See Clearon III*, Slip-Op 16-110, *aff'd* 711 Fed. Appx. 648 (Fed. Cir. 2018).  The *Clearon II* court explained that "Commerce therefore acts not unreasonably in burdening the party proposing a non-listed country with demonstrating that no country on the surrogate country list provides the scope of 'quality' data that it requires in order to make a primary surrogate country selection."  *See Clearon II*, Slip Op. 15-91 at 10-11.  We also note that the *Clearon II* court stated that "Commerce's primary reliance on per capita GNI to identify economically

The petitioners next assert that Commerce's citation to *Jacobi Carbons* (wherein Commerce focused its analysis on a band of countries at the same level of economic development) is unhelpful to the agency's position because "{t}he Court has already determined that, at least in the context of this proceeding, the 'same'-level methodology is statutorily unsound."[212]  This point is conclusory and does not serve to distinguish or otherwise undermine the cited case – the very purpose of the citation was to demonstrate that Commerce acted in a manner consistent with a court-affirmed practice.  Nevertheless, in *Jacobi Carbons*, as here, Commerce "provided a reasoned explanation of how it generated the Surrogate Country List, including why it considers those countries on the list to be at the same level of economic development" as the NME country in question.[213]  We identified the factors that we considered in deriving the Surrogate Country List used in this proceeding,[214] and we explained why doing so is appropriate.  The *Jacobi Carbons* court explicitly recognized that Commerce properly may "narrow a list of countries within a band for purposes of administrative feasibility," and found that Commerce's "decision to limit {the Office of Policy's} list of potential surrogates to six countries represents precisely the type of discretion left within the agency's domain."[215]

Thus, the petitioners' arguments in this regard do nothing to undermine the persuasiveness of the *Clearon* and *Jacobi Carbons* holdings cited by Commerce.  In any case, as

---

comparable countries was not unreasonable and was in accordance with law" and observed that "Commerce provided a reasonable explanation of how it generated the Surrogate Country List" and selected the range of GNIs of the countries listed therein.  *See Clearon II*, Slip Op. 15-91 at 8; *see also Jacobi Carbons*, 313 F. Supp. 3d at 1321 ("Commerce's decision to exclude the Philippines is supported by substantial evidence demonstrating the widening gap between its per capita GNI and China's, and the apparent availability of other suitable countries."); and *Juangcheng Kangtai Chem. Co., Ltd. v. United States*, Consol. Ct. 14-56, Slip Op. 15-93 (CIT August 21, 2015), at 22 ("The court in this matter adheres to precedent holding that primary reliance on per capita GNI in compiling the surrogate country list is reasonable and in accordance with law").

[212] *See* Petitioners' Comments at 17.
[213] *See Jacobi Carbons*, 313 F. Supp. 3d at 1322.
[214] *See* Draft Results at 19-23.
[215] *See Jacobi Carbons*, 313 F. Supp. 3d at 1320.

the petitioners acknowledge, we have considered Indonesia and India as potential sources of SV data and have, under respectful protest, compared the Indonesian data on the record to the Indian data used in the underlying review on an equal basis.

## 2. Data Considerations

The petitioners present numerous arguments regarding our assessment of the relative quality of the Indian and Indonesian data, in particular concerning:  (a) whole live fish, fingerlings, and feed; (b) financial ratios; (c) labor; and (d) by-products.  We address these arguments in turn.

### a)  Whole Live Fish, Fingerlings, and Feed

The petitioners' assertions do not undermine Commerce's analysis regarding the main production inputs, *i.e.*, whole live fish, fingerlings, and feed, for which we relied on *Fishing Chimes*[216] (fingerlings and feed) and *UCN* (whole live fish, fingerlings, and feed) for surrogate valuation.  The petitioners' most significant line of argument regarding these SV sources relates to whether they reflect broad market averages.  We find that they do meet that SV selection criterion, as it is understood and intended in the context of Commerce's SV analysis.  And, as noted above, the broad market average consideration – like all of the SV criteria – is one factor among many that must be analyzed in selecting SVs, and, by extension, when making the concomitant primary surrogate country selection (*i.e.*, when considering sources for potential SVs in the aggregate).

The petitioners' arguments are without merit.  As noted above, the Act does not define the term "broad market average;" under Commerce's practice, Commerce has generally interpreted this term to mean that the data themselves are broader than a single data point (such

---

[216] The record contains data from *Fishing Chimes* as well as *Chepala Sandadi*, its sister publication.  We refer to the sources as "*Fishing Chimes,*" unless otherwise noted.

as an offer for sale or a transaction-specific price) and are generally reflective of market conditions on a larger scale. We do not require that the "average" be based on data points collected from every segment of an entire market; such an interpretation would not only be overly restrictive, but it would also be virtually impossible to achieve. Thus, we have found that data based on the experience of multiple companies – especially when accompanied by other indicia of representativeness (*e.g.*, where data are drawn from a location where the majority of the relevant transactions take place or are ascertained based on a trusted source/methodology) – constitute a broad market average.[217] The petitioners have turned this concept on its head, positing that there are various specific and stringent data requirements (such as an unidentified minimum number of survey respondents and transaction-specific volume data) which must be met in order for Commerce to find the *Fishing Chimes* / *UCN* survey data represent a broad market average. This proposed standard, however, is not required by the Act or the regulations, nor is it grounded in Commerce's practice. Rather, the petitioners make a series of strawman arguments that are designed to impugn the Indian data, irrespective of the merits of that data and the breadth of the experience from which they were drawn.

    As detailed above, there is no question that the survey relied on a large number of data points from the Indian state (Andhra Pradesh) that accounted for a clear majority of India's

---

[217] *See, e.g., Hangzhou Yingqing*, 195 F. Supp. 3d at 1311 (affirming Commerce's finding that the *Doing Business* survey reflects a broad market average, because: (1) Bangkok is the largest and most industrial city in Thailand; (2) the survey was done by a trusted source, the World Bank; and (3) the survey was based on multiple sources and companies' actual experience); *Diamond Sawblades from China* IDM at Comment 20 ("*Doing Business* contains data collected from local freight forwarders, shipping lines, customs brokers, port officials and banks. Thus, although *Doing Business* provides freight costs solely for the distance between the main city and the port, it reflects the freight costs of multiple vendors and users (*i.e.*, shipping lines, customs brokers, port officials and banks) and it is a broad market average"); and *STR from China* IDM at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in *Doing Business: Thailand 2014* is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").

production.[218]  Moreover, the *Fishing Chimes* publication, in multiple instances, sets forth the

steps that the researchers took to achieve generalizable data,[219] and the source also states that,

following field collection, the researchers engaged in "cross verification of economic data

outcomes" from other sources.[220]  The number of survey respondents and the method of sample

selection all support Commerce's decision to rely on the *Fishing Chimes* data, as well as our

characterization of these data as representative of a broad market average.

With respect to the *UCN* source, Commerce underscored that the publication referenced

"{d}ata collected via interviews with farmers in all major producing regions" and "{d}ata

collected via interviews with feed mills in all major producing regions."[221]  The petitioners

characterize these statements as "vague and unsupported."[222]  Although we agree with the

proposition that having greater detail on a source is always preferable, we believe that the

petitioners similarly attempt to impose an improper bright-line standard on potential SV sources

that cannot be met in many cases.  In fact, various other sources on the record of this review

which were proffered for key FOPs – including those relating to the Indonesian alternative SVs

on this record – would not meet this stringent standard, as noted below.

We also find it significant that no party to this proceeding has provided evidence that

tangibly calls into question the representativeness of the data in general, nor has any party

provided evidence to undermine the survey findings.  Rather, the discussion here has centered

around the meaning of the term "broad market average" itself, and whether this criterion requires

a finding that the data on which the discussion is premised cover a majority of the market.  As

---

[218] *See* NTSF May 10, 2021 SV Submission at Exhibit SV-5-A (citing a publication titled "Current Status of Pangasius (*Pangasianondon hypopthalmus*) Farming in India," July 2019 Edition (*Fishing Chimes*), page 35).
[219] *Id*.
[220] *Id*.
[221] *See* NTSF August 2, 2021 SV Submission at Exhibits 1-3.
[222] *See* Petitioners' Comments at 23.

noted above, the petitioners misapprehend the definition of this term and, as a result, their arguments are misplaced.

Concerning the *UCN* data, the petitioners also assert that representatives from the publication "refused to engage with independent market researchers" and make the conclusory assertion that the data bear indicia of unreliability.[223]  The first argument is a mischaracterization of the communications on the record.  An individual hired by the petitioners contacted *UCN* to ask an extensive list of detailed questions about data collection, in May 2021.[224]  The individual and a subscription manager at *UCN* had several emails to each other over the next few weeks and, in July 2021, the representative from the publication apologized for the delay and cited

[                                                                                ].[225]  We do not find that this evinces a "refusal to engage" as the petitioners contend nor that it otherwise serves to undermine the data.

With regard to the reliability of the data source itself, the petitioners do not expand upon this aspect of their argument.  However, we disagree that *UCN* is unreliable in general; the publication has a wide scope, and the data series extend well beyond just Indian aquaculture or data relating to whole fish, fingerling, and fish feed pricing.[226]  Further, the publication also features hundreds of available datasets.[227]

We also disagree that the data themselves are unreliable or that the petitioners' arguments in this regard have merit.  The petitioners contend, for example, that the *Fishing Chimes* data did not consist of the same number of observations in each month.  However, we find this fact neither surprising nor concerning, given that the researchers conducted a longitudinal study over

---

[223] *See* Petitioners' Comments at 24, 29, and 34.
[224] *See* Petitioners' Letter, "Initial Comments and Factual Information in Advance of Commerce's Preliminary Results of Review," dated August 3, 2021, at Exhibit 2.
[225] *Id*.
[226] *See* NTSF May 10, 2021 SV Submission at SV-9 (referencing data pertaining to "Chinese shrimp," "Russian cod," "Skipjack tuna, Bangkok," "Fishmeal, CIF Peru," "US Shrimp," "Northeast Arctic Cod," *etc*.).
[227] *See, e.g.*, NTSF August 2, 2021 SV Submission at Exhibit 1 (referencing "386 LIVE DATASETS").

a two-year period, rather than relying on a snapshot of data taken from any single month.  As a result, we are not troubled by the fact that the data points – which were numerous – were not evenly distributed across the POR.  Further, while we recognize that "not all farmers answered every question" and in certain instances "monthly pricing data for feed is missing,"[228] we do not find these facts indicative of a fatal flaw; trends in the number of data points over time can readily be explained by harvesting periods or simply as a function of the survey's timing, rather than being suggestive of non-reporting or data irregularities.

Moreover, although the petitioners attempt to introduce uncertainty concerning the specificity of the *UCN* data, there is no record support for their assertions.  For instance, they assert that "the Indian data also do not offer concrete evidence on species-specific pricing, especially given the lack of any data on how many farmers were interviewed."[229]  This contention is puzzling.  The "concrete evidence" of species specificity is the explicit statement in the publication that the data relate to *Pangasius Hypophthalmus*,[230] the species at issue.  The number of farmers interviewed relates to a different question, *i.e.*, whether the data represent a broad market average, and their arguments regarding that SV criterion are unconvincing for the reasons discussed above.  Here, as elsewhere, the petitioners attempt to sow doubt where none exists:  the Indian data are unambiguously species-specific, and the Indonesian data (as explained above) are not.

Beyond the petitioners' arguments concerning broad market averages and the sourcing information for certain data series – which apply broadly to the *Fishing Chimes* and *UCN*

---

[228] S*ee, e.g.*, Petitioners' Comments at 35 and 28.
[229] *Id*. at 24.
[230] *See, e.g.*, NTSF August 2, 2021 SV Submission at Exhibits 1-4 ("Mean prices for ex-farmgate pangasius (*Pangasianodon hypophthalmus*), whole fish, in India"), ("Mean prices for ex-farmgate pangasius (*Pangasianodon hypophthalmus*) fingerlings in India") and ("Mean ex-factory prices for extruded feed pellets for pangasius").

sources and to all three main inputs – we also consider below several FOP-specific arguments raised in this remand proceeding.

<u>Whole Live Fish</u>

With respect to whole live fish, the petitioners' characterization of the Indian and Indonesia data does not reflect a balanced treatment of the competing sources.  As discussed above, the Indian data broadly meet the SV criteria,[231] and the Indonesian data have certain drawbacks that must be acknowledged.  Regarding the specificity of the Indonesian whole live fish data, the petitioners argue that the data are species-specific, as supported by:  (1) two affidavits confirming that *patin siam* was the "predominant" and "mainstay" product cultivated in Indonesia;[232] (2) the declaration from a fisheries expert that 99 percent of the pangasius production corresponds to *Pangasius hypophthalmus*;[233] and (3) other data regarding the relative quantity of *patin siam* fingerlings cultivated.[234]  However, representatives from the Indonesian MMAF, the agency that collected the data, could not identify the percentage of the proffered data that related to the species in question (*i.e.*, *Pangasianodon hypophthalmus*).  Mr. Priatno answered that "there is no information"[235] in this regard, and, while Dr. Budiyanto stated that the predominant species in Indonesia was *patin siam*, he offered no insight into what he meant by "predominant" nor did he indicate the extent to which other species were reflected in the presented figures.[236]  We find no basis to conclude that estimates from third parties are more probative than the information provided by the officials associated with the agency that actually

---

[231] *See* Draft Results at 24.
[232] *See* Petitioners' Comments at 25 (citing Petitioners' July 30, 2021 SV Submission at Exhibit 3, Attachment 3; and Petitioners' May 10, 2021 SV Submission at Exhibit 2-A).
[233] *Id*. (citing Petitioners' Letter, "Surrogate Country Selection Comments," dated April 20, 2021 (Petitioners' April 20, 2021 SC Comments) at Exhibit SC-7.K (containing the November 11, 2020 Affidavit).
[234] *Id*. (citing Petitioners' April 20, 2021 SC Comments at Exhibit SC-7.K (containing the July 14, 2017 Dr. Soebjakto Letter).
[235] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 4.
[236] *Id*. at Exhibit 3 (Attachment 3).

collected the data.  In summary, the record shows that the Indonesian data cover multiple species, without any information that would allow us to reliably assess how much of that data relates to *Pangasius hypophthalmus*, the particular species under consideration here.

The petitioners disagree with Commerce's observation that the Indonesian whole live fish data may have been provisional,[237] arguing that Commerce misinterpreted their submission. According to the petitioners, the figures provided in response to the 2020 Prianto questionnaire and the 2021 Dr. Budiyanto questionnaire were not provisional, but, rather, the petitioners provided provisional data from an MMAF website *to the affiants* to provide context for the information that the petitioners were requesting.[238]  These website data are clearly marked as provisional with asterisks.  The English translations of the data provided by Dr. Budiyanto and Mr. Prianto were not explicitly marked as provisional, though the 2020 Budiyanto data contain an asterisk but no key as to whether this too reflects a disclaimer regarding the finality of the data.[239]  In this regard, we note that Table 1 of the 2021 Budiyanto affidavit[240] contains a source/data description that appears not to have been fully translated:

ENGLISH

Source: 2019 Patin Production, BAPPENAS (Indonesian Ministry of Development Planning) and PDSPKP (Directorate General of the Strengthening of Competitiveness Level of Marine and Fisheries Products)

INDONESIAN

Sumber : 2019 Produksi patin BAPENAS dan PDSPKP (bahan paparan direktorat pasar) 2020 angka prediksi produksi patin dan angka proyeksi KKP

---

[237] *See* Draft Results at 26.
[238] *See* Petitioners' Comments at 26-27 ("Rather, those data, which were printed from the website on January 26, 2021, were provided *to* Mr. Priatno by the law firm that solicited final 2019 pangasius production statistics from Mr. Priatno, to provide context for the law firm's request for that data.").
[239] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 4 (Attachment 1).
[240] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 3, Attachment 3 (Budiyanto Affidavit).

In short, we can conclude that the MMAF website data were unambiguously provisional, and the English language translations on the record appears to be incomplete regarding whether the Prianto/Budiyanto data are similarly non-final data.  Further, in contrast to the Indian data, we note that the Indonesian data are not published, as the data were provided solely through affidavits.

For the foregoing reasons, we find the Indian SV data for whole live fish to be superior to the Indonesian SV data.

<u>Fingerlings</u>

Regarding the Indian *Fishing Chimes/Chepala Sandadi* fingerling data, the petitioners argue[241] that the majority of fingerling production is outside of Andhra Pradesh,[242] but that many of the surveyed farmers bought their fingerlings locally,[243] contending that there is, accordingly, a disconnect between pricing and production which make the data not representative.  However, we note that the reports suggest that most of the fingerlings produced in West Bengal, India's hub of fingerlings production, are sent to Andhra Pradesh.[244]  Thus, most of the demand (where purchasing/pricing and consumption takes place) is in one state.  It is not surprising that fingerlings are transported to the location where a consuming sector is located; nor do the petitioners provide any basis (beyond speculation) to conclude that fingerling prices in the survey are unrepresentative or irrelevant.  In fact, the publication explicitly contradicts the petitioners' hypothesis, stating:

> {d}uring interviews with the farmers and stakeholders, it was noted that the actual source of seed remains unknown in most of the cases.  Field observations indicate

---

[241] *See* Petitioners' Comments at 29.
[242] *Id.* (citing NTSF May 10, 2021 SV Submission at Exhibit SV-5-A, p. 35 and Exhibit SV-5-B (English translation)).
[243] *Id.* (citing NTSF May 10, 2021 SV Submission at Exhibit SV-5-A, p. 35, 38 and Exhibit SV-5-B (English translation)).  Eluru's location is also visible on the map of surveyed farms included with the *Fishing Chimes* report.
[244] See NTSF May 10, 2021 SV Submission at Exhibit SV-5-A, p. 38

that the local agents book the orders from the farmers and contact the seed suppliers in West Bengal.[245]

This passage indicates that fingerlings purchased at a nursery within the region covered by the study, for instance, could be sourced from outside the region.  In short, there is no basis to conclude that the fingerling market is bifurcated or otherwise split and, in any case, the *prices* reflect the purchase price of fingerlings in the major pangasius producing region of India, and the petitioners provided no evidence to show that those prices are unrepresentative or unreliable.

The petitioners also raise several other arguments regarding the fingerling data, contending that the source:  (1) does not indicate any volume; (2) does not indicate that surveyed farms purchased fingerlings in every month; (3) does not contextualize how much is purchased vis-à-vis overall production/consumption throughout the country; and (4) contains data that are not contemporaneous.[246]  Each of the arguments  is unavailing.  First, using estimated parameters from the study, the total volume of fingerlings covered by the survey is significant (*e.g.*, approximately 5.1 million fingerlings in 2018).[247]  Second, the non-uniform timing of survey responses is not surprising, as the study noted that stocking patterns are not constant and change according to many factors, such as market price, the prevalence of other types of farming activities, and water availability.[248]  Third, as we explained at length above, the petitioners' assertion that a survey must cover a certain amount of the market is misguided.

Regarding contemporaneity, the *Fishing Chimes* data reflect prices in 2017-2018, while the *UCN* data reflect prices during the POR.[249]  It is true that, for a subset of these data, *i.e.*,

---

[245] *Id*.
[246] *See* Petitioners' Comments at 30-31.
[247] *See* NTSF May 10, 2021 SV Submission at Exhibit 5.  We note that the same source (*Fishing Chimes*) was submitted in this review and in the 2018-2019 review, where we reached the same conclusion.  *See* November 6, 2023 Redetermination at 43.  *See also* NTSF May 10, 2021 SV Submission at Exhibit 5.
[248] *See* NTSF May 10, 2021 SV Submission at Exhibit 5.
[249] *See* Preliminary SV Memorandum.

fingerlings 6-7 inches,[250] we relied on 2017-18 data which we inflated to the POR; however, we do not find that inflating a subset of the data to account for the fact that the data pre-date the POR by less than a year is a major drawback of the Indian fingerling data.

In contrast, the Indonesian data for this key input are flawed. Regarding the fingerling pricing data provided by Dr. Budiyanto, we continue to find that these data are clearly less preferable than the Indian data. Regarding the 2019 Indonesian fingerling pricing data (which was provided in response to Question 13 in the affidavit), the answer states:

> Based on information from hatchery business actors, the price of seeds highly depends on the consumers (rearing farmers and production costs). For the price ranges, sizes ¾ - 3 inches have price range of Rp 15 – Rp 35/fish, while for size 3 - 6 inches have price range of Rp 50 – Rp 80/Kg. For > 6 inches, they have range of 40 ~ 70, as follows:[251]

However, the source of these data: (1) does not define/identify "hatchery business actors"; (2) does not state the number of such actors; (3) does not state if this information was collected by the MMAF or if it is third party information; (4) does not state the collection methods relied upon by the unidentified data gatherer; (5) does not state if they are farm-gate prices exclusive of taxes; (6) states the information is for "seed," but makes no mention of what type/species of seed are included; (7) does not provide volumes; and (8) are not published, but instead are based on information in an affidavit. Further, the figures do not reconcile with the statement introducing the table. For example, the narrative statement says that prices for ¾ - 3 inches are Rp 15-35/fish, but in the table the prices are Rp 60-180; similarly, the statement says that prices for 3-6 inches are Rp 50-80/Kg, and for >6 inches are Rp 40-70, yet in the table the prices for those sizes are Rp 175-400 and Rp 350-500, respectively. Thus, it is unclear which, if any, of the data

---

[250] We also inflated a subset of the feed data in this manner, relating to 26 percent protein content and 32 percent protein content, as noted below.

[251] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 2-A (Attachment 3: Answer to Question 13).

are accurate.

The petitioners provided another set of 2019-2020 fingerling data in a different affidavit.[252] The affiant provided fingerling data in response to question 10 and, as we noted in the Draft Results,[253] the information was apparently obtained from a single source "Sari Agri" about which no information was provided.[254] In their comments, the petitioners claim that "{t}he data in this table is {sic} not marked as having been obtained through Sari Agri."[255] However, this is not the case, as the answer to question 10 clearly states that "{i}nformation from statistic production deriving from fingerlings farmers and literatures of Sari Agri, 2020,"[256] and the values and volumes in the response reconcile to the attached Table 2 that the petitioners point to, thus linking the "Sari Agri, 2020" reference to the table.[257] As a result, it is clear that the data are from a single source with limited information concerning the nature of underlying information. Regardless of the particular identity of the source, Commerce's point was to highlight the limited number of sources identified (*i.e.*, one), as well as the dearth of detail on the collection method/parameters. It is ironic that the petitioners raised the same concerns with respect to the corresponding Indian sources, given that these concerns are more valid here.

Notably, the petitioners do not address either of the concerns raised in the Draft Results with respect to the Indonesian data. The data are not species specific and they also lack information concerning the underlying sources of the information and on the data collection methods.[258] In contrast, the Indian data are from two reliable/established sources and, when one

---

[252] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 3, Attachment 3.

[253] *See* Draft Results at 31.

[254] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 3, Attachment 3.

[255] *See* Petitioners' Comments at 32 (Footnote 141).

[256] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 3, Attachment 3.

[257] *Id*.

[258] The source provides information on the Indonesia fingerling industry more generally, but not on the underlying sources of the data presented therein.

uses a common standard to evaluate the various data sources, it is clear the Indian data provide the more appropriate source for the SVs relied upon in this proceeding.

Feed

The petitioners raise a number of arguments concerning the Indian feed data, including ones which are similar to those raised for other SVs: (1) the data do not represent a broad market average; (2) the data are lacking volume information; (3) certain survey response rates vary by month; (4) the data are not contemporaneous with the POR; and (5) the data are not complete, given that they do not cover fish feed with a protein content of 35 percent. These arguments are without merit.

With respect to the question of whether the data represent a broad market average, this is addressed in the separate discussion above. Regarding the volume underlying the data, using estimated parameters from the study, we have noted that the total volume of feed covered by the *Fishing Chimes* study is significant (*e.g.*, 12.7 million kilograms of feed during the 2017-2018 period, which is a significant volume of feed.[259] Further, while the petitioners question the timing of survey responses, this is not surprising, as the study noted that stocking patterns are not constant and change according to many factors, such as market price, the prevalence of other types of farming activities, and water availability.[260]

With respect to the contemporaneity of the data, the *Fishing Chimes* data are dated less than a year (seven months) from the POR and have been inflated. The *UCN* data are contemporaneous with the POR. Thus, we do not find this to be a basis to question the Indian feed data, especially given the deficiencies of the Indonesian data.

Finally, with respect to the completeness of the data, we acknowledge that the Indian data

---

[259] *See* November 6, 2023 Redetermination at 44. *See also* NTSF May 10, 2021 SV Submission at Exhibit 5.
[260] *See* November 6, 2023 Redetermination at 41.

do not include information for fish feed with a protein content of 35 percent.  While this is admittedly a drawback to the Indian data, it is merely a minor one:  NTSF only consumed a miniscule amount of this protein content in its production during the POR, representing less than one hundredth of one percent of feed consumed.[261]

Regarding the Indonesian feed data, the data are contained in two affidavits (April 2020 and July 2021) from Dr. Budiyanto, both of which the petitioners placed on the public record but neither of which contain published data.[262]  Regarding the April 2020 affidavit, these data are not specific to the particular type of feed applicable here.  In particular, we note that, although the question requested data on "*patin siam* fish feed" pricing, the data clearly are not limited to this type of feed, as two of the entries explicitly state that the pricing is "specifically for marine fish."[263]  The affidavit also raises serious questions about the source of the data; it states that the information was not collected by the MMAF, but rather was obtained from a single third-party source ("Mr. Deni of CPP"), with no mention of any collection methods or discussion of how the collected data are representative of data throughout the Indonesian market as a whole.[264]  The affidavit similarly does not indicate whether the prices are those of CPP alone or whether they also include prices from other sources.  Even more concerning, it is unclear whether the prices are market prices, given that the affidavit states that "{t}he low price of independent feed is because the independent feed is not taxed, and no investment calculation because all the equipment is supported by MMAF, therefore the only calculation is the variable cost."[265]  Finally the source provides no volumes.

---

[261] In particular, NTSF's 35 percent protein content fish feed accounted for less than 0.01 percent of all feed consumed, *i.e.*, FEED_35 / ∑FEED_*n*.  *See* NTSF Preliminary Analysis Memorandum at Attachment 4.
[262] *See* Petitioners' Comments at 40 (citing Petitioners' May 10, 2021 SV Submission at Exhibit 2-A (containing the April 22, 2020 Affidavit), and Petitioners' July 30, 2021 SV Submission at Exhibit 3, Attachment 3).
[263] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 2-A Attachment 3 (response to question 16).
[264] *Id*. (CPP stands for "PT. Central Protein Prima."  The affidavit states Mr. Deni is general manager there.)
[265] *Id*.

The July 2021 affidavit also suffers from similar serious defects, given that the data are not specific (*i.e.*, they contain pricing for shrimp feed) and they raise the same questions about their sourcing (*i.e.*, they are from "Mr. Deni, Marketing of CPP", and the internet). While the petitioners point to another data source to value feed in the July 2021 affidavit, consisting of a table at the end of the affidavit,[266] this table "Table 2. Feed Volume On Various Types of Feed ln 2019-2020"[267] is unaccompanied by any explanation except "See Table 2," nor does it have a citation to any source for the data contained therein.[268] Moreover, the affidavit makes no mention of the number of data points for this information. Accordingly, the data raise numerous important questions as to its reliability. Further, and also significant, it is unclear as to whether the figures are finalized and are tax and duty free, and it is similarly not clear if the MMAF even collects this kind of information, much less publishes it.[269]

Given the deficiencies present in the Indonesian data, we do not find the non-contemporaneity of the *Fishing Chimes* data nor the lack of specific information for one particular type of feed (*i.e.*, 35 percent protein content)[270] to be determinative to our analysis.[271] On balance, and in light of the considerations outlined above, we find that the Indian data are clearly superior for this input.

---

[266] *See* Petitioners' Comments at 41.
[267] *See* Petitioners' July 30, 2021 SV Submission at Exhibit 3, Attachment 3, Response to Question 19.
[268] This is in contrast to Table 1 that immediately precedes it, and clearly identifies the underlying source of the data presented therein.
[269] The petitioners' assertions that the Indian data are "one off" studies or their critique that the data were attributable to "just 54 farms," *see, e.g.*, Petitioners' Comments at 37 and 39, ring hollow upon examination of the competing Indonesia data, which are from a limited number of (sometimes unidentified) sources and were obtained for the purpose of responding to the petitioners' questionnaire.
[270] As noted above, NTSF's 35 percent protein content fish feed accounted for less than 0.01 percent of all feed consumed. *See* NTSF Preliminary Analysis Memorandum at Attachment 4.
[271] *See* NTSF's May 10, 2021 SV Submission at Exhibit SV-5-B.

Summary

We have reviewed the information on the record for the whole live fish, fingerlings, and fish feed inputs and addressed the favorable aspects and shortcomings of each.  Taken together, and for the reasons stated above, we find that the data for India are better in the aggregate for the three main inputs into the production of subject merchandise.  Further, in terms of contribution to NV, fish feed accounts for the majority (over two thirds) of NV.[272]  The drawbacks of the Indonesia sources for this particular FOP input are substantial, giving rise to the reasonable conclusion that selection of India as the primary surrogate country provides superior data to value a sizeable majority of NV.

> b)  *Financial Ratios*

The petitioners also assert that Commerce's assessment of the Indonesian financial statements in this review was inappropriate, arguing that Commerce has not only relied on these financial statements in other instances but that it has a preference for using multiple financial statements.[273]  We disagree, however, that our assessment was improper.

As noted above, and discussed in the *Final Results*,[274] the record contains two contemporaneous Indian financial statements from companies that produce comparable merchandise.[275]  These companies, Ananda and MMC, were both profitable during the POR, and their financial statements both received unqualified opinions from their auditors.

The record also contains contemporaneous statements for two Indonesian companies, Dharma and Japfa.  In contrast to the Indian financials statements, Dharma's financial statements

---

[272] This figure was calculated by multiplying the feed FOP by the surrogate value and dividing by the NV, weighing them by the respective quantity and summing these to arrive at the weighted-average percent, then finally summing the weighted feed percentages *i.e.*, $\sum(((\sum(\text{FEED}\_n \text{ x FEED}n\text{SV\_USD})) / \text{NV}) \text{ x } (\text{QTYU}/\sum\text{QTYU}))$.  *See* Preliminary Results Analysis Memorandum at Attachment 4.

[273] *See* Petitioners' Comments at 45-49.

[274] *See Final Results* IDM at 56-57.

[275] *See* NTSF May 10, 2021 SV submission at Exhibits SV-19b and SV-19c.

include a "going concern" note, while Japfa's financial statements reflect a relatively low percentage of business activity relating to aquaculture.[276]  While we do not find that either of these observations render the statements unusable, *per se*, we disagree with the petitioners that they are irrelevant to our determination that the Indonesian statements are not preferable to the Indian statements.

Regarding the Dharma financial statements, our consideration of the going concern note is appropriate.  While the petitioners assert that the Dharma statements were prepared "based on the assumption that the company will continue as a going concern and without any adjustment relating to the potential for future business disruption" and "the company achieved net profitability in in both 2018 and 2019,"[277] these observations do not render the going concern note irrelevant under Commerce's practice.

In *PVLT from China*, we recently considered the import of a going concern note, and provided the following discussion:

> {i}n the *Preliminary Results*, we rejected these financial statements because of the going concern note in the financial statements.  The auditor's note states that, as of December 31, 2022, Toyo Tyre's current liabilities exceeded its current assets and that Toyo Tyre intended to utilise the available funds from the cash pooling arrangements with its related companies to meet its liabilities as and when they fall due.  As a result, the auditor stated that a material uncertainty exists that may cast significant doubt about the Company's ability to continue as a going concern … . Giti and Sumitomo contend that the going concern note is not an issue where the company is profitable and demonstrates increased profitability from the previous year.  However, a company with greater current liabilities than current assets, which is offsetting its obligations with external funds, may potentially understate its full costs of production.  Where there is a going concern on a company's ability to continue operating, and where there are other viable financial statements on the record, Commerce has rejected the financial statements with the going concern.[278]

---

[276] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 11.
[277] *See* Petitioners' Comments at 46.
[278] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021-2022*, 89 FR 17817 (March 12, 2024) (*PVLT from China*), and accompanying IDM at Comment 2.

Thus, profitability alone does not obviate an auditor's concern as to whether a company can continue as a going concern, nor does it render the financial statements of such a company equivalent in quality to the financial statements of companies which are on a solid financial footing. Here, the Dharma statements indicated that "{t}he Company and its subsidiary has suffered deficits as of 31 December 2019 of Rp 92,141,303,468 (2018: Rp 100,574,805,538)."[279] The auditors determined that this situation warranted a going concern note despite company management's belief[280] that Dharma's financial performance would continue to grow.

Regarding Japfa, we acknowledge that we have relied on financial statements from this company in other segments of this proceeding. Further, while we also agree that this fact indicates that Japfa's financial statements *could* be used as a source of SV data, we disagree that it indicates that they *should* be used, given that Japfa's main business activity is not aquaculture. Given this, we disagree that the precedent the petitioners cite is on point.

In particular, the petitioners reference Commerce's determinations in the 2016-2017 and 2021-22 administrative reviews of the *Order*.[281] However, in both of those reviews, Commerce selected Indonesia as the primary surrogate country, and in neither of those reviews was India proposed as an alternative.[282] Thus, neither case supports the petitioners' argument that the Japfa

---

[279] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 11.

[280] *Id*.

[281] *See* Petitioners' Comments at 48-49 (citing *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results, and Final Results of No Shipments of the Antidumping Duty Administrative Review; 2016–2017*, 84 FR 18007 (April 29, 2019) (*Vietnam Fish 16-17*), and accompanying IDM at Comment 6; and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Administrative Review; 2021-2022*, 89 FR 18595 (March 14, 2024) (*Vietnam Fish 21-22*), accompanying IDM at Comment 5).

[282] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments and Partial Rescission of the Antidumping Duty Administrative Review; 2016-2017*, 83 FR 46479 (September 13, 2018), and accompanying PDM at 10-13 (where parties submitted data for Indonesia and the Philippines, Commerce selected Indonesia as the primary surrogate country, and no party disputed the selection for the final results), unchanged in *Vietnam Fish 16-17; see also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Notice of Intent to Rescind, in Part; 2021-2022*, 88 FR 61525 (September 7, 2023), and accompanying PDM at 12 (where parties submitted data only for

statements are superior to the Indian statements on the record.  In this regard, we again note that Commerce has not indicated that the Dharma/Japfa statements are unusable as financial statements – nor is that the relevant question.  Rather, our conclusion here is simply that the statements do not offer an advantage that would warrant a conclusion that the financial statements – in conjunction with the array of data presented for the other SVs – support selecting Indonesia as the primary surrogate country over India.

We also disagree with the petitioners that the MMC statements are fatally flawed.  While the petitioners maintain that MMC is engaged in limited processing activities, the record does not clearly support this claim (nor does it clearly undermine it).  Under the "Corporate Information" heading of the company financial statements, it reads:  "MMC Exports Limited is engaged in the business of *processing* and trading of marine products and allied activities."[283] Despite this statement, the petitioners note that MMC's processing and packing expenses constitute a small percentage of total expenses, that it engages in retail sales, and there is no mention of deep freezers in its financial documents, suggesting that the company primarily buys and sell marine products rather than self-processes the merchandise.[284]  We acknowledge the petitioners' point but find it speculative, due to the limited detail in the financial statements. That said, to the extent that the MMC statements may have drawbacks in this regard, that *possibility* still does not render the Indonesian financial statements better alternatives; as noted above, similar drawbacks are *explicitly* present in the Japfa financial statements, because

---

Indonesia and the selection of financial statements from a producer in an alternate surrogate country was not at issue), unchanged in *Vietnam Fish 21-22*.
[283] *See* NTSF's May 10, 2021 SV Submission at Exhibit SV-19-B (emphasis added).
[284] *See* Petitioners' Comments at 48.

aquaculture represents around nine percent of its operations.[285]  Thus, we do not find that the Japfa statements provide a superior alternative.

We also disagree with the petitioners that MMC's profit rate of 0.013 percent renders them less viable as a source for SV data.  Under Commerce's long-standing practice, Commerce generally does not rely on the financial statements of companies that make no profits or whose financial statements show that they operated at a loss; where the company is profitable, there is no minimum profit threshold requirement.[286]  In any event, we note that the administrative record also contains financial statements from Ananda, an Indian company whose profit rate the petitioners do not challenge.

Finally, we note that all of the financial statements on the record are contemporaneous with the POR.  Given this, we disagree that Japfa's financial statements offer a clear advantage in terms of contemporaneity because they cover the full POR (in contrast to the two Indian financial statements, which cover the majority of the POR or, indeed, the financial statements of the other Indonesian company, which cover only a minority of it).  Moreover, the Indonesian companies' statements also come with certain drawbacks as noted above.

The petitioners, ultimately, ask that we reweigh these various considerations to find that, not only are the Indonesian statements preferable to the Indian statements, but also that they offer an advantage that warrants selecting Indonesia as the primary surrogate country overall.  We do not find that the record supports such an outcome.

---

[285] *See* Petitioners' May 10 2021 SV Submission at Exhibit 11 (Note 24 (2019) & 27 (2020)-Net Sales).
[286] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009), and accompanying IDM at Comment 1 (noting that Commerce's "preference … is to use the financial statements of companies that have earned a profit and disregard the financial statements of companies that have zero profit.").

c)  Labor

The petitioners maintain that Commerce should rely on the Indonesian data for the SV for labor, asserting "Commerce's duty to seek the "best available information" for each FOP, and its policy of relying on non-primary country data where it is of higher quality."[287]  This is a partially accurate, but incomplete, statement of Commerce's practice in this regard.

Commerce's court-affirmed practice is to value as many FOPs as possible a single surrogate country.[288]  Specifically, pursuant to 19 CFR 351.408(c)(2) and administrative practice, Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."[289]  The Court has held that Commerce's regulatory directive to value FOPs with information from a single surrogate country, where possible, is reasonable, given that deriving surrogate data from one surrogate country limits the amount of distortion introduced into the calculations because a domestic producer would be more likely to purchase a product available in the domestic market.[290]  As a result, Commerce tries to "use as much data as possible from the primary surrogate country."[291]  Thus, the fact that India is a better surrogate country overall, and is thus being used as the primary surrogate

---

[287] See Petitioners' Comments at 45.
[288] See Clearon Corporation v. United States, Court No. 08-00364, Slip Op. 13-22 (CIT February 20, 2013) (Clearon) at 6 ("{T}he court must treat seriously {Commerce's} preference for the use of a single surrogate country."); see also Fine Furniture (Shanghai) Ltd. v. United States, Slip Op. 18-163 at 42 (CIT November 26, 2018); and Jiaxing Brother CAFC. 822 F. 3d at 1302 (affirming Commerce's preference to source SVs from a single surrogate country).
[289] See Jiaxing Brother, 961 F. Supp. 2d at 1335 (internal citations omitted).
[290] See Clearon, Slip Op. 13-22, at 12-14; see also Hand Trucks and Certain Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012, 79 FR 44008 (July 29, 2014), and accompanying IDM at Comment 2.
[291] See, e.g., Jiaxing Brother, 822 F.3d at 1294 & n.3; and T. T. International v. United States, 439 F. Supp. 3d 1370, 1382 (CIT 2020); Certain Walk-Behind Snow Throwers and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, 87 FR 17984 (March 29, 2022), and accompanying IDM at Comment 3, n.101 ("Commerce has a regulatory preference to use as much data as possible the primary surrogate country); and Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, 77 FR 59375 (September 27, 2012), and accompanying IDM at Comment I.

country, does not amount to "circular reasoning,"[292] as the petitioners contend.  Rather, it reflects

adherence to a long-established and court-affirmed methodology designed to limit distortions

resulting from mixing and matching SVs from different source countries.

The petitioners also mischaracterize Commerce's determination by arguing that

Commerce is required to use the best available information, not merely data that are usable.[293]

We agree with the petitioners' statement to the extent that it applies to data choices within a

given primary surrogate country; however, we find that the alternative that the petitioners

propose here would lead to absurd results.  Specifically, the petitioners appear to be arguing that

Commerce must select the "best" SV data on a factor-specific basis, regardless of the primary

surrogate country *chosen on an aggregate basis*.  Pursuant to this interpretation, Commerce

could elect to source SVs from a wide range of countries, on an *ad hoc* basis, simply because

each country offers the best data for valuing a particular FOP.  However, this is not the surrogate

country process that is contemplated in Commerce's regulations[294] nor the approach that is

applied by Commerce.  Moreover, as noted above, the courts have recognized that the decision to

source SVs from multiple surrogate countries can introduce distortions into the calculation and,

accordingly, Commerce only does it to the extent necessary.[295]

Against this backdrop, the petitioners urge Commerce to value labor using supposedly

more specific values from Indonesia as they contain data for both "manufacturing" and

"agriculture" labor, as opposed to the more general "skilled agriculture and fisheries workers"

---

[292] *See* Petitioners' Comments at 52.
[293] *Id*. at 45.
[294] *See* 19 CFR 351.408(c)(2) ("The Secretary normally will value all factors in a single surrogate country").
[295] We note that, as with the Indonesian data, the Indian labor data were sourced from the International Labor Organization, and it is Commerce's preference to rely on that source for valuing labor.  *See Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production: Labor*, 76 FR 36,092 (June 21, 2011); *see also Preliminary Results* PDM at 21.

data from India.[296]  The petitioners argue that, "while {the Indian labor} value may well be specific as to the farming labor involved in this review, it is not at all clear that it is specific for the processing and packing labor."[297]  Thus, the petitioners are simply speculating that the Indian labor does not reflect the type of labor applied in the production of subject merchandise.

As the petitioners note, processing labor involves bleeding, washing, filleting, trimming, inspecting, re-washing, soaking/tumbling, sorting, weighing, re-washing, and freezing the fish.[298] The petitioners make the assumption that this type of labor is classified as "manufacturing" labor, while providing no evidence that this type of labor is classified as such.  Moreover, the petitioners point to no evidence that the respondent's processing labor is not of a type captured by the "skilled fisheries worker" portion of the Indian data.  Furthermore, the Indian data are classified as "skilled" whereas the Indonesian agriculture or manufacturing data is not.  On balance, while we recognize that the record does not permit a definitive determination as to whether the Indian or Indonesian data are more specific, it is reasonable to conclude that a company that processes fish would be classified as part of the fisheries industry, supporting Commerce's use of the Indian data as specific to the labor input at issue.

Regarding contemporaneity, the petitioners also assert that Commerce is using data that is "woefully out of date" and contend that the Court disapproved of non-contemporaneous data in other remand proceedings relating to this order.[299]  However, the facts here are clearly distinguishable from those cases.  In the 2018-2019 review, Commerce relied on 2006 labor data.[300]  Although we disagree that such labor data are unusable after being inflated to reflect the

---

[296] *See* Petitioners' Comments at 44.
[297] *Id.*
[298] *Id.* (citing NTSF Section CD Response at Exhibits D-5 and D-6).
[299] *See* Petitioners' Comments at 50.
[300] *See, e.g.*, November 6, 2023 Redetermination at 23.

POR, it bears noting that the 2006 data predated that POR by a longer period of time as compared with the data here (*i.e.*, where we relied on 2011-2012 data for a 2019-2020 POR).[301] Similarly, in the 2018-2019 case, we noted that it was not clear whether those data were specific.[302] Thus, the facts are different, and we find this to be a circumstance where Commerce's primary surrogate country preference outweighs any downside associated with the Indian labor data.

### d) By-products

Regarding by-products, the petitioners argue that the Indian fish meal and fish oil by-product values also exceed the agency's selected SV for whole live fish, the main processing input, and, thus, the Indonesian data are clearly superior.[303] However, we disagree with the petitioners' conclusion; a by-product SV may be higher than the input SV on an equal volume (*e.g.*, per-kg) basis and still be a valid, useable figure. In this instance, such a result is hardly surprising, given that (i) a majority of the input, *i.e.*, a whole live fish, yields by-products beyond the fillet, such as head, bones, skin, meat trimmings, *etc.*,[304] and (ii) the by-products in question undergo substantial further processing prior to their sale.

In the underlying review, NTSF submitted a production flow chart detailing the steps and inputs used in the production process for fish meal and fish oil.[305] NTSF described the production process steps (and factors used) as follows:

> Fish meal is made by cooking, pressing, drying, and grinding fish waste into a solid. Most of the water and some of the oil is removed in making fish meal. Once the fish waste is received, it passes through a slicing machine to make a finer material. Next the fish waste is moved through a commercial steamer to cook the waste. Next

---

[301] *Id.*
[302] *Id.* at 50-51.
[303] *See* Petitioners' Comments at 50.
[304] A whole live fish is roughly two-thirds composed of fresh by-products. This estimate is calculated as: 1 – ((the reciprocal of the fish input) x (1 – NETWTGU%)). *See* NTSF Letter, "Part 2 of Response to Supplemental Questionnaire," dated September 14, 2021 (NTSF September 14, 2021 SQR), at Exhibit Q62.
[305] *Id.* Q83 and Exhibit Q83.

the cooked by-product is compressed inside a perforated tube, expelling some of the oil and water. The pressed cake is dried by tumbling inside a heated drum. The dried meal is sieved and checked for metal or foreign objects followed by grinding, cooling, and packaged into bags. Please see Exhibit Q83 for a diagram of the production process.

Fish oil is made from the oil that is pressed out of the cooked by-product as described above. Fish oil undergoes further refinement called "polishing" to separate the water and sludge from the oil. The water is added back to the cooked by-product as the water also contains sludge or cooked fish solids. The fish oil is then packed into tanks for shipment. Fish waste, rice husk, electricity, and labor {are} the inputs used to produce fish meal and fish oil. Rice husk is the energy source to cook the fish waste. Electricity is used for lighting and operating of machinery in the workshop.[306]

Thus, fish meal undergoes substantial additional processing, using a separate production process of converting fresh fish waste (*e.g.*, fish head, bones, viscera)[307] into fish meal. Fish oil undergoes even more processing, as explained by NTSF.[308] In its questionnaire response, NTSF also reported separate production factors (*e.g.*, labor, electricity, rice husk)[309] and packing (*e.g.*, polypropylene bag)[310] for these products, further confirming the substantial amount of additional processing and factors necessary to create these products.

For fish oil and fish meal, then, the fact that the corresponding SVs were higher than the SV for the underlying input (*i.e.*, whole live fish) does not signify that the SV for the by-product is necessarily distortive, and we find no reason to conclude so here. This is especially true, given that Commerce's practice is to subtract the costs of the additional processing from the value of the by-product prior to relying on it as an offset in our calculations.[311] Just as processing results in the value of a fillet being more valuable than the raw/unprocessed fish input, substantial

---

[306] *Id.*

[307] *Id.*

[308] *Id.*

[309] *Id.* at Exhibit 2.

[310] *Id.*

[311] *See, e.g.*, Initial Questionnaire at D-10 (noting that, where a claimed by-product is a "downstream by-product" Commerce requires information regarding "the per-unit usage rate of each input used to produce the downstream by-product" and a "description of the production process used to generate the downstream by-product").

further processing similarly may render the value of the fish oil and fish meal more valuable than the input when considered on an equal weight (*i.e.*, per kg) basis.

Regarding the petitioners' argument that the fish meal and fish oil by-product SVs are not specific, *i.e.*, to pangasius,[312] as we stated in the *Final Results*:

> …while Commerce has found specificity with regard to species crucial with respect to the whole fish input (because species is a CONNUM characteristic), we note that fish meal and fish oil are not inputs but, rather, outputs.[313] Moreover, the petitioners do not provide any evidence that input species is a determining factor in the selling and/or buying of fish meal or fish oil… Moreover, we note that Commerce relied on import data (under similar tariff subheadings), in prior segments of this proceeding to value fish meal and fish oil by-products.[314]

Furthermore, although the Harmonized System (HS) subheading relied upon for the SV includes imports of merchandise that may be distinct from the by-products in question (*e.g.*, are not derived from the same species of fish), that is not dispositive as to whether the heading provides an appropriate basis for SVs. It is hardly uncommon for an HS subheading to cover a wider set of items than the precise input/by-product that is used or generated by the respondent, despite the frequent use of trade data in SV-based margin calculations.[315]

In any case, the appropriateness of these data must also be viewed against the backdrop of the alternative (Indonesian) data submitted by the petitioners for these by-products. The petitioners provided seven price quotes for fish meal and five price quotes for fish oil from Indonesian sellers.[316] However, the price quotes are not contemporaneous with the POR, and

---

[312] *See* Petitioners' Comments at 50.
[313] *See Final Results* IDM at 56 (citing Final Results of Redetermination Pursuant to Court Remand, *NTSF Seafoods Joint Stock Company and Vinh Quang Fisheries Corporation v. United States*, Court No. 19-00063, Slip Op. 20-180 (CIT December 21, 2020), dated March 22, 2021, at 14-15).
[314] *See Final Results* IDM at 56 (internal citations omitted).
[315] Although we would prefer that the by-product (non-subject merchandise output) be as specific as possible, species is crucial for "inputs" to produce the subject merchandise, as it is a physical characteristic in the construct of the control number (also known as the "CONNUM").
[316] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 9-C.

are, more generally, a disfavored type of source[317] because they are based on price lists, which often represent a starting point in negotiations rather than a final price, and frequently do not reflect the experience of the market as a whole.[318]  Our preference against such sources has been consistently applied in Commerce's analysis of potential SV data for FOPs.[319]

The petitioners proffered additional Indonesian values consisting of fish oil prices from the April 22, 2020 Budiyanto affidavit.[320]  These data were provided in response to question 17, that asked for by-product prices for several fresh/frozen by-products and fish meal and fish oil from 2017-2019.[321]  While the response included a table, ostensibly with prices[322] for 2016-2019 for several by-products, this table did not include prices for fish meal or fish oil.  Instead, the affidavit included one vague bullet point regarding fish oil:  "Crude fish oil made of patin is only

---

[317] *See, e.g.*, *Certain Polyethylene Terephthalate Resin from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 81 FR 13331 (March 14, 2016), and accompanying IDM at Comment 2 ("Our general practice is not to use price quotes to value factors of production.  {Commerce} often does not know the conditions under which price quotes were solicited and whether or not these were self-selected from a broader range of quotes.  Without access to all of the information on how the price quotes were obtained (including any negotiations or agreed-upon adjustments), it is impossible to confirm that quotes reflect a typical broad market average cost.").

[318] *See Utility Scale Wind Towers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 77 FR 75992 (December 24, 2012) (*Wind Towers from China*), and accompanying IDM at 12 ("Moreover, {Commerce} generally does not use price lists to value FOPs because (1) these prices often represent a starting point in a negotiation that could result in a significantly different final sale price and (2) price lists reflect the experience of a single producer rather than a broad market average."); *Certain Tissue Paper Products from the People's Republic of China:  Final Results and Partial Rescission of the 2007-2008 Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 74 FR 52176 (October 9, 2009), and accompanying IDM at Comment 3 ("Price quotes are merely that, and may not reflect actual transaction values.  Further, they are easily subject to manipulation and may be dependent on various factors not evident on the administrative record."); *Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances:  Certain Polyester Staple Fiber from the People's Republic of China*, 72 FR 19690 (April 19, 2007), and accompanying IDM at Comment 7 ("When other usable and reliable information is available, it is {Commerce}'s practice to not use price quotes to value FOPs."); *Certain Cased Pencils from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 70 FR 42301 (July 22, 2005) (*Pencils from China*), and accompanying IDM at Comment 2; and *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (CIT 2010) (*Bristol Metals*).

[319] *See Wind Towers from China* IDM at 12; *Pencils from China* IDM at Comment 2; and *Bristol Metals*, 703 F. Supp. 2d at 1376.

[320] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 9-A.

[321] *Id*.

[322] The values in the table do not appear to be prices, as the table suggests, as the values are in the hundreds of millions of Rp.

produced from the sale patin industry (hot smoked patin) such as in Jambi and Riau, this oil is in the form of crude oil at Rp 5,000/litre, whereas the MMAF has made a center for refining oil at Rp 10,000/litre."[323]  Thus, with this statement:  (1) no time frame is associated with the price statements (*i.e.*, it is not clear if the prices are contemporaneous); (2) no volume is stated; (3) no source was identified for the crude fish oil; (4) there is no indication of number of data points; (5) it is not clear what type of oil MMAF is "refining" or whether it has produced/sold any; (6) it is not clear if the figure is based on price quotes; and (7) it does not appear to be data that are regularly collected, much less published, by the MMAF.  It bears noting again that, according to the petitioners, deficiencies of this exact nature would render data unusable for surrogate valuation, as seen throughout their arguments regarding the Indian data on the record.  In the context of key inputs such as fish feed, for example, or regarding the by-products discussed here, they appear unconcerned when the Indonesian data are missing detailed source information or are unaccompanied by volume figures.  We do not believe that applying different standards to the data is appropriate.  Thus, the petitioners' proffered fish meal and oil data offer no advantage over the Indian data, and, instead, suffer from multiple significant defects.

## V.      FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Opinion*, and in light of the record evidence, Commerce has provided additional explanation regarding its:  (1) determination that ESS was eligible for a separate rate; (2) selection of a rate to assign to Greens Farms; and (3) selection of India as a surrogate country, which was used to calculate a margin for mandatory respondent NTSF.  First, we continue to find that ESS was eligible for a separate rate.  Second, we find that the record evidence demonstrates that the rate assigned to Green Farms reflected commercial reality with

---

[323] *See* Petitioners' May 10, 2021 SV Submission at Exhibit 9-A.

respect to Green Farm's own pricing behavior.  Finally, we continue to find that India was the

most appropriate surrogate country from which to obtain the SVs used in our margin calculations

for NTSF.

10/18/2024

X

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance