# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE M. MILLER BAKER, JUDGE

GREEN FARMS SEAFOOD JOINT
STOCK COMPANY,

          Plaintiff,

v.

UNITED STATES,

          Defendant,

   and

CATFISH FARMERS OF
AMERICA, *et al.*

          Defendant-
Intervenors.

**PUBLIC VERSION**

**Court No. 22-00092**

## PLAINTIFF'S COMMENTS IN OPPOSITION TO REMAND

Robert L. LaFrankie

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:  (202) 624-2500
Email:  rlafrankie@crowell.com

*Counsel to Plaintiff Green Farms
Seafood Joint Stock Company*

Dated:  December 16, 2024

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STANDARD OF REVIEW ................................................................................... 1

BACKGROUND ................................................................................................... 2

    A.    The Court's Remand Order and Findings ................................ 2

    B.    Commerce's Draft and Final Remand Determinations .......... 4

ARGUMENT ........................................................................................................ 7

I.    Commerce's Decision Granting East Sea A Separate Rate
Fails To Consider All Of The Evidence And Is Otherwise
Unlawful ...................................................................................................... 7

    A.    Commerce Ignores that East Sea Quit the case ..................... 7

    B.    Commerce Normally Rejects a Separate Rate Application
when the Applicant Quits the case ......................................... 9

    C.    Commerce Fails to Distinguish its Prior Decisions ............. 11

    D.    Conclusion: Commerce's Final Remand Results are Unlawful
and Unsupported by Substantial Evidence .......................... 13

II.    Commerce's Calculation Of Green Farms' Separate Rate Is
Unlawful And Fails To Comply With The Court's Remand
Order ........................................................................................................ 14

    A.    Commerce Failed to Follow its Prior Practice for Calculating
Separate Rates in Similar Circumstances ........................... 15

    B.    Commerce Failed to Evaluate the Calculated Rates of Other
Mandatory Respondents from Recent Reviews ................... 16

    C.    Commerce Fails to Distinguish Prior Decisions. ................. 18

    D.    Commerce's Separate Rate Analysis for Green Farms was
Arbitrary and Otherwise Unreasonable. ............................. 20

III.    Conclusion ............................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AMS Assocs. v. United States*,
719 F. 3d 1376 (Fed. Cir. 2013)................................................................10, 11, 13

*Ausimont USA, Inc. v. United States*,
19 CIT 151, 882 F. Supp. 1087 (1995) .................................................................3

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012)............................................................................3

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)............................................................................................3

*Globe Metallurgical, Inc., v. United States*,
350 F. Supp 2d 1148, 28 CIT 1608 (2004) ........................................................16

*Huvis Corp. v. United States*,
570 F.3d 1347 (Fed. Cir. 2009)....................................................................16, 20

*Nakornthai Mill Public Co. v. United States*,
587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) ......................................................3

*Navneet Publications (India) Ltd. v. United States*,
999 F. Supp. 2d 1354 (Court Int'l Trade 2014) ....................................18, 21, 26

*Nippon Steel Corp. v. U.S. Int'l Trade Comn'n*,
494 F.3d 1371 (Fed. Cir. 2007).....................................................................15, 20

*Pro-Team Coil Nail Enterprise Inc. v. Unicatch Industrial Co., Ltd.*,
No. 22-2241, slip. op. (Fed. Cir. Aug. 15, 2024)...................................................21

*Suramerica de Aleanciones Laminadas C.A. v. United States*,
44 F.3d 978 (Fed. Cir. 1994)...............................................................................9

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ......................................................3

**Statutes**

19 U.S.C.
§ 1516a(b)(1)(B)(i) ............................................................................................3

DCACTIVE-78628440.1

19 U.S.C. §§ 1673e(a)(1), 1677b, 1677a(a)...................................................................25

19 U.S.C. §1677b...........................................................................................................25

**Other References**

Final Results of Redetermination Pursuant to Court Remand, *GODACO Seafood Joint Stock Co. v. United States,* Court No. 18-0063, Slip. Op. 21-03 (Court Int'l Trade Jan. 6, 2021) ...................................................................................20

*Final Results of Redetermination Pursuant to Court Remands; Navneet Publications (India) Ltd. v. United States*, Court No. 13-00024; Slip Op. 14-87 (CIT July 22, 2014)..................................................................................................18

*Issues and Decision Memorandum for Final Affirmative Determination of Dumping in Certain Tool Chests and Cabinets from China* (A-570-056) (April 3, 2018) ...............................................................................................................11

*Issues and Decision Memorandum for Final Affirmative Determination of Dumping in Sodium Gluconate, Gluconic Acid, and Derivative Products from China* (A-570-071) (Sept. 17, 2018).....................................................................11

DCACTIVE-78628440.1

# GLOSSARY

| Abbreviation | Term |
|---|---|
| AFA | Adverse Facts Available |
| CD | Confidential Record Document (intitial case record) |
| Commerce | United States Department of Commerce |
| East Sea | East Sea Seafoods LLC |
| FOP | Factors of Production |
| NTSF | NTSF Seafods Joint Stock Company |
| IDM | *Issues and Decision Memorandum for the Final Results of the Seventeenth Administrative Review: 2019-2020,* (March 19, 2022) (PD 444) |
| Kg | *Kilogram* |
| PD | Public Record Docuent (Initial case record) |
| RCD | Remand Confidential Record Document |
| RPD | Remand Public Record Document |

v

## INTRODUCTION

On behalf of Green Farms Seafood Joint Stock Company ("Green Farms" or "Plaintiff"), and pursuant to the Court's April 17, 2024 Opinion and Order, ECF No. 52, and the Court's November 18, 2024 remand Scheduling Order, ECF No. 63, we submit Plaintiff's comments in opposition to the Final Results of Redetermination Pursuant to Court Remand (Oct. 18, 2024) ("*Final Remand*"), filed by the U.S. Department of Commerce ("Commerce") on October 18, 2024, ECF No. 57. Commerce filed the administrative record for the *Final Remand* on November 1, 2024, ECF Nos. 59-1 and 59.2.[1]

## STANDARD OF REVIEW

The Court will hold unlawful agency determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Ausimont USA, Inc. v. United States*, 19 CIT 151, 157, 882 F. Supp. 1087, 1092 (1995). Substantial evidence means that there is "more than a mere scintilla. It

---

[1] References to the administrative record for the *Final Remand* are shown as "RCD" (confidential) and "RPD" (public). References to the initial administrative record submitted to the Court on May 31, 2022, ECF Nos. 18-1 and 18-2, are shown as "CD" (confidential) and "PD" (public).

1

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The Court also reviews Commerce's remand redeterminations for compliance with the Court's remand order. *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014) (quoting *Nakornthai Mill Public Co. v. United States*, 587 F. Supp. 2d 1303, 1306 (Ct. Int'l Trade 2008).

Commerce must act reasonably and may not be arbitrary and capricious. *See e.g.*, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("Commerce's decision will be set aside if it is arbitrary and capricious.").

## <u>BACKGROUND</u>

### A.    The Court's Remand Order and Findings

These remand proceedings arise from Plaintiff Green Farms' challenge to the antidumping ("AD") rate assigned to it in the *Final Results* of the seventeenth administrative review ("AR17") of the AD order on certain frozen fish fillets from Vietnam. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Administrative Review,* 87 Fed. Reg. 15,912 (Dep't of Commerce March

DCACTIVE-78628440.1

21, 2022) ("*Final Results*"), Appx__ (PD 447), and accompanying Issues and Decision Memorandum ("IDM"), Appx__ (PD 444). Green Farms challenged the methodology used by Commerce in the *Final Results* to calculate Green Farms' "separate rate". Green Farms argued that Commerce unreasonably relied on a very high punitive AD rate assigned to another respondent in that case to calculate Green Farms' AD rate.

The Court remanded two separate aspects of Commerce's *Final Results* regarding the calculation of Green Farms' separate rate. *See Green Farms Seafood Joint Stock Co. v. United States,* Court No. 22-00092, Slip Op. 24-46 (Ct. Int'l Trade April 17,202), ECF No. 53 *("Slip Op.")* at 14 and 18. First, the Court determined that Commerce did not adequately explain its decision granting a separate rate to East Sea (one of the mandatory respondents in the case). *See id.* at 13-14. The Court therefore remanded and instructed Commerce to provide a "fuller explanation" of its decision granting East Sea a separate rate. *Id.* at 14.

Second, the Court separately held that Commerce improperly relied upon East Sea's punitive "adverse facts available" ("AFA") rate in calculating Green Farms' dumping rate without adequate justification.

3

*See id*. at 16-18.  Specifically, the Court determined that Commerce's decision lacked "substantial evidence showing that Green Farms' tariff reflects economic reality." *Id*. at 18.  The Court agreed with Green Farms that Commerce's decision on this point was "wholly circular and arbitrary." *Id*.

The Court therefore remanded on both points, ordering first that "Commerce must reconsider East Sea's eligibility for a separate rate." *Id*.  The Court further ordered that "{i}nsofar as the Department reaffirms that determination, it must then reconsider the calculation of Green Farms' margin." *Id*.

## B.    Commerce's Draft and Final Remand Determinations

On August 13, 2024, Commerce issued its Draft Results of Redetermination Pursuant to Court Remand (Aug. 13, 2024) ("*Draft Remand*"), Appx__ (RCD 1; PCD 1). In its *Draft Remand*, Commerce upheld both of its prior decisions without substantive change.

With regard to East Sea's separate rate, Commerce continued to find that East Sea was eligible for a separate rate.  *See id.* at 4-11. Commerce provided a more fulsome explanation to support its decision, including a more detailed analysis of the separate rate statutory factors

4

addressing the so-called "*de jure*" and "*de facto*" requirements. *See id.* at 6-10. But Commerce failed to address several other evidentiary shortcomings regarding East Sea's separate rate eligibility, including the fact that East Sea quit the case, thus preventing Commerce from verifying East Sea's information. *See Id.* at 4-11. Indeed, Commerce never even mentioned this fact in the *Draft Remand*. Rather, Commerce asserted that "the record contains no evidence indicating that {East Sea's} statements were false, or that the information it provided was incomplete or otherwise deficient." *Id.* at 10.

With regard to Green Farms' separate rate calculation, Commerce again calculated Green Farms' separate rate by averaging the harshly punitive total AFA rate (of $3.87/kg) applied to East Sea and the zero rate ($0.00/kg) calculated for NTSF, the other mandatory respondent in the case. *See id.* at 11-14. Commerce sought to address the Court's concerns that Green Farms' rate must be "reflective of commercial reality" by comparing Green Farms' prices to the prices of the two other respondents, East Sea and NTSF. *See id.* at 11-12. Commerce concluded that this comparison "shows that the dumping margin assigned to Green Farms is reasonably reflective of its commercial

DCACTIVE-78628440.1

behavior, given that its pricing fell between the prices reported by the two mandatory respondents." *Id*. at 12.

On August 27, 2024, Green Farms submitted its comments on the Department's *Draft Remand*. *See* Green Farms' Comments on Draft Remand Redetermination *(*August 27, 2024*)* ("*Remand Comments*"), Appx__ (RCD 3; RPD 5). In its *Remand Comments*, Green Farms argued that Commerce's *Draft Remand* results failed to address the Court's concerns, and that they were otherwise unlawful and unsupported by substantial evidence. *See id*. at 1-2.

On October 18, 2024, Commerce issued its *Final Remand* Results, rejecting all of Green Farms' arguments and continuing to find that East Sea was eligible for a separate rate.  Commerce also continued to find it was otherwise appropriate to assign Green Farms a final separate rate based on an average of the East Sea and NTSF rates.  *See Final Remand* at 5-14 and 35-50, Appx__ (RCD 4; RPD 6).  For the reasons discussed below, the Court should remand Commerce's findings on both of these issues for a second time. Commerce has failed to consider all of the evidence and fully explain its findings. Commerce's decision is also contrary to its practice.

6

## ARGUMENT

### I.    Commerce's Decision Granting East Sea A Separate Rate Fails To Consider All Of The Evidence And Is Otherwise Unlawful

Commerce provided additional explanation to support its decision granting East Sea a separate rate.  *See Final Remand* at 5-11 and 36-41, Appx__ (RCD 4; RPD 6).  Indeed, Commerce drafted six pages of additional explanation in its underlying decision, and five more pages addressing Green Farms' comments. *See id*.  While Commerce has addressed some of the Court's concerns, Commerce still fails to address all of the relevant record evidence, including that which detracts from its findings. Commerce's actions are unlawful because the "substantial evidence" standard requires that Commerce consider "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleanciones Laminadas C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994).

### A.    Commerce Ignores that East Sea Quit the case

Indeed, there is one glaring evidentiary omission in Commerce's analysis.  Specifically, Commerce declares that "the record contains no evidence indicating that {East Sea's} statements were false, or that the

DCACTIVE-78628440.1

information that it provided was incomplete or otherwise deficient."
*Final Remand* at 11, Appx__ (RCD 4; RPD 6). But this finding
contradicts the record evidence. In particular, Commerce fails to
overcome the critical fact that East Sea *quit the case*, thereby
preventing Commerce from verifying or otherwise confirming the very
separate rate information Commerce now relies upon. Commerce itself
conceded in the underlying proceeding that East Sea voluntarily
"suspended participation in the review." *See IDM* at 26, Appx__ (PD 444).

The fact that East Sea quit the case is important because
Commerce's normal practice is to deny a separate rate application when
the separate rate applicant quits the case or "withdraws" from the
proceeding. *See e.g., AMS Assocs. v. United States*, 719 F. 3d 1376,
1378-80 (Fed. Cir. 2013). A company's "withdrawal" from a proceeding
leaves Commerce "unable to verify" the company's separate rate status.
*Id.* at 1379. Thus, where a separate rate applicant quits the case,
Commerce should deny the company's separate rate status. *See id*.

The Federal Circuit has specifically upheld this practice by
Commerce. *See id*. at 1380. The Federal Court noted in *AMS* that
Commerce reasonably denied the applicant's separate rate status

8

because Commerce was "unable to verify" its separate rate information

after it withdrew from the case. *Id*. at 1379. This is analogous to East

Sea's situation where it completely withdrew from the case, thus

depriving Commerce of an opportunity to verify its information.

### B. Commerce Normally Rejects a Separate Rate Application when the Applicant Quits the case

Indeed, Commerce has rejected separate rate status in similar

situations where the mandatory respondent quit the case. *See e.g.,*

*Issues and Decision Memorandum for Final Affirmative Determination*

*of Dumping in Certain Tool Chests and Cabinets from China* (A-570-

056) (April 3, 2018) ("*Tool Chests*") at 6-7 *(*rejecting separate rate status

where mandatory respondent had "withdrawn" from proceeding). *See*

*also Issues and Decision Memorandum for Final Affirmative*

*Determination of Dumping in Sodium Gluconate, Gluconic Acid, and*

*Derivative Products from China* (A-570-071) (Sept. 17, 2018) ("*Sodium*

*Gluconate*") at 4 (rejecting separate rate status where mandatory

respondent "notified Commerce of its intention to not continue

participating" in the case).

Commerce's response in its *Final Remand* to these arguments is

wholly unconvincing.  Commerce seeks to downplay the significance of

DCACTIVE-78628440.1

East Sea's complete withdrawal from the case by emphasizing that it relied on the information East Sea provided before its withdrawal from the case. *See Final Remand* at 38-40, Appx__ (RCD 4; RPD 6). Commerce references the *Final Results,* stating "{w}e found no basis to determine that the separate rate information submitted was not reliable." *Id.* at 38-39. But this self-serving statement ignores that East Sea quit the case, *thereby preventing Commerce from confirming that the information submitted was reliable.* Commerce's statement begs the question - how does Commerce know the information was reliable if it was unable to verify that information?

Indeed, the *Tool Chests* decision (discussed by Commerce in the *Final Results*) is particularly instructive, and Commerce fails to distinguish that decision. Commerce acknowledged in *Tool Chests* that the separate rate information was unreliable because the separate rate respondent "refused to allow Commerce to verify the separate rate information that it had placed on the record." *See IDM* at 29, Appx__ (PD 444). Commerce explained further in *Tool Chests* (about the separate rate applicant "Geelong") that "{g}iven that Geelong has withdrawn from participation in this investigation such that we cannot

10

verify the information Geelong submitted to demonstrate its eligibility for separate rate status, we have denied Geelong separate rate eligibility and treated Geelong as part of the China-wide entity." *See Tool Chests* at 7.

This is precisely the situation for East Sea in this case. East Sea provided separate rate information, but then withdrew from the case, thereby preventing Commerce from verifying that information. Commerce should therefore deny East Sea's separate rate and treat it as part of the country-wide entity, just as it did for the respondent in the *Tool Chests* decision. Doing so is consistent with other Commerce decisions, including the *Sodium Gluconate* case noted above, where Commerce also denied separate rate eligibility for a respondent that quit the case, thereby rendering its separate rate responses "unverifiable." *See Sodium Gluconate* at 4. (finding separate rate responses "unreliable" where respondent quit the case rendering its separate rate responses unverifiable.).

## C.  Commerce Fails to Distinguish its Prior Decisions

Commerce's efforts to distinguish these decisions in the *Final Remand* results lack merit. Commerce argues unconvincingly that the

11

*AMS* decision is inapposite because the respondent in that case removed its information from the record. *Final Remand* at 40 - 41, Appx__ (RCD 4; RPD 6). But this is a distinction without a difference because, as Commerce itself concedes, the respondent in *AMS* ceased participation in the case and "rendered its response unverifiable." *Id.*

Finally, Commerce also seeks to justify its decision by wrongly claiming East Sea's circumstances are "unique" because the AFA rate in this case (*i.e.,* $387/kg) is higher than the country-wide rate (*i.e.,* $2.39/kg). *See id.* at 39. Commerce claims this unique fact would allow East Sea to "benefit from its lack of cooperation" if it were denied a separate rate. *See id.* at 39-40. But this argument lacks merit for a number of reasons. First, the country-wide rate in the current AR17 proceeding is already prohibitively high (*i.e.* $2.39/kg as already noted above). There is no practical difference for East Sea as between the total AFA rate of $3.87/kg and the Vietnam-wide rate of $2.39/kg. Both rates are prohibitive.

Second, this fact pattern is not as unique as Commerce alleges. Indeed, Commerce faced this same situation in the immediately preceding sixteenth administrative review ("AR16*"*), but it reached the

12

opposite result. In the AR16 proceeding, Commerce rejected the separate rate application for mandatory respondent DOTA Seafoods for its failure to cooperate, and it then applied the $2.39/kg Vietnam-wide rate and not the higher 3.87/kg AFA rate for its failure to qualify for a separate rate. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of Sixteenth Antidumping Administrative Review; 2018-2019, (June 25, 2021) at 39-40.* Commerce's actions in this current AR17 proceeding are directly contrary to its actions in the AR16 proceeding for a different mandatory respondent.

## D. Conclusion: Commerce's Final Remand Results are Unlawful and Unsupported by Substantial Evidence

Thus, Commerce's *Final Remand* results do not comply with the Court's remand instructions, and they are otherwise unlawful and unsupported by substantial evidence. Commerce has not only failed to overcome evidentiary shortcomings, but its actions are also contrary to its prior decisions in other cases and prior holdings of the Court. Commerce may not arbitrarily depart from this written policy, and particularly not without adequate notice or explanation. An agency must adequately explain a change or deviation in policy. *See, e.g.,*

13

*Nippon Steel Corp. v. U.S. Int'l Trade Comn'n*, 494 F.3d 1371, 1377 n.5 (Fed. Cir. 2007) (agency must "adequately explain the reason for a reversal of policy"); *see also Huvis Corp. v. United States*, 570 F.3d 1347, 1354-55 (Fed. Cir. 2009) (Commerce must show "good reasons" for methodological change). Indeed, "{a} court may measure Commerce's reasonableness by determining whether Commerce's actions are consistent with a past practice or stated policy." *See Globe Metallurgical, Inc., v. United States*, 350 F. Supp 2d 1148, 1159, 28 CIT 1608, 1621 (2004).

Commerce has failed to do so here and its actions are arbitrary. The Court should remand yet again for these reasons.

## II.    Commerce's Calculation Of Green Farms' Separate Rate Is Unlawful And Fails To Comply With The Court's Remand Order

Commerce correctly frames the remand issues for the calculation of Green Farms' separate rate, but it fails to comply with the law and the Court's instructions. Commerce also fails to support its decision with substantial evidence. Indeed, Commerce does not fully justify how the harshly punitive AFA rate it calculated for Green Farms actually "reflects economic reality", as the Court instructed. Commerce instead

14

reverse-engineered its result by arbitrarily selecting and adjusting individual prices derived from sample sales documents. Commerce performed a contrived "short-cut" dumping calculation for Green Farms to obtain the result it wanted. Commerce's actions are contrary to its practice and otherwise unreasonable. We discuss this below.

## A. Commerce Failed to Follow its Prior Practice for Calculating Separate Rates in Similar Circumstances

In its *Final Remand*, Commerce justifies the margin it applied to Green Farms as "reflective of commercial reality" by examining record information regarding Green Farms' pricing. *See Final Remand* at 11–14, Appx__ (RCD 4; RPD 6). Commerce compared a single sales price taken from Green Farms' separate rate application to single sales prices submitted by the two mandatory respondents (*i.e.*, East Sea and NSTF). *See id.* Commerce made multiple adjustments and concluded that the dumping margin assigned to Green Farms was reasonably reflective of its commercial behavior because "its pricing fell between the prices reported by the two mandatory respondents." *See id.* at 12.

Commerce's actions are unreasonable and fail to follow its established practice under similar circumstances. In determining the separate rate for non-selected respondents using an average in this

15

context, Commerce normally assigns "non-selected respondents the average of the most recently determined margins that are not zero, de minimis, or based entirely on facts available (which may be from a prior review or a new shipper review or the investigation)." *See e.g. Final Results of Redetermination Pursuant to Court Remands; Navneet Publications (India) Ltd. v. United States*, Court No. 13-00024; Slip Op. 14-87 (CIT July 22, 2014) at 3. *See also Navneet Publications (India) Ltd. v. United States*, 999 F. Supp. 2d 1354, 1363 (Court Int'l Trade 2014) (noting that Commerce's "preferred, alternative 'reasonable method'" under these circumstances is to use "margins previously calculated for respondents" from prior proceedings).

But Commerce did not use its "preferred" methodology. Commerce invented a new methodology comparing a single price for the non-selected respondent (Green Farms) to the single prices of the two mandatory respondents. *See Final Remand* at 11–14, Appx__ (RCD 4; RPD 6).

## B. Commerce Failed to Evaluate the Calculated Rates of Other Mandatory Respondents from Recent Reviews

Commerce failed to follow its practice. Commerce normally evaluates the prior calculated rates of other cooperating respondents

16

from prior proceedings in this context to determine or confirm a separate rate. Indeed, this is exactly what Green Farms argued in its briefs to Commerce and in its opening Rule 56.2 brief to the Court. As noted therein, Green Farms urged Commerce to consider the prior calculated rates of other cooperating respondents from various prior administrative reviews, including the fifteenth review (AR15), the sixteenth review (AR16), and the seventeenth review (AR17). *See Green Farms Rule 56.2 Motion and Memorandum in Support* (Oct. 20, 2022) (ECF No. 29) at 42-49. This included the rate of $0.15/kg calculated for NTSF in AR15, as well as the calculated rates of $0.00/kg for NTSF and Vinh Hoan in AR17 and AR16, respectively. *See id.*

But Commerce did not even consider the calculated rates of the mandatory respondents from the immediately preceding reviews. Nor did Commerce consider the AD rates calculated in the recently completed nineteenth administrative review (AR19), which were $0.00/kg for Vinh Hoan and $0.18/kg for Caseamex. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Administrative Review; 2021-2022, 89 Fed. Reg.*

17

18,595 - 96, (Dep't of Commerce March 14, 2024). Indeed, these are the most recent calculated rates for cooperating respondents.

Evaluating rates from the recently completed segments of the same proceedings is consistent with the approach Commerce itself used in its recently completed third remand pursuant to court proceedings in the thirteenth administrative review (AR13). *See* Final Results of Redetermination Pursuant to Court Remand, *GODACO Seafood Joint Stock Co. v. United States,* Court No. 18-0063, Slip. Op. 21-03 (Court Int'l Trade Jan. 6, 2021). Indeed, in that case, after two remands, Commerce ultimately used an average of the calculated AD rates from the most recently completed administrative reviews. *See id.*

As noted earlier, Commerce may not arbitrarily depart from its prior policies without adequate justification. *See, e.g.*, *Nippon Steel Corp. v. U.S. Int'l Trade Comn'n*, 494 F.3d 1371, 1377 n.5 (Fed. Cir. 2007); *see also Huvis Corp. v. United States*, 570 F.3d 1347, 1354-55 (Fed. Cir. 2009). Commerce failed to do so here.

## C.  Commerce Fails to Distinguish Prior Decisions.

Commerce tries to distinguish prior decisions as not applicable in this case but its efforts to do so are not persuasive.  Commerce argues it

18

has no such established policy of considering the dumping rates of other mandatory respondents in prior proceedings in this context. *See Final Remand* at 42, Appx__ (RCD 4; RPD 6). Commerce says this is "misstatement" of its policy and that various prior decisions (including the *Navneet* decision) are not on point. *Id.* at 42-43. Yet Commerce itself concedes that it is appropriate to consider prior margins of mandatory respondents in this context if "the circumstances of a particular case make it reasonable to do so." *Id.* at 43. Green Farms has argued that the circumstances of this case make it reasonable to do so given the lack of record evidence demonstrating that the use of a harshly punitive AFA rate reflects economic reality.

Commerce next points to the recent Federal Circuit decision of *Pro-Team Coil Nail Enterprise Inc. v. Unicatch Industrial Co., Ltd.*, No. 22-2241, slip. op. (Fed. Cir. Aug. 15, 2024) as further support for its actions. *See Final Remand* at 43-44, Appx__ (RCD 4; RPD 6). But the *Pro-Team* decision actually supports Green Farms arguments. In *Pro-Team* the Court held that Commerce may use AFA rates of the mandatory respondents to determine the separate rates of the non-

19

selected respondents, but only if it is reasonable to do so under the facts. *See Pro-Team* at 15.

Moreover, *Pro-Team* is factually distinguishable. The AFA rate in that case was corroborated by actual "transaction-specific dumping margins" of those respondents. *See id.* at 13. Commerce had record evidence of actual dumping margins by the mandatory respondents above the AFA rate used to derive the separate rate. *See id.* at 15. By contrast, there is no record evidence of any such dumping margins by NTSF above the AFA rate used for Green Farms. Indeed, as Green Farms has argued all along, NTSF's rate is much lower.

### D. Commerce's Separate Rate Analysis for Green Farms was Arbitrary and Otherwise Unreasonable.

Commerce not only ignored its prior practice, Commerce also arbitrarily created a new methodology, and it failed to support its findings with substantial evidence. Commerce made arbitrary assumptions and evidentiary errors in devising its new short-cut methodology.

DCACTIVE-78628440.1

### 1. *Commerce's Comparison Methodology Uses Arbitrary Assumptions and Adjustments.*

Specifically, Commerce compared a single sale price from Green Farms' separate rate application to single sales prices submitted by the two mandatory respondents (*i.e.,* East Sea and NSTF). *See Final Remand* at 12-14, Appx__ (RCD 4; RPD 6). Commerce then made arbitrary adjustments to the prices ostensibly to account for any "known differences." *See id.* This included adjustments for (1) international freight and (2) U.S. inland movement expenses and other expenses of NTSF's U.S. affiliate (for CEP sales). *See id.* Commerce tried to account for 9 different expenses, which it then summarized into three different expense categories (including (1) international freight expenses; (2) U.S. Inland Movement expenses and (3) CEP expenses). *See id.* at 13.

Commerce made arbitrary assumptions and adjustments to the prices. Commerce also made an error in the starting price (which it later corrected). *See id.* at 44. In short, its comparison was arbitrary because the sales were made on such different terms of sale. In particular, each of the three sales were made on completely different sales terms, including [                              ]. *See id. at* 13. Importantly,

NTSF made its U.S. sales through an affiliate in the U.S., whereas Green Farms and East Sea made sales to unaffiliated customers directly. *See id*. at 12. These differing sales terms result in [                    ] pricing differences, as Commerce's own summary chart shows. *See id*. at 12-13. Commerce purports to account for these differences, but it is not clear that Commerce accurately did so inasmuch as the adjustments appear to be based entirely on NTSF's data. *See id*. The adjustments were mere estimates and not precise.

In sum, the individual sales that were compared as between NTSF and Green Farms are not in fact wholly comparable. One was [

]. The other was [

] in the US. *See id*. Commerce was not able to fully adjust for the differences.

## 2. *Commerce's Comparison Methodology is Otherwise Flawed*

Moreover, Commerce ultimately made a meaningless comparison between the sales prices of the various U.S. respondents. Commerce used the selling prices of respondents as a type of surrogate comparison point for determining potential dumping on Green Farms' sales. Such a comparison does not measure dumping. Dumping is a comparison of an

22

exporter's pricing in the US either to that exporter's own pricing in the home market or third country, or constructed value, or surrogate value. *See generally* 19 U.S.C. §§ 1673e(a)(1), 1677b, 1677a(a) (noting, *inter alia*, that dumping measures the amount by which "normal value" exceeds "export price"). These provisions make clear that Commerce measures dumping by comparing "normal value" (*i.e.*, home market value) to the "export price" or "constructed export price." *See* 19 U.S.C. §1677b. Further, these provisions require a "fair comparison." *See id.*

Commerce's short-cut methodology is neither fair, nor proper. Commerce is comparing Green Farms' U.S. "export price" (*i.e.,* Green Farms' selling price in the U.S.) to its competitor's U.S. "export price" (*i.e.,* NTSF's selling price in the US). Such a comparison is not contemplated by the statute. It is wholly arbitrary.

Commerce acknowledges it does "not have the data necessary to conduct a full margin analysis for the company." *See Final Remand* at 13-14, Appx__ (RCD 4; RPD 6). Commerce admits it does not have the data because Green Farms "was not selected for individual examination." *Id.* But Commerce should not use a short-cut based on incomplete data and incorrect assumptions. Doing so unfairly and

23

improperly penalizes Green Farms for the lack of data that "is not the fault of the separate rate respondents." *See Navneet*, 999 F. Supp. 2d at 1363. This is particularly true where, as here, "the available data … were limited by the Department's decision" as to the number of mandatory respondents. *See id.*

In short, Commerce is unfairly penalizing Green Farms for the uncooperative behavior of East Sea and for Commerce's own decision not to replace East Sea as a respondent when it quit the case. And, Commerce is doing so despite the fact that Green Farms fully cooperated.

In response to these numerous critiques, Commerce states that it has no other basis to make such a comparison, and that "Green Farms suggests no alternatives." *Final Remand* at 45, Appx__ (RCD 4; RPD 6).. This response misses the point. Green Farms is arguing that Commerce should abandon this approach, and not make this comparison at all. Commerce's approach is arbitrary, flawed, and meaningless. Green Farms has, in fact, offered an alternative, which is

that Commerce look to the rates of the respondents from the preceding reviews.[2]

Green Farms is not aware that Commerce has ever used such a methodology in any prior case. Commerce appears to have invented this methodology in this case solely to avoid looking at and using the actual calculated rates of the other mandatory respondents.

## III.  Conclusion

Thus, for these reasons, we respectfully request that the Court remand the case back to Commerce for reconsideration again consistent with the arguments in this brief.

Respectfully submitted,

/s/ Robert L. LaFrankie
Robert L. LaFrankie

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:  (202) 624-2500
Email:  rlafrankie@crowell.com

---

[2] Commerce also states it does not have the resources to perform a full dumping calculation for Green Farms. *Id.* at 48-49. Commerce's response again misses the point.  Green Farms is not arguing that Commerce undertake this analysis for non-selected respondents. Green Farms is simply pointing out the fallacy of Commerce's short-cut approach.

DCACTIVE-78628440.1

*Counsel to Plaintiff Green Farms*
*Seafood Joint Stock Company*

DCACTIVE-78628440.1

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE M. MILLER BAKER, JUDGE

GREEN FARMS SEAFOOD JOINT
STOCK COMPANY

                    Plaintiff,

    v.

UNITED STATES,                  **Court No. 22-00092**

                    Defendant,

     and

CATFISH FARMERS OF
AMERICA, *et al.*

                  Defendant-
Intervenors.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to U.S. Court of International Trade Rule 2(b)(2) of the Court's Standard Chambers Procedures, undersigned counsel for Plaintiff Green Farms certifies this brief complies with the Court's type-volume limitation rules. This brief contains no more than 4762 words and therefore does not exceed 10,000 words. This brief also complies with all typeface requirements.

                    Respectfully submitted,

/s/ Robert L. LaFrankie
Robert L. LaFrankie

*Counsel to Plaintiff Green Farms
Seafood Joint Stock Company*

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE M. MILLER BAKER, JUDGE

GREEN FARMS SEAFOOD JOINT
STOCK COMPANY

                        Plaintiff,

            v.

UNITED STATES,                          **Court No. 22-00092**

                        Defendant,

            and

CATFISH FARMERS OF
AMERICA, *et al.*

                        Defendant-
Intervenors.

## <u>ORDER</u>

Upon consideration of Plaintiff's Comments in Opposition to the

Remand, and all other papers and proceedings, it is hereby:

**ORDERED** that Plaintiff's Comments in Opposition to the Final

Remand requesting further remand are **GRANTED**; and it is further

**ORDERED** that this case is remanded to the U.S. Department of

Commerce in accordance with the Court's decision.

_____
Judge M. Miller Baker, Judge

Dated: _____2021
        New York, New York