# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| GREEN FARMS SEAFOOD JOINT STOCK COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 22-00092 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) | |
| Defendant-Intervenors. | ) ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 22-00125 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |

NAM VIET CORPORATION, NTSF )
SEAFOODS JOINT STOCK COMPANY, )
and GREEN FARMS SEAFOOD )
JOINT STOCK COMPANY, )
 )
     Defendant-Intervenors. )
_____)

## DEFENDANT'S RESPONSE IN SUPPORT
## OF THE REMAND REDETERMINATION

BRETT A. SHUMATE
Acting Assistant Attorney
General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
K. GARRETT KAYS
Of Counsel
Office of the Chief Counsel
 for Trade Enforcement & Compliance
U.S. Department of Commerce
Kenneth.Kays@trade.gov

KARA M. WESTERCAMP
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7571

January 22, 2025     Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................i

TABLE OF AUTHORITIES ...................................................... iii

DEFENDANT'S RESPONSE IN SUPPORT OF THE REMAND
REDETERMINATION ...............................................................1

BACKGROUND ........................................................................2

    I.    Commerce's Final Results And The Court's Remand Order ..2

    II.    Remand Results ......................................................6

        A.    ESS Separate Rate Eligibility .......................................7

        B.    Calculation Of Green Farms's Rate................................8

        C.    Primary Surrogate Country Selection.........................10

            1.    Commerce's Selection Of India As The Primary
                Surrogate Country ...............................................10

            2.    The Indian Data Are The Best Available
                Information ......................................................11

ARGUMENT ........................................................................12

    I.    Standard Of Review ...........................................................12

    II.    Commerce's Remand Results With Respect To ESS's
        Separate Rate Eligibility And Green Farms's Separate Rate
        Calculation Comply With The Remand Order ...................13

        A.    Commerce's Determination That ESS Is Eligible For A
            Separate Rate Is Supported By Substantial Evidence
            And In Accordance With Law ......................................14

B.    Commerce Lawfully Calculated Green Farms's
       Separate Rate ............................................................. 24

III.   Commerce's Remand Results Comply With The Remand
       Order Regarding Its Selection of India As The Primary
       Surrogate Country ........................................................ 34

A.    Legal Standard For Best Available Information ......... 36

B.    Substantial Evidence Supports Commerce's Reliance
       On Indian Data For Whole Live Fish, Fingerlings, And
       Feed ............................................................................. 37

       1.    Indian Data Are The Best Available Information
             For Whole Live Fish ............................................. 38

       2.    Indian Data Are The Best Available Information
             For Fingerlings .................................................... 42

       3.    Indian Data Are The Best Available Information
             For Feed ............................................................... 50

       4.    Indian Data Are The Best Available Information
             For Labor ............................................................. 54

       5.    Indian Data Are The Best Available Information
             For By-Products ................................................... 59

       6.    Indian Data Are The Best Available Information
             For Financial Ratios ........................................... 64

CONCLUSION ......................................................................... 70

# TABLE OF AUTHORITITES

## CASES

*AMS Assocs. v. United States,*
   719 F.3d 1376 (Fed. Cir. 2013)........................................................ 20, 22

*Baroque Timber Indus. (Zhongshan) Co. v. United States,*
   971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014)........................................ 28

*Bristol Metals L.P. v. United States,*
   703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010)........................................ 36

*Carbon Activated Tianjin Co. v. United States,*
   547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021)........................................ 58

*Changzhou Trina Solar Energy Co. v. United States,*
   975 F.3d 1318 (Fed. Cir. 2020) ........................................................ 36

*Clearon Corp. v. United States,*
   Consol. Court No. 13-00073, 2016 WL 6892556 (Ct. Int'l Trade Nov.
   23, 2016)...................................................................................... 35, 55

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938)........................................................................ 13

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1996)..................................................................... 13, 29

*Diamond Sawblades Mfrs. Coalition v. United States,*
   866 F.3d 1304 (Fed. Cir. 2017) ......................................................... 22

*Downhole Pipe & Equip., L.P. v. United States,*
   776 F.3d 1369 (Fed. Cir. 2015) .................................................... passim

*Fresh Garlic Producers Ass'n v. United States,*
   121 F. Supp. 3d 1313 (Ct. Int'l Trade 2015)........................................ 17

iii

*Gerber Food (Yunnan) Co. v. United States,*
  387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005)........................................17

*Globe Metallurgical, Inc. v. United States,*
  865 F. Supp. 2d 1269 (Ct. Int'l Trade 2012)...................... 50, 54, 61, 70

*Goldlink Indus. Co. v. United States,*
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)........................................37

*Green Farms Seafood Joint Stock Company v. United States,*
  Ct. Nos. 22-00092, 22-00125, Slip Op. 24-46, 2024 WL 1653791
  (Ct. Int'l Trade Apr. 17, 2024) .................................................... passim

*Hangzhou Yingqing Material Co. v. United States,*
  195 F. Supp. 3d 1299 (Ct. Int'l Trade Dec. 21, 2016)..........................53

*Heze Huayi Chemical Co., Ltd. v. United States,*
  Ct. No. 17-32, 2018 WL 2328183 (Ct. Int'l Trade May 22, 2018)........57

*Home Meridian Int'l, Inc. v. United States,*
  772 F.3d 1289 (Fed. Cir. 2014) ............................................................56

*Jacobi Carbons AB v. United States,*
  313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018)............................ 11, 35, 55

*Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States,*
  396 F. Supp. 3d 1334 (Ct. Int'l Trade 2019)........................................57

*Jiaxing Bro. v. United States,*
  961 F. Supp. 3d 1326 (Ct. Int'l Trade 2014), *aff'd, Jiaxing Bro. v.
  United States,*
  822 F.3d 1289 (Fed. Cir. 2016) ......................................................56, 67

*List Indus. v. United States,*
  641 F. Supp. 3d 1400  (Ct. Int'l Trade 2023)........................................57

*MacLean-Fogg Co. v. United States,*
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015)........................................12

iv

*Michaels Stores, Inc. v. United States,*
  766 F.3d 1388 (Fed. Cir. 2014) ............................................................ 22

*Pro-Team Coil Nail Enter. Inc. v. United States,*
  587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ...................................... 28

*Pro-Team Coil Nail Enter. Inc. v. United States,*
  Ct. No 2022-2241, 2024 WL 3824005
  (Fed. Cir. Aug. 15, 2024) ........................................................ 29, 30, 31

*QVD Food Co. v. United States,*
  658 F.3d 1318 (Fed. Cir. 2011) ............................................................ 62

*Shenzhen Xinboda Indus. Co. v. United States,*
  456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ...................................... 56

*Solianus, Inc. v. United States,*
  391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019) ...................................... 28

*Tri Union Frozen Prods., Inc. v. United States,*
  227 F. Supp. 3d 1387 (Ct. Int'l Trade 2017) ...................................... 57

*Uttam Galva Steels Ltd. v. United States,*
  No. 21-2119, 2022 U.S. App. LEXIS 12135 (Fed. Cir. May 5, 2022) ... 69

*Viet I-Mei Frozen Foods Co. v. United States,*
  839 F.3d 1099 (Fed. Cir. 2016) ...................................................... 40, 42

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
  716 F.3d 1370 (Fed. Cir. 2013) ........................................................ 9, 25

*Yantai Xinke Steel Structure Co. v. United States,*
  Slip Op. 12-95, 2012 WL 2930182
  (Ct. Int'l Trade July 18, 2012) ................................................ 16, 17, 18

*Zhejiang DunAn Hetian Metal Co. v. United States,*
  652 F.3d 1333 (Fed. Cir. 2011) ............................................................ 37

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................ 12

19 U.S.C. § 1673d(c)(1)(B) .................................................................... 25

19 U.S.C. § 1673d(c)(5)(B) ............................................................ passim

19 U.S.C § 1677e(d)(2) ........................................................................... 19

19 U.S.C § 1677e(d)(2)(A-D) ................................................................ 21

19 U.S.C. § 1677f-1(c)(2) ................................................................. 24, 31

## REGULATIONS

19 C.F.R. § 351.408(c)(2) ................................................................ 55, 58

19 C.F.R. § 351.213(b) ........................................................................... 22

## FEDERAL REGISTER NOTICES

*Sparklers from the People's Republic of China,*
  56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) ..................... 15

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*
  74 Fed. Reg. 11,349 (Dep't of Commerce Mar. 17, 2009) ................... 68

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
  75 Fed. Reg, 12,726 (Dep't of Commerce Mar. 17, 2010) ................... 46

*Laminated Woven Sacks from the Peopl's Republic of China,*
  76 Fed. Reg. 14,906 (Dep't of Commerce Mar. 18, 2010) ................... 21

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
  78 Fed. Reg. 17,350 (Dep't of Commerce Mar. 21, 2013) .............. 19, 31

*Certain Steel Threaded Rod from the People's Republic of China,*
  79 Fed. Reg. 71,743 (Dep't of Commerce Dec. 3, 2014)................ 47, 53

*Certain Polyethylene Terephthalate Resin from the People's Republic of China,*
  81 Fed. Reg. 13,331 (Dep't of Commerce Mar. 14, 2016)....................59

*Sodium Gluconate, Gluconic Acid, and Derivative Products from the People's Republic of China,*
  83 Fed. Reg. 15,365 (Dep't of Commerce Apr. 10, 2018) ....................23

*Tool Chests from China,*
  83 Fed. Reg. 15,365 (Dep't of Commerce Apr. 10, 2018)....................23

*Sodium Gluconate, Gluconic Acid, and Derivative Products from the People's Republic of China,*
  83 Fed. Reg. 47,876 (Dep't of Commerce Apr. 10, 2018) ..............23, 24

*Certain Hardwood Plywood Products from the People's Republic of China,*
  85 Fed. Reg. 77,157 (Dep't of Commerce Dec. 1, 2020)........................64

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam,*
  86 Fed. Reg. 50,698 (Dep't of Commerce Sept. 10, 2021) ....................30

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
  87 Fed. Reg. 15,912 (Dep't of Commerce Mar. 21, 2022)......................2

*Final Results,*
  87 Fed. Reg. 15,913 (Dep't of Commerce              )......................3, 4

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China,*
  89 Fed. Reg. 17,817 (Dep't of Commerce Mar. 12, 2024)....................*66*

*Aluminum Extrusions from Malaysia,*
  89 Fed. Reg. 80,458 (Dep't of Commerce Oct. 3, 2024)........................28

# GLOSSARY

AFA:                Adverse Facts Available

CFA:                Catfish Farmers of America, *et al.*

ESS:                East Sea Seafoods Joint Stock Company

FOP:                Factors of Production

GNI:                Gross National Income

GTA:                Global Trade Atlas

HTS:                Harmonized Tariff Schedule

IDM:                Issues and Decision Memorandum

ILOSTAT:            Indian International Labor Organization

MMAF:               Ministry of Marine Affairs and Fisheries

MMC:                MMC Exports Limited

NME:                Non-Market Economy

NTSF:               NTSF Seafoods Joint Stock Company

PDM:                Preliminary Decision Memorandum

POR:                Period of Review

SAA:                Statement of Administrative Action

SRA:                Separate Rate Application

SRC:                Separate Rate Certification

SV:                    Surrogate Value

## DEFENDANT'S RESPONSE IN SUPPORT
## OF THE REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments filed by the plaintiffs, CFA[1], Ct. No. 22-00125, ECF No. 75 (CFA Cmnts.), and Green Farms Seafood Joint Stock Company (Green Farms), Ct. No. 22-00092, ECF No. 64 (Green Farms Cmnts.) concerning the United States Department of Commerce's final results of redetermination filed in accordance with this Court's decision and remand order in *Green Farms Seafood Joint Stock Company v. United States*, Ct. Nos. 22-00092, 22-00125, Slip Op. 24-46, 2024 WL 1653791 (Ct. Int'l Trade Apr. 17, 2024). *See* Final Results of Redetermination Pursuant to Court Remand, Oct. 18, 2024 (Remand Results), Ct. No. 22-00125, ECF Nos. 68-69, and Ct. No. 22-00092, ECF Nos. 57-58 (Remand P.R. 6, C.R. 4), Appx____-_____, Appx____-_____.[2]  For the reasons

---

[1] Catfish Farmers of America, America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, CFA) are the petitioners, representing the domestic industry, in the underlying review.

[2] Citations to the public record "P.R. _" and confidential record "C.R._" refer to the underlying administrative review record.  Citations

explained below, we respectfully request that the Court sustain Commerce's remand results and enter final judgment for the United States.

## BACKGROUND

I.    Commerce's Final Results And The Court's Remand Order

On March 21, 2022, Commerce published its final results in the 2019-20 administrative review of the order covering certain frozen fish fillets from Vietnam. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 87 Fed. Reg. 15,912 (Dep't of Commerce Mar. 21, 2022) (final results) (P.R. 447) (Final Results), Appx_____- _____, and accompanying Issues and Decision Memorandum (IDM) (P.R. 444), Appx____-_____.  Commerce selected East Sea Seafoods Joint Stock Company (ESS) and NTSF Seafoods Joint Stock Company (NTSF) as the mandatory respondents in the review.  Respondent Selection Memo (P.R. 112), Appx____-____.  Green Farms, ESS, and NTSF, all submitted the necessary documentation to seek a separate rate from the

to "Remand P.R._" and "Remand C.R._" refer to the public and confidential record of the remand redetermination, respectively.

Vietnam-wide rate, either as individually examined or non-individually examined companies. IDM at 2, Appx___. In the final results, Commerce determined that it was appropriate to use India as the primary surrogate country because India was at the same level of economic development as Vietnam, a significant producer of merchandise comparable to the subject merchandise, and provided reliable data with which to value the factors of production (FOPs). *See id.* at 41-57, Appx____-____. Accordingly, Commerce calculated the normal value using Indian surrogate value data to value NTSF's factors of production (FOPs), with the exception of boat freight, for which it used Indonesian data because the record did not have usable Indian surrogate data for this minor input. *Id.* Commerce calculated a final dumping margin for NTSF of $0.00 per kilogram. Final Results, 87 Fed. Reg. at 15,913, Appx____.

Separately, Commerce determined that ESS and Green Farms were each eligible for a separate rate. IDM at 26-31, Appx___-___. With respect to ESS, Commerce explained that the company had provided adequate responses regarding its independence from the Vietnamese government and separate rate

eligibility, but that the company ceased its participation after it had submitted this evidence. *Id.* at 24-30, Appx___-___. Based on ESS's decision to cease participation, Commerce disregarded ESS's submitted information and assigned ESS a dumping margin using total facts available with an adverse inference (AFA), resulting in a $3.87 per kilogram margin. *Id.* at 30, Appx___.

For Green Farms, Commerce determined that it was appropriate to calculate a separate rate by using a simple average of the $0.00 per kilogram margin for NTSF and $3.87 per kilogram total AFA margin for ESS as the two mandatory respondents in this review. *Id.* at 34-36, Appx___-___. Thus, Commerce assigned Green Farms the separate rate of $1.94 per kilogram. *Id.* at 36, Appx___; Final Results, 87 Fed. Reg. at 15,913, Appx___.

Both CFA and Green Farms filed an action challenging certain aspects of Commerce's final results. For the purposes of this remand, CFA primarily challenged Commerce's selection of India as the primary surrogate country, arguing instead for Indonesia to be selected. Green Farms primarily challenged the

calculation of its rate, as a separate rate recipient, and ESS's eligibility for a separate rate.

On April 14, 2024, the Court sustained, in part, and remanded, in part, certain aspects of the final results. *Green Farms*, 2024 WL 1653791, at *3–8. The Court remanded three issues from the Final Results. First, although the Court held that Commerce did not err as a matter of law in assigning ESS a separate rate based on AFA, *id.* at *3, the Court remanded Commerce's determination that ESS was eligible for a separate rate because Commerce had not adequately explained the evidence supporting its findings under each of the factors relevant for determining the absence of both *de jure* and *de facto* control. *Id.* at *5.

Second, the Court remanded Commerce's rate calculation for non-examined companies, including Green Farms, stating that Commerce's use of "any reasonable method" under 19 U.S.C. § 1673d(c)(5)(B) when averaging NTSF's zero rate and ESS's AFA rate did not reflect Green Farms's economic reality. *Id.* at *6-7. Third, the Court remanded Commerce's primary surrogate country

selection for further analysis, holding that Commerce misapplied the statutory standard, and that it must explain why Indonesia is not economically comparable to Vietnam, or otherwise compare the Indian and Indonesian data on the record to determine which data set is superior. *Id.* at *7.

## II. Remand Results

On October 18, 2024, Commerce filed the remand results and provided additional explanation relevant to the issues remanded in the Court's opinion. *See generally* Remand Results, Appx____-____; *see also Green Farms*, 2024 WL 1653791, at *5-8. On remand, Commerce further explained (1) how ESS demonstrated the absence of *de facto* and *de jure* control from the Vietnamese government, (2) how the calculation of Green Farms's separate rate was supported by substantial evidence, (3) and why it had selected India as the primary surrogate country, providing additional discussion of its surrogate country selection process, and considering the merits of the provided Indonesia data relative to the Indian data on the record. *See generally id.*

A.    ESS Separate Rate Eligibility

Although the Court sustained Commerce's rationale underlying its selection of a rate based on AFA due to ESS's cessation of participation in the proceeding, the Court held that Commerce failed to explain how ESS demonstrated the absence of *de jure* and *de facto* control to warrant eligibility for a separate rate in the first instance and remanded for further explanation. *Green Farms*, 2024 WL 1653791 at *5.

Prior to ESS terminating its participation in the review, ESS had submitted a separate rate certification (SRC) and a response to section A of Commerce's standard antidumping duty questionnaire (*i.e.*, the section related to the general operations of the company, including the company's eligibility for a separate rate), which provided the information necessary for Commerce to assess ESS's independence from government control.  Remand Results at 7, Appx___ (citing ESS's Nov. 5, 2020 SRC), Appx___-___; ESS's Feb. 5, 2021 Section A Resp., Appx___-___).  Commerce analyzed the requisite factors for a company to demonstrate the absence of both *de facto* and *de jure* governmental control and concluded that record evidence supported a finding that ESS met both factors, such that the company was

eligible for a separate rate. *Id.* at 10, Appx___.  To wit, Commerce

determined that ESS is eligible for a separate rate because (1) ESS is a

private company owned by individuals who are not affiliated with the

government, (2) ESS's business license reflects no restrictive stipulations, and

(3) ESS reported that Vietnam has no legislative enactments, or any other

formal measures by the government, centralizing control over the company's

export activities. *Id.*  Commerce also found that the record supported a

finding that, consistent with the statements made by other companies during

this review, Vietnam generally did not impose formal measures restricting

exporters. *Id.* (citing Green Farms Aug. 2, 2021 Separate Rate Application

(SRA) (Green Farms SRA), at 9-13, Appx___-___; NTSF's Oct. 30, 2020 SRC

(NTSF's SRC), at 4, Appx___).  Furthermore, ESS's documentation showed

that it has authority to negotiate and to sign sales contracts, and it certified

that it also independently sets its own export prices, selects its own

management, retains the proceeds of its export sales, and makes decisions

regarding the disposition of its profits. *Id.* (citing ESS SRC at 5-7, Appx___-

___).

B.    Calculation Of Green Farms's Rate

Next, in response to the Court's order to reconsider the

calculation of Green Farms's separate rate such that it reflects Green Farms's "economic reality," *Green Farms*, 2024 WL 1653791, at \*6-7 (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)), Commerce compared the price of the sale supported by the documentation contained in Green Farm's separate rate application with ESS's and NTSF's sale prices during the period of review (POR). *See* Remand Results at 11-14, 41-49, Appx\_\_\_-\_\_\_, Appx\_\_\_-\_\_\_. Commerce then adjusted the sale prices to reflect sales on the same terms of sale and found that this comparison shows that the dumping margin assigned to Green Farms is reasonably reflective of its commercial behavior, given that its pricing fell between the prices reported by the two mandatory respondents. *See id.* Commerce explained that record information in Green Farm's separate rate application did not provide a sufficient basis to conduct a full margin analysis. *Id.* Thus, Commerce explained that the pricing data on the record supported the application of a margin that is a simple average of the margins of the mandatory respondents–NTSF's zero rate and ESS's total AFA rate–as "any reasonable method" under 19 U.S.C.

9

§ 1673d(c)(5)(B). *See id.*

    C.   <u>Primary Surrogate Country Selection</u>

The Court ordered Commerce to explain on remand "why it disagrees {with CFA's argument that Indonesia is economically comparable to Vietnam} or else compare the two {Indonesian and Indian} data to assess which set is superior." *Green Farms,* 2024 WL 1653791, at *7. On remand, Commerce provided extensive explanation of its sequential surrogate country selection process, why record evidence warranted the selection of India as the primary surrogate country, and the relative merits of the Indian data compared to the Indonesian data. *See* Remand Results at 14-35, 51-80, Appx___-___, Appx___-___.

        1.   <u>Commerce's Selection Of India As The Primary Surrogate Country</u>

In the remand results, Commerce explains its practice and reasons for identifying India as one of the six countries at the same level of economic development as Vietnam, based on *per capita* gross national income (GNI) data, and other data considerations. *Id.* at 14-23, Appx___-____. Commerce explained that Indonesia was outside the *per capita* GNI range set forth by the countries included in the Surrogate

Country List, which Commerce determined were at the same level of economic development as Vietnam. *Id.* at 3, Appx___. Furthermore, Commerce stated that this review did not present an instance when "none of the countries on the list are significant producers of comparable merchandise or have suitable sources of surrogate value data," requiring the selection of a country that was not at the same level of economic development. *Id.* at 22, Appx___ (citing *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1318 n.12 (Ct. Int'l Trade 2018)). Nonetheless, Commerce treated both Indonesia and India as viable primary surrogate countries and, under respectful protest, afforded India no preference despite its inclusion on the surrogate country list issued on the record of this segment. *Id.* at 2 n.6, Appx___.

2.    The Indian Data Are The Best Available Information

Additionally, as directed by the Court, Commerce explains why the Indian FOP data are the best available information compared to the competing Indonesian data submitted by CFA. *See Green Farms*, 2024 WL 1653791, at *7. Specifically, the Court remanded for Commerce to "compare the {Indonesian and Indian} countries' data to assess which set is superior." *Id.*

On remand, Commerce compared the Indonesian data on the record to the Indian data used for valuing FOPs and continued to find that the Indian data are superior for surrogate values (SVs). Remand Results at 24-35, 54-80, Appx___-___, Appx___-___. Significantly, for the inputs that, in the aggregate, comprise a substantial portion of the normal value calculated for the respondent (*i.e.*, whole live fish, fingerlings, and fish feed), Commerce found that the Indian data are superior. *Id.* Although Commerce found that the Indian SV data were superior to Indonesian data in most respects, it relied on Indonesian data for one FOP (*i.e.*, boat freight) because it found the Indian data to be lacking. *Id.* at 24, 48-53, Appx___, Appx___-___; *see also* IDM at 55-56, Appx___-___. Nonetheless, Commerce explained that it continued "to find that the Indian data are the best available information for valuing the FOPs here." Remand Results at 35, Appx____.

## ARGUMENT

### I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349,

1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

"Substantial evidence" means "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence

may be "less than the weight of the evidence, and the possibility of

drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by

substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620

(1996).

## II.    Commerce's Remand Results With Respect To ESS's Separate Rate Eligibility And Green Farms's Separate Rate Calculation Comply With The Remand Order

Commerce's remand results comply with the Court's remand

order by providing additional explanation and addressing record

evidence regarding (1) the absence of *de facto* and *de jure* government

control over ESS's operations, and (2) how the assignment of a

separate rate to Green Farms reflects its economic reality.  *Green*

*Farms*, 2024 WL 1653791, at *5-6; *see* Remand Results at 5-14, 35-49,

Appx___-___, Appx___-___.  The Court should reject Green Farms's

arguments that Commerce failed to provide adequate explanation or

consider contradictory evidence to support its remand results because

13

they are meritless, as we explain below.

A.    Commerce's Determination That ESS Is Eligible For A
Separate Rate Is Supported By Substantial Evidence And
In Accordance With Law

Green Farms asserts that Commerce did not consider record evidence regarding ESS's cessation of participation in the review and did not address Commerce's treatment of companies in other scenarios when it has denied a separate rate when a respondent quits a case. Green Farms Cmnts. at 7-14. As explained below, Commerce has complied with the Court's remand order, and its determination to grant ESS a separate rate is supported by substantial evidence and is otherwise in accordance with law.

On remand, Commerce explained its practice that, when a respondent is in a non-market economy (NME) country and desires a separate rate from the country-wide rate, it must rebut the presumption that its export activities, including the setting of its U.S. sales prices, are under government control. *See* Remand Results at 5, Appx___; IDM at 27, Appx___. Specifically, respondents can exhibit the absence of *de jure* government control through the absence of restrictive stipulations associated with an individual exporter's

14

business and export licenses or any legislative enactments or other formal government measures decentralizing control of companies. *See* Remand Results at 5, Appx___.   Additionally, absence of *de facto* government control is assessed by examining evidence that each exporter sets its prices independently of the government and that each exporter keeps the proceeds of its sales. *Id.* (citing *Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588, 20,589 (Dep't of Commerce May 6, 1991) (final LTFV determ.)).

In the underlying review, Commerce found that the information in ESS's separate rate application and full response to Commerce's Section A questionnaire, with respect to the company's operations, independence from the government, and relevant affiliations, supported a finding that it was eligible for a separate rate. *See* Remand Results at 5-6, Appx___-___ (citing IDM at 27, Appx___; ESS SRC, Appx___-___; ESS Section A Resp., Appx___-___).   On remand, Commerce further explained how record information that ESS submitted provided the information necessary to support a finding of the absence of *de jure* and *de facto* government control of ESS's operations. *Id.* at 5-11, Appx___-___.   Ultimately, Commerce concluded the record evidence

15

demonstrates that (1) ESS is a private company owned by individuals who are not affiliated with the government, (2) ESS's business license reflects no restrictive stipulations, and (3) Vietnam has no legislative enactments or any other formal measures by the government centralizing control over the company's export activities. *Id.* at 10, Appx___.   Commerce explained that ESS provided documentation showing that it has authority to negotiate and to sign sales contracts, and it certified to the facts that it also independently sets its own export prices, selects its own management, retains the proceeds of its export sales, and makes decisions regarding the disposition of its profit. *Id.* (citing ESS SRC at 5-7, Appx___-___).   Because neither Green Farms nor any other party offered evidence to show that ESS's statements were or false, incomplete, or otherwise deficient, and because ESS's statements regarding the lack of formal measures restricting exporters by the Vietnamese government were consistent with other exporters seeking separate rates, Commerce explained in the remand results that there was no basis to deny ESS a separate rate in this review.  *Id.* (citing Green Farms SRA at 9-13, Appx___-___; NTSF's SRC at 4, Appx___); *see also Yantai Xinke Steel Structure Co. v. United States,* Slip Op. 12-95, 2012 WL 2930182, at *14 (Ct. Int'l Trade July 18, 2012) ("This Court has

16

consistently held that it is unreasonable for Commerce to impute the
unreliability of a company's questionnaire responses and submissions
concerning its factors of production and/or U.S. sales to its separate
rate responses when there is no evidence on the record indicating that
the latter were false, incomplete, or otherwise deficient.").

It is well established that Commerce's separate rate analysis is
separate and distinct from the selection of an AFA rate. *Fresh Garlic
Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1328 (Ct. Int'l
Trade 2015). The Court has also held that Commerce cannot ignore a
party's separate rate information solely because it relies upon total
AFA to determine a rate due to defects related to sales data. *Id.* at
1382 (citations omitted). Commerce's determination that a party is not
entitled to a separate rate because its separate rate information is
unreliable must be based on substantial evidence. *See Gerber Food
(Yunnan) Co. v. United States*, 387 F. Supp. 2d 1270, 1287 (Ct. Int'l
Trade 2005). When Commerce fails to make findings that a
respondent's separate rate responses were inaccurate or deficient, its
denial of a separate rate is unsupported by substantial
evidence. *Yantai Xinke*, 2012 WL 2930182, at *14.

Against this backdrop, Green Farms does not attempt with evidence on the record to rebut any of Commerce's findings regarding the *de facto* and *de jure* absence of government control of ESS. *See generally* Green Farms Cmnts. Rather, Green Farms merely disagrees with the Court's holding that Commerce lawfully determined that ESS was eligible for a separate rate. Green Farms focuses on the statutory scheme's intent that a party "does not obtain a more favorable result by failing to cooperate than if it had cooperated fully," and that the Vietnam-wide rate was lower than the AFA rate. *Green Farms*, 2024 WL 1653791, at *3 ("The court therefore rejects Green Farms's argument that Commerce erred as a matter of law in granting East Sea a separate rate."). In other words, Green Farms argues only that, because ESS "quit the case" and Commerce normally denies a company's request for a separate rate in that circumstance, Commerce should deny ESS's request for a separate rate because Commerce allegedly cannot verify ESS's submissions. Green Farms Cmnts. at 7-11. Not only does Green Farms fail to satisfy its burden to show that ESS's reporting was "false, incomplete, or otherwise deficient" by proffering substantial evidence, *Yantai Xinke*, 2012 WL 2930182, at *14, but this weak argument is also

18

unpersuasive.

Based on the unique circumstances of this administrative review, adoption of Green Farms's argument and proposed statutory interpretation would undermine the statutory intent of the AFA provision. *See Green Farms*, 2024 WL 1653791, at *3 (explaining that the SAA[3] allows for an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."). As Commerce explained, unlike most NME proceedings, the applicable AFA rate in this case (*i.e.*, $3.87 per kilogram) is distinct from the country-wide rate (*i.e.*, $2.39 per kilogram).[4] *See* Remand Results at 39, Appx___; IDM at Cmnt. 6, Appx___-___. Commerce's practice is to consider, in employing adverse

---

[3] Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, at 870, Vol. 1 (1994)).

[4] Commerce explained that the AFA rate in this review (*i.e.*, $3.87 per kilogram) is based on a margin calculated in a prior review, without the application of adverse inferences. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 78 Fed. Reg. 17,350 (Dep't of Commerce Mar. 21, 2013) (final results); *see also* 19 U.S.C § 1677e(d)(2) (Commerce "may apply any of the . . . dumping margins specified {from any segment of the proceeding} including the highest such rate or margin, based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available.").

19

inferences, the extent to which a party may benefit from its own lack of

cooperation. Remand Results at 39, Appx___. By denying separate

rate status to ESS in this context, the company would benefit from its

*lack* of participation (receiving the Vietnam-wide rate of $2.39 per

kilogram rather than the AFA rate of $3.87 per kilogram), despite the

fact that it began participating in this review and submitted separate

rate information that Commerce has no basis to disregard. *Id.* Thus,

after considering the information on the record, Commerce determined

that there is no merit to Green Farms's claims that Commerce failed to

consider ESS's cessation of participation in the review before it

granted a separate rate. *See id.* at 40, Appx___.

Green Farms cites *AMS Assocs. v. United States*, 719 F.3d 1376,

1378-80 (Fed. Cir. 2013), for the proposition that an exporter is not

eligible for a separate rate when it withdraws from participating in the

proceeding, such that Commerce is not able to verify an exporter's

separate rate status. Green Farms Cmnts. at 11-13. In *AMS*, the

respondent at issue withdrew from the proceeding and asked

Commerce to remove from the record, and to destroy, all documents

containing its confidential information. 719 F.3d at 1378. Commerce

explained that the respondent was no longer eligible for a separate rate because "it ha{d} significantly impeded the Department's ability to conduct {the} proceeding and, by withdrawing from the review, prevented the verification of the information it had earlier provided." *Id.* Thus, pursuant to 19 U.S.C. § 1677e(a)(2)(A)-(D), Commerce found that the company had not responded to the best of its ability and significantly impeded Commerce's ability to conduct that administrative review and, by withdrawing from the review and requesting the removal of information from the record, prevented the verification of the information it had earlier provided, such that AFA was warranted. *Id.* (citation omitted). Because there was only one mandatory respondent subject to individual examination in that administrative review, Commerce applied the same AFA rate to the non-individually examined plaintiff as the China-wide entity rate at 91.73 percent. *Laminated Woven Sacks from the People's Republic of China*, 76 Fed. Reg. 14,906, 14,909-14,910 (Dep't of Commerce Mar. 18, 2010) (final admin. review).

But *AMS* does not present a scenario when the AFA rate and entity-wide rate are different rates. Additionally, as distinguished

from the facts in this case, the respondent's confidential information in

*AMS* had been removed from the record, at the respondent's request,

further preventing Commerce from analyzing the company's separate

rate eligibility. *Compare* ESS Sec. A Questionnaire, Appx\_\_\_-\_\_\_;

ESS SRC, Appx\_\_\_-\_\_\_, *with AMS Assocs*, 719 F. 3d at 1379-81

("Because Commerce could properly apply the default country-wide

rate after concluding that, with critical information missing or

unverifiable, Aifudi could not carry its burden to justify a separate

rate, we affirm.").

Despite Green Farms's contention that *AMS* is "analogous to

{ESS's} situation," Green Farms Cmnts. at 8-9, that is not true.

Exporters normally seek a separate rate to avoid the *higher* country-

wide rate. *Diamond Sawblades Mfrs. Coalition v. United States*, 866

F.3d 1304, 1311 (Fed. Cir. 2017) (citing *Michaels Stores, Inc. v. United

States*, 766 F.3d 1388, 1390 (Fed. Cir. 2014) ("Commerce therefore

applies a single country-wide antidumping deposit rate to *all* NME

producers and exporters, unless the producer, exporter, or another

interested party can prove through an administrative review process

(established by 19 C.F.R. § 351.213(b)) that the exporter or producer

at issue is not subject to government control and thus eligible for a *lower* rate." (emphasis added)). Applying the Vietnam-wide rate to ESS, the lower rate of the two determined rates, would allow ESS to benefit from its lack of cooperation, which is inconsistent with the statutory scheme.

Green Farms cites other administrative cases when Commerce has rejected a company's separate rate application when a company has withdrawn from the proceeding, but those references do not support Green Farms's arguments. Green Farms Cmnts. at 9-13 (citing *Certain Tool Chests and Cabinets from the People's Republic of China*, 83 Fed. Reg. 15,365 (Dep't of Commerce Apr. 10, 2018) (final LTFV determ.) (*Tool Chests from China*), and accompanying IDM at 6-7; *Sodium Gluconate, Gluconic Acid, and Derivative Products from the People's Republic of China*, 83 Fed. Reg. 47,876 (Dep't of Commerce Sept. 18, 2018) (final LFTV determ.) (*Sodium Gluconate from China*), and accompanying IDM at 4).

For example, *Tool Chests from China* and *Sodium Gluconate from China* present distinguishable factual scenarios when respondents were denied a separate rate and received the total AFA

rate, which also was the country-wide rate. *See Tool Chests from China*, 83 Fed. Reg. at 15,366; *Sodium Gluconate from China*, 83 Fed. Reg. at 47,877. Even putting aside Green Farms's failure to offer any rebuttal evidence, Green Farms fails to identify any authority indicating that Commerce's separate rate findings are unlawful. *See generally* Green Farms Cmnts.

B. **Commerce Lawfully Calculated Green Farms's Separate Rate**

Commerce complied with the Court's remand order to address the economic reality of Green Farms's assigned rate. *See Green Farms*, 2024 WL 1653791, at \*6-7; *see also* Remand Results at 11-14, 41-49, Appx___-___, Appx___-___. Although Green Farms argues that Commerce's analysis of its assigned rate is unsupported by substantial evidence, Green Farms Cmnts. at 14-25, all of its arguments merely constitute requests to reweigh evidence, which the Court may not do. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2015).

When Commerce limits the number of individually examined exporters under 19 U.S.C. § 1677f-1(c)(2), it calculates an "all-others" rate for the non-selected respondents by weight-averaging the

dumping margins assigned to the mandatory respondents, excluding any margins that are zero, *de minimis*, or determined entirely based on AFA.  19 U.S.C. § 1673d(c)(1)(B), (c)(5)(A).  The statute provides an exception when the dumping margins for all mandatory respondents are zero, *de minimis*, or determined entirely based on AFA:  it instructs Commerce to "use any reasonable method" to calculate the all-others rate, including averaging the dumping margins for the mandatory respondents. 19 U.S.C. § 1673d(c)(5)(B).

This Court rejected Green Farms's argument that Commerce erred as a matter of law in granting ESS a separate rate.  *Green Farms*, 2024 WL 1653791, at *3.  The Court held, however, that Commerce must affirmatively tie the rate to record evidence to demonstrate that it reflects commercial reality.  *Id.* (citing *Yangzhou Bestpak,* 716 F.3d at 1378).  In the remand results, Commerce examined the record information regarding Green Farms's pricing and its economic reality.  *See* Remand Results at 11-14, 41-49, Appx___-___, Appx___-___.  Generally, Commerce analyzed Green Farms's *only* sale during the POR, which served as the basis for Commerce's separate rate application, and compared the price of the sale covered

by the documentation contained in Green Farm's separate rate application with the price of a sale made by ESS during the POR, as well as the pricing of NTSF. *Id.* at 12, Appx___ (citing Green Farms SRA at Exhibit SRA-2, Appx___-____; ESS Section A Resp. at Exhibit A-5, Appx____-____; NTSF's Feb. 5, 2021 Section A Resp. at Exhibit A-10, Appx____-_____). Commerce found that this comparison indicated that the dumping margin assigned to Green Farms is reasonably reflective of its commercial behavior because its pricing fell between the prices reported by the two mandatory respondents. *Id.*

Green Farms raises various challenges with this approach, arguing that the comparison, for the purposes of this remand, was inconsistent with Commerce's practice and past cases, while also raising certain factual assertions regarding Commerce's comparison. Green Farms Cmnts. at 14-25. These arguments are meritless.

First, Green Farms argues that "Commerce does not fully justify how the harshly punitive AFA rate it calculated for Green Farms actually 'reflects economic reality.'" *Id.* at 14. Beyond its request to have this Court reweigh record evidence, Green Farms's argument contorts Commerce's well-reasoned and articulated approach. First,

26

Commerce *did not* apply AFA to Green Farms; Commerce merely

averaged ESS's AFA rate with NTSF's zero rate.  Remand Results at 3,

Appx___.  Second, Commerce *did* analyze the commercial reality of

Green Farms's pricing information, at the Court's direction, and found

no basis to conclude that the rate derived using the simple average

was improper.  *Id.* at 12, 14, Appx___, Appx___.  Based on Commerce's

analysis of Green Farms's commercial reality, Commerce also found

that there was no basis to conclude that the margin calculated for

NTSF alone would be reflective of the commercial reality for Green

Farms.  *Id.* at 14, Appx___.

Seeking to avoid the statute's directive to Commerce, Green

Farms asserts that Commerce did not follow its "preferred" practice

when it did not assign non-individually examined, separate rate

companies the average of the most recently determined margins that

are not zero, *de minimis*, or based entirely on facts available.  Green

Farms Cmnts. at 16 (citation omitted).  Green Farms's argument

disregards the statute, SAA, Federal Circuit precedent, and

Commerce's practice.[5]  As Commerce explained and consistent with

guidance from the SAA, the expected method of calculating the rates

for non-individually examined, separate rate companies was not

possible in this case because the requisite publicly ranged volume data

was not available on the record from ESS to calculate a weighted

average margin, such that a simple average was necessary to calculate

Green Farms's margin.  *See* Remand Results at 42-43, Appx___-___;

*see also Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971

F. Supp. 2d 1333, 1341 (Ct. Int'l Trade 2014); *Solianus, Inc. v. United*

*States*, 391 F. Supp. 3d 1331, 1339 (Ct. Int'l Trade 2019); *Aluminum*

*Extrusions from Malaysia*, 89 Fed. Reg. 80,458, 80,459 (Dep't of

Commerce Oct. 3, 2024) (final affirm. LTFV determ.).  Thus, when

faced with similar situations, Commerce has simple averaged zero and

---

[5]  For example, "the 'expected method' refers to the preferred method for calculating all-others rates when individually investigated exporters and producers receive dumping margins that are zero, *de minimis*, or based on facts available."  *Pro-Team Coil Nail Enter. Inc. v. United States*, 587 F. Supp. 3d 1364, 1366 n.3 (Ct. Int'l Trade 2022). Thus, contrary to Green Farms's argument, Congress has outlined its "preferred" method for calculating an all-others rate in the expected method.  *See* 19 U.S.C. § 1673d(c)(5)(B).  Because the "preferred method" was not possible in this case, Commerce relied on the statutory exception  of "any reasonable method," which is not at issue in this case.

AFA rates to calculate the separate rate for non-individually examined companies. To the extent that Green Farms argues that this approach is inconsistent with Commerce's practice, Green Farms Cmnts. at 16, Commerce has explained how its approach in this case (*i.e.*, simple average of the respondent's rates) is consistent with its practice and why, due to the absence on the record of publicly-ranged shipment data for ESS, Commerce appropriately applied its statutorily preferred expected method. Remand Results at 43, Appx___.

Second, Green Farms fails to identify any record evidence to support its assertion that the calculated rates from prior administrative reviews are more reflective of Green Farms's commercial reality, and instead registers mere disagreement with Commerce's comparison of its sales price to various prices on the record. *See generally* Green Farms Cmnts.; *see also Consolo*, 383 U.S. at 620. Indeed, Commerce explains in the remand results that the Federal Circuit has held that "absent {evidence that the largest exporters are not representative}, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." Remand Results at 44, Appx___ (citing *Pro-Team Coil Nail Enter. Inc. v. United States*, Ct.

29

No 2022-2241, 2024 WL 3824005 (Fed. Cir. Aug. 15, 2024)). Thus, Green Farms's attempt to have this Court select a calculated rate from a cooperative respondent from a prior review, disconnected from any facts on this record, is inconsistent with the statutory scheme and binding precedent from the Federal Circuit.

Nonetheless, Green Farms seeks to distinguish *Pro-Team Coil*, arguing that the case is factually distinguishable from the instant case. Green Cmnts. at 19-20. It is not. In *Pro-Team Coil*, Commerce's calculation of an all-others rate using AFA in the expected method was at issue. 2024 WL 3824005, at *6. Although Green Farms argues that it was unreasonable for Commerce to include an AFA rate in the calculated all-others rate because it was not corroborated by NTSF's "transaction-specific dumping margins," Green Cmnts. at 20, this argument misinterprets the facts and the statute. For example, Commerce explained that Green Farms's sales prices (and, thus, any dumping margins) were not consistent with NTSF's sales. *See* Remand Results at 11-14, Appx___-___. Furthermore, Commerce explained that the AFA rate in this segment (*i.e.*, $3.87 per kilogram) is from a prior review and was calculated without the application of adverse inferences. *See*

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 86
Fed. Reg. 50,698 (Dep't of Commerce Sept. 10, 2021) (prelim. results),
and accompanying PDM at 8-9 (citing *Certain Frozen Fish Fillets from
the Socialist Republic of Vietnam*, 78 Fed. Reg. 17,350 (Dep't of
Commerce Mar. 21, 2013) (final results)).  Although Green Farms
argues that Commerce should corroborate its all-other rate margin with
NTSF's rates, Green Cmnts. at 20, record evidence does not support a
finding that NTSF's rate would be appropriate for Green Farms, given
that Green Farms's price on the record is between that of ESS's and
NTSF's prices.  Remand Results at 12-14, Appx___-____.  Lastly,
because Green Farms failed to offer any affirmative evidence that the
all-others rate from the largest exporters is "not representative,"
Commerce's simple average of ESS's and NTSF's rates is consistent
with the statute and is consistent with Federal Circuit precedent.  *Pro-
Team Coil*, 2024 WL 3824005, at *6 (citing 19 U.S.C. § 1677f-1(c)(2)).
Thus, Green Farms, again, fails to identify any legal error in
Commerce's calculation of the all-others rate.

Third, Green Farms raises various evidentiary arguments
regarding the record evidence used to support Commerce's rate

31

assignment determination, Green Farms Cmnts. at 20-25, none of
which are persuasive. Green Farms first criticizes Commerce's
comparison of record prices from Green Farms, ESS, and NTSF,
arguing that these prices are made on different terms of sale (*i.e.,*
different incoterms) and that it was arbitrary for Commerce to compare
NSTF's sales through its affiliate with Green Farms's and ESS's
unaffiliated sales. *Id.* at 21-22. Commerce, however, addressed each of
these concerns, and made certain adjustments to be able to reasonably
adjust the sales prices to be on comparable terms of sale by removing
from the prices, for instance, (1) international freight expenses from
both the Green Farms and NTSF prices, using NTSF's reported
international freight costs as representative for a Vietnamese exporter
during the POR, (2) NTSF's U.S. inland movement expenses, and
(3) any U.S. selling expenses incurred by NTSF's U.S. affiliate in
making the sale and the associated profit. *See* Remand Results at 12-
13, Appx__-___.

   Second, Green Farms argues that those adjustments are "not
precise" and do not account for any volume differences between the
different parties' sales. Green Farms Cmnts. at 22. These critiques do

not undermine Commerce's price comparison and are a request for this Court to reweigh evidence, which it cannot do. *Downhole Pipe*, 776 F.3d at 1377. These arguments merely hypothesize that different incoterms and volume size *could* reflect different prices, but Green Farms fails to identify any record evidence to rebut Commerce's comparison of prices.

Finally, Green Farms critiques Commerce's price comparison as "meaningless," arguing that Commerce did not "measure dumping." Green Farms Cmnts. at 22-25. Green Farms, however, is unable to identify any record evidence, other than its single sale price from its separate rate application, that would support its proposed selection of the calculated rate from prior reviews. *Id.* As Commerce explained, Green Farms's export price was comparatively closer to ESS's sales price than to NTSF's prices and was in between ESS's and NTSF's prices. *See* Remand Results at 14, Appx___. Commerce explained that it did not have the data necessary to conduct a full margin analysis for Green Farms, which is of course unsurprising because Green Farms was not selected for individual examination. Therefore, in the absence of other evidence on the record, Green Farms cannot reasonably claim that Commerce's remand results are unsupported by substantial

evidence.  Because Commerce found that the comparison of Green

Farms's price shows that the dumping margin assigned to Green Farms

is reasonably reflective of its commercial behavior, given that its pricing

"was comparatively close to ESS's sales price" and fell between the

prices reported by the two mandatory respondents, Commerce complied

with the remand order.  Remand Results at 14, Appx____; *see Green*

*Farms*, 2024 WL 1653791, at *6-7.

III.    Commerce's Remand Results Comply With The Remand Order
        Regarding Its Selection of India As The Primary Surrogate
        Country

        Commerce's remand results comply with the Court's remand order

by providing additional explanation and addressing record evidence

regarding (1) Commerce's compliance with its statutory obligation to

consider countries at a "comparable level of economic development" as

potential surrogates on an equal basis with countries that Commerce

deems to be at "the same level of economic development," and (2) its

consideration of CFA's data regarding Indonesia as a potential primary

surrogate country and explanation why Indonesia is not at a

"comparable level of economic development."  *Green Farms*, 2024 WL

1653791, at *8; *see also generally* Remand Results at 14-35, 49-81,

Appx___-___, Appx___-___.    The Court should reject CFA's various

34

arguments that Commerce failed to provide adequate explanation to support its remand results because they are meritless, as we explain below.

In the remand results, Commerce explained its surrogate country selection process to provide further context for its approach and to identify various considerations underlying its generation of the Surrogate Country List. *See* Remand Results at 14-23, Appx___-___. Commerce explained why there is a need to limit the scope of Commerce's universe of potential sources for surrogate valuation and why it is warranted based on concerns regarding resources to administer NME dumping orders, but also in light of the fact that India's GNI was far more proximate to Vietnam's GNI than Indonesia's GNI was to Vietnam's GNI. *Id.* Commerce also explained that this practice is consistent with its administrative practice and court precedent relating to Commerce's sequential surrogate country selection practice. *Id.* at 15-16, 20, Appx____-_____, Appx_____ (citing *Clearon Corp. v. United States*, Consol. Court No. 13-00073, 2016 WL 6892556, at *3 (Ct. Int'l Trade Nov. 23, 2016) (*Clearon III*); *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1316 (Ct. Int'l

Trade 2018); administrative proceedings in footnote 81)).

Nonetheless, even though Indonesia was not on Commerce's
Surrogate Country List, Commerce treated both Indonesia and India
as viable primary surrogate countries and has, under respectful
protest, afforded India no preference despite its inclusion on the
surrogate country list issued on the record of this segment. *See id.* at 2
n.6, Appx___.  Because CFA does not challenge this determination or
Commerce's explanation of its practice, the remainder of this response
addresses CFA's comments regarding data considerations.  As we
explain below, CFA fails to show that Commerce's reliance on Indian
data is unsupported by substantial evidence.

   A.    Legal Standard For Best Available Information

Commerce's practice when selecting the best available information
to value FOPs is to select, to the extent practicable, surrogate values that
are product-specific, representative of a broad-market average, publicly
available, contemporaneous with the period of review, and free of any
taxes or duties. *See, e.g.*, *Changzhou Trina Solar Energy Co. v. United
States*, 975 F.3d 1318, 1331 (Fed. Cir. 2020).  When Commerce provides
a reasoned basis for finding that the chosen data satisfy its criteria and

36

constitute better data than alternatives, courts are "reluctant to substitute {their} own evidentiary evaluation for Commerce's{.}" *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010) (cleaned up).  Indeed, the Court should consider whether Commerce's selection was reasonable in light of only information available on the record, rather than evaluating directly whether the information that Commerce used was the best available. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citing *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006) ("This court's duty is "not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.")).

    B.    <u>Substantial Evidence Supports Commerce's Reliance On Indian Data For Whole Live Fish, Fingerlings, And Feed</u>

CFA largely requests this Court to reweigh evidence, *see* CFA Cmnts., which the Court cannot do.  Specifically, CFA argues that only sources that meet CFA's proposed requirements, that are not required by the regulations or by Commerce's practice, can satisfy the statutory requirements for "best available information." *Id*.  The Court should

37

reject these unprecedented and unsupported restrictions on what

constitutes the "best available information."

       1.    Indian Data Are The Best Available Information For Whole Live Fish

As Commerce explained in the remand results, it relied on the

*Undercurrent News* as the Indian data for whole live fish because it

satisfied each of Commerce's SV selection criteria: it was publicly

available, contemporaneous, representative of a broad market average,

tax- and duty-exclusive, and specific to the inputs (*i.e.*, the particular

species of pangasius) in question. *See* Remand Results at 25, Appx___

(citing IDM at 53-55, Appx___-___; NTSF Aug. 2, 2021 SV Submission,

at Exhs. 1-3, Appx_____-_____).[6] Commerce further explains, however,

---

    [6] CFA confusingly argues that Commerce relied on *Fishing Chimes/Chepala Sandadi* data for whole live fish. CFA Cmnts. at 8 n.2, 9-10. This is not true. A review of the remand results shows that Commerce relied on *Undercurrent News* data for whole live fish, *see* Remand Results at 54, Appx___ ("The petitioners' assertions do not undermine Commerce's analysis regarding the main production inputs, *i.e.*, whole live fish, fingerlings, and feed, for which we relied *on Fishing Chimes* (fingerlings and feed) and *UCN* (whole live fish, fingerlings, and feed) for surrogate valuation."), but merely included references to both data sets together, to show why its reliance on Indian data complies with the Court's remand order. Indeed, when Commerce inadvertently referenced its reliance on *Fishing Chimes* for whole live fish, that constitutes a harmless error, *see id.* at 29, Appx___ ("even assuming

that the Indonesian whole live fish data were not entirely species-specific, it is unclear the extent to which the Indonesian prices are finalized, and there is no indication that the Indonesian prices were ultimately published. *See* Remand Results at 26-27, Appx___ -____,

CFA seeks to impose certain limitations on Commerce's broad market average analysis, imposing volume and geographic requirements, which are not necessitated by Commerce's practice. CFA Cmnts. at 10. Commerce explained that the data series from the *Undercurrent News* publication provided for whole live fish, was sourced from "{d}ata collected via interviews with farmers in all major producing regions," and thus represented a broad market average. Remand Results at 25, Appx___. Even if this Court were to find CFA's arguments persuasive, that the *Undercurrent News* source has limited information to determine that this data reflects a broad market average (*i.e.,* number and timing of interviews conducted, regions considered to be major, and volume of pangasius production

---

*arguendo* that the *Fishing Chimes's* whole live fish data are lower on such a continuum"), because its reliance on *Undercurrent News* for whole live fish is adequately explained, consistent with the Court's remand order.

represented), Commerce's explanation about the deficiencies of the
Indonesian data warrant a finding that Indian data are usable and
satisfies the statutory standard of "best available information." *Id.*;
*see also Viet I-Mei Frozen Foods Co. v. United States*, 839 F.3d 1099,
1106 (Fed. Cir. 2016). In other words, any assertion that Indonesian
data are preferrable to the Indian data constitutes another request for
this Court to reweigh evidence, which it cannot do. *Downhole Pipe*,
776 F.3d at 1377.

Nonetheless, CFA references statements from independent
market researchers as another attempt to undermine the
*Undercurrent News* data, arguing that the publication never answered
certain questions. CFA Cmnts at 21-22. However, Commerce explains
that these statements did not undermine the data source, and CFA
mischaracterizes the cited correspondence. *See* Remand Results at 57,
Appx___. Moreover, *Undercurrent News* has a wide scope, and its data
series extend well beyond just Indian aquaculture or data relating to
whole fish, fingerling, and fish feed pricing, and includes hundreds of
available datasets. *Id.* (citing NTSF May 10, 2021 SV Submission at
SV-9, Appx___-____). Thus, CFA fails to show that Commerce's

40

explanation is unsupported by substantial evidence.

CFA contends, however, that Commerce mischaracterizes the record regarding its analysis of the Indonesian whole live fish species information.  *See* CFA Cmnts. at 24-27.  Specifically, CFA cites statements from individuals within the Indonesian Ministry of Marine Affairs and Fisheries (MMAF) and others that highlight that *Pangasius hypophthalmus* is the predominant species represented in the Indonesian data, and that other record sources support a finding that pangasius production represents over 90 percent of Indonesian catfish production.  *Id.*

However, Commerce, did not find this evidence to be probative. *See* Remand Results at 59, Appx___.  Specifically, the MMAF's Director admitted in his statement that MMAF did not have the necessary data to determine the relative percentage for the species at issue.  *Id.* at 59, Appx____ (citing Petitioners' July 30, 2021 SV Submission at Exh. 3, Appx___-____, and Exh. 4 (Attachment 1), Appx____-____).  Additionally, other record information does not provide any insight into the percentage of pangasius included in the submissions.  *Id.*  Thus, as Commerce explains, this information does not provide a basis to alleviate

41

Commerce's concern about the inclusion of multiple species in the Indonesian data. *See id.* at 59-60, Appx____-___.

CFA also challenges Commerce's findings regarding the "very provisional" or "preliminary" nature of the prices provided by the 2020 Prianto questionnaire and the 2021 Dr. Budiyanto questionnaire, arguing that the information did not include the "provisional" caveat after CFA asked them to clarify their submission. CFA Cmnts. at 26-27. Although Commerce disagreed and found that the affidavits did not explain that the prices *were not* provisional, and indeed, record evidence indicated otherwise, Remand Results at 60, Appx___, CFA fails to show that Commerce's explanation is not supported by substantial evidence. *See Viet I-Mei Frozen Foods Co.*, 839 F.3d at 1106.

> 2. Indian Data Are The Best Available Information For Fingerlings

For fingerlings, Commerce explains that it relied on data from *Fishing Chimes* and *Undercurrent News*, as each source satisfied each of Commerce's SV selection criteria. *See* Remand Results at 30, Appx___ (citing IDM at 53-55, Appx___-___). The fingerling prices were from commercial nurseries in two locales, which supplied

fingerlings to 96 percent of India's pangasius farms. *See id.* at 31,

Appx___ (citing NTSF May 10, 2021 SV Submission at Exhibit SV-5-A,

Appx___-____). Commerce acknowledges that *Fishing Chimes* did not

identify the name of each individual survey participant, and explains

that the data source identifies key characteristics and the location of

the participants, which were from numerous farmers and corroborated

by field visits and comparisons to other data sources. *Id.* Indeed,

Commerce explains that the *Undercurrent News* source was based on

"{d}ata collected via interviews with farmers in all major producing

regions." *Id.* (citing NTSF Aug. 2, 2021, SV Submission at Exhs. 2-3,

Appx____-____). Therefore, Commerce explains that these data

sources are representative of a broad market average of fingerling

prices within the Indian market and satisfy each of Commerce's other

SV selection criteria. *Id.*

Commerce also explains why the Indonesian data were less

preferable to the Indian data. To wit, Commerce explains that there

was no basis to conclude that the Indonesian data are species specific

and there were questions about the sourcing of Indonesian fingerling

prices and the collection methods from the farmers. *See id.* Indeed, for

43

the other Indonesian data source for fingerlings, Commerce raised concerns that this data source's prices are internally contradictory and inaccurate. *Id.* at 63, Appx___ (citing Petitioners' May 10, 2021 SV Submission at Exh. 2-A, Appx___-___). "For example, the narrative statement says that prices for ¾ - 3 inches are Rp 15- 35/fish, but in the table the prices are Rp 60-180; similarly, the statement says that prices for 3-6 inches are Rp 50-80{ per kilogram}, and for >6 inches are Rp 40-70, yet in the table the prices for those sizes are Rp 175-400 and Rp 350-500, respectively." *Id.* Additionally, Commerce explained that the affidavit did not provide certain details about its sourcing, whether the prices are tax exclusive, type/species information for such fingerlings, volume information, and are not published. *Id.*

CFA next challenges Commerce's findings, that both Indian data sources represent a broad market average, and seeks to apply factors based on geographic representation, volume, and temporal coverage, CFA Cmnts. at 10-15, which are not required by Commerce's practice. Commerce explains in the remand results that the *Fishing Chimes* study provided survey responses from farmers within the state of Andhra Pradesh, which is the largest pangasius-producing state

44

during the period, which accounted for 60 percent of Indian pangasius

at the beginning of 2019, and no other state was close to Andhra

Pradesh in terms of production volume.  *See* Remand Results at 27,

Appx____.  The study states that "{f}ield visits were conducted in 300

villages from two large-scale pangasius producing districts in Andhra

Pradesh" and "108 data sets were collected for one crop each in 2017

and 2018 from 54 farmers" in 46 villages.  *Id.*  Commerce explains that

it found this data to constitute many data points in the largest

pangasius-producing state in India, thus providing representative

values regarding the market conditions in India.  *Id.* at 27-28,

Appx___-___.

　　　CFA seeks to undermine Commerce's reliance on *Fishing*

*Chimes* by arguing that the report does not indicate certain volume or

percentage requirements (*i.e.*, percentage of pangasius volume produced

by each farm or volume of fingerlings/feed purchased by each farm).

CFA Cmnts. at 13.  CFA cites no authority in which Commerce has

required certain volume or percentage requirements in order for a

survey to represent a broad market average; rather, such a restriction is

*not* Commerce's practice.  *See* Remand Results at 37-42, Appx___-___.

45

Undeterred, CFA argues that the lack of farm-specific data for fingerlings and feed consumption within the Krishna and West Godavari districts, or within Andhra Pradesh as a whole, reduces the reliability of the *Fishing Chimes* data. CFA Cmnts. at 12-13. Specifically, CFA questions the number of months for which the *Fishing Chimes* publication provides harvest data for whole live fish and what volume was gleaned from each month. *Id.* at 14. As Commerce explains, however, the representativeness and reliability of the *Fishing Chimes* data does not hinge on the survey information for each specific farmer from a particular month but, rather, on the substantial volume of production of whole live fish covered by this source in India's largest pangasius-producing region. *See* Remand Results at 62, Appx___. Commerce explains that the pricing information reflected a significant volume of approximately 5.1 million fingerlings in 2018, and the "non-uniform timing of survey responses is not surprising, as the study noted that stocking patterns are not constant and change according to many factors, such as market price, the prevalence of other types of farming activities, and water availability." *Id.* (citing NTSF May 10, 2021 SV Submission at Exh. 5, Appx____-____). The fact that the volume of

46

whole live fish reflects India's largest producing region is further buttressed by Commerce's practice that a subset of a country's economy can still provide a basis for a finding that a particular source for surrogate values reflects a broad market average. *Id.* at 29, Appx___; *see also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 75 Fed. Reg. 12,726 (Dep't of Commerce Mar. 17, 2010) (final results admin. review), and accompanying IDM at Comment 1.A; *Certain Steel Threaded Rod from the People's Republic of China*, 79 Fed. Reg. 71,743 (Dep't of Commerce Dec. 3, 2014) (final results admin. review), and accompanying IDM at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in Doing Business: Thailand 2014 is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").

CFA, however, argues also that the *Fishing Chimes* survey never consisted of more than 11 farms providing data for a single month, and that this is too limited a sample. *See* CFA Cmnts. at 14. However, this observation merely reflects the existing market conditions in the industry, as Commerce explains in the remand results, because farms

47

do not seed/harvest fish in unison, so the level of distribution, across a two-year survey, was irrelevant. *See* Remand Results at 55, Appx___.

Furthermore, CFA seeks to undermine the contemporaneity of the *Fishing Chimes* data. *See* CFA Cmnts. at 15. But Commerce explains that a subset of the *Fishing Chimes* data reflected prices in 2017-2018 (*i.e.,* fingerlings of 6-7 inches, which was subsequently inflated to reflect the POR), while the *Undercurrent News* data reflect prices during the POR. *See* Remand Results at 62-63, Appx___-___. Thus, Commerce explains that it did not "find that inflating a subset of the data to account for the fact that the data pre-date the POR by less than a year is a major drawback of the Indian fingerling data," warranting reliance on the Indonesian alternative, especially when it also relies on the contemporaneous *Undercurrent News* source. *Id.* at 63, Appx____.

CFA argues that Commerce has a preference of relying on country-wide data to represent a broad market average, and that Commerce cannot use the *Undercurrent News* source for that reason. CFA Cmnts. at 17. There are two problems with this argument. First, because neither the statute nor regulations require country-wide data

48

to satisfy Commerce's broad market average criterion, Commerce selected a data source from the state of Andhra Pradesh that accounted for a vast majority of pangasius production in India during the POR. *See* Remand Results at 27, Appx___. Second, as explained above, this argument does not overcome Commerce's concerns about the other surrogate value criteria (*i.e.*, specificity, contemporaneity, *etc.*), which does not render the Indian and Indonesian data sources equal. In other words, CFA's continued mere disagreement with Commerce's findings, regarding what constitutes the best available information, does not invalidate or undermine Commerce's explanation of its practice as applied to the facts of this proceeding. *See Downhole Pipe*, 776 F.3d at 1377.

CFA seeks to undermine Commerce's findings regarding the applicability to the species at issue, claiming that the Indonesian data covers 99 percent of pangasius production, and that the government sourcing of such information overcomes all of Commerce's concerns. CFA Cmnts. at 28-29. This continues to be a self-serving review of the record. There is contradictory record information regarding the viability of these sources, and it remains unclear whether these data

49

sources identify the percentage of pangasius in this data source.  *See*
Remand Results at 59, Appx___.  Even if Commerce has used similar
data sources in prior reviews referenced by CFA, CFA Cmnts. at 28-29,
those proceedings did not concern economic comparability and
respective data qualities was not at issue.  Thus, CFA again erroneously
invites the Court to reweigh the evidence and to select inferior data,
while failing to show that Commerce's explanation is unreasonable.  *See*
*Downhole Pipe*, 776 F.3d at 1377; *Globe Metallurgical, Inc. v. United*
*States*, 865 F. Supp. 2d 1269, 1276 (Ct. Int'l Trade 2012) (substantial
evidence review "contemplates {that} more than one reasonable outcome
is possible on a given administrative record").  Therefore, the Court
should find that substantial evidence supports Commerce's
determination that Indian data are the best available information to
value whole live fish.  Remand Results at 25-26, 59-61, Appx___-____,
Appx___-_____.

   3.  <u>Indian Data Are The Best Available Information For Feed</u>

   Similar to fingerlings, for feed, Commerce relied on *Fishing*
*Chimes* and *Undercurrent News* because these data sources satisfy
each of the SV selection criteria and further support the selection of

50

India as the primary surrogate country. *See id.* at 26, Appx___. For specificity, Commerce explains that the Indian data sources contained values for the feed types used by NTSF (*i.e.*, 24, 26, and 28 percent protein content), and when 35 percent protein content was unavailable, Commerce relied on a very similar protein content feed value, *i.e.*, 32 percent protein content. *Id.* at 26-27, Appx____-____ (citing NTSF May 10, 2021 SV Submission at Exh. SV-5-A, Appx___-____, and 7, Appx____-____; NTSF Aug. 2, 2021, SV Submission at Exhibits 4-5, Appx____-____; Prelim. SV Memorandum, Appx_____-_____). Regarding the contemporaneity consideration, similar to fingerlings, Commerce explains in the remand results that the *Undercurrent News* data were contemporaneous with the POR, and the *Fishing Chimes* data were inflated to reflect POR values to address the mere seven-month difference between the data and the POR. *Id.* at 27, Appx_____. Additionally, Commerce continued to explain that *Fishing Chimes* and *Undercurrent News* represented a broad market average because *Fishing Chimes* provided data points from a broad collection of farmers in the most significant pangasius-producing area in India and *Undercurrent News* from farmers "in all major producing

51

regions." *Id.* at 27-28, 30, Appx___-___, Appx___.

Commerce also explains that the Indonesian feed data were less preferable because the feed data were not specific to the particular type of feed at issue because it partially included data for feed used for other species. *See id.* at 30, Appx___. Commerce also found that the sourcing of the Indonesian data was questionable because it was from "Mr. Deni, Marketing of CPP {PT. Central Protein Prima}, and internet," stating that it is unclear whether different protein contents were obtained from different sources, or if the prices reflect some average between (an uncertain number of) sources. *Id.* Thus, Commerce concluded that "there is no basis" to determine that the Indonesian data reflected a broad market average, and found "that the Indian data for fish feed are preferable." *Id.*

CFA attempts to undermine Commerce's reliance on the Indian data, based on similar arguments for the fingerling data, claiming that the data do not reflect the number of farms provided and the respective volume, and does not allow for a comparison of input prices among Indian regions. CFA Cmnts at 15-16, 19. But as explained above, the specific number of farms and consumption volume by the

surveyed farms do not prohibit Commerce's finding regarding whether
such sources reflect a broad market average.  Remand Results at 28-
29, Appx____-____.  Rather, the feed consumption among surveyed
farms within India's largest producing state–Andhra Pradesh–and
other "major producing regions" served as the basis for Commerce's
findings regarding the representativeness of a broad market average.
*Id.*

     Either way, the total volume of feed covered by the *Fishing
Chimes* study is significant (*e.g.*, 12.7 million kilograms of feed during
the 2017-2018 period).  *See id.* at 65, Appx___.  Indeed, requiring a
comparison to the entire Indian market as a whole is not required by
the statute, nor is it required under Commerce's practice, and
Commerce has previously explained that a subset of an economy can
still represent a broad market average.  *Hangzhou Yingqing Material
Co. v. United States*, 195 F. Supp. 3d 1299, 1311 (Ct. Int'l Trade Dec.
21, 2016); *Certain Steel Threaded Rod from the People's Republic of
China*, 79 Fed. Reg. 71,743 (Dep't of Commerce Dec. 3, 2014) (final
admin. review), and accompanying IDM at Comment 3.  Thus,
Commerce's practice does not impose such farm-specific and absolute

volume thresholds, nor is it necessary to determine whether data

represents a broad market average.  Remand Results at 28-29,

Appx___-___.

Although CFA disagrees with Commerce's analysis of the

Indonesian feed data, arguing that the sources provide numerous

protein levels and are from an industry expert with direct knowledge

of the industry, CFA Cmnts. at 31-33, this argument does not

overcome Commerce's concerns regarding the collection methods or

whether the Indonesian feed data represent the Indonesian market as

a whole.  *See* Remand Results at 66, Appx___.  Furthermore, CFA's

argument that Commerce incorrectly criticizes the Indonesian data for

not being tax and duty exclusive misses the point of Commerce's

critique.  CFA Cmnts. at 33.  Commerce explains that whether the

data sources constitute market prices is not clear because the affidavit

indicated some variety of government involvement, such that the only

included costs were variable costs.  *See* Remand Results at 66,

Appx___ (citing Petitioners' May 10, 2021 SV Submission at Exh. 2-A

Attachment 3, Appx___-_____).  Even if the Court were to find merit to

CFA's argument, which it should not, CFA has still failed to satisfy its

burden to demonstrate that Commerce's analysis of the Indonesian

feed data is unsupported by substantial evidence.  *See Globe*

*Metallurgical,* 865 F. Supp. 2d at 1276.

> 4.    Indian Data Are The Best Available Information For
>        Labor

For labor, Commerce relied upon data from the Indian

International Labor Organization (ILOSTAT) from 2012, inflating it

to reflect the POR.  *See* Remand Results at 33, Appx___.  Commerce

explained that it found the ILOSTAT data to be specific because it

relates to "Skilled agricultural and fishery workers."  *Id.* (citing NTSF

May 10, 2021 SV Submission at Exh. SV-15, Appx___-____).

Although Commerce explains that the Indonesian labor data were

contemporaneous and specific, this difference did not warrant a

departure from India as the primary surrogate country because the

Indian data, on an aggregate basis satisfy the statutory standard of

"best available evidence."  *Id.* (citing Petitioners' May 10, 2021 SV

Submission at Exh. 8, Appx____-____); *see also Clearon III*, 2016 WL

6892556, at *3, *Jacobi Carbons*, 313 F. Supp. 3d at 1316.

CFA argues that the lack of contemporaneity of the Indian data

does not factually support its use, and that Commerce must seek the

best FOP data source for each input.  CFA Cmnts. at 34-36.  Commerce

explains how it favors selecting SVs from a single country to the extent

possible, pursuant to 19 C.F.R. § 351.408(c)(2).  *See* Remand Results at

33 n.148, Appx___.  Consistent with its practice and court-sustained

methodology, Commerce will "resort to a secondary surrogate country if

data from the primary surrogate country are unavailable or unreliable,"

and nothing on the record suggests that the Indian values are

anomalous. *Id.* at 73, Appx___; *see also Jiaxing Bro. v. United States*,

961 F. Supp. 3d 1326, 1332-33 (Ct. Int'l Trade 2014), *aff'd*, *Jiaxing Bro.

v. United States*, 822 F.3d 1289, 1293-96, 1298 (Fed. Cir. 2016).  As we

explain above, Commerce found the Indian data to be preferable overall,

and because the Indian labor data were still usable, Commerce relied on

that information to reflect the wages during the POR.  Remand Results

at 73, Appx___; *see also Shenzhen Xinboda Indus. Co. v. United States*,

456 F. Supp. 3d 1272, 1284 (Ct. Int'l Trade 2020) (citing *Home Meridian

Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)

(recognizing that Commerce has discretion in SV selection and may

select non-contemporaneous data)).  Commerce also properly considered

the shortcomings in the Indian data (*i.e.*, that the data predated the

56

POR) and took reasonable steps to mitigate it by adjusting the figures for inflation to reflect the POR. *See* Remand Results at 33, Appx___.

To the extent CFA argues that Commerce must select the "best" SV data on a FOP-specific basis, regardless of its primary surrogate country, this Court has held otherwise. First, although Commerce prefers to value FOPs with contemporaneous surrogate values, Commerce has previously selected primary surrogate country labor values when there are other values on the record that may have been more contemporaneous. *See Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*, 396 F. Supp. 3d 1334, 1350-51 (Ct. Int'l Trade 2019) ("Commerce was therefore justified in using the South African labor data despite its lack of contemporaneity because the other factors favored the South African data as a whole over the Bulgarian data"); *Heze Huayi Chemical Co., Ltd. v. United States,* Ct. No. 17-32, 2018 WL 2328183, at *8 (Ct. Int'l Trade May 22, 2018) ("Commerce was able to adjust the labor value for Mexico through its normal method of inflating the value for labor . . . to account properly for inflation or changes in the labor rate over this time period"). Furthermore, CFA does not address Commerce's concern about

57

introducing distortions from relying on labor values from a non-primary surrogate.  *See* Remand Results at 73, Appx___.  This Court has sustained and acknowledged Commerce's practice of valuing FOPs from its "primary surrogate country" as a way "to minimize distortion."  *List Indus. v. United States*, 641 F. Supp. 3d 1400, 1413 (Ct. Int'l Trade 2023) (citing *Tri Union Frozen Prods., Inc. v. United States*, 227 F. Supp. 3d 1387, 1400 (Ct. Int'l Trade 2017)); *see also Carbon Activated Tianjin Co. v. United States,* 547 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2021) (discussing Commerce's preference to value all factors of production in a single surrogate country).  Indeed, Commerce's practice and regulation satisfies the statutory standard of applying the "best available information," by relying on data from one primary surrogate country, without introducing distortions from a separate country, unless necessary.   Thus, although CFA asks the Court to prioritize contemporaneity over other factors, CFA Cmnts at 34-36, substantial evidence supports Commerce's preference to use data from the primary surrogate country.  *See* Remand Results at 33, 73-76, Appx___, Appx___-___; 19 C.F.R. § 351.408(c)(2).

5.     Indian Data Are The Best Available Information For By-Products

Commerce explains that it was able to rely on Indian data for the two key by-products at issue, fish meal and fish oil, by relying on Global Trade Atlas (GTA) data. *See* Remand Results at 32, Appx___. Indeed, after Commerce explained that it relies on GTA import statistics across numerous proceedings, Commerce found that the GTA data satisfy each of Commerce's SV selection criteria. *Id.* Additionally, Commerce explains that the Indonesian fish oil data source provided limited explanation regarding the data and its sources. *Id.* (citing Petitioners' May 10, 2021 SV Submission at Exh. 9-A (Attachment 3), Appx___-____). Furthermore, Commerce explains that the Indonesian data source for fish meal are price quotes from seven sellers, which are not contemporaneous with the POR and are, more generally and from a disfavored type of source. *See id.* at 32-33, Appx___-___ (citing Petitioners' May 10, 2021 SV Submission at Exh. 9-C, Appx____-____); *see also Certain Polyethylene Terephthalate Resin from the People's Republic of China*, 81 Fed. Reg. 13,331 (Dep't of Commerce Mar. 14, 2016) (final LTFV determ.), and accompanying IDM at Comment 2 (explaining that price quotes are unreliable

because Commerce "often does not know the conditions under which price quotes were solicited and whether or not these were self-selected from a broader range of quotes," and without that information, "it is impossible to confirm that quotes reflect a typical broad market average cost."). Thus, Commerce concluded that the Indonesian data were not preferrable to the Indian sources on the record. Remand Results at 33, Appx___.

CFA argues that it is "undisputed that generally speaking, a byproduct is less valuable than its input." CFA Cmnts. at 36. Commerce explains, however, that record evidence for this proceeding contradicts this assertion when considering value on an equal volume basis. Indeed, NTSF submitted a flow chart detailing the steps and inputs used in the production process for fish meal and fish oil. *See* Remand Results at 76-77, Appx___-___ (citing NTSF Sept. 14, 2021 Supp. Questionnaire Resp. at Q83, Appx____-____). Commerce explains that, based on this record information, fish meal undergoes substantial additional processing using a separate production process of converting fresh fish waste (*e.g.*, fish head, bones, viscera) into fish meal, and NTSF explained that fish oil undergoes *even more*

60

processing. *Id.* Additionally, NTSF reported multiple additional

production (*e.g.*, labor, electricity, rice husk) and packing (*e.g.*,

polypropylene bag) inputs that are required to produce these by-

products. *Id.* CFA argues that the flow chart does not establish that

producing fish meal and fish oil are independently more costly than

the process of raising commercial grade pangasius. CFA Cmnts. at

37. To the contrary, Commerce explains that "{j}ust as processing

results in the value of a fillet being more valuable than the

raw/unprocessed fish input, substantial further processing similarly

may render the value of the fish oil and fish meal more valuable than

the input when considered on an equal weight (*i.e.*, per {kilogram})

basis." Remand Results at 77-78, Appx___-___. Thus, CFA again

asks this Court to reweigh evidence, which is inconsistent with the

substantial evidence standard of review. *Globe Metallurgical,* 865 F.

Supp. 2d at 1276.

CFA also challenges the specificity of the Indian by-product

data. CFA Cmnts. at 37-39. As Commerce explains, however, species

information is crucial for determining the specificity for *inputs*,

particularly for whole fish because they are dispositive for analyzing

61

product characteristics to determine the export price and normal value of subject merchandise (*i.e.,* species is a "control number" (CONNUM) characteristic). Remand Results at 78, Appx___ (citing IDM at 56, Appx___). Although Commerce explains that CFA had not provided any evidence that input species is a determining factor in the selling or buying of fish meal or fish oil as an *output*, CFA continues to argue that "Commerce presents no evidence to show that input species is not a determining factor in the selling and/or buying of fish meal or fish oil." CFA Cmnts. at 38. CFA again fails to satisfy its burden and fails to show that the Indian by-product is insufficiently specific for valuation of by-product SVs or that record evidence does not support its explanation. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).

Commerce explains that it frequently uses Harmonized Tariff Schedule (HTS) subheadings to value a given input, which often cover a wider set of items than the precise input/by-product that is used or generated by the respondent, but any concerns about the Indian SV specificity are not overcome by concerns about the Indonesian data. Remand Results at 78, Appx___. First, the

Indonesian by-product data are not contemporaneous with the POR. *Id.* at 32-33, Appx___-___; *see also* Petitioners' May 10, 2021 SV Submission at Exh. 9-C, Appx___-___. Additionally, Commerce explains that the Indonesian data constitute price lists, which are less preferrable as data sources because they frequently do not reflect the experience of the market as a whole. Remand Results at 78-79, Appx___-___. CFA argues that the affidavits from Indonesian sellers state that they provided "sales prices," CFA Cmnts. at 40, but this argument does not address Commerce's concern because the same affidavits state, "{a}s part of this effort, I collected the patin siam byproducts *price list* submitted here." Remand Results at 78-79, Appx___-___ (emphasis added). Thus, even though the Indonesian data fail to pass the test that CFA seeks to impose on other Indian FOPs (*i.e.,* lack of contemporaneity information, volume information, irregularly collected information, and more), *see id.* at 80, Appx___, CFA has failed to show that Commerce's selection of Indian by-product data is unsupported by substantial evidence.

6.    Indian Data Are The Best Available Information For Financial Ratios

Commerce relied on Indian data for financial ratios, explaining that they are superior to the Indonesian alternatives. *Id.* at 33-34, Appx___-____ (citing IDM at 56-57, Appx___-___).  Specifically, there were two Indian financial statements on the record from Ananda Enterprises (India) Private Limited (Ananda) and MMC Exports Limited (MMC), which Commerce explains provide a reliable basis for the purpose of valuing the surrogate financial ratios. *Id.* Additionally, Commerce explains that the financial statements from the two Indonesian companies–PT Dharma Samudera Fishing Industries Tbk (Dharma) and PT Japfa Comfeed Indonesia Tbk (Japfa)–are less favorable than the statements from the Indian companies. *Id.* Specifically, Commerce explained that Dharma's statement was accompanied by an unqualified auditor's opinion questioning the company's ability to continue as a going concern, which is important to determining whether a financial statement serves as the best available information for financial ratios. *Id.* at 34, Appx____ (citing *Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 77,157 (Dep't of Commerce

64

Dec. 1, 2020) (final results) (*Hardwood Plywood from China*), and accompanying IDM at Comment 3 (observing that certain "events or conditions indicate that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern."). Furthermore, Commerce explains that "aquaculture" comprised a relatively small percentage of Japfa's sales, specifically under ten percent for the period covered by each set of statements. *Id.* Commerce explains that neither of these "observations render{ed} the statements unusable" *per se*, but these observations are informative to Commerce's analysis of the Indonesian financial statements, when compared to the Indian financial data. *Id.*

CFA, however, seeks to undermine Commerce's analysis of Dharma as potentially not being a "going concern," stating that Dharma's assets exceeded its liabilities and that Dharma's financial statements represent greater profitability than MMC. CFA Cmnts. at 41-43. CFA misses the point, however, because this argument does not undermine the auditor's opinion regarding Dharma's ability to continue as a going concern. At a minimum, Commerce explains even if "we do not find that {this} observation{} render{s} the statements automatically

unusable, {it is} relevant to our determination that the Indonesian statements are not preferable to the Indian statement." Remand Results at 34, Appx___. And Commerce further explains that the Dharma statements indicated that "{t}he Company and its subsidiary has suffered deficits as of 31 December 2019 of Rp 92,141,303,468 (2018: Rp 100,574,805,538)," raising further concerns about its lack of preference compared to the Indian alternatives. *Id.* at 70, Appx___ (citing Petitioners' May 10, 2021 SV Submission at Exh. 11, Appx___-____). Thus, no matter the weight of Commerce's concern regarding Dharma's profitability and its continuation as a going concern, CFA fails to demonstrate that Commerce's findings regarding Dharma's statements are unsupported by substantial evidence. *See id.*

Even considering Dharma's profitability, these facts do not negate the auditor's statement questioning Dharma's ability to continue as a going concern, despite the company's efforts in "implement{ing} strategies to maintain {its} sustainability," nor is it something that Commerce should have ignored. *Id.* at 42, Appx____; *see also id.* at 69, Appx___. Plainly, Dharma's financial statements were "red flagged" because an auditor's opinion note questioned the company's ability to

66

continue as a going concern. *See id*. at 22, 50, Appx___, Appx____.

Such notes are important because they are indicative of the financial

health of the company whose financial statements are being relied

upon. *Id*. at 44, Appx___; *see also Hardwood Plywood from China* IDM

at Comment 3; *Certain Passenger Vehicle and Light Truck Tires from*

*the People's Republic of China*, 89 Fed. Reg. 17,817 (Dep't of Commerce

Mar. 12, 2024) (final results), and accompanying IDM at Comment 2.

Thus, although the factual circumstances that would cause an auditor

to raise concerns about a company's ability to continue operating as a

going concern vary from case to case, Commerce reasonably weighs

auditor's note against the financial statements for the applicable

company. Remand Results at 69-70, Appx___-___.

Along similar lines, CFA argues that Commerce's criticism of

Japfa's financial statements is not warranted. CFA Cmnts. at 43-44.

Specifically, CFA states that because Commerce has relied on Japfa's

statements in other segments of this proceeding, it should continue to

do so, even if Japfa had participated in other commercial activities. *Id*.

Commerce explains that it acknowledged that it had previously used

Japfa's financial statement; however, as Commerce explains, Japfa's

67

shortcomings relative to the Indian financial statements did not warrant its usage in this review. *Id.* at 70, Appx\_\_\_. This is particularly important because the administrative reviews that CFA cites are inapposite because no other surrogate country options existed other than Indonesia. *See Jiaxing Bro. Fastener*, 822 F.3d at 1299 ("{E}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."). Nevertheless, Commerce's concerns surrounding Japfa's financial statements simply reflect that the Indonesian statements do not offer an advantage that would warrant a conclusion that the financial statements on this record–in conjunction with the array of data presented for the other SVs–support selecting Indonesia as the primary surrogate country over India. *See* Remand Results at 70, Appx\_\_\_\_.

CFA argues that relying on MMC's financial statement is inconsistent with Commerce's practice because MMC is "barely profitable." CFA Cmnts. at 44. In other words, CFA wishes to impose an additional profitability requirement for MMC's financial statements that does not exist in the statute or the regulations, stating that

68

Commerce should be concerned by their profit rate of 0.013 percent. *Id.*
Although Commerce explains its practice of disfavoring zero or negative
profit companies, it also explains that there is no minimum profit
threshold. *See* Remand Results at 49, Appx\_\_\_ (citing *Certain Frozen
Fish Fillets from the Socialist Republic of Vietnam*, 74 Fed. Reg. 11,349
(Dep't of Commerce Mar. 17, 2009) (admin. review. and new shipper
review), and accompanying IDM at Comment 1 (Commerce's
"preference . . . is to use the financial statements of companies that
have earned a profit and disregard the financial statements of
companies that have zero profit.")).  CFA has not provided a basis on
which to find this practice unreasonable.  Again, because CFA has not
shown that there is "only one reasonable outcome," Commerce's
determination to rely on MMC's financial statements is supported by
substantial evidence. *Uttam Galva Steels Ltd. v. United States*, No. 21-
2119, 2022 U.S. App. LEXIS 12135, *12 (Fed. Cir. May 5, 2022) (holding
that a plaintiff can demonstrate that Commerce's determination was
unsupported by substantial evidence only if it can show that the cited
evidence "could lead Commerce to reach one and only one reasonable
outcome on the administrative record.").

69

Finally, CFA argues that MMC is not a producer of comparable merchandise, and that Commerce did not adequately consider record evidence contradicting MMC's status as a producer/processor.  CFA Cmnts. at 44-46.  Although CFA asserts that MMC operates "retail sale of food in specialized stores" and does not have the assets necessary to be a producer/processor, and has minimal "processing and packing" expenses, *id.* at 45, MMC's financial statements indicate that it "is engaged in the business of *processing* and trading of marine products and allied activities."  Remand Results at 71, Appx (citing NTSF's May 10, 2021 SV Submission at Exh. SV-19-B, Appx___-___) (emphasis added).  Thus, Commerce explains that it found CFA's assertions to be speculative and, as such, does not render the Indonesian statements or Indonesian data as a whole superior such that Commerce should set aside its selection of India as the primary surrogate country.  *Id.* at 71-72, Appx___-___; *see also Globe Metallurgical, Inc. v.*, 865 F. Supp. 2d at 1276.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter final judgment in favor of the

United States.

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
K. GARRETT KAYS                    /s/ Kara M. Westercamp
Of Counsel                         KARA M. WESTERCAMP
Office of the Chief Counsel        Senior Trial Counsel
  for Trade Enforcement & Compliance   U.S. Department of Justice
U.S. Department of Commerce        Civil Division
Kenneth.Kays@trade.gov             Commercial Litigation Branch
                                   P.O. Box 480
                                   Ben Franklin Station
                                   Washington D.C. 20044
                                   Tel: (202) 305-7571

January 22, 2024                   Attorneys for Defendant

CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to the Court's amended post-remand scheduling order, that this brief contains 13,388 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

s/ Kara M. Westercamp
KARA M. WESTERCAMP
Senior Trial Counsel

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| GREEN FARMS SEAFOOD JOINT STOCK COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Court No. 22-00092 |
| UNITED STATES, | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) | |
| Defendant-Intervenors. | ) ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Court No. 22-00125 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) ) | |
| and | ) ) | |
| NAM VIET CORPORATION, NTSF | ) | |

SEAFOODS JOINT STOCK COMPANY,    )
and GREEN FARMS SEAFOOD          )
JOINT STOCK COMPANY,             )
                                 )
                Defendant-Intervenors.    )
_____)

## <u>ORDER</u>

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety.


Dated: _____, 2025      _____
      New York, NY                      JUDGE