**Slip Op. 25-89**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

————————————

**Court No. 22-00092**

————————————

GREEN FARMS SEAFOOD
JOINT STOCK COMPANY,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

CATFISH FARMERS OF AMERICA
and eight of its individual members,

*Defendant-Intervenors*.

————————————

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining the Department of Commerce's redetermination.]

Dated: July 10, 2025

*Robert L. LaFrankie*, Crowell & Moring LLP, Washington, DC, on the comments for Plaintiff.

*Yaakov M. Roth*, Acting Assistant Attorney General; *Patricia M. McCarthy*, Director; *Reginald T. Blades, Jr.*, Assistant Director; and *Kara M. Westercamp*,

Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the comments for Defendant. Of counsel for Defendant was *K. Garrett Kays*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Nazak Nikakhtar*, *Maureen E. Thorson*, *Stephanie M. Bell*, and *Tatiana Sainati*, Wiley Rein LLP, Washington, DC, on the comments for Defendant-Intervenors.

*Baker*, Judge: This case involving the Department of Commerce's 17th administrative review of its antidumping order on catfish imports from Vietnam returns from remand. The court presumes the reader's familiarity with its previous decision. *See Green Farms Seafood Joint Stock Co. v. United States*, Cases 22-00092 and 22-00125, Slip Op. 24-46, 2024 WL 1653791 (CIT Apr. 17, 2024) (*Green Farms I*).[1] As explained below, the court sustains the agency's decision to calculate Green Farms's separate rate using the simple average of the margins assigned to the mandatory respondents.

## I

The first issue the court remanded is whether East Sea Seafoods Joint Stock Company is independent of Vietnamese government control and thus eligible for a

---

[1] *Green Farms I* included issues raised by Catfish Farmers of America and some of its constituent members as plaintiffs in Case 22-125, which they since have voluntarily dismissed.

separate rate.[2] "In layman's terms, the Department didn't show its work . . . ." *Id.* at 13–14, 2024 WL 1653791, at *5 (cleaned up).

On remand, Commerce discussed the criteria it applies in considering a company's *de jure* and *de facto* independence from government control.[3] As to the former, it made three observations. First, East Sea represented that it was not required to obtain any license

---

[2] Catfish Farmers contest whether this matters to Green Farms. *See Green Farms I*, Slip Op. 24-46, at 7 n.2, 2024 WL 1653791, at *2 n.2. "Because the court reviews, not prophesies, agency action," it did not consider this question, which was for the agency to address in the first instance if it concluded that East Sea was ineligible. *Id.*

[3] The *de jure* criteria are "1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; 2) any legislative enactments decentralizing control of companies; and 3) any other formal measures by the government decentralizing control of companies." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 n.21 (CIT 2013) (quoting Import Administration Policy Bulletin 05.1, *Separate-Rates Practice & Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries* at 2 (Apr. 5, 2005)). The *de facto* criteria are "1) whether the export prices are set by, or subject to the approval of, a governmental authority; 2) whether the respondent has authority to negotiate and sign contracts and other agreements; 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses." *Id.* (quoting Policy Bulletin 05.1, at 2).

beyond a valid Vietnamese business registration cer-
tificate and certificate of tax registration and that the
government does not restrict the company's use of ex-
port revenues. The Department found those facts sug-
gested a lack of restrictive stipulations on East Sea.
Appx18515–18516. Second, the company certified that
its exports are unregulated. Appx18516. Third, it re-
ported that its merchandise is not subject to export
quotas, it need not obtain an export license, there are
no foreign exchange targets in effect, and it can ex-
change foreign currency at market rates rather than
sell it to the government. *Id.*

   As to the *de facto* criteria, the agency observed that
East Sea certified that it negotiates prices directly
with customers—the Vietnamese government does not
set export prices, nor are they subject to its approval.
Appx18517. Similarly, the company reported that it
has independent authority to negotiate and sign ex-
port contracts and other agreements and provided a
sales contract to support that assertion. *Id.* It also con-
firmed that its ownership had not changed since it last
sought a separate rate, its largest shareholders had no
significant connections with the Vietnamese govern-
ment, and it was not required to submit managerial
candidates for approval. Appx18517–18518. Finally, it
stated that it retains the proceeds of export sales and
makes independent decisions about disposition of prof-
its or financing of losses. Appx18518.

   Based on this analysis, Commerce found the record
established East Sea's independence from government
control. *Id.* The Department also observed that the
company's representations aligned with other produ-

cers' reports, including Green Farms's. *Id.* And as there was no evidence that East Sea's submissions were false, incomplete, or otherwise deficient, there was no basis for denying the separate rate. Appx18519.

Green Farms attacks Commerce's bottom-line finding that East Sea is independent of government control and thus eligible for a separate rate. ECF 72, at 7–14. But it fails to challenge the Department's explanation of why the latter company showed such independence under the relevant *de jure* and *de facto* criteria. Indeed, it acknowledges that the agency provided a "detailed analysis" of those benchmarks. *Id.* at 5.

Instead, Green Farms complains that "Commerce failed to address several other evidentiary shortcomings regarding East Sea's separate rate eligibility, including the fact that" the latter company "quit the case." *Id.* But the court already rejected those arguments, *see* Slip Op. 24-46, at 8–10, 2024 WL 1653791, at *3, and it declines to reconsider them.

The point Green Farms misses is that the remand was narrow. As directed, *id.* at 13–14, 2024 WL 1653791, at *5, Commerce showed its work regarding the *de jure* and *de facto* criteria. *See* Appx18515–18518. The company fails to critique that explanation. Instead, it vaguely asserts that the redetermination is "unsupported by substantial evidence," ECF 72, at 13–14, but offers no reasoning bearing on the actual subject of the remand. *See Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 528 (1st Cir. 2015) ("[L]itigants must provide meat on the bones of their arguments if

they expect [the court] to seriously entertain them."). The court therefore concludes that substantial evidence supports the Department's finding that East Sea showed independence from government control and thus eligibility for a separate rate.

## II

The second issue the court remanded is whether assigning Green Farms the simple average of NTSF Seafoods Joint Stock Company's zero margin and East Sea's adverse-inference rate reasonably reflects economic reality. Slip Op. 24-46, at 17, 2024 WL 1653791, at *6 (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

To address this question, the Department "examined the information on the record regarding Green Farms's pricing." Appx18520. It compared the sale price in the company's separate rate application with prices reported by NTSF and East Sea during the period of review. *Id.* Because the companies used different sales terms, and because NTSF sold to a U.S. affiliate ("constructed export price") while the other two sold directly to unaffiliated U.S. customers ("export price"),[4] the agency adjusted their pricing to render it comparable. Appx18520–18521. It found Green Farms's adjusted prices well below NTSF's,

---

[4] "Commerce makes certain statutory adjustments to the price of goods to reflect various costs involved in preparing [them] for sale in the United States, and the adjustments to 'constructed export price' are more extensive than the adjustments to 'export price.'" *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1353 n.34 (CIT 2020).

Appx18521 n.74, and "comparatively close" to East Sea's, Appx18522. Because the former fell between the latter two, the Department found "the dumping margin assigned to Green Farms is reasonably reflective of its commercial behavior." Appx18520. Commerce said it could not conclude that using NTSF's zero margin alone would reflect Green Farms's commercial reality and found the evidence supported using a simple average of the other companies' rates. Appx18522.

Green Farms contends that in so finding, the Department "fails to comply with the law and the Court's instructions" because it "does not fully justify how the harshly punitive AFA rate[5] it calculated . . . actually 'reflects economic reality.'" ECF 72, at 15. It says the agency "arbitrarily select[ed] and adjust[ed] individual prices derived from sample sales documents" to obtain its desired result. *Id.*

It first claims that "each of the three sales were made on completely different sales terms." *Id.* at 22. But the agency addressed that point when it explained its adjustments to each company's pricing to render the figures comparable. Appx18520–18521.

Green Farms then complains that "[t]he adjustments were mere estimates and not precise." ECF 72,

---

5 The government correctly notes that Green Farms misrepresents the facts by claiming it received an "AFA rate." ECF 70, at 27. East Sea received an "AFA rate." Green Farms received the average of that and NTSF's zero margin (i.e., half the "AFA rate"). "AFA" is shorthand for an adverse-inference rate. *See Hung Vuong*, 483 F. Supp. 3d at 1336.

at 22 (citing Appx18520–18521). But it cites nothing in the record to support that assertion, and the court's search came up empty.[6] The company's only other objection is that the sales "are not in fact wholly comparable" and "Commerce was not able to fully adjust for the differences." ECF 72, at 22–23 (citing Appx18520–18521). The phrase "not in fact" implies the court should re-weigh the evidence, which the standard of review does not allow. And the government correctly observes that this argument "merely hypothesize[s] that different [sales terms] and volume size *could* reflect different prices, but Green Farms fails to identify any record evidence to rebut Commerce's comparison." ECF 70, at 33 (emphasis in original).

Finally, the company claims the Department's pricing comparison was "meaningless" and irrelevant because it "does not measure dumping." ECF 72, at 23. But as the government responds, Green Farms "is unable to identify any record evidence" to support its claim that the agency's price comparison was unreasonable. ECF 70, at 33. The company fails to grapple with the evidence Commerce cited showing that its pricing "'was comparatively close to [East Sea's] sales price' and fell between the prices reported by the two mandatory respondents." *Id*. at 34 (quoting Appx18522). The court therefore finds that substantial evidence supports the agency's finding that the

---

[6] The agency's sole reference to any "estimate" was that it chose the lowest price in NTSF's sales database as the one closest to Green Farms's price, such that "it is a conservative estimate." Appx18521 n.74. In other words, Commerce picked the price most favorable to Green Farms.

company's assigned rate—the simple average of NTSF's zero margin and East Sea's adverse-inference rate—reflects economic reality.

Green Farms also argues that Commerce should have instead used the average of the most recently determined margins in recent reviews that are not zero, de minimis, or based on facts otherwise available. *See* ECF 72, at 15–20. The company asserts that the failure to do so conflicts with past practice and that the agency did not explain the change. *See id*.

The authorities Green Farms cites do not establish the existence of any such "practice." Instead, they only show that the Department previously acknowledged the undisputed proposition that looking to margins established in previous reviews is "*a* 'reasonable method' to use" when the rates of all mandatory respondents are de minimis, zero, or based on an adverse inference. *Navneet Publ'ns (India) Ltd. v. United State*s, Case 13-204, ECF 66, at 3 (remand results) (emphasis added). And while the *court* in *Navneet* hyperbolically characterized this approach as Commerce's "*preferred*, alternative 'reasonable method,'" *Navneet Publ'ns (India) Ltd. v. United States*, 999 F. Supp. 2d 1354, 1363 (CIT 2014) (emphasis added) (citing I&D Memo at 14), the cited document merely confirms the *agency's* view that it is "*a* 'reasonable method' to use . . . ." Case 13-204, ECF 30, at ECF page 45 (emphasis added).[7]

---

[7] Green Farms also relies on Commerce's final redetermination under protest in *GODACO Seafood Joint Stock Co. v. United States*, where the agency used previous reviews

(footnote continues on next page)

Not only do the authorities Green Farms invokes fail to establish the existence of any agency practice of looking to prior reviews, on remand Commerce showed otherwise. It pointed to two recent occasions where it used the simple average of the margins assigned to mandatory respondents receiving zero, de minimis, or adverse-inference rates to calculate margins for non-investigated entities—as it did here. *See* Appx18551 n.178. It also explained that it relies on "prior margins over the contemporaneous results of mandatory respondents" when "the circumstances of a particular case make it reasonable to do so." Appx18551.

As long as using the mandatory respondents' contemporaneous results generates a reasonable margin for "non-selected respondents," the agency does not have to consider alternatives, including "pulling forward rates from earlier administrative reviews." *PrimeSource Bldg. Prods., Inc. v. United States*, 111 F.4th 1320, 1335 (Fed. Cir. 2024). "When all mandatory respondents receive a rate that is zero, *de minimis*, or based entirely on [adverse-inference] rates, Commerce's statutory obligation is to select '*any* reasonable method,' not the most reasonable method." *Id.* (quoting 19 U.S.C. § 1673d(c)(5)(B)) (emphasis by the Federal Circuit).

As explained above, substantial evidence supports the Department's finding here that using the simple

---

because the court suggested that the Department could "rely upon non-contemporaneous data." Case 18-63, ECF 95-1, at 9–10. Agency action taken under protest cannot be fairly characterized as its "practice."

average of NTSF's zero margin and East Sea's adverse-inference rate reasonably reflects economic reality. Thus, contrary to Green Farms's argument, the agency had no duty to explore "pulling forward rates from earlier administrative reviews." *Id.*

*       *       *

The court sustains Commerce's redetermination. A separate judgment will issue. *See* USCIT R. 58(a).

Dated:    July 10, 2025          /s/ *M. Miller Baker*
          New York, NY          Judge